UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.,

             Plaintiffs,

  -against-

BARSTOOL SPORTS, INC., ADAM SMITH,
KEVIN CLANCY, ERIC NATHAN and
DAVID PORTNOY,

           Defendants.

------------------------------------- X

Case No. 1:18-CV-08783 (NRB)

**DEFENDANTS' ANSWER TO
COMPLAINT AND BARSTOOL
SPORTS, INC.'S COUNTERCLAIM
AGAINST PLAINTIFFS**

**DEMAND FOR JURY TRIAL**

## ANSWER

Defendants Barstool Sports, Inc. ("Barstool"), Adam Smith, Kevin Clancy, Eric Nathan and David Portnoy (collectively, "Defendants"), for their answer to the Complaint of Plaintiffs Michael Rapaport and Michael David Productions, Inc. ("MDP") (collectively, "Plaintiffs"), and Defendant Barstool, for its Counterclaim against Plaintiffs, allege as follows:

## JURISDICTION AND VENUE

1.      Answering Paragraph 1, Defendants admit these allegations on information and belief.

2.      Answering Paragraph 2, Defendants admit these allegations on information and belief.

3.      Answering Paragraph 3, Defendants admit these allegations on information and belief.

4.      Answering Paragraph 4, Defendants admit these allegations on information and belief.

## PARTIES

5.      Answering Paragraph 5, Defendants admit these allegations on information and belief.

6.      Answering Paragraph 6, Defendants admit these allegations on information and belief.

7.      Answering Paragraph 7, Defendants admit the allegations in the first sentence but otherwise deny Plaintiffs' allegations.

8.      Answering Paragraph 8, Defendants admit that Mr. Smith is employed by Barstool but otherwise deny the allegations in the first sentence.   Defendants admit Plaintiffs' allegations in the second and third sentences.

9.      Answering Paragraph 9, Defendants admit that Mr. Clancy is employed by Barstool, and that Mr. Clancy hosts a Barstool podcast and appears on Barstool Radio, but otherwise deny the allegations in the first and second sentences.  Defendants admit Plaintiffs' allegations in the third and fourth sentences.

10.     Answering Paragraph 10, Defendants admit that Mr. Nathan is employed by Barstool, but otherwise deny the allegations in the first sentence.  Defendants admit Plaintiffs' allegations in the second and third sentences.

11.     Answering Paragraph 11, Defendants admit that Mr. Portnoy is the founder of Barstool, uses the nickname "El Presidente" and uses the handle "@stoolpresidente" on Twitter, but otherwise deny the allegations in the first sentence.  Defendants admit the allegations in the second sentence.

## **FACTUAL BACKGROUND**

12.     Answering Paragraph 12, Defendants admit these allegations on information and belief, other than to deny Plaintiffs' allegation in the first sentence that Rapaport is "renowned," to the extent Plaintiffs are suggesting that Rapaport is critically acclaimed.

13.     Answering Paragraph 13, Defendants admit the allegations in the first and second sentences on information and belief.  Defendants deny the allegations in the third sentence.

14.     Answering Paragraph 14, Defendants admit that Barstool and Rapaport signed the Term Sheet in May 2017 but otherwise deny Plaintiffs' allegations.

15.     Answering Paragraph 15, Defendants admit that Barstool and Plaintiffs entered into the Talent Agreement on June 17, 2017 but otherwise deny Plaintiffs' allegations.

16.     Answering Paragraph 16, Defendants admit the allegations in the first sentence, and that Barstool paid Plaintiffs $400,000, but otherwise deny Plaintiffs' allegations.

17.     Answering Paragraph 17, Defendants admit the allegations in the first sentence but otherwise deny Plaintiffs' allegations.

18.     Answering Paragraph 18, Defendants admit that Mr. Smith posted the referenced blogs on November 17, 2018 and February 14, 2018, but otherwise deny Plaintiffs' allegations.

19.     Answering Paragraph 19, Defendants admit that Rapaport and Mr. Clancy engaged in an exchange on Twitter on February 17, 2018 but otherwise deny Plaintiffs' allegations.

20.     Answering Paragraph 20, Defendants admit that Mr. Portnoy posted a video to Twitter on February 18, 2018 announcing the termination of Rapaport, but otherwise deny Plaintiffs' allegations.

21.     Answering Paragraph 21, Defendants admit that Mr. Smith posted the referenced blog on February 9, 2018, but otherwise deny Plaintiffs' allegations.

22.     Answering Paragraph 22, Defendants lack sufficient information and belief to admit or deny these allegations and deny them on that basis.

