UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – –X

| | | |
|---|---|---|
| MICHAEL RAPAPORT AND MICHAEL DAVID PRODUCTIONS, INC., | : | Case No. 1:18-cv-08783 (NRB) |
| | : | |
| Plaintiffs, | : | |
| | : | **PLAINTIFF'S FIRST** |
| v. | : | **AMENDED COMPLAINT** |
| | : | |
| BARSTOOL SPORTS, INC., ADAM SMITH, | : | **DEMAND FOR JURY TRIAL** |
| KEVIN CLANCY, ERIC NATHAN AND | : | |
| DAVID PORTNOY | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

– – – – – – – – – – – – – – – – – – – – – – – – X

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Michael Rapaport (Mr. Rapaport) and Michael David Productions, Inc., ("MDP") (collectively "Plaintiffs"), bring this action, by and through their attorneys, KING & BALLOW, against Barstool Sports, Inc. ("BSI" or "Barstool"), Adam Smith, Kevin Clancy, Eric Nathan, and David Portnoy (collectively "Defendants") and assert as follows:

## NATURE OF ACTION

1.      The causes for which this action arises include breach of contract by BSI, fraudulent inducement by BSI, fraudulent concealment by BSI, defamation and defamation per se by all Defendants.

2.      The breach of contract causes of action arise from a talent agreement ("Talent Agreement") entered into June 17, 2017 between BSI and MDP furnishing the services of Mr. Rapaport. The Talent Agreement consists of both a principal agreement ("Principal Agreement")

and standard terms ("Standard Terms"). In the event of a conflict between the Principal Agreement and the Standard Terms, the Principal Agreement controls.  The defamation causes of action arises out of actions taken by the Individual Defendants and BSI as further described herein.

3.      Plaintiffs' claims for breach of contract arise from BSI's breach of various terms in the Talent Agreement. Specifically, BSI breached its obligations to Plaintiffs to: (1) use good faith efforts to secure an opportunity for Plaintiffs to produce and host a 1-2 hour, 5 days a week show, in a format to be agreed upon by the parties, (2) discontinue the exploitation of Plaintiffs' name or likeness in the event of an early termination of the Talent Agreement absent limited exceptions, (3) pay Plaintiffs appropriate revenue splits under the Talent Agreement, (4) reasonably promote Plaintiff's Content, (5) use good faith efforts to promote Mr. Rapaport and his brand, and (6) not terminate the Talent Agreement improperly.

4.      Plaintiffs' claim for fraudulent inducement arises from BSI providing false promises to Plaintiffs that Mr. Rapaport would receive a 1-2 hour, 5 days a week show. ("Weekly Show"). Plaintiffs clearly and convincingly communicated to BSI that any deal between Plaintiffs and BSI would require a guarantee from BSI that Mr. Rapaport would receive a Weekly Show. Despite BSI having actual knowledge that a Weekly Show would not be provided to Mr. Rapaport, BSI provided false assurances during the negotiation of the Talent Agreement that Mr. Rapaport would receive a Weekly Show.  Such actions induced Plaintiffs to sign the Talent Agreement. BSI made further assurances to Plaintiffs that Mr. Rapaport would receive his Weekly Show mere weeks after the Talent Agreement went into effect. Additionally, BSI made a last-minute change during the negotiation of the Talent Agreement to weaken BSI's guarantee to provide a Weekly Show to Mr. Rapaport. When Plaintiffs asked about the change, BSI made false statements as to why the change was made and falsely promised that the change would not affect BSI's guarantee to provide Mr. Rapaport a Weekly Show. During the term of the Talent Agreement, BSI never

provided Mr. Rapaport a Weekly Show despite its ability to do so. Plaintiffs would not have entered into the Talent Agreement had they known that a Weekly Show would not be provided to Mr. Rapaport.

5.    Plaintiffs' claim for fraudulent concealment arises from BSI's concealment of material information from Plaintiffs related to BSI's promise to provide Mr. Rapaport a Weekly Show. Plaintiffs clearly and convincingly communicated to BSI that any deal between Plaintiffs and BSI would require a guarantee from BSI that Mr. Rapaport would receive a Weekly Show. Despite BSI having actual knowledge that a Weekly Show would not be provided to Mr. Rapaport, BSI never communicated this information to Plaintiffs. BSI further concealed from Plaintiffs that it had yet to commit to acquiring the means to provide Mr. Rapaport a Weekly Show. BSI concealed this material information from Plaintiffs despite BSI's assurances to Plaintiffs that Mr. Rapaport would receive a Weekly Show mere weeks after the Talent Agreement went into effect. During the term of the Talent Agreement, BSI never provided Mr. Rapaport a Weekly Show despite its ability to do so. Plaintiffs would not have entered into the Talent Agreement had they known that a Weekly Show would not be provided to Mr. Rapaport.

6.    Plaintiffs' claims for defamation arise out of the intentional, reckless and malicious publication of statements and commercialization of products by Defendants constituting defamation per se. These statements and products falsely and plainly communicate that Mr. Rapaport suffers from the sexually transmitted disease, herpes. Mr. Rapaport does not have herpes.

7.    Defendants' statements and products include but are not limited to: (1) a t-shirt advertised by Defendants and heavily sold on BSI's website, (2) a diss track and accompanying video created by Kevin Clancy that was hosted on BSI's website and promoted by Defendants, (3) numerous segments on talk radio programs, and (4) an abundance of public statements on social media platforms. Despite each of these items falsely and prominently communicating that Mr.

Rapaport has herpes, Defendants produced, advertised, and commercialized these items with full knowledge that Michael Rapaport did not have herpes.

8.      Prior to the production and exploitation of the defamatory items, Michael Rapaport privately and publicly communicated that he did not have herpes. Despite Mr. Rapaport communicating to Defendants that he does not have herpes and Defendants privately acknowledging in emails between each other that they have no knowledge to suggest that Mr. Rapaport has herpes, Defendants still chose to engage in defamatory acts against Mr. Rapaport and continue to do so. These defamatory acts include not only Defendants' false statements about Mr. Rapaport having herpes but further false statements that Mr. Rapaport is, among other things, a racist, a stalker, a person who has physically abused a woman, and a fraud. Defendants undertook these defamatory actions with actual malice and with a reckless disregard for the truth.

## JURISDICTION AND VENUE

9.      The jurisdiction of the Court over the controversy is based upon 28 U.S.C. §1332(a)(1).

10.     The amount in controversy exceeds $75,000.00.

11.     There is complete diversity of citizenship between the parties and thus the district court has original jurisdiction.

12.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 as the acts which give rise to the claim occurred in this district and as the Defendants reside in this district.

## PARTIES

13.     Plaintiff Michael Rapaport ("Mr. Rapaport") is an actor, performer and comedian who since the early 1990s has appeared in dozens of movies and television series.  He also

developed, produced and appears on his podcast, "I AM RAPAPORT: STEREO PODCAST."  At all relevant times Mr. Rapaport was and is a citizen of the State of California.