23.     Answering Paragraph 23, Defendants admit that, on February 18, 2018, Mr. Portnoy posted a Tweet that stated, "[f]inally some Rapaport gear people will buy," and linked to barstoolsports.com.  Defendants otherwise deny Plaintiffs' allegations.

24.     Answering Paragraph 24, Defendants acknowledge that Mr. Smith posted Tweets on February 18, 2018 but otherwise deny Plaintiffs' allegations.

08032-00008/3112705.8

25.     Answering Paragraph 25, Defendants acknowledge that Mr. Clancy posted a blog on February 18, 2018 titled "*Last Night Was A Pivotal Moment In Barstool History,*" and that Mr. Nathan posted a blog on February 19, 2018 titled "*Michael Rapaport Just Made Me And Johnny Football Best Friends #ComebackSZN.*"  Defendants otherwise deny Plaintiffs' allegations.

26.     Answering Paragraph 26, Defendants lack sufficient information and belief to admit or deny these allegations and deny them on that basis.

27.      Answering Paragraph 27, Defendants admit that Mr. Nathan posted the referenced blog on June 23, 2018, but otherwise deny Plaintiffs' allegations.

28.     Answering Paragraph 28, Defendants lack sufficient information and belief to admit or deny these allegations and deny them on that basis.

29.     Answering Paragraph 29, Defendants deny these allegations.

## COUNT I

## Breach of Contract

## (As against Defendant BSI)

30.     Answering Paragraph 30, Defendants incorporate by reference their answers above.

31.     Answering Paragraph 31, Defendants admit these allegations.

32.     Answering Paragraph 32, Defendants deny these allegations.

33.     Answering Paragraph 33, Defendants deny these allegations.

34.     Answering Paragraph 34, Defendants deny these allegations.

///

///

08032-00008/3112705.8

**COUNT II**

**Breach of Contract**

**(As against Defendant BSI)**

35.     Answering Paragraph 35, Defendants incorporate by reference their answers above.

36.     Answering Paragraph 36, Defendants admit these allegations.

37.     Answering Paragraph 37, Defendants deny these allegations.

38.     Answering Paragraph 38, Defendants deny these allegations.

**COUNT III**

**Defamation**

**(As against all Defendants)**

39.     Answering Paragraph 39, Defendants incorporate by reference their answers above.

40.     Answering Paragraph 40, Defendants deny these allegations.

41.     Answering Paragraph 41, Defendants deny these allegations.

42.     Answering Paragraph 42, Defendants deny these allegations.

43.     Answering Paragraph 43, Defendants deny these allegations.

## DEFENDANTS' AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

#### (Rapaport is Defamation-Proof)

1.      Defendants incorporate by reference the allegations in their Affirmative Defenses and Counterclaim.

2.      Defendants allege that Rapaport is defamation-proof because his reputation is so badly tarnished that it cannot be harmed any further.

3.      With respect to the allegedly defamatory statements regarding herpes, as alleged below, Rapaport has acknowledged that there are publicly available photos of him in which it "looks like" he has "a herpe."  As a result, Rapaport cannot recover even nominal damages for his defamation claim.

4.      More broadly, as alleged below, Rapaport has a bad reputation that is not capable of further tarnishment.  Among other things, Defendants are informed and believe, and based thereon allege, that Rapaport has pled guilty to aggravated assault of his ex-girlfriend.  Rapaport also has a long history of publicly making racist, sexist and otherwise offensive comments. Rapaport cannot seriously dispute that this is his reputation: He refers to himself as the "King of Trash Talk" and promotes his podcast by stating that he is sharing "offensive" takes.

I.      **Summary of Relevant Facts Showing that Rapaport is Defamation-Proof as to the Allegedly Defamatory Statements Regarding Herpes**

A.      **Rapaport Had a Reputation for Having Herpes *Before* the Allegedly Defamatory Statements Were Made**

5.      Rapaport had a reputation for having herpes *before* any of the allegedly defamatory statements were made.

a.  On April 24, 2015, the wire service Getty Images posted numerous photos of

Rapaport with a large red lesion under his lower lip, including the following

photo:



Exh. 1 to Answer and Counterclaim.  (Defendants have used web capture

software to capture the electronic articles and Tweets referenced in this pleading,

attaching the captures as exhibits.  For ease of reference, Defendants also have

included hyperlinks in this pleading to the referenced articles and Tweets.)

b.  An oral lesion on or near someone's lip is a common symptom of herpes. Exh. 2.

c.  After the photo was posted, many people commented that it looked like Rapaport

had herpes. Exh. 3.