14.     Plaintiff MDP is a California corporation with its principal place of business in Los Angeles, California.

15.     Defendant BSI is a Delaware corporation with its principal place of business in New York, New York.  BSI's main business is running a sports and popular culture website at www.barstoolsports.com.

16.     Defendant Adam Smith ("Mr. Smith") is employed by BSI as a writer, blogger and personality.  Mr. Smith posts on BSI's website using the nickname "Smitty" and posts on Twitter using the handle "@smittybarstool." Mr. Smith is a citizen of the State of New York.

17.     Defendant Kevin Clancy ("Mr. Clancy") is employed by BSI as a writer, blogger and personality.  He also hosts his own BSI podcast and appears on the Barstool Radio Show on BSI's SiriusXM channel.  Mr. Clancy posts on BSI's website using the nickname "KFC" and posts on Twitter using the handle "@KFCBarstool."   Mr. Clancy is a citizen of the State of New York.

18.     Defendant Eric Nathan ("Mr. Nathan") is employed by BSI as a writer, blogger and personality.  Mr. Nathan posts on BSI's website using the nickname "Nate" and posts on Twitter using the handle "@BarstoolNate."   Mr. Nathan is a citizen of the State of New York.

19.     Defendant David Portnoy (Mr. Portnoy") is the founder and President of BSI and uses the nickname "El Presidente" on the BSI website and the handle "@stoolpresidente" on Twitter.  Mr. Portnoy is a citizen of the State of New York.

## FACTUAL BACKGROUND

20.     Mr. Rapaport is a renowned and award-winning actor, comedian, and personality. Mr. Rapaport is credited with over a hundred acting roles, in addition to credits for directing,

producing, and writing various entertainment. Mr. Rapaport has been nominated for and won awards through over a dozen venues, including the Behind the Voice Actors Awards, the Black Reel Awards, CPH:DOX, the Film Independent Spirit Awards, the Florida Film Festival, the Grammy Awards, the Los Angeles Film Festival, the Online Film & Television Association, the PGA Awards, the Sundance Film Festival, the São Paulo International Film Festival, the Teen Choice Awards, and the Tribeca Film Festival.

21.     Building off over twenty years of entertainment experience, Mr. Rapaport developed a podcast under the "I AM RAPAPORT: STEREO PODCAST" name and brand in 2014. Pursuant to an agreement with CBS (the "CBS Agreement"), the I AM RAPAPORT: STEREO PODCAST (the "Podcast") was broadcast on CBS Radio from approximately June 16, 2015 until June 16, 2017.  Under the CBS Agreement, Mr. Rapaport continued the production of his Podcast and received significant compensation from CBS in exchange for exclusive broadcast rights to the Podcast.

22.     The CBS Agreement was set to automatically renew after consecutive, one-year terms unless a party to the agreement provided to the other party a written notice to terminate no less than thirty days before the end of a term.  In the event that Plaintiffs terminated the CBS Agreement, Plaintiffs would be barred from distributing content by means of a podcast unless CBS was afforded a right of first refusal to match the terms between Plaintiffs and any third parties.

23.     On or around this same time, Mr. Rapaport began producing and uploading short videos known as "rants" ("Rants") to his social media handles, including Twitter, Instagram, and YouTube. Through these Rants, Mr. Rapaport delivers his unfiltered views on politics, sports and popular culture. These Rants serve as a crucial vehicle through which Mr. Rapaport connects to his audience and establishes his media persona.

24.     In connection with his soaring popularity and audience appeal in the sports entertainment industry, Mr. Rapaport began to make frequent guest appearances on sports radio and television programs. Beginning on or about November 24, 2015 with a guest appearance on Mr. Clancy's "KFC Radio" podcast, Mr. Rapaport made numerous guest appearances on BSI's network. These appearances included several guest appearances between May 2016 and January 2017 on BSI's "Pardon My Take" podcast.

25.     Upon information and belief, in May 2016, BSI began internal discussions related to adding Mr. Rapaport to its network. As described by BSI employee, Dan Katz (Mr. Katz) in an email to Mr. Portnoy and Mr. Clancy, the intent was to add Mr. Rapaport as a "Kat Timpf role" that would send "the message to the world we're all in on the 'comedy' aspect of sports." As Mr. Portnoy acknowledged in an email between himself and Mr. Rapaport, BSI saw Mr. Rapaport as a "huge name" that "fit perfectly with [Barstool's] style of comedy."

26.     Mr. Katz reached out to Mr. Rapaport on September 15, 2016 and formally introduced him to Mr. Portnoy. From the very first conversation between Mr. Portnoy and Mr. Rapaport, BSI clearly and convincingly communicated to Mr. Rapaport what Plaintiffs could expect from entering into an agreement with BSI. As noted by Mr. Portnoy and reiterated through months of conversation and draft term sheets, Plaintiffs would be contracted to 1) produce a daily, two hour radio show ("Weekly Show"), 2) have the Podcast join BSI's podcast network, and 3) post all videos made by Plaintiffs on BSI's platform in addition to anywhere else that Plaintiffs chose to post their videos.

27.     Plaintiffs clearly and convincingly communicated to BSI that any deal between them would need to include guarantees for the Rants, Podcast, and Weekly Show. These guarantees were negotiated between Plaintiffs and BSI to equal $200,000 for the Rants, $400,000 for the Podcast, and $375,000 for the Weekly Show.

28.     Because of Mr. Rapaport's fame and ongoing ascendance in the sports entertainment industry, it was material to Mr. Rapaport that he maximize his immediate and substantial earning potential while continuing to grow his media presence. BSI was not the only company from which Plaintiffs considered offers, and Plaintiffs' decision to contract with BSI was based both on the immediate financial earnings offered by BSI and the support and platforms that BSI promised to provide to help Mr. Rapaport further grow his renown.

29.     The vast majority of Plaintiffs' negotiations with BSI, including the value of the guarantees, occurred through communications with Erica Nardini (Ms. Nardini), the CEO of BSI. In March 2017, Ms. Nardini communicated to Plaintiffs that BSI would provide a daily show to Mr. Rapaport on BSI's SiriusXM provided radio channel. Ms. Nardini communicated that BSI, who was already contracted to a daily two-hour radio show with SiriusXM, was finalizing the terms of acquiring its own radio channel from SiriusXM. Ms. Nardini communicated that the radio channel could launch as soon as May or as late as September. Ms. Nardini later clarified in April 2017 that the SiriusXM channel should be done in a matter of weeks at most.

30.     Contrary to her communications with Plaintiffs, Ms. Nardini was informed by SiriusXM in March 2017 that they did not intend to approve or invest $375,000 in a show for Mr. Rapaport. Sirius did not want to invest in and promote a show that could theoretically go away six months later. If SiriusXM was to invest in a show for Mr. Rapaport, it would require BSI to acquire its own radio channel and provide a commitment to SiriusXM that Mr. Rapaport's show would not disappear six months later. SiriusXM informed BSI that should it choose to pursue the acquisition of its own radio channel, the expected launch date for the radio channel would be "fall."