08032-00008/3112705.8

d.  In February 2017, Rapaport referred to the host of a national sports show as a "twinkie-eating fuck boy" and to one of his producers as a "Long Island Jew." Exhs. 4 and 7.  In response, one of the show's producers, who has more than 100,000 followers, posted to Twitter the photo of Rapaport with the lesion and wrote: "[Y]ou should be proud. That herpe was the most standout performance you've had since 1994."  The post generated almost 1,000 comments, Likes and Retweets. Exh. 5.

    i.  After the producer posted the photo, even more people expressed their belief that Rapaport had herpes. Exh. 6.

    ii.  Rapaport threatened to sue for defamation over these comments but never did. Exh. 7.

e.  Rapaport himself has acknowledged that it "looks like" he has "a herpe" in the photo. Exh. 8.

f.  As a result, any statements by Defendants allegedly asserting that Rapaport had herpes could not have harmed his reputation because this was already part of his reputation.

## II.    Summary of Relevant Facts Showing that Rapaport Generally is Defamation-Proof

### A.    Rapaport is Well Known for Having a Criminal Background

6.  Defendants are informed and believe, and based thereon allege, that Rapaport has a criminal background.  After an actress broke up with him, he called her 21 times in four days, showed up at her apartment at 1 a.m., and repeatedly banged on her window.  He was arrested the next day.  The New York Supreme Court issued a protective order directing Rapaport to stay away from the actress.  Rapaport ultimately pled guilty to aggravated harassment. *See* Exh. 9.

7.       Rapaport is well known for having a criminal background.  It was publicized in the media and appears on Rapaport's Wikipedia page. *See* Exhs. 9 and 10.

8.       People on social media are aware of and regularly reference Rapaport's criminal background. *See* Exh. 11.

### B.       Rapaport Has a Reputation for Making Racist, Sexist and Otherwise Offensive Comments

9.       Rapaport has a reputation for making racist, sexist and otherwise offensive comments.  Merely by way of example:

a.   <u>Racist Conduct</u>:

    i.   Earlier this year, Rapaport posted to Instagram a picture of an African-American actress, Kenya Moore, and a picture of a gorilla. Exh. 12. Although Rapaport deleted the post, one news organization saved it:



Exh. 13.  Many people commented that Rapaport's conduct was racist.

Exh. 14.

ii.    Rapaport Tweeted at the African-American producer of a national

       sports show a photo that, according to one respected sports media

       website, "evoked old-America racial caricature imagery":



Although Rapaport has since deleted the Tweet, the sports media website

captured it. Exh. 15.

-10-

b. <u>Sexist Conduct</u>:

    i.    In February 2018, Rapaport attacked political commenter Laura Ingraham, <u>stating</u>:

> I'm apologizing in advance, I know this is going to offend some women, but I have to do it. . . . No cluckhead, you shut up and dribble deez nuts, bitch. You mayonnaise-eatin, melba toast, no seasoning on your chicken cracker. Your butt is so flat that when you stand up, you could see your entire asshole. I'm sorry ladies, I warned you at the top. . . . Your lord and savior Donald Trump wouldn't even grab you by the pussy. If he did he'd probably get his fingers caught in a mousetrap. You went to college, Laura, and you're proud of that and what do you got to show for it? A mouth full of fake teeth, a face full of Botox and some dry-ass hair extensions. And you still never got fucked right, you little jumpoff.

Exh. 16.  Rapaport was <u>suspended</u> from Twitter for these comments. Exh. 17.

    ii.    A month later, Rapaport <u>attacked</u> Ms. Ingraham again, focusing on her personal appearance: "You filthy pig. You dog-faced animal. . . . You fucking pig. . . . She's a sweaty pig."  He also referred to her as "this savage, this dog, this mutt." Exh. 18.

    iii.    In April 2018, Rapaport Tweeted to journalists who were critical of him an image of a man unzipping his pants.  One of the journalists <u>wrote</u> that Rapaport was "basically insinuating that we should suck his dick."

Exh. 19-1.  In an interview published in the *New York Times*, Rapaport responded that the journalists, who are African-American, were "race hustlers . . . slinging race" as if they were "slinging crack." Exh. 19-2.

iv.   On his podcast, Rapaport referred to a female sports reporter as "rail thin, no ass"—someone "looking to get piped at an R. Kelly concert . . . backstage and at the hotel." Exh. 20.