31.     Ms. Nardini never communicated to Plaintiffs the content of her discussions with SiriusXM. At no point during Plaintiffs' negotiations with BSI were Plaintiffs informed that SiriusXM had reservations about investing in a show for Mr. Rapaport or that BSI had yet to

commit to creating its own radio channel. In fact, as communications as late as August 2017 reveal, Ms. Nardini, acting on behalf of BSI, stopped pursuing the creation of a BSI radio channel to instead pursue SiriusXM selling BSI audio. Although BSI eventually launched its own radio channel in January 2018, BSI told SiriusXM that they would not be providing a Weekly Show to Mr. Rapaport.

32.    Plaintiffs would not have entered into a contract with BSI had they known the contents of Ms. Nardini's communications with SiriusXM. As Mr. Rapaport's Podcast and Rants were already developed and performing well on CBS' platform, Mr. Rapaport had no incentive to enter into an agreement with BSI without a guarantee that he would receive a daily radio show. Mr. Rapaport had already received competitive offers from other media platforms, and it was BSI's committal to providing a daily radio show to Mr. Rapaport that induced Plaintiffs to enter into the Talent Agreement with BSI.

33.    As evidence of BSI's bad faith, early drafts of the Talent Agreement between Plaintiffs and BSI included a hard guarantee that Mr. Rapaport would produce a "1-2 hour, weekday (i.e., 5 days a week) podcast or radio show for Barstool Radio or Barstool Radio on Sirius XM ("Sirius Show")." On April 20, 2017, Ms. Nardini removed this guarantee and replaced it with a guarantee that BSI would make "good faith efforts" to secure the opportunity for Mr. Rapaport to host and produce a Weekly Show. Ms. Nardini claimed that this change was made so that an agreement could be finalized in time to satisfy CBS' right of first refusal. Because the then current term of the CBS Agreement would have ended on or about June 2017, Plaintiffs needed to submit any proposed agreements between Plaintiffs and BSI to CBS by approximately May 2017.

34.    Pursuant to the term sheet provided to CBS in May 2017 ("CBS Term Sheet"), which was drafted by Ms. Nardini, BSI would provide a Weekly Show to Mr. Rapaport contingent only upon SiriusXM and BSI entering into a channel agreement. Although the Talent Agreement

that BSI and Plaintiffs ultimately entered into guaranteed only that BSI would make good faith efforts to provide Mr. Rapaport the opportunity to host and produce a Weekly Show, the CBS Term Sheet clearly clarifies "good faith efforts" to mean BSI entering into a channel agreement with SiriusXM.

35.     However, even after BSI had amended the guarantee for a Weekly Show in the finalized draft of the Talent Agreement and submitted a terms sheet to CBS, BSI continued to conceal material information from Plaintiffs that 1) it had yet to commit to acquiring its own radio station, and 2) SiriusXM had no intention of investing in a show for Mr. Rapaport under its then current agreement with BSI. BSI also continued to make knowingly false statements to Plaintiffs that BSI was only weeks away from launching its own radio channel and that a show would be provided to Mr. Rapaport.

36.     Subsequent to CBS declining its option to enforce its right of first refusal, Plaintiffs and BSI entered into the Talent Agreement on June 17, 2017.  Pursuant to the Talent Agreement, BSI agreed to guarantee payment to MDP and Mr. Rapaport of $200,000 for his Rants ("Rant Guarantee") and $400,000 for his Podcast ("Podcast Guarantee").  Of that combined $600,000, $200,000 was to be paid within ten days of the execution of the Talent Agreement with the remaining $400,000 to be paid in three future, equal installments. These payments were to be made at the end of the second, third, and fourth quarters of the Talent Agreement's one-year term. One third of each payment would be attributable to the Rant Guarantee, and two thirds of each payment would be attributable to the Podcast Guarantee.

37.     The Talent Agreement also set forth that MDP and Mr. Rapaport would receive 60% of revenue attributable to the Rants ("Rant Revenue") after BSI had recouped 100% of the Rant Guarantee, which would be recouped from Mr. Rapaport's share of Rant Revenue. The Talent Agreement similarly set forth that MDP and Mr. Rapaport would receive 60% of revenue

attributable to the Podcast ("Podcast Revenue") after BSI had recouped 100% of the Podcast Guarantee, which would be recouped from Mr. Rapaport's share of Podcast Revenue. The Talent Agreement provided however that "[n]otwithstanding any of the foregoing, Barstool acknowledges your pre-existing relationships with The LA Clippers, DraftKings, Fandango / Rotten Tomatoes and Casper and agrees that you shall have the right to continue such relationships during the Term; Barstool further acknowledges that it shall have no right to any sums paid to you under any of the related agreements with those companies."

38.     Among the advertising deals entered into by BSI on behalf of Plaintiffs was a contract ("DraftKings Contract") with DraftKings for a fantasy football show ("Fantasy Football Follies") that upon information and belief was valued at approximately $102,000. Despite Plaintiffs' fulfillment of their commitments under the DraftKings Contract and BSI incurring at most nominal expenses related to the fulfillment of the contract, BSI never transferred to Plaintiffs any payments received by DraftKings.

39.     Plaintiffs are further entitled to an additional $40,000 for its production of a special video for DraftKings. Upon information and belief, BSI received payment for this video from DraftKings but never forwarded this payment to Plaintiffs.

40.     The Talent Agreement also set forth that MDP and Mr. Rapaport were to receive 60% of the net revenue from the sale by BSI of any merchandise based on or associated with Mr. Rapaport or his content.   The Talent Agreement further set forth that MDP and Mr. Rapaport were to receive 60% of the net revenue attributable to the sale of merchandise based on or associated with Mr. Rapaport or his content.   BSI has failed to fully pay MDP or Mr. Rapaport the merchandise revenue as set forth in the Talent Agreement.   BSI paid the first installment on July 25, 2017.

41.     As set forth above, the Talent Agreement promised a $375,000 guarantee to MDP and Mr. Rapaport should a Weekly Show come to fruition.  BSI promised to use good faith efforts to secure an opportunity for Mr. Rapaport to produce and host a Weekly Show. As clarified through months of communications with BSI and the terms sheet sent to CBS, "good faith efforts" meant that a show would be provided to Plaintiffs contingent upon BSI acquiring its own radio channel. Although BSI launched its own radio channel with SiriusXM on January 17, 2018, BSI chose not to provide a show to Plaintiffs or provide the $375,000 guarantee to Plaintiffs to which they would have been entitled.

42.     BSI announced that Mr. Rapaport was joining BSI on June 19, 2017 and his "I AM RAPAPORT: STEREO PODCAST" debuted on BSI on June 20, 2017.  In BSI's first press release following its hire of Mr. Rapaport, BSI emphasized Mr. Rapaport's "infamous rants and unfiltered opinion", his "absurd, dominant, unique social media presence", and his "unfiltered comments." BSI's second press release highlighted Mr. Rapaport as a "s--- talking extraordinaire." As BSI communicated with Mr. Rapaport, it was his role to "stir things up" and keep the spotlight on BSI.