  1.   Rapaport frequently uses the terms "pipe" and "piped." Defendants are informed and believe, and based thereon allege, that the term "pipe" refers to his penis, and the term "piped" refers to having sex.

v.   Rapaport has admitted to touching an actress' breasts on a movie set without her consent. Exh. 21.

vi.   Despite having pled guilty to harassment, Rapaport has developed a reputation as an apologist for male actors accused of sexual harassment. Exh. 22.

vii.   Even after bringing this lawsuit, Rapaport has not moderated his offensive conduct.  A mere two days before Defendants filed this pleading, Rapaport attacked musician Ariana Grande's physical appearance, Tweeting that "there's hotter women at Starbucks – no disrespect to Starbucks." Exh. 41-1.  His Tweet generated widespread outrage at Rapaport's sexism; this backlash was covered in major media publications. Exh. 41-2, 3, 4, 5.  Far from being remorseful, Rapaport

responded to his critics by Tweeting: "EAT Dwyck SnowFlakes. . . .
Stay Disruptive Stay Disruptive." Exh. 41-6.

c.  <u>Otherwise Offensive Conduct</u>:

    i.  Rapaport regularly makes other offensive comments and jokes.

        1.  For example, in July 2018, he faced criticism for Tweeting the
following in connection with the story of the Thai boys soccer
team trapped in a cave: "I haven't seen someone try to get a Thai
boy out of a hole this frantically since I walked in on Kevin
Spacey in the men's room at Chuckie Cheese." Exh. 23.

        2.  Even though Rapaport stars on a television program in which he is
the father of a teenager with special needs, he regularly refers to
people as "retards"—including to attack Barstool's fans. Exh. 24.
His use of the word "retard" has generated widespread criticism.
Exh. 25.

        3.  Even though he is married, Rapaport regularly brags about having
sex with women other than his wife.  For example, Rapaport, who
is 48, falsely Tweeted to Barstool employee Henry Lockwood that
he "fucked Yo Bitch"—referring to Mr. Lockwood's 19-year-old
girlfriend.  When a third party responded, "so you are saying [she]
has herpes?"—referring to Rapaport's reputation for having
herpes—Rapaport replied: "Nah but she got this Pipe." Exh. 26.

4.   Rapaport recently mocked the comedian Pete Davidson for posting a note about his mental health. In response to widespread criticism, Rapaport was forced to apologize. Exh. 27.

5.   After Barstool announced that it was terminating the Talent Agreement, Rapaport posted a Photoshopped image depicting himself having sex with Mr. Portnoy:



`

Exh. 39.

10.   Rapaport's reputation for trash talking and making offensive comments is something that he himself embraces.  Rapaport promotes his podcast, *I am Rapaport*, by stating that he is sharing his "strong" and "offensive" "points of view on life, sports, music, film &

-14-

everything." Exh. 28.  Rapaport titled his 2017 book: *This Book Has Balls: Sports Rants from the*

*MVP of Talking Trash*. Exh. 29.  Rapaport often refers to himself as the "King of Trash Talk."

## **Affirmative Defense No. 2**

### **(Lack of Damages)**

11.     Defendants incorporate by reference the allegations in their Affirmative Defenses

and Counterclaim.

12.     Although Plaintiffs have the burden of proof as to damages, Defendants allege

that, even if Rapaport is not defamation-proof, he will be unable to be show that he suffered any

damages.  Defendants are informed and believe, and based thereon allege, that Rapaport has

continued to receive work since the allegedly defamatory statements were made.  Defendants are

informed and believe, and based thereon allege, that, if anything, the allegedly defamatory

statements increased Rapaport's profile.  For example:

      a.   He continues to star in *Atypical*, a Netflix show that, in October 2018, was

         renewed for a third season.

      b.   He continues to appear in *The Guest Book*, a TBS comedy.

      c.   His podcast remains one of the most downloaded podcasts in its genre.

      d.   He regularly makes media appearances, including on popular shows, such as *The*

         *Late Show with Stephen Colbert* and *The Howard Stern Show*.

      e.   His social media following has grown since the allegedly defamatory statements.

## **Affirmative Defense No. 3**

### **(Lack of Actual Malice)**

13.     Defendants incorporate by reference the allegations in their Affirmative Defenses

and Counterclaim.

14.     Defendants allege that Rapaport is a general-purpose public figure and that, as a result, his defamation claim is subject to the "actual malice" standard.  This standard requires that Defendants made the allegedly defamatory statements with knowledge that they were false or reckless disregard for their truth.  Defendants allege that, to the extent Plaintiffs have identified the allegedly defamatory statements with the requisite particularly, Defendants did not make these statements with knowledge that they were false or reckless disregard for their truth.