43.     Mr. Rapaport's "electric style" and ability to go viral were key selling points of BSI's pitches to advertisers. Mr. Rapaport was encouraged by advertisers to turn up the heat, even against fellow hosts of BSI's platform. BSI mirrored these comments to Mr. Rapaport and told him they wanted him to light flames and be the bad guy. In a meeting between Mr. Portnoy, Mr. Katz, and Mr. Rapaport, Mr. Rapaport was compared to being the "2Pac of Barstool Sports." At no point was Mr. Rapaport reprimanded for crossing any line with BSI. As Mr. Portnoy has publicly acknowledged, BSI has no rules.

44.     Throughout the term of the Talent Agreement, Plaintiffs went above and beyond their minimal obligations. In addition to Mr. Rapaport's Rants and Podcast, Plaintiffs actively promoted BSI's brand, coordinated and attended live events, and produced other digital media and

merchandise. Notably, Plaintiffs produced a digital short sponsored by the MGM Feature Film "Death Wish." ("Sponsored Short"). Pursuant to the Talent Agreement, BSI and Plaintiffs were required to make good faith efforts to negotiate the ownership, cost, and split of revenue in connection with the Sponsored Short. BSI has failed to provide any accounting for the Sponsored Short or make any payments to Plaintiffs relating to it.

45.     Not only did Plaintiffs exceed the minimum requirements for content production under the Talent Agreement, but Mr. Rapaport actively defended BSI despite the many controversies it found itself in during the term of the Talent Agreement. These controversies included BSI staff making sexual and sexist comments, often against girls below the age of majority, and BSI host, Mr. Clancy, being publicly humiliated for cheating on his pregnant wife. Mr. Portnoy also caused the early termination of a partnership between BSI and ESPN, with whom Mr. Rapaport had amicably worked only a year prior, by publicly telling an ex-employee that her "#1 requirement" was to "make men hard" and that "[w]e want to see you sex it up and be slutty and not see some prude f*cking jerk."

46.     These controversies negatively harmed the reputations of those employed by BSI, including those of Plaintiffs. As recounted by BSI's CEO, Ms. Nardini, in a January 2018 interview, she lost numerous friends because her employment with BSI and the site's reputation. Plaintiffs themselves lost over $100,000 from advertisers revoking their contracts with Plaintiffs because of Barstool's reputation and the controversies around it. Despite these hardships, Plaintiffs continued to fulfill their obligations under the Talent Agreement.

47.     Despite Plaintiffs' efforts to advance BSI's interests even when Plaintiffs themselves did not financially benefit, BSI did not reciprocate these good faith efforts. As noted above, Plaintiffs never received their revenue share for merchandising or payments made to BSI related to the DraftKings Contract or Sponsored Short. Upon information and belief, BSI did not

actively shop advertisements for Mr. Rapaport's Rants nor did it provide any accounting statements to Plaintiffs related to these Rants. In fact, BSI never showed Plaintiffs any advertising materials designed to solicit advertisements for Mr. Rapaport's Rants. Although materials were designed to promote Mr. Rapaport's Podcast to advertisers, these materials significantly underreported metrics related to the Podcast.

48.     Unbeknownst to Mr. Rapaport, BSI decided as early as October 2017 that it would likely forego the renewal of Mr. Rapaport's contract. Related to these discussions, BSI opted against providing Mr. Rapaport a Weekly Show on its SiriusXM radio channel. BSI never communicated to Plaintiffs the reason for its decision not to provide Mr. Rapaport with a Weekly Show. As noted by Mr. Portnoy on BSI's radio show in April 2018, both Mr. Rapaport and SiriusXM wanted to do the show but Mr. Portnoy decided against offering the show.

49.     Following BSI's decision not to retain Mr. Rapaport, BSI employees, personalities and bloggers began a systematic campaign to publicly and privately discredit, disparage and undermine Mr. Rapaport's relationship with BSI as well as his credibility as an actor and performer.  As examples, on November 17, 2017, BSI published a blog written by Mr. Smith entitled "Michael Rapaport is a Fraudulent Sack of Shit."  BSI and Mr. Smith followed this up by publishing a follow up blog, "Michael Rapaport is A Fraudulent Sack of Shit Part II" on February 14, 2018. The campaign also included highly defamatory statements against Mr. Rapaport and the co-host of his Fantasy Football Follies. These statements included accusations of Mr. Rapaport being a racist, a stalker, a person who has physically abused a woman, and a fraud. Notably, Defendants also began accusing Mr. Rapaport of having herpes. For example, on February 17, 2018, in a tweet, Mr. Clancy referred to Mr. Rapaport as "a creepy herpes riddled failure."

50.     Upon information and belief, BSI's rampant campaign of misinformation and hostility against Mr. Rapaport related to BSI's decision not to renew the Talent Agreement. Upon

further information and belief, BSI's campaign against Mr. Rapaport was undertaken to establish grounds for his early termination from BSI.

51.     As a result of the campaign to sabotage Mr. Rapaport, on February 18, 2018, Mr. Portnoy, without cause or justification, publicly terminated the Talent Agreement by way of posting a video on the BSI website.  Mr. Portnoy has publicly acknowledged that Mr. Rapaport's termination related to 1) Mr. Rapaport being disliked by various members of BSI, 2) Mr. Rapaport not liking the people who built up and promoted his Podcast, and 3) Mr. Rapaport not bringing in enough money.  Mr. Portnoy has further acknowledged that any statements made by Mr. Rapaport against fellow BSI employees were reasonable given their prior attacks against him and described such statements as promotional. Mr. Portnoy has also publicly stated that none of Mr. Rapaport's statements would have been sufficient grounds to terminate other hosts on BSI's network. As explained by Mr. Portnoy, "BSI has no rules."

52.     Because BSI had no cause to terminate the Talent Agreement, BSI could only terminate the Talent Agreement through what it defines as a termination for convenience. Such a termination may only be enacted through a 90 days' written notice to the other party. As Plaintiffs only received an immediate termination of the agreement by means of text message, BSI terminated the Talent Agreement improperly, and in doing so, violated its terms.

53.     Following BSI's termination of the Talent Agreement, BSI refused to pay MDP or Mr. Rapaport the balance of the guaranteed payments due under the Talent Agreement. At the time of the Talent Agreement's termination, Plaintiffs had only received the initial $200,000 to which they were entitled and two thirds of the remaining combination of guarantees. Plaintiffs had not received revenue from merchandising, the Fantasy Football Follies show with DraftKings, or the Sponsored Short.

54.     Upon BSI's wrongful termination of the Talent Agreement, BSI and its employees, bloggers and personalities, including Mr. Smith, Mr. Clancy, Mr. Nathan, and Mr. Portnoy, upped the ante and took their public campaign to defame and disparage Mr. Rapaport to an entirely new level.  Shortly after BSI publicly and wrongfully terminated the Talent Agreement., on February 19, 2018, BSI and Mr. Smith published the blog "Michael Rapaport is a Fraudulent Sack of Shit: Part III, the Final Chapter."