**Affirmative Defense No. 4**

**(The Allegedly Defamatory Statements are Non-Actionable Statements of**

**Rhetorical Hyperbole)**

15.     Defendants incorporate by reference the allegations in their Affirmative Defenses and Counterclaim.

16.     Defendants allege that, to the extent Plaintiffs identified the allegedly defamatory statements with the requisite particularity, these statements are non-actionable statements of rhetorical hyperbole.  For example, the blogs and Tweets that reference herpes are non-actionable because, considered in context, they are imprecise, hyperbolic assertions in the nature of insults being directed at Rapaport.  No reasonable reader would believe these statements are factual, nor do they have a clear meaning that could be proven true or false.

17.     Rapaport's appearance on *The Howard Stern Show* **after** he filed this lawsuit underscores that the allegedly defamatory statements are non-actionable statements of rhetorical hyperbole:

a.  Rapaport told one of Stern's sidekicks, Brent Hadley: "I'll continue to take my dick and dry fuck you all season long.  What are you gonna do with that[?]" Hadley responded: "I'm gonna slap the herpes out of your mouth, brother."  Like

the allegedly defamatory statements regarding herpes at issue in this lawsuit, it was clear from the context of Hadley's herpes comment that it was a hyperbolic insult, not a statement of fact.

b. Another of Stern's sidekicks, Gary Dell'Abate, said: "Michael, while he is a ball-buster, the herpes thing, he's like, 'I know it's ball busting, **I know it's a joke**. . .'" (Emphasis added.) Rapaport did not dispute this characterization, but instead responded: "**[T]hat's the short version**." (Emphasis added.) Rapaport then indicated that the real focus of this lawsuit was the breach of contract claims, not the defamation claim.

### Affirmative Defense No. 5

#### (The Allegedly Defamatory Statements are Truthful)

18. Defendants incorporate by reference the allegations in their Affirmative Defenses and Counterclaim.

19. Although Plaintiffs have the burden of proof as to falsity, Defendants are informed and believe, and based thereon allege, that the allegedly defamatory statements are truthful and/or substantially true.

### Affirmative Defense No. 6

#### (Unclean Hands)

20. Defendants incorporate by reference the allegations in their Affirmative Defenses and Counterclaim.

21. Defendants allege that, by virtue of Plaintiffs' own careless, negligent and other wrongful conduct, Plaintiffs should be barred from recovering against Defendants by the equitable doctrine of unclean hands.

08032-00008/3112705.8

## **Affirmative Defense No. 7**

### **(Offset)**

22.     Defendants incorporate by reference the allegations in their Affirmative Defenses and Counterclaim.

23.     Defendants allege that Plaintiffs' recovery, if any, must be offset by, among other things, the amounts they are required to reimburse Barstool under the Talent Agreement.

08032-00008/3112705.8

## BARSTOOL'S COUNTERCLAIM

### I.      NATURE OF THE COUNTERLCAIM

1.      Defendant and Cross-Complainant Barstool Sports, Inc. ("Barstool") brings this Counterclaim against Plaintiffs and Cross-Defendants Michael Rapaport and Michael David Productions, Inc.'s ("MDP") (collectively, "Plaintiffs") for breach of the Talent Agreement.

### II.      JURISDICTION AND VENUE

2.      The Court has jurisdiction over the controversy based on 28 U.S.C. § 1332(a)(l).

3.      The amount in controversy exceeds $75,000.00.

4.      There is complete diversity of citizenship between the parties and thus the District Court has original jurisdiction.

5.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 as the acts that give rise to the claim occurred in this district, and as Barstool's principal place of business is in this district.

### III.      PARTIES

6.      Barstool is a Delaware corporation with its principal place of business in New York, New York.  Barstool is a fast-growing, boundary-pushing media company with an incredibly loyal and passionate fan base, known as "Stoolies."

7.      Rapaport is a personality better known for his offensive and outlandish conduct than for his acting or comedy.  Barstool is informed and believes, and based thereon alleges, that Rapaport is a California resident.

8.      Barstool is informed and believes, and based thereon alleges, that MDP is a California corporation with its principal place of business in Los Angeles, California.

## IV.    SUMMARY OF FACTS RELEVANT TO COUNTERCLAIM

**A.    The Parties Executed the Talent Agreement, Requiring Rapaport to Generate Content, Promote Barstool and Refrain from Making Damaging Statements**

9.      Barstool incorporates by reference the allegations in its Affirmative Defenses.

10.     In or around November 2015, Rapaport started appearing as a guest on Barstool shows.

11.     During his guest appearances, Rapaport often would make controversial statements but did not attack Barstool or its fans or say anything racist, sexist or otherwise problematic.

12.     Rapaport's guest appearances led Barstool to believe it could expand its audience by having Rapaport generate content and promote Barstool in media appearances and to his large social media following.  In doing so, Barstool did not want Rapaport to be politically correct, but also wanted to ensure that Rapaport did not say things that damaged Barstool's reputation or antagonized Stoolies.