55.     Furthermore, on or about February 18, 2018, BSI and its employees, including defendants Mr. Portnoy, Mr. Smith, Mr. Nathan, and Mr. Clancy, continued their campaign against Mr. Rapaport and continued to defame and discredit him by repeatedly and publicly stating through various platforms, including the BSI website, BSI SiriusXM channel, and Twitter, that, among other things, Mr. Rapaport suffered from the sexually transmitted disease, herpes.   These statements were made with actual malice and with a reckless disregard for the truth.

56.     On or about February 25, 2018, Kevin Clancy authored and released a diss track accusing Rapaport of having herpes. The track repeatedly accuses Mr. Rapaport of having herpes and overlays a video that includes several photoshopped and falsified photographs of Mr. Rapaport. These photographs were created and incorporated into the video by BSI in an effort to defame Mr. Rapaport and make it appear as if he suffers from herpes. The track also includes a statement by Mr. Smith that insinuates that Mr. Rapaport physically abused is "ex." BSI approved the diss track and related video (collectively the "Diss Track") prior to its release, hosted the Diss Track on its website, and actively promoted the Diss Track on its website, Twitter, and radio channel. BSI acknowledged that the Diss Track garnered over 500,000 views and about 500,000 minutes of users actually watching it within a week of the Diss Track being uploaded.

57.     On top of this, on the same day the Talent Agreement was wrongfully terminated, BSI began selling t-shirts (the "Herpes Shirt") depicting Mr. Rapaport with a clown nose and what

BSI describes as a herpes sore beneath Mr. Rapaport's lower lip.   Mr. Portnoy announced the launch of BSI's sale of the t-shirts via Twitter with the statement "Finally some Rapaport gear people will buy."  BSI has acknowledged that the t-shirt sold "like wildfire" and generated at least $100k in revenue on its first day of sale. BSI's marketing and sale of the Herpes Shirt were done with actual malice in an obvious effort to convey that Mr. Rapaport suffered from herpes and to harm Mr. Rapaport's reputation.

58.     Mr. Portnoy has further publicly acknowledged that he had the Herpes Shirt designed prior to Mr. Rapaport's termination and was "just waiting for him to say something like so I had him." The obvious implication of these statements are that Defendants, led by Mr. Portnoy, had premeditated plans to fire Mr. Rapaport and systematically defame his character prior to BSI's termination of the Talent Agreement.

59.     On the same day as BSI's termination of the Talent Agreement, Mr. Smith sent out the following tweet: "Hey @MichaelRapaport, you unfollowed me like a bitch boy and now going after my boss?  I'm still here, and will always be here, Like the herp."  Mr. Smith tweeted this statement utilizing his BSI handle with actual malice, with reckless disregard for the truth and with the intent of harming Mr. Rapaport's reputation.  Mr. Smith also tweeted that same day "That lying fraud hack Michael Rapaport is FIRED from Barstool Sports."

60.     That day, Mr. Clancy also published a blog on the BSI website which referred to Mr. Rapaport as an "old crusty herpe" and referred to Mr. Rapaport's "herpes infested mouth." Mr. Nathan joined in by penning a blog on the BSI website that referred to Mr. Rapaport as a "herpe having, race baiting, D-list actor."

61.     Shortly after BSI wrongfully terminated the Talent Agreement, Mr. Portnoy and Mr. Clancy, on the Barstool Radio with Dave Portnoy show, discussed the wrongful termination of Mr. Rapaport and, while doing so, defamed Mr. Rapaport by discussing and stating that he

suffered from herpes.  Additionally, Mr. Clancy stated during that broadcast that BSI was "literally selling a t-shirt about [Mr. Rapaport's herpes]."

62.     The campaign by BSI and its employees to malign and defame Mr. Rapaport did not simply end in February 2018.  On June 23, 2018, Mr. Nathan posted a blog on the BSI website concerning Mr. Rapaport entitled "Sad Story: D List Actor With A Slight STD Problem Traps Plane of Innocent Travelers Inside."  BSI and Mr. Nathan published this defamatory blog with actual malice, with reckless disregard for the truth and with the intent of harming Mr. Rapaport's reputation.

63.     The above defamatory statements were made either by BSI or by its employees in the course of their employment and with BSI's assent, approval and encouragement.  As discussed above, many of the defamatory statements appeared directly on BSI's website or were published on Twitter by BSI employees utilizing a BSI handle.  BSI and its employees made these defamatory statements as well as others, with actual malice, with reckless disregard for the truth and with the intent that the defamatory statements would reach the maximum audience possible. BSI and its employees did this to not only harm Mr. Rapaport but also to generate "traffic" and publicity for the BSI website and brand.

64.     Beyond this, upon information and belief, BSI and its employees continue to disparage and defame Mr. Rapaport "behind the scenes" in an effort to further hurt Mr. Rapaport's career and steer potential advertisers away from Mr. Rapaport's ongoing podcast.  As a result of BSI and its employees' actions, Mr. Rapaport has suffered harm to his reputation and career. Prior to working with BSI, Mr. Rapaport was actively sought by various talent platforms and advertising agencies hoping to partner with him. However, because of BSI's fraudulent actions against Plaintiffs and BSI's malicious campaign to defame Mr. Rapaport and destroy his career, many of these talent platforms and advertising agencies no longer wish to contract with Mr. Rapaport.

These talent platforms and advertising agencies have communicated to Plaintiffs that while they would like to contract with Mr. Rapaport, they are unable to do so because of fear of blowback and retaliation from BSI.

65.     In addition to Plaintiffs' immediate financial hardships related to BSI's breaches of the Talent Agreement, Plaintiffs have suffered significant damage to their future and historic earnings. As noted above, Plaintiffs had other suitors for Mr. Rapaport's services prior to contracting with BSI. Through BSI's fraudulent concealment of material information and false promises, Plaintiffs were fraudulently induced into entering into a contract to which they would not have participated otherwise. Accounting for BSI's false guarantee of providing Mr. Rapaport a weekly show, Plaintiffs could have acquired a superior contract by contracting with another party. Moreover, because of Defendant's campaign of toxic hostility against Mr. Rapaport and a fear that such a campaign may be waged against them, many of Plaintiffs' previous suitors are afraid to and refuse to work with Plaintiffs moving forward.

66.     In at least one instance, BSI mandated that Plaintiffs discontinue a prior relationship with an advertiser in favor of their own. Prior to contracting with BSI, Plaintiffs had an amicable and lucrative partnership with Casper that generated, upon information and belief, $20,000 during the term of the Talent Agreement. Not only did BSI mandate that Plaintiffs discontinue this relationship with Casper, but no money paid to BSI by Casper was redirected to Plaintiffs. As noted in the Talent Agreement, "Barstool further acknowledges that it shall have no right to any sums paid to you under any of the related agreements with [Casper]." Through BSI's actions, BSI not only breached the Talent Agreement by failing to forward sums received by Casper to Plaintiffs, but it acted in bad faith towards Plaintiffs by mandating that they terminate a relationship that BSI acknowledged in the Talent Agreement.