13.     Barstool was careful to ensure that the Talent Agreement with Rapaport and his loan-out company, MDP, dated June 17, 2017, included provisions addressing these concerns. *See* Exh. 30.

14.     The Talent Agreement required Rapaport to regularly provide Barstool with content, including "rant" videos at least two times per week and a podcast up to three times per week. *Id*. at ¶ 1.

15.     The Talent Agreement also required Rapaport to promote Barstool, including by using his best efforts to refer to himself as "Michael Rapaport from Barstool Sports" in media appearances. *Id*. at ¶ 2.

16.     In exchange for performing these services, Barstool agreed to compensate Rapaport.

17.     Barstool agreed to pay Rapaport an upfront amount of $200,000 for his "rant" videos, subject to Barstool's right to recoup this amount based on the revenue generated by the rant videos (the "Rant Guarantee"). *Id*. at ¶¶ 8.a., 10.  Barstool agreed to pay Rapaport $400,000 for his podcast, paid in three equal installments at the end of the second, third and fourth quarters of the one-year term of the agreement, subject to Barstool's right to recoup this amount based on the revenue generated by the podcasts (the "Podcast Guarantee"). *Id*. at ¶¶ 8.b., 10.

18.     Barstool also agreed to pay Rapaport 60% of revenue generated from his rants and podcasts—what the Talent Agreement refers to, respectively, as "Rant Revenue" and "Podcast Revenue." *Id*. at ¶¶ 8, 9.  However, the Talent Agreement made clear that Barstool only had to make the Rant Revenue and Podcast Revenue payments **after** it had recouped 100% of the Rant and Podcast Guarantees. *Id*. at ¶ 9(a), (b).

19.     Barstool did not agree to provide Rapaport with a radio show.  Instead, it agreed that it would use good faith efforts to secure an opportunity for Rapaport to produce and host a radio show.  If this happened, Barstool agreed to pay Rapaport $375,000. *Id*. at ¶ 12.

20.     The Talent Agreement encouraged Rapaport to be himself, but also recognized that "certain topics may generate controversy." *Id*., Standard Terms, at ¶ 1.b.  Accordingly, under the heading "Prohibited Topics," the Talent Agreement stated that Rapaport should, "in no event," generate content that is "racist or homophobic" or "would constitute harassment." *Id*.

21.     The Talent Agreement gave Barstool the right to "immediately terminate" the agreement if Rapaport "**engage[d] in conduct that br[ought] [Rapaport] or Barstool into public disrepute**." *Id*. at Standard Terms, at ¶ 3.a. (emphasis added).

22.     The Talent Agreement stated that, if Barstool terminated the Talent Agreement for cause, including for a material breach by Rapaport, any "pre-paid portions" of the Rant or Podcast Guarantee would "immediately be refunded to Barstool."  The Talent Agreement stated that the "only amounts owed [to Rapaport] by Barstool w[ould] be [Rapaport's] share of any Rant Revenue or Podcast Revenue collected by Barstool through the date of termination." *Id*. at ¶ 3.b.

23.     Barstool performed all of its obligations under the Talent Agreement.  Barstool paid Plaintiffs a total of $400,000: the $200,000 upfront Rant Guarantee and $200,000 of the Podcast Guarantee.

24.     Plaintiffs did not comply with their obligations under the Talent Agreement.

**B.      Rapaport Violated the Talent Agreement by Bringing Himself and Barstool into "Public Disrepute" by Attacking Barstool and Stoolies**

25.     Rapaport engaged in conduct that brought himself and Barstool into "public disrepute" by, among other things, making vulgar, offensive statements about Barstool and Stoolies in violation of Paragraph 3.a. of the Standard Terms to the Talent Agreement.

26.     To generate attention, Rapaport started a feud with Defendant Smith, a longtime Barstool employee.

27.     Rapaport lost a $2,000 fantasy football bet with Mr. Smith and refused to pay. Rapaport then bet Mr. Smith another $2,000 that he would lose a fight he was doing to promote Barstool's amateur boxing business, "Rough N' Rowdy."  Mr. Smith won the fight, but Rapaport again refused to pay.

28.     Instead of honoring his bet, Rapaport went on the attack, claiming Rough N'
Rowdy (a Barstool-owned business) was "corrupt[ ]," repeatedly calling Mr. Smith a "Dumb
Fuck," and lashing out at and harassing his Barstool coworkers. Exh. 31.