67. BSI also caused significant financial harm to Plaintiffs through the breach of its contractual obligations under Section 4 of the Talent Agreement. Section 4 of the Talent Agreement requires Plaintiffs to reasonably promote Mr. Rapaport's content and use good faith efforts to promote Mr. Rapaport and his brand. BSI failed to make meaningful efforts to reasonably promote Mr. Rapaport's content and failed to use good faith efforts to promote Mr. Rapaport and his brand. BSI failed to take meaningful or reasonable efforts to secure advertisements for Plaintiffs' Rants. BSI also excluded Mr. Rapaport from the promotional opportunities and platforms that it provided to each of its other hosts. These exclusions include, among others, 1) Mr. Rapaport being excluded from companywide communications, 2) Mr. Rapaport not being invited to companywide events, 3) Mr. Rapaport not being provided individually numbered, branded clothing as was done with other content employees, and 4) BSI not posting Mr. Rapaport's Rants or tagging them on Instagram with @michaelrapaport and @iamrapaport. BSI also made only negligible efforts to market and promote Mr. Rapaports Rants, Podcast, and merchandise. Through these actions, BSI significantly inhibited the earnings potential that Plaintiffs could have reasonably expected under the Talent Agreement and breached the Talent Agreement.

68. Beyond the financial harms inflicted upon Plaintiffs by Defendants' actions, Defendants' campaign of toxic hostility and defamatory acts against Mr. Rapaport have caused him and his family to suffer significant emotional hardships to which he is entitled recovery.

**COUNT I**
**Breach of Contract**
**(As against Defendant BSI)**

69. Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

70.     Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

71.     Plaintiffs performed all of their obligations under the terms and conditions of the Talent Agreement.  Despite this, on February 18, 2018, BSI wrongfully terminated and breached the Talent Agreement.

72.     Of the $600,000 guaranteed under the Talent Agreement, BSI has failed to pay Plaintiffs $200,000.  Furthermore, pursuant to the terms of the Talent Agreement, BSI is obligated to pay Plaintiffs 60% of the net merchandise revenue.  BSI has failed to pay the merchandise revenue as set forth in the Talent Agreement.

73.     Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

**COUNT II**
**Breach of Contract**
**(As against Defendant BSI)**

74.     Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

75.     Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

76.     Pursuant to the terms and conditions of the Talent Agreement, "Barstool will use good faith efforts to secure an opportunity for you to produce and host a 1-2 hour, weekday (i.e., 5 days a week) show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a

terrestrial radio show, a podcast, a video series) ("Weekly Show"). In the event such a Weekly Show comes to fruition, Barstool will pay you a fixed fee of $375,000, unless otherwise agreed."

77.     The meaning of "good faith efforts" as described in the Talent Agreement was clarified in the CBS Term Sheet as meaning that Mr. Rapaport would receive a Weekly contingent only upon SiriusXM and BSI entering into a channel agreement.

78.     BSI entered into a channel agreement with SiriusXM and launched its own channel on or about January 19, 2018.

79.     BSI breached the Talent Agreement by failing to provide Mr. Rapaport an opportunity to produce and host a Weekly Show and by failing to pay Mr. Rapaport the agreed upon $375,000.  Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

## COUNT III
## Breach of Contract
## (As against Defendant BSI)

80.     Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

81.     Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

82.     Pursuant to the terms and conditions of the Talent Agreement, BSI acknowledged Plaintiffs' pre-existing relationship with DraftKings and Casper and further acknowledged that it had no right to any sums paid under any of the related agreements with those companies.

83.     During the term of the Talent Agreement, BSI, on behalf of Plaintiffs, contracted with DraftKings to produce the fantasy football show, Fantasy Football Follies. Upon information and belief, the value of the contract was for approximately $102,000.

84.     Plaintiffs are further entitled to an additional $40,000 for its production of a special video for DraftKings. Upon information and belief, BSI received payment for this video from DraftKings but never forwarded this payment to Plaintiffs.

85.     During the term of the Talent Agreement, BSI, on behalf of Plaintiffs, also contracted with Casper to read advertisements. Upon information and belief, BSI received approximately $20,0000 from these reads.

86.     Plaintiffs fully performed under both the DraftKings and Casper contracts and incurred the brunt of the costs for performing these contracts. BSI suffered at most nominal costs related to the fulfillment of these contracts.

87.     At no point has BSI accounted to or provided payment to Plaintiffs for their fulfillment of the DraftKings and Casper contracts. Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial but believed to be in excess of approximately $160,000. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

**COUNT IV**
**Breach of Contract**
**(As against Defendant BSI)**

88.     Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

89.     Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

90.     Pursuant to the terms and conditions of the Talent Agreement, Mr. Rapaport agreed to produce digital shorts and other short form digital content to be mutually agreed upon and subject to the parties' agreement (after good faith negotiation) regarding ownership, responsibility for cost and split of revenue in connection therewith.

91.     During the term of the Talent Agreement, Plaintiffs produced a digital short sponsored by the MGM Feature Film "Death Wish." ("Sponsored Short").

92.     At no point has BSI accounted to or provided payment to Plaintiffs for their role in producing the Sponsored Short. Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

**COUNT V**
**Breach of Contract**
**(As against Defendant BSI)**

93.     Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

94.     Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

95.     Pursuant to the terms and conditions of the Talent Agreement: "Upon expiration or earlier termination of the Term, Barstool will no longer have the right to use your name/likeness rights in connection with the advertising and promotion of the previously-delivered Content, except that Barstool shall not be required to pull or modify any existing promotions, advertising or content created and distributed during the Term related to the Content that may continue to be

available after the Term." "Content" is defined in the Principal Agreement as including the Rants, the Podcast, and digital shorts and other short form digital content.

96.     The Principal Agreement further provides that BSI could only "produce, distribute, sell and promote merchandise (including apparel) based on or associated with you and/or your Content" subject to the "mutual approval of the parties in each instance."

97.     BSI unilaterally and improperly terminated the Talent Agreement on February 19, 2018.

98.     Following BSI's unilateral and improper termination of the Talent Agreement, BSI no longer had the right to use Mr. Rapaport's name and likeness to advertise and promote previously delivered Content. BSI also could not produce, distribute, sell, and promote merchandise (including apparel) based on or associated with Mr. Rapaport and Plaintiffs' Content.

99.     Nonetheless, subsequent to the termination of the Talent Agreement, BSI created a new shirt bearing Mr. Rapaport's name and likeness, the Herpes Shirt. BSI's owner, Dave Portnoy, has publicly acknowledged that 1) the Herpes Shirt was designed to resemble Mr. Rapaport, 2) the Herpes Shirt was not produced until after Mr. Rapaport was fired, and 3) BSI never sought Mr. Rapaport's approval for the Herpes Shirt. In fact, following the production, advertisement, and sale of the of the Herpes Shirt, a cease and desist letter was sent to BSI by Plaintiffs' then legal counsel to cease the production and sale of the Herpes Shirt. BSI chose to ignore the cease and desist letter because of the significant revenue the shirt was generating. Mr. Portnoy has publicly acknowledged that BSI sold over $100,000 worth of Herpes Shirts during the shirt's first day of sale.

100.    Also, upon information and belief, Mr. Rapaport's Content was still available on at least part of BSI's platform at the time the Herpes Shirt was produced, distributed, sold, and

promoted. Further, digital content is still available on BSI's platform that prominently features Mr. Rapaport.