29.     Rapaport also attacked Stoolies—the very people who support Barstool and allow
it to pay people like Rapaport.  Merely by way of example:

> a.  In response to Rapaport Tweeting that Mr. Smith was on performance enhancing
>     drugs ("PEDS"), a Stoolie asked him: "Did your girlfriend ask you to get tested
>     for PEDS after you beat her?"—referring to Rapaport's well-known criminal
>     background.  Rapaport responded: "Only thing I ever beat is my dick & your
>     moms pussy."  The Stoolie replied by posting the photo of Rapaport with the
>     lesion and writing: "My mom doesn't have herpes tho." Exh. 32-1.
>
> b.  Rapaport called another Stoolie a "Bish" (aka a "bitch") and a "Ho." Exh. 32-2.

30.     On February 17, 2018, Rapaport's stepped up his attack on Stoolies.  A Stoolie
Tweeted: "Can you start a pol[l] asking stoolies if they like @MichaelRapaport. I think that may
shut him up[.]"  Rapaport responded: "**[I]f you call yourself a fucking stoolie for real, you've
already lost in life**." Exh. 33 (emphasis added).

31.     Rapaport's attack on the fans who paid his salary was a bombshell statement, akin
to a member of the New York Yankees being paid millions of dollars cursing out the team's fans
and saying that anyone who calls themselves a "Yankees Fan" is a loser.

32.     Rapaport's Tweet enraged Stoolies.  Many of them commented that Rapaport did
not understand the culture of Barstool or appreciate its fans, and should be fired:

> a.  "The only reason he has a platform is because of stoolies and now he just went
>     after them." Exh. 34-1.

-23-

    b.   "Lost all respect for rapaport." Exh. 34-2.

    c.   "I mean the company that pays you ([I don't know] why they do), their fans are called stoolies." Exh. 34-3.

    d.   "Come on man. Whether or not you're right, it's still low to go after a company's following like that[.]" Exh. 34-4.

    e.   "Then you shouldn't work with barstool. You're basically telling people if they're a fan of barstool then they suck at life. You make no sense in any of your arguments. You realize you spend your time fighting with a lot of people half your age." Exh. 34-5.

    f.   "I'm not here to argue but being a Stoolie has changed my life for the better. When you're a Stoolie, you're part of the Pirate Ship. You belong." Exh. 34-6.

33.    Rapaport's Tweet also enraged his coworkers, who felt he was undoing all their hard work to help build Barstool, brick by brick, into a wildly popular and influential media company:

    a.   One employee wrote that Rapaport "[d]idn't mind the Stoolies" when he was trying to sell them his book and "begging to be in the newsletter[.]" Exh. 35-1.

    b.   Another longtime employee, Defendant Clancy, criticized Rapaport for attacking "everything a lot of people have building for a long time now." Exh. 35-2. Rapaport responded by making light of personal issues Mr. Clancy was having in his marriage: "Kinda like what you did to you Wife and family? Shitted on something a lot of people had been working on for a while?" Exh. 35-2

///

///

**C.     Rapaport Violated the Talent Agreement in Other Material Ways**

34.     Barstool is informed and believes, and based thereon alleges, that Rapaport violated the Talent Agreement in at least three other material ways.

35.     Barstool is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport regularly made media appearances in which he promoted himself but did not promote or reference that he worked for Barstool in violation of Paragraph 2 of the Talent Agreement.

36.     Barstool also is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport generated harassing content in violation of Paragraph 1.b. of the Standard Terms to the Talent Agreement.

37.     Barstool is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport did not provide the required "rant" videos at least two times per week in violation of Paragraph 1 of the Talent Agreement.

**D.     Barstool Exercised its Right to Terminate the Talent Agreement**

38.     Rapaport had been violating the terms of the Talent Agreement for months.  But after Rapaport called Stoolies losers, Barstool decided enough was enough.

39.     On February 18, 2018, Mr. Portnoy, Barstool's founder, gave Rapaport notice that Barstool was terminating the Talent Agreement.  Mr. Portnoy then posted a video announcing Rapaport's termination.  In a blog, Mr. Portnoy wrote that it was bad for Rapaport to criticize Barstool and Stoolies at the same time he was "being paid to be part of our world."  Mr. Portnoy emphasized that Rapaport could not call Stoolies losers and "still expect to work here." Exh. 36.

40.     Mr. Clancy posted a blog further summarizing Barstool's reasons for ending its relationship with Rapaport.  Mr. Clancy explained that Rapaport "was never . . . a Stoolie" and

that the most important lesson was "showing loyalty to that [Barstool] logo and to the fans who stand behind it."  Mr. Clancy added that Rapaport did nothing to help spread the brand, never "mention[ing] our name once during any of the 50 million appearances he made." Exh. 37.