101.    Through BSI's publication, distribution, sale, and promotion of the Herpes Shirt, it has breached the Talent Agreement. Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

### COUNT VI
### Breach of Contract
### (As against Defendant BSI)

102.    Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

103.    Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

104.    Pursuant to the terms and conditions of the Talent Agreement: "Upon expiration or earlier termination of the Term […] Barstool shall, however, continue to have the perpetual right to exhibit, display, distribute and otherwise monetize all Content previously delivered to Barstool during the Term, subject only to Barstool's continuing obligation to pay you your Revenue Splits in connection therewith."

105.    BSI unilaterally and improperly terminated the Talent Agreement on February 19, 2018.

106.    Subsequent to the termination of the Talent Agreement, BSI created a new shirt bearing Mr. Rapaport's name and likeness, the Herpes Shirt. BSI's owner, Dave Portnoy, has

publicly acknowledged that the Herpes Shirt was designed to resemble Mr. Rapaport and that BSI sold over $100,000 worth of Herpes Shirts during the shirt's first day of sale.

107.    The Principal Agreement classifies merchandise (including apparel) based on or associated with Mr. Rapaport or his content as "Approved Merchandise." Pursuant to the Talent Agreement, Plaintiffs are entitled to 60% of "gross sums actually received by or credited to Barstool or its affiliated companies directly arising from the sale of Approved Merchandise less (i) any and all third party fees, expenses and commissions, (ii) Barstool's actual verifiable costs and expenses relating to the production, distribution, licensing, sale, advertising and promotion of the Approved Merchandise, and (iii) returns, allowances and discounts" ("Herpes Shirt Revenue").

108.    The Herpes Shirt, which Mr. Portnoy and other BSI personal have acknowledged was designed to resemble Mr. Rapaport, classifies as Approved Merchandise under the Talent Agreement. Pursuant to the Talent Agreement, Plaintiffs are entitled to 60% of the Herpes Shirt Revenue. Despite this, BSI has never accounted to or paid Plaintiffs their portion of Herpes Shirt Revenue.

109.    Plaintiffs have been damaged by BSI's breach of the Talent Agreement and failure to account to them their share of Herpes Shirt Revenue in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

### COUNT VII
### Breach of Contract
### (As against Defendant BSI)

110.    Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

111.    Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

112.    Pursuant to the terms and conditions of the Talent Agreement, the Effective Date was June 17, 2017.    The Term was continuing for 1 year from this date.    In addition, "Notwithstanding the foregoing, either party may terminate this Agreement for convenience upon 90 days' written notice to the other party at any time during the Term.

113.    Rather than comply with the 90 days written notice requirement, BSI unilaterally and improperly terminated the Talent Agreement on February 19, 2018.

114.    Following BSI's unilateral and improper termination of the Talent Agreement, BSI no longer had the right to use Mr. Rapaport's name and likeness to advertise and promote previously delivered Content. BSI also could not produce, distribute, sell, and promote merchandise (including apparel) based on or associated with Mr. Rapaport and Plaintiffs' Content.

115.    BSI's reason(s) for terminating the contract are pretextual and false.    BSI improperly terminated the contract in an attempt to withhold money properly owed and due to Plaintiffs.  BSI did not have any reason to terminate Rapaport for cause and did not state he was terminated for cause.

116.    There was no material breach of the Contract on Rapaport's part and BSI did not give Rapaport any opportunity to cure any alleged material breach.

117.    Upon the improper termination of the Talent Agreement, all amounts owed and due to Rapaport were due in full, including full amount for the Rant Guarantee and the Podcast Guarantee.

118.    Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the

conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

## COUNT VIII
### Breach of Contract
### (As against Defendant BSI)

119.    Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

120.    Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

121.    Pursuant to the terms and conditions of the Talent Agreement, BSI agreed to, among other items, "Reasonably promote the Content and your involvement with Barstool," "Handle all aspects of the manufacture, inventory, sale, fulfillment and promotion of the Approved Merchandise," and "Use good faith efforts to promote you and your brand to, and connect you with, its network of contacts (e.g., television producers) subject to your prior written approval in each instance."

122.    Despite BSI's contractual obligation to reasonably promote Plaintiffs' content and use good faith efforts to promote Mr. Rapaport and his brand, BSI acted in willful defiance of these obligations and breached its obligations and commitments.

123.    BSI failed to make meaningful efforts, if any, to secure advertisements for Mr. Rapaport's Rants. BSI similarly failed to take reasonable steps to effectively promote Mr. Rapaport's Podcast.  Although BSI did send promotional materials to advertisers, these materials grossly misstated Mr. Rapaport's audience size and metrics related to the Podcast. Through these misstatements, advertisers were far less inclined to invest in the Podcast.

124.    As a result of BSI's failure to reasonably promote Plaintiffs' content, Plaintiffs have incurred significant damages related to their potential earnings under and subsequent to the Talent Agreement.

125.    BSI also failed to use good faith efforts to promote Mr. Rapaport and his brand. Like the other hosts at BSI, Mr. Rapaport derived much of his value not just from the quality of his productions but from the public recognition of his brand. While BSI took significant steps to further the brands of its other hosts, Barstool intentionally excluded Mr. Rapaport from these promotions.

126.    The importance of exposure and brand building to a media personality cannot be understated.  BSI specifically contracted to "Use good faith efforts to promote [Mr. Rapaport] and [his] brand", yet BSI failed to use good faith efforts to promote Mr. Rapaport and his brand causing his significant harm that ultimately led to BSI's unlawful termination of the Talent Agreement.

127.    As BSI failed to take reasonable steps to promote Mr. Rapaport's content or use good faith efforts to promote Mr. Rapaport and his brand, BSI has materially breached the Talent Agreement.

128.    Plaintiffs have been damaged by BSI's breach of the Talent Agreement in an amount to be determined at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of BSI, including lost profits, opportunities, and/or any consequential damages of any kind.

## COUNT IX
### Fraudulent Inducement
### (As against Defendant BSI)

129.    Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

130.    Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

131.    During the negotiation of the Talent Agreement, Plaintiffs clearly and convincingly communicated to BSI that any deal between them would need to include guarantees for the Rants, Podcast, and Weekly Show. These guarantees were negotiated between Plaintiffs and BSI to equal $200,000 for the Rants, $400,000 for the Podcast, and $375,000 for the Weekly Show.

132.    BSI had full knowledge during the negotiation and execution of the Talent Agreement that the condition that Mr. Rapaport be provided a Weekly Show was a material and essential requirement to for Plaintiffs to enter into a contract with BSI.

133.    BSI assured Plaintiffs through months of conversation and draft term sheets that Plaintiffs would be contracted to 1) produce a Weekly Show, 2) have the Podcast join BSI's podcast network, and 3) post all videos made by Plaintiffs on BSI's platform in addition to anywhere else that Plaintiffs chose to post their videos.

134.    Despite these assurances to Plaintiffs, BSI had actual knowledge that 1) SiriusXM did not intent to invest in Rapaport under its contract with BSI, and 2) it had not yet committed to obtaining its own SiriusXM channel.