41.     Stoolies celebrated Barstool's decision to end its relationship with Rapaport:

  a.  Mr. Portnoy's video informing Stoolies about Barstool's decision to terminate Rapaport received almost 50,000 comments, Likes and Retweets. Exh. 38-1.

  b.  One Stoolie wrote:"I'm as proud of being a Stoolie as I am of being a Veteran." Exh. 38-2.

  c.  Another wrote: "Finally! Thank you Dave I couldn't love you more." Exh. 38-3.

  d.  Another wrote: "Finally!! He was THE worst part of Barstool. Now I won't have to watch these selfie videos of him just yelling and swearing." Exh. 38-4.

**D.     Rapaport Responded to the Termination by Making More Offensive Statements**

42.     In response, Rapaport took the low road, posting the Photoshopped image of himself having sex with Mr. Portnoy. Exh. 39.  Rapaport also accessed the Barstool Twitter page without authorization and posted a video attacking Barstool. Exh. 40.

**E.     Rapaport Has Violated the Talent Agreement by Not Refunding to Barstool the $400,000 in Payments He Received**

43.     Because Barstool terminated the Talent Agreement for cause, Rapaport was required under Paragraph 3.b. of the Standard Terms to immediately refund the $400,000 in payments he received from Barstool.  Rapaport has not refunded the payments.

44.     Barstool is informed and believes, and based thereon alleges, that there was no Rant Revenue or Podcast Revenue through the date of termination to pay Rapaport under Paragraph 3.b. of the Standard Terms to the Talent Agreement.

## FIRST COUNTERCLAIM

### (Breach of Talent Agreement – Barstool Against Rapaport and MDP)

45.     Barstool realleges Paragraphs 1 through 44 as if set forth in full.

46.     The parties entered into the Talent Agreement on June 17, 2017.

47.     Barstool performed all of its obligations under the Talent Agreement.

48.     Rapaport and MDP breached the Talent Agreement in at least four material ways:

a.   First, during the term of the Talent Agreement, Rapaport brought himself and Barstool into public disrepute by, among other things, attacking Barstool and Stoolies in violation of Paragraph 3.a. of the Standard Terms.

b.   Second, Barstool is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport regularly made media appearances in which he promoted himself but did not promote or reference that he worked for Barstool in violation of Paragraph 2 of the Talent Agreement.

c.   Third, Barstool is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport generated harassing content in violation of Paragraph 1.b. of the Standard Terms.

d.   Fourth, Barstool is informed and believes, and based thereon alleges, that, during the term of the Talent Agreement, Rapaport did not provide the "rant" videos at least two times per week in violation of Paragraph 1 of the Talent Agreement.

49.     On February 18, 2018, Barstool exercised its right to terminate the Talent Agreement for cause in accordance with Paragraph 3.a. of the Standard Terms.

50.     As a result of Plaintiffs' material breaches of the conduct, Barstool has suffered damages in the amount of at least $400,000.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Counterclaim-Plaintiff Barstool pray for relief as follows

1.      That the Court dismiss Plaintiffs' claims in all respects, with prejudice;

2.      That the Court find that Rapaport and MDP breached the Talent Agreement;

3.      That the Court require Rapaport and MDP to pay Barstool no less than $400,000

        in damages;

4.      For Defendants' reasonable attorneys' fees according to proof; and

5.      For costs of suit and other relief as the Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Defendants and Counterclaim-Plaintiff Barstool hereby demand a jury trial on all issues.

Dated: December 21, 2018                      Respectfully submitted,

                                              GREENBERG GLUSKER FIELDS CLAMAN
                                              & MACHTINGER LLP


                                              By:/s/ Aaron J. Moss
                                              _____
                                                  GREENBERG GLUSKER FIELDS
                                                  CLAMAN & MACHTINGER LLP
                                                  Aaron J. Moss (AMoss@ggfirm.com)
                                                  Ricardo P. Cestero (RCestero@ggfirm.com)
                                                  Steven A. Stein (SStein@ggfirm.com)
                                                  1900 Avenue of the Stars, 21st Floor
                                                  Los Angeles, CA 90067
                                                  (310) 553-3610 Telephone
                                                  (310) 553-0687 Facsimile

                                                  HERRICK FEINSTEIN, LLP
                                                  Barry Werbin (BWerbin@Herrick.com)
                                                  Elena McDermott
                                                  (EMcdermott@Herrick.com)
                                                  2 Park Avenue
                                                  New York, New York 10016
                                                  (212) 592-1400 (Phone)
                                                  (212) 592-1500 (Fax)
                                                  Attorneys for Defendants