135.    In furtherance of BSI's deceit, BSI's CEO, Ms. Nardini, made "last minute", material changes to the draft Talent Agreement that had been circulated between Plaintiffs and BSI. In place of BSI's hard guarantee to provide Mr. Rapaport a Weekly Show, Ms. Nardini inserted a guarantee that it would make "good faith efforts" to secure the opportunity for Mr. Rapaport to host and produce a Weekly Show. This change was made under the false pretext that it was necessary to timely provide CBS a term sheet to satisfy its right of first refusal under the CBS Agreement. Following the change, BSI made further assurances that a Weekly Show would be provided to Mr. Rapaport contingent only upon BSI entering into a channel agreement with

SiriusXM. These assurances are documented both in electronic communications and in the CBS Term Sheet.

136.   Despite BSI's assurances to Plaintiffs that a Weekly Show was only weeks away, BSI knew that it was still undecided on committing to such a show and that should such a show occur, it would certainly be more than a few weeks. In fact, not only did BSI not obtain its own radio channel until over eight months after these assurances were made but BSI decided not to provide a show to Mr. Rapaport.

137.   BSI's actions clearly illustrate that its statements were made with the intent to fraudulently induce Plaintiffs to enter into a contract that BSI knew Plaintiffs would not have entered into absent its knowingly false statements. Plaintiffs have been damaged by BSI's fraudulent inducement into signing the Talent Agreement in an amount to be determined at trial. These damages include lost profits, opportunities, and/or any consequential damages. Plaintiffs are further entitled to punitive damages in an amount to be determined at trial.

## COUNT X
### Fraudulent Concealment
### (As against Defendant BSI)

138.   Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

139.   Plaintiffs and BSI entered into a valid and binding contract, specifically the Talent Agreement.

140.   During the negotiation of the Talent Agreement, Plaintiffs clearly and convincingly communicated to BSI that any deal between them would need to include guarantees for the Rants, Podcast, and Weekly Show. These guarantees were negotiated between Plaintiffs and BSI to equal $200,000 for the Rants, $400,000 for the Podcast, and $375,000 for the Weekly Show.

141.    BSI had full knowledge during the negotiation and execution of the Talent Agreement that the condition that Mr. Rapaport be provided a Weekly Show was a material and essential requirement for Plaintiffs to enter into a contract with BSI.

142.    Despite this knowledge, BSI concealed from Plaintiffs that it had actual knowledge that 1) SiriusXM did not intend to invest in Rapaport under its contract with BSI, and 2) it had not yet committed to obtaining its own SiriusXM channel.

143.    In furtherance of BSI's deceit, BSI's CEO, Ms. Nardini, made "last minute", material changes to the draft Talent Agreement that had been circulated between Plaintiffs and BSI. In place of BSI's hard guarantee to provide Mr. Rapaport a Weekly Show, Ms. Nardini inserted a guarantee that it would make "good faith efforts" to secure the opportunity for Mr. Rapaport to host and produce a Weekly Show. This change was made under the false pretext that it was necessary to timely provide CBS a term sheet to satisfy its right of first refusal under the CBS Agreement.

144.    However, even as this change was made, BSI continued to conceal material information from Plaintiffs that (1) it had yet to commit to acquiring its own radio station, (2) SiriusXM had no intention of investing in a show for Mr. Rapaport under its then current agreement with BSI, and (3) if BSI did acquire its own radio channel, the acquisition would not occur until at least "fall."

145.    BSI's fraudulently concealed this information with full knowledge that Plaintiffs would not have entered into the Talent Agreement had they been aware of this information. Plaintiffs have been damaged by BSI's fraudulent concealment related to the Talent Agreement in an amount to be determined at trial. Plaintiffs are further entitled to punitive damages in an amount to be determined at trial.

COUNT XI
**Defamation and Defamation Per Se**
**(As against all Defendants)**

146.    Plaintiffs repeat, reiterate and re-allege each and every allegation above as though fully set forth herein.

147.    As set forth above, Defendants intentionally, recklessly, and maliciously published statements and commercialized products that falsely and plainly communicate that Mr. Rapaport suffers from the sexually transmitted disease, herpes. Defendants made further defamatory, public statements, including that Mr. Rapaport was a racist, a stalker, a person who has physically abused a woman, and a fraud. Defendants acted with the intent of spreading their defamatory message to the widest possible audience, that they be repeated, re-tweeted, and commented upon by the general public.  Defendants' defamatory statements are not true, including Defendant's statement that Mr. Rapaport has herpes. Mr. Rapaport does not have herpes. Defendants' false assertions that Mr. Rapaport has herpes constitutes defamation per se.

148.    Defendants' statements and products include but are not limited to: 1) a t-shirt advertised by Defendants and heavily sold on BSI's website, 2) a diss track and accompanying video created by Kevin Clancy that was hosted on BSI's website and promoted by Defendants, 3) numerous segments on talk radio programs, and 4) an abundance of public statements on social media platforms.

149.    Despite each of these items falsely and prominently communicating that Mr. Rapaport has herpes, Defendants produced, advertised, and commercialized these items with full knowledge that Michael Rapaport did not have herpes. Prior to the production and exploitation of the defamatory items, Michael Rapaport had privately and publicly communicated that he did not have herpes. Despite Mr. Rapaport's private and public comments and private emails between

Defendants acknowledging that they have no knowledge as to whether Mr. Rapaport has herpes, Defendants still chose to engage in defamatory acts against Mr. Rapaport and continue to do so.

150.    Defendants made their defamatory statements and products with actual malice and made them either knowing they were false or with reckless regard as to the truth of the statements.

151.    As a result of these false statements, Mr. Rapaport has suffered damages in an amount to be proven at trial, including, but not limited to, harm to his personal and professional reputation, emotional harm, contempt and ridicule.  Defendants have also benefitted financially through their defamatory actions.

152.    In making the defamatory statements as set forth herein, Defendants acted with actual malice and thus are responsible for compensatory and punitive damages in an amount to be proven at trial. Plaintiffs are entitled to all damages proximately caused by the conduct of Defendants, including lost profits, opportunities, and/or any consequential damages of any kind. Plaintiffs are further entitled to damages for embarrassment, humiliation, mental anguish, and/or any other emotional harm caused by the conduct of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, upon all of the facts and circumstances herein alleged, Plaintiffs respectfully requests that this Court:

a.      Grant judgement against BSI on Counts I – X;

b.      Grant judgment against all Defendants on Count XI;

c.      Grant an order awarding Plaintiffs damages in an amount to be determined at trial, together with interest and the costs and disbursements of this action, plus reasonable attorney's fees, punitive damages, as well as any other damages permitted to be received by law; and

d.      Grant any such further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues in this action.

New York, New York
Dated: September 9, 2019

KING & BALLOW

/s/ *Richard S. Busch*_____
Richard S. Busch (3985884)
Joshua Wilson (Admitted Pro Hac Vice)
*Attorney for Plaintiffs*
*Michael Rapaport and Michael*
*David Productions, Inc.*
1999 Avenue of the Stars, Suite 1100
Century City, CA 90067