UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

**MICHAEL RAPAPORT and MICHAEL DAVID PRODUCTIONS, INC.,**

        **Plaintiffs,**

    **-against-**

**BARSTOOL SPORTS, INC., ADAM SMITH, KEVIN CLANCY, ERIC NATHAN and DAVID PORTNOY,**

        **Defendants.**

:
:
:
:
:
:
:
:
:
:

**Case No. 1:18-CV-08783**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

------------------------------------- X

------------------------------------- X

**BARSTOOL SPORTS, INC.,**

        **Counterclaimant,**

    **-against-**

**MICHAEL RAPAPORT and MICHAEL DAVID PRODUCTIONS, INC.,**

        **Cross-Defendants.**

:
:
:
:
:
:

------------------------------------- X

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................................1

II.    STATEMENT OF FACTS ...............................................................................3

III.   LEGAL STANDARD.....................................................................................5

IV.   BREACH OF CONTRACT (WRONGFUL TERMINATION) ............................6

      A.    Breach of Section 8 of the Principal Agreement (Count I of Plaintiffs' FAC) ...................................................................................................6

      B.    Barstool Sports' Counterclaim.....................................................................8

V.    COUNT X OF PLAINTIFFS' FAC: FRAUDULENT CONCEALMENT ...........9

      A.    Barstool Made Material Omissions ...............................................................9

      C.    Barstool Intended to Defraud Plaintiffs .....................................................11

      D.    Plaintiffs Reasonably Relied on Defendants' Materially False Representation.........................................................................................11

      E.    Plaintiffs Suffered Damages as a Result of Barstool's Omissions ............12

VI.   COUNT IX OF FAC: FRAUDULENT INDUCEMENT .....................................12

VII.  COUNT II OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 12 OF PRINCIPAL AGREEMENT)..........................................................................12

VIII. COUNT III OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 13 OF PRINCIPAL AGREEMENT)..........................................................................14

IX.   COUNT IV OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 1 OF PRINCIPAL AGREEMENT)............................14

X.    COUNTS VII OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 3 OF PRINCIPAL AGREEMENT).......................15

XI.   COUNT VIII OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 4 OF PRINCIPAL AGREEMENT)..........................................................................15

      A.    Barstool is Liable Under Respondeat Superior for Defendants' Actions ..17

      B.    Defendants' Statements Constituted Statements of Fact ...........................18

      C.    Defendants Made Their Statements with Actual Malice ...........................21

      D.    Accusations of Herpes ...............................................................................22

      E.    Accusations of Physical Abuse.................................................................23

F.      Accusations of Stalking ........................................................23

G.      Accusations of Fraud and Racism...........................................24

H.      Resulting Damages .............................................................25

# TABLE OF AUTHORITIES

CASES                      PAGE(s)

*Abdelhamid v. Altria Group, Inc.,*

 515 F. Supp. 2d 384 (S.D.N.Y. 2007)............................................................ 18

*Anderson v. Liberty Lobby, Inc.,*

 477 U.S. 242 (1986)......................................................................................... 6

*Bacon v. Nygard,*

 2019 NY Slip Op 32103[U] [Sup Ct, NY County 2019]................................ 24

*Brummer v. Wey*

 (Sup.Ct.) 2016 NY Slip Op 31021(U) ........................................................... 24

*Celle v. Filipino Reporter Enters.,*

 209 F.3d 163 (2d Cir. 2000)........................................................................... 21

*Daniels v. Kostreva,*

 No. 15 CV 3141 (ARR)(LB), 2017 U.S. Dist. LEXIS 5534 (E.D.N.Y. Jan. 12, 2017) ... 24

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*

 631 F.3d 42 (2d Cir. 2011)................................................................... 6, 14, 15

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC,*

 194 F. Supp. 3d 263 (S.D.N.Y. 2016)...................................... 18, 19, 20, 21, 24

*Essig v. United States,*

 675 F. Supp. 84 (E.D.N.Y. 1987) .................................................................. 18

*Farago Advert., Inc. v. Hollinger Int'l, Inc.,*

 157 F. Supp. 2d 252 (S.D.N.Y. 2001)............................................................. 6

*First Hill Partners, LLC v. Bluecrest Capital Mgmt.,*

 52 F. Supp. 3d 625 (S.D.N.Y. 2014)............................................................... 9

*Liberty Lobby, Inc. v. Dow Jones & Co.,*

 267 U.S. App. D.C. 337, 838 F.2d 1287 (D.C. Cir. 1988) ............................. 21

*Miele v. Am. Tobacco Co.,*

2 A.D.3d 799, 770 N.Y.S.2d 386 (App. Div. 2003) ............................................................. 9

*Mullenmeister v. Snap-On Tools Corp.*,

    587 F. Supp. 868 (S.D.N.Y. 1984) ................................................................................. 21

*Needham v. Candie's Inc.*,

    2002 U.S. Dist. LEXIS 15144 (S.D.N.Y. Aug. 16, 2002) ................................................. 7

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*,

    315 F.3d 171 (2d Cir. 2003) .............................................................................................. 6

*Oakley v. Dolan*,

    2020 U.S. Dist. LEXIS 28267 (S.D.N.Y. Feb. 19, 2020) ......................................... 17, 23

*Ruel v. McGrath*,

    No. 1:12-CV-417 (LEK/RFT), 2013 U.S. Dist. LEXIS 202738 (N.D.N.Y. June 19, 2013)
    .................................................................................................................................... 9, 11

*State St. Glob. Advisors Tr. Co. v. Visbal*,

    No. 1:19-cv-01719-GHW, 2020 U.S. Dist. LEXIS 4706 (S.D.N.Y. Jan. 3, 2020) .......... 10

*Stern v. Cosby*,

    645 F. Supp. 2d 258 (S.D.N.Y. 2009) ............................................................................. 17

*Thorsen v. Sons of Norway*,

    996 F. Supp. 2d 143 (E.D.N.Y. 2014) ............................................................................ 23

*USI Ins. Servs. LLC v. Miner*,

    801 F. Supp.2d 175 (S.D.N.Y. 2011) ................................................................................ 6

*Wynn v. AC Rochester*,

    273 F.3d 153 (2d Cir. 2001) .............................................................................................. 9

<u>RULE</u>

FED. R. CIV. P. 56(C) ............................................................................................................. 5

## I.   **PRELIMINARY STATEMENT**

Plaintiffs Michael Rapaport ("Mr. Rapaport") and Michael David Productions, Inc. (collectively "Plaintiffs") move for summary judgment against Defendants Barstool Sports, Inc. ("Barstool"), David Portnoy ("Mr. Portnoy"), Adam Smith ("Mr. Smith"), Kevin Clancy ("Mr. Clancy"), and Eric Nathan ("Mr. Nathan") (collectively "Defendants"), all of whom were employed by Barstool during the events at issue in this litigation. (SOMF ¶21).

Plaintiffs' Motion is brought as to Counts 1-4 and 7-11 of their First Amended Complaint ("FAC") (Doc. 60) and Barstool Sports' only Counterclaim. The facts necessary for this Court to rule on each of these issues are not in dispute. As discussed fully below, Barstool is a sports and popular culture website that creates and openly promotes controversy and whose services include a website, radio (Satellite Radio on SiriusXM), podcasts, articles, blogs, a newspaper, and merchandise. (SOMF ¶¶19-20). A few months into their relationship, Defendants decided that Mr. Rapaport did not fit with Barstool, and decided to declare war on him for the purpose of generating publicity and viewers to its site for profit. This was a literal declaration of war admittedly designed to ruin Mr. Rapaport's career by: (1) openly and for pre-textual reasons firing him in breach of contract; and (2) defaming him repeatedly by stating that he was a racist, had beaten his ex-girlfriend "black and blue," was a "fraud," had a "stalking charge," and had "herpes."   Barstool's founder Mr. Portnoy admits actual malice.  He admits not only that Defendants had no basis to make these false statements, but that they made the herpes comments (and a Herpes shirt with Mr. Rapaport's face on it) to humiliate Mr. Rapaport, and in fact everything done was meant to humiliate him. (SOMF ¶¶296-297). Mr. Portnoy stated that everything that was done to Mr. Rapaport was done to "put [him] down like a wounded animal." (SOMF ¶300). Mr. Portnoy also admits that, even if he knew the statements were false, he would not apologize to Mr. Rapaport or retract the statements. (SOMF ¶¶276, 292-295). When questioned

publicly about the truth of these statements, Defendants went a step further and said that the statements they made about Mr. Rapaport were true: "That's all we spit. Truth and justice baby. Truth and justice." (SOMF ¶303). Mr. Portnoy confirmed that Barstool's brand is being authentic, true and real, and that he knows of nothing Barstool has published on its website stating that Barstool engages in satire. (SOMF ¶302).

The claims of racism and being a fraud were designed to alienate Mr. Rapaport's African-American fans by implying that he was not the person he portrayed himself to be and that Defendants supposedly knew facts about him others did not that made him a racist. The allegation that Mr. Rapaport physically abused his ex-girlfriend, a blatant lie as well, was designed to ruin his career as an actor in Hollywood. Defendants' actions had the desired effect: Mr. Rapaport's podcast ratings went from 4.5 stars to 1.5 stars, and his ability to attract sponsors for his content was devastated. (SOMF ¶¶336, 363-368).[1]

---

[1] Barstool's unapologetic, public trashing of Mr. Rapaport with false and vile statements now extends to their counsel, who made an extended public statement trashing Mr. Rapaport after the press picked up on the original filing of this motion. (SOMF ¶¶406-08). (e.g. "This is a guy who has been suspended from Twitter for his misogynistic remarks, who pled guilty for aggravated harassment of an ex-girlfriend, and who has been accused by African-American cultural publications as having a 'hobby of castigating black women' and of being the 'worst kind of racist.' Rapaport has publicly acknowledged that it looked like he had herpes…") These statements are irrelevant to this litigation, and completely mischaracterized. The alleged misogynistic comments relate to Mr. Rapaport and tens of thousands of others expressing outrage (including canceling advertisements on her show) when Fox News host Laura Ingraham said that basketball star LeBron James should "shut up and dribble" instead of commenting on social inequities toward African-Americans, the "aggravated harassment" was nearly 25 years ago, the quotes from the single publication (not "publications") being referred to have been discredited for being based on a fake picture that the author pretended was made by Mr. Rapaport, and Mr. Rapaport actually said publicly that he did not have herpes and would sue anyone who said he did. Barstool's counsel, in the same article, also referenced Mr. Rapaport posting a picture of himself behind Mr. Portnoy in what appears to be a compromising position. While in bad taste perhaps, that occurred well after Barstool's very public termination of Mr. Rapaport, the creation and sale of a herpes shirt bearing Mr. Rapaport's picture, and other nasty defamatory remarks being made against him. The same is true of another tweet Barstool's counsel mentioned. None of this is therefore relevant or excuses

(footnote continued)

Plaintiffs also seek summary judgment on various breach of contract claims against Barstool and on the grounds that Barstool fraudulently induced them into entering into the Talent Agreement.

## II.   **STATEMENT OF FACTS**

In 2014, Mr. Rapaport, continuing a twenty-five year career as an award-winning actor, comedian, and personality, launched a podcast titled "I AM RAPAPORT: STEREO PODCAST" ("Podcast"). (SOMF ¶¶1-4). Pursuant to an agreement with CBS (the "CBS Agreement"), Mr. Rapaport's Podcast was broadcasted on CBS Radio from approximately June 16, 2015 until June 16, 2017. (SOMF ¶5).  In 2016, after only two years in podcasting, Mr. Rapaport was already considered a "huge name" in the podcast industry and was highly sought after by advertisers and talent platforms. (SOMF ¶¶341-353). Mr. Rapaport's Podcast was also experiencing growth that far outpaced industry growth rates during this time. (SOMF ¶370). On September 15, 2016, Barstool reached out to Mr. Rapaport about a potential partnership, wherein Mr. Rapaport would move his Podcast to Barstool's network and create content exclusively for Barstool. (SOMF ¶25).

From Plaintiffs' first meeting with Mr. Portnoy until less than a month prior to the Talent Agreement's executed, Barstool made assurances that a Weekly Show would be provided to Mr. Rapaport as part of a proposed agreement with Barstool. (SOMF ¶¶108-122). In draft agreements exchanged between Plaintiffs and Barstool, Barstool was required to provide "[a] 1-2 hour, weekday (i.e., 5 days a week) podcast or radio show for Barstool Radio or Barstool Radio on Sirius XM ('Sirius Show')." (SOMF ¶121).  The Weekly Show was central to Plaintiffs' decision to contract with Barstool. Barstool was not the only platform interested in partnering with Mr. Rapaport, but it was the only one that offered to provide a Weekly Show. (SOMF ¶¶133-134)

---

Barstool engaging in a coordinated defamatory set of attacks designed to "put [Rapaport] down like a wounded animal." (SOMF ¶300).

3

Knowing the importance of the Weekly Show to Mr. Rapaport, Barstool made repeated assurances that it would provide a Weekly Show despite knowing that its ability and desire to provide such a show was dubious. Rather than disclose this information, Barstool removed the Weekly Show from the Talent Agreement less than a month before Plaintiffs' contractual deadline to provide CBS a notice of termination and right of first refusal.  (SOMF ¶122). Mr. Rapaport opposed this change, noting that he considered the Podcast and Weekly Show to be essential parts of the same deal. (SOMF ¶123). Barstool informed Mr. Rapaport that the Sirius deal would be done "in a matter of weeks at most." (SOMF ¶124). Despite this assurance, Plaintiffs required that Barstool implement a "good faith efforts" requirement into the Talent Agreement. (SOMF ¶125). This provision was finalized on April 26, 2017 and appears as Section 12 in the Principal Agreement of the Talent Agreement ("Principal Agreement"). (SOMF ¶¶126-127).

In compliance with CBS's right of first refusal, a term sheet ("Term Sheet") was provided to CBS on May 17, 2017 signed by Barstool and Mr. Rapaport. (SOMF ¶128). The Term Sheet clarified Barstool's good faith duty as requiring that a Weekly Show be provided if Barstool enters into a channel agreement with Sirius. (SOMF ¶129). CBS did not enforce its right of first refusal, subsequent to which the Talent Agreement was entered into on May 31, 2017. (SOMF ¶130). The Term of the Talent Agreement was from June 17, 2017 until June 16, 2018. (SOMF ¶135).

Even after the Talent Agreement was entered into, Plaintiffs continued to inquire about the status of the Sirius show. (SOMF ¶¶150, 154). These inquiries were left unanswered by Barstool, who decided as early as October 19, 2017 that it probably wouldn't renew Mr. Rapaport's contract. (SOMF ¶142).  Barstool informed Sirius on October 31, 2017 that it had removed Mr. Rapaport from its planned launch lineup for its upcoming radio channel because of "some doubts" about Mr. Rapaport, but requested that none of this be shared with Plaintiffs. (SOMF ¶¶141-144). Barstool

further noted that it felt Mr. Rapaport was too expensive for its proposed budget. (SOMF ¶145). Sirius asked if Barstool would oppose it hiring Mr. Rapaport to contribute to Mad Dog radio. Barstool opposed this request, noting that it "defeats the purpose of our bigger partnership w/ him but we are concerned about his radio fee eating too much into our $1.5." (SOMF ¶¶146-147).

Mr. Rapaport worked for Barstool as an independent contractor from June 17, 2017 until February 18, 2018 when he was publicly terminated by Mr. Portnoy via a Twitter video, without prior notice or opportunity to cure. (SOMF ¶¶37, 68-69). While Barstool began attacking Mr. Rapaport in approximately October 2017 when it secretly decided it would not renew the Contract, concurrent with this termination, Barstool declared an all-out "war" against Mr. Rapaport wherein Defendants falsely accused him of having herpes, being a racist, beating his ex-girlfriend black and blue, being a stalker, and being a fraud. (SOMF ¶¶190-264). These statements were repeated across Barstool's radio network, podcasts, website, and social media. As part of this smear campaign, Defendants released a seven-minute video that repeated and contextualized its statements and sold a t-shirt purporting to show Mr. Rapaport with herpes ("Herpes T-shirt"). (SOMF ¶¶39, 213). Defendants reiterated the truthfulness of their statements throughout their attacks and encouraged their fans to repeat their statements and "torpedo" Mr. Rapaport's Podcast by leaving 1-star ratings and reviews. (SOMF ¶336). These actions irrevocably tarnished Mr. Rapaport's and his Podcast's reputations and have caused him great suffering. (SOMF ¶¶394-397).

## III.   LEGAL STANDARD

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Whether a fact is "material" is determined by the substantive law defining the claims.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a party moves for summary judgment, the non-moving party bears the burden of coming forward with more than "[c]onclusory allegations, conjecture, and speculation." *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quotations and citation omitted).

## IV.   BREACH OF CONTRACT (WRONGFUL TERMINATION)

To establish a breach of contract claim under New York law, a plaintiff must plausibly allege (1) the existence of a contract; (2) plaintiff's performance; (3) breach of the contract by defendant; and (4) damages caused by the breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir. 2011). "Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Farago Advert., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001).

### A.  Breach of Section 8 of the Principal Agreement (Count I of Plaintiffs' FAC)

That Talent Agreement requires that Barstool provide 90 days' notice to terminate for convenience and 15 days' notice and an opportunity to cure to terminate for a material breach so long as that breach was not a matter of public disrepute. (SOMF ¶¶63-65). The existence of the Talent Agreement and Barstool's failure to comply with its mandatory notice and cure provisions are not disputed. (SOMF ¶¶68-69).[2] Given Barstool's non-compliance with the Talent

---

[2] Although Barstool has alleged various breaches by Mr. Rapaport of the Talent Agreement, each of these alleged breaches are clearly false and pretextual. Barstool has either failed to provide any proof of the alleged breaches occurring or previously stated that the alleged activity was permissive. (SOMF ¶¶102-106). These "conclusory allegations" are not enough to defeat Plaintiffs' Motion. (SOMF ¶¶102-106). Moreover, these alleged breaches are irrelevant to Plaintiffs' breach of contract claims as Barstool's failure to comply with the mandatory notice and cure provision excuses any curable breach by Plaintiffs. *USI Ins. Servs. LLC v. Miner*, 801 F. Supp.2d 175, 181 (S.D.N.Y. 2011) ("Under New York law, where no notice was given as set forth
(footnote continued)

Agreement's mandatory cure provision, Barstool has attempted to shoehorn a baseless argument that Mr. Rapaport brought himself into public disrepute through a February 17, 2018 tweet ("February Tweet").[3] For motives discussed herein, Barstool terminated Mr. Rapaport the next day, falsely characterizing the February Tweet as an attack against Barstool's brand (SOMF ¶37).

Barstool's brand is premised upon actively promoting itself through controversy, which it encourages both among its employees and against third parties. (SOMF ¶¶70-76). Barstool also engages in frequent insults against its fans. (SOMF ¶¶90-99). According to Mr. Portnoy "killing the comment section" is part of what Barstool does. (SOMF ¶91). Mr. Portnoy himself refers to Stoolies as "morons," "losers," and "braindead idiots." (SOMF ¶92). The Talent Agreement recognizes this controversy, noting "Barstool encourages you to be you, and recognizes that certain topics may generate controversy." (SOMF ¶67). While Barstool has received significant public criticism for its self-inflicted controversies, no employees have been punished for this. (SOMF ¶80).[4] Additionally, Barstool claims to have no rules governing employee conduct. (SOMF ¶¶86, 89, 102). As Mr. Portnoy said, "[t]here are no rules. [...] I do what I want. When I want. All the time. Those are the only fucking rules that there are at this company." (SOMF ¶86).

---

under the [Agreement], there can be no breach of the [Agreement] because defendant was not afforded the opportunity to cure the defect."); *Needham v. Candie's Inc*., 2002 U.S. Dist. LEXIS 15144, at *3 (S.D.N.Y. Aug. 16, 2002) (holding that no notice, or chance to cure, was provided as required under the agreement, and thus there was no breach).

[3] The February Tweet, wherein Mr. Rapaport stated "if you call yourself a fucking stoolie for real, you've already lost in life," was made in response to a promotional Twitter feud, encouraged by Barstool, between Mr. Rapaport and Mr. Smith. (SOMF ¶62) The February Tweet was not, nor was it intended to be, an attack on all Stoolies.  (SOMF ¶62).

[4] These controversies include, among others, Barstool losing a partnership with ESPN because Mr. Portnoy called ESPN employee Samantha Ponder a slut and "a chick that has a job where the #1 requirement is you make men hard." (SOMF ¶¶76(d), 327-334).

Given Barstool's core effort to "monetize chaos," including through attacks against its fans, the February Tweet cannot possibly be considered one of public disrepute. Even had Mr. Rapaport attacked Barstool's brand, Mr. Portnoy already told him in October 2017 that he would not be punished for engaging in attacks against Barstool. (SOMF ¶93).[5]  Barstool's actions are particularly incriminating here where, unbeknownst to Plaintiffs, Barstool had already decided not to renew the Talent Agreement. (SOMF ¶100). Mr. Portnoy also acknowledged developing the Herpes T-shirt prior to Mr. Rapaport's termination and just waiting for him to say something stupid. (SOMF ¶104). The clear implication here is that Mr. Rapaport was fired for pretextual reasons to avoid Barstool's contractual obligations. Mr. Portnoy has effectively acknowledged this pretext, noting that Barstool's other hosts would not have been fired for the same actions, and that Mr. Rapaport would not have been fired if he brought in more money. (SOMF ¶88). Given these circumstances, the February Tweet did not constitute public disrepute and Barstool materially breached the Talent Agreement and is liable to Plaintiffs for the remaining $200,000 in unpaid guarantees under the Agreement due to Barstool's failure to provide a fifteen-day notice and cure period. (SOMF ¶50).

## B. Barstool Sports' Counterclaim

Barstool's Counterclaim seeks $400,000 under the basis that Barstool terminated the Talent Agreement for cause. (SOMF ¶54). This claim is meritless because Barstool's termination of the Talent Agreement was in breach of its notice and cure requirements and pretextual.[6]

---

[5] This assurance was provided as a follow-up to a feud between Mr. Rapaport's co-host and another Barstool host, wherein the co-host called Stoolies "basement dwelling losers" on Twitter. (SOMF ¶¶94-95). The co-host was never punished and the co-host was invited onto Barstool radio where he and Barstool laughed about it. (SOMF ¶97).

[6] During Ms. Nardini's deposition, she noted that despite being Barstool's CEO, she had no knowledge of Barstool's counterclaim. (SOMF ¶60). Even if Barstool had properly terminated the

(footnote continued)

## V.    **COUNT X OF PLAINTIFFS' FAC: FRAUDULENT CONCEALMENT**

"New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *First Hill Partners, LLC v. Bluecrest Capital Mgmt.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (citation omitted). "Fraudulent concealment is a subset of the broader cause of action of fraud." *Ruel v. McGrath*, 2013 U.S. Dist. LEXIS 202738, at \*20 (N.D.N.Y. June 19, 2013) (internal citations omitted). "Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). "If a plaintiff is proceeding under a material omission theory, it must further allege that the 'defendant had a duty to disclose material information.'" *First Hill Partners,* LLC, 52 F. Supp. 3d at 637.

### A.  **Barstool Made Material Omissions**

"Information is material when the misinformation would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *State St. Glob. Advisors Tr. Co. v. Visbal*, 2020 U.S. Dist. LEXIS 4706, at \*60 (S.D.N.Y. Jan. 3, 2020) (citation omitted). Since Plaintiffs'

---

Talent Agreement, however, it would still be precluded from recovery due to a lack of damages. Under Paragraph 3(b) of the Standard Terms, if the Talent Agreement is terminated by Barstool for Mr. Rapaport's material breach, "any pre-paid portions of [his] Guarantees will immediately be refunded to Barstool and the only amounts owed to [him] by Barstool will be [his] share of any Rant Revenue or Podcast Revenue collected by Barstool through the date of termination." (SOMF ¶51). According to Barstool, the Rant and Podcast revenue collected by it that was attributable to Mr. Rapaport as of February 5, 2018 was at least $417,646, with only $182,354 remaining in possible recoupment to Barstool. (SOMF ¶52). As Mr. Rapaport's share of Rant and Podcast Revenue exceeded the $400,000 in guarantees that he received, it would be Plaintiffs, not Barstool, who would be owed money from Barstool's termination of the Talent Agreement.

first meeting with Mr. Portnoy, Barstool made continuous, knowingly false assurances to Plaintiffs that Mr. Rapaport would be provided a Weekly Show in "a matter of weeks at most." Mr. Rapaport considered the Weekly Show to be fundamental to any proposed agreement with Barstool, and had he known that a Weekly Show was unlikely, he would have more actively shopped himself and his content to other talent platforms. (SOMF ¶134) As noted above, Mr. Rapaport was a huge name in the podcast industry and Barstool was not the only company who approached him. (SOMF ¶¶8-18). By waiting until the last hour to change the Weekly Show guarantee to a "good faith" guarantee, a full seven months since Barstool started making its assurances to Plaintiffs, Plaintiffs were foreclosed the opportunity to fully explore their options with other platforms and were forced to either accept Barstool's assurances that a Weekly Show would be provided in "a matter of weeks at most" or refuse to sign the Talent Agreement and continue for another year with CBS.

Due to Barstool's withholding key information from Plaintiffs that it had learned from Sirius, Plaintiffs entered into the Talent Agreement. These omissions included that: (1) Barstool would not provide Mr. Rapaport a Weekly Show unless Sirius covered all costs (SOMF ¶113); (2) Sirius wouldn't invest in Mr. Rapaport without an extension to its pre-existing contract with Barstool as it did not want to invest in a show that may be gone in six months (SOMF ¶119); (3) Barstool did not intend to extend its prior contract with Sirius and preferred to negotiate a new contract for its own radio channel (SOMF ¶118); (4) even if Sirius did invest in a show for Mr. Rapaport, it would not cover the full cost of the show (SOMF ¶136); and (5) a Sirius radio channel would not occur until after Memorial Day at the earliest. (SOMF ¶119). This information would have evidenced to Plaintiffs, months before the Talent Agreement was executed, that it was unlikely that Barstool would provide a Weekly Show.

**B.  Barstool Had a Duty to Disclose Material Information to Plaintiffs**

A duty to disclose can arise "where the 'special facts doctrine' exists, in which one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Ruel v. McGrath*, 2013 U.S. Dist. LEXIS 202738, at *20-21 (N.D.N.Y. June 19, 2013). Because Plaintiffs were not participants in Barstool's negotiations with Sirius, Barstool had vastly superior knowledge compared to Mr. Rapaport about information that he was unable to acquire. Barstool also knew that Plaintiffs were relying upon the information it provided. (SOMF ¶123). As such, Barstool had a duty to disclose material information regarding its communications with Sirius to Plaintiffs.

### C. Barstool Intended to Defraud Plaintiffs

Barstool made omissions with the intent of coercing Plaintiffs to enter into the Talent Agreement prior to CBS's termination cutoff period. This intent is clearly evidenced by Barstool's repeated misrepresentations to Plaintiffs despite being told by them that they considered the Weekly Show and Podcast to be fundamental parts of the same deal. (SOMF ¶123).

### D. Plaintiffs Reasonably Relied on Barstool's Materially False Representation

"[W]here matters are held to be peculiarly within defendant's knowledge, it is said that a plaintiff may rely [on his representations] without prosecuting an investigation, as he had no independent means of ascertaining the truth." *Niederhofer v. Wittels*, 2018 U.S. Dist. LEXIS 128979, *15-16 (S.D.N.Y. July 31, 2018) (citation omitted). Barstool is a media company with open lines of communication with Sirius, whereas Mr. Rapaport is an individual. The nature of the relationship between Barstool and Sirius was of a high-level confidential business nature. Plaintiffs had no reason to dispute the information provided by Barstool about its relationship with Sirius.

### E.  Plaintiffs Suffered Damages as a Result of Barstool's Omissions

Barstool's omissions caused significant harm to Plaintiffs' ability to promote their content and brand. (SOMF ¶157).

## VI.  COUNT IX OF FAC: FRAUDULENT INDUCEMENT

To demonstrate a claim for fraudulent inducement under New York law, a plaintiff must show that a defendant (1) made a material misrepresentation of a presently existing or past fact, (2) with intent to deceive, (3) that plaintiffs reasonably relied on this misrepresentation, and (4) damages resulted. *Johnson v. Nextel Comnc'ns, Inc*., 660 F.3d 131, 143 (2d Cir. 2011). Plaintiffs' fraudulent inducement claim is predicated on the same facts as their fraudulent concealment claim and it succeeds for the same reasons articulated in the above analysis. In addition to the above, Barstool made repeated false statements about the progress of its deal with Sirius and its ability to provide a Weekly Show, including that a show could be provided in "a few weeks at most" and that a Weekly Show would be provided contingent upon Barstool contracting with Sirius for a radio channel. (SOMF ¶¶124, 129).

## VII.  COUNT II OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 12 OF PRINCIPAL AGREEMENT)

Section 12 of the Principal Agreement states that "Barstool will use good faith efforts to secure an opportunity for [Mr. Rapaport] to produce and host a 1-2 hour, weekday (i.e. 5 days a week) show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series)."  (SOMF ¶132). Barstool removed its absolute guarantee to provide a Weekly Show from the draft Talent Agreement on April 20, 2017, (SOMF ¶122), and replaced it with a "good faith" guarantee on April 26, 2017. (SOMF ¶¶125-127). The Section 12 language appearing in the April 26 draft is identical to the language in the executed Talent Agreement. Subsequent to the April 26 draft, a term sheet was provided to CBS in compliance

with its right of first refusal. According to this term sheet, Barstool agreed to provide Mr. Rapaport a Weekly Show and $375,000 in compensation contingent only upon Barstool entering into a channel agreement with Sirius.   (SOMF ¶129).   Barstool and Sirius entered into a channel agreement on or about January 2018 (SOMF ¶155). Defendants breached the Talent Agreement by failing to use good faith efforts to secure Plaintiffs a show on this channel.  As shown from the term sheet, Mr. Rapaport was to be provided a show contingent only upon Barstool entering into an agreement with Sirius.

Even disregarding the term sheet, there is no evidence in the record to indicate Barstool made any good faith efforts to secure Plaintiffs a Sirius radio show.  As early as July 2017, Barstool learned that Sirius was willing to pay $300,000 for a Rapaport show, subject to a channel agreement between Barstool and Sirius, but never communicated this to Plaintiffs.  (SOMF ¶136). This information was never communicated however to Plaintiffs. (SOMF ¶138). Instead, in October 2017, Barstool decided to remove Mr. Rapaport entirely from a list of initial hosts for the Barstool Radio channel. (SOMF ¶141).  When Sirius asked why this was done, Barstool responded it had doubts about Mr. Rapaport. (SOMF ¶143).  Barstool CEO Erika Nardini stated that Mr. Rapaport "is pretty polarizing" and Barstool was "watching closely how our crowd responds to him."  (SOMF ¶145).  Clearly wanting Rapaport on the network, Sirius then asked Barstool whether Rapaport could appear on another Sirius radio station called Mad Dog Radio.  (SOMF ¶ 146).  Ms. Nardini responded that Rapaport "going on Mad Dog defeats the purpose of our bigger partnership w[ith] him." (SOMF ¶ 147).  Throughout these discussions, Ms. Nardini requested that Sirius keep their conversations "confidential" and away from Mr. Rapaport.  (SOMF ¶¶143-44).

Plaintiffs were clearly damaged by Barstool's breach of contract by failing to use good faith efforts to secure Mr. Rapaport a weekly radio show.  Section 12 of the Principal Agreement

provided that in the event a Weekly Show comes to fruition, Barstool would provide Plaintiffs with a fixed fee of $375,000.  (SOMF ¶132).

## VIII.   COUNT III OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 13 OF PRINCIPAL AGREEMENT)

Pursuant to Section 13 of the Principal Agreement, "Notwithstanding any of the foregoing, Barstool acknowledges your pre-existing relationships with The LA Clippers, DraftKings Fandango / Rotten Tomatoes and Casper and agrees that you shall have the right to continue such relationships during the Term; Barstool further acknowledges that it shall have no right to any sums paid to you under any of the related agreements with those companies." (SOMF ¶159).

Both DraftKings and Casper advertised with Mr. Rapaport during the Term of the Talent Agreement. (SOMF ¶160). In both cases, Barstool was paid money under these agreements but never dispersed these funds to Plaintiffs. (SOMF ¶¶161-65). Pursuant to the clear terms of Section 13 of the Principal Agreement, Barstool has no right to these funds.[7] As established herein and above, each of the four *Diesel* factors are clearly met and summary judgment should be granted in favor of Plaintiffs.

## IX.   COUNT IV OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 1 OF PRINCIPAL AGREEMENT)

---

[7] Barstool has argued in their depositions that this provision is ambiguous as to whether the restraint on Barstool's financial rights extends to all agreements with Casper and DraftKings or only those predating the Talent Agreement. The narrowed scope that Barstool seeks to assert is unsupported by the clear language of the provision and is inappropriate. "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Seiden Assocs. v. ANC Holdings, Inc*., 959 F.2d 425, 428 (2d Cir. 1992). "The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Id*. The above provision is one such example of a contract containing definite and precise meaning absent any ambiguity. The clear language of this provision is that Barstool has no right to money generated from contracts on behalf of Mr. Rapaport with DraftKings and Casper.

Under Section 1 of the Talent Agreement, Mr. Rapaport agreed to "produce, edit, and deliver to Barstool […] [d]igital shorts and other short form digital content to be mutually agreed upon and subject to the parties' agreement (after good faith negotiation) regarding ownership, responsibility for costs and split of revenue in connection therewith." (SOMF ¶166).  In February 2018, Mr. Rapaport assisted in the development of a digital short as part of a promotion for the film "Death Wish." (SOMF ¶167). This video was added to Barstool's blog but was removed by Barstool after Mr. Rapaport's termination. (SOMF ¶168). Although Barstool derived revenue from the "Death Wish" video, no payments were made to Mr. Rapaport (SOMF ¶¶169-170).

## X.    COUNTS VII OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 3 OF PRINCIPAL AGREEMENT)

Under Section 3 of the Principal Agreement, Barstool was required to secure Mr. Rapaport's approval prior to producing, distributing, selling, or promoting merchandise (including apparel) based on or associated with Mr. Rapaport and/or his Content. ("Approved Merchandise"). (SOMF ¶172). Subject to this approval, Mr. Rapaport would be entitled to a percentage of revenue derived from the sale of the Approved Merchandise. (SOMF ¶173). As discussed above, Barstool's termination of the Talent Agreement breached its terms. If not for this breach, Barstool would have been required to obtain Mr. Rapaport's approval prior to selling the Herpes T-shirt. As the Herpes T-shirt was sold both in the 15-day window for material breach and 90-day window for convenience, Mr. Rapaport is entitled, at a minimum, to a percentage of earnings derived from the sale of the Herpes T-shirt. (SOMF ¶¶174-178). As established herein and above, each of the four *Diesel* factors are clearly met and summary judgment should be granted in favor of Plaintiffs.

## XI.    COUNT VIII OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 4 OF PRINCIPAL AGREEMENT)

Section 4 of the Principal Agreement requires Barstool to "[r]easonably promote the Content and your involvement with Barstool," and "[u]se good faith efforts to promote you and

your brand." (SOMF ¶399). At no point during the Term of the Agreement did Barstool acquire advertisements for Mr. Rapaport's Rant videos. (SOMF ¶400). The fact that Plaintiffs were able to sell advertisements for Rant videos shortly after being terminated from Barstool, in the midst of Mr. Rapaport's reputation and that of his podcast being completely tarnished, shows that Barstool was not making legitimate efforts to sell advertisements for his Rant videos. (SOMF ¶¶401-02). Mr. Rapaport was likewise excluded from benefits generally provided to Barstool's employees, with Barstool even blocking his involvement with certain business partners. (SOMF ¶¶146-47, 403). Significantly, as noted below, Barstool engaged in a defamatory campaign designed to destroy Mr. Rapaport and his brand. (SOMF ¶404). In addition to the defamations listed below, Barstool repeatedly accused Mr. Rapaport of being insane, delusional, bipolar, stupid, unsanitary, a slave catcher, a crazy person, an idiot, and "a one trick pony" whose "trick sucks" on its platform. (SOMF ¶405). These attacks began while he was still employed by Barstool, with the bulk of Defendants' statements occurring within two weeks of his termination. These statements fall within the notice and cure periods that Barstool was required to provide to Mr. Rapaport and Mr. Rapaport's reputation and brand were significantly damaged as a result of Barstool's actions.

## XII.   COUNT XI OF PLAINTIFFS' FAC: DEFAMATION AND DEFAMATION PER SE

Plaintiffs have identified dozens of instances of both written and spoken defamatory statements made by Defendants.[8] (SOMF ¶¶190-264). Each of Defendants' defamatory statements fall within one or all of the following categories: (1) Mr. Rapaport having herpes, (2) Mr. Rapaport being a domestic abuser, (3) Mr. Rapaport having a stalking charge, (4) Mr. Rapaport being a

---

[8] The source, speaker, date, and context of these statements were identified to Defendants in an Excel spreadsheet pursuant to a stipulation. (SOMF ¶¶180-181). This list nonetheless fails to capture the full scope of Defendants' defamatory statements, as Defendants deleted 60,000 social media posts during this litigation. (SOMF ¶184).

fraud, and (5) Mr. Rapaport being a racist. "Under New York law, a defamation claim requires a plaintiff to establish (1) a 'defamatory statement of fact concerning the plaintiff;' (2) 'publication to a third party;' (3) 'fault (either negligence or actual malice depending on the status of the [defamed] party);' (4) 'falsity of the defamatory statement;' and (5) 'special damages or per se actionability.' *Oakley v. Dolan*, 2020 U.S. Dist. LEXIS 28267, at *17-18 (S.D.N.Y. Feb. 19, 2020).

"The New York Court of Appeals has recognized four categories of statements as defamatory per se: (1) those that accuse the plaintiff of a serious crime; (2) those that 'tend to injure another in his or her trade, business or profession'; (3) those that accuse the plaintiff of having a 'loathsome disease'; or (4) and those that impute 'unchastity to a woman.' Determining whether a statement is defamatory per se is a question of law for the Court." *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) (citation omitted). Defamation per se is not limited to these four categories however. "[A] statement is libelous per se, even if it does not fall within one of the four categories, if the statement is so severe that serious injury to the plaintiff's reputation can be presumed." *Id*. at 290. "The reason damages are presumed when forms of defamation are actionable per se is because the defendant's conduct is considered so severe that serious injury to the plaintiff's reputation is 'virtually certain.'" *Id.* at 289 (citation omitted). "In other words, certain statements are so clearly damaging that the law presumes that the plaintiff has suffered damages. It is inconsistent with this rationale to say that only statements within the four categories can be so inflammatory and offensive that damages will be presumed, particularly because there is no principled reason why the rule only applies to these four categories." *Id*.

### A.  Barstool is Liable Under Respondeat Superior for Defendants' Actions

Each of Defendants' defamatory statements were made by Defendants within their capacity as employees of Barstool. (SOMF ¶21). "Under the common law doctrine of respondeat

superior, an employer may be held liable for the tortious acts of an employee committed within the scope of his employment." *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007). "[I]f an enterprise can foresee risks as incidental to its business activity, then by continuing to pursue that activity it necessarily assumes those risks and consequences that attach." *Essig v. United States*, 675 F. Supp. 84, 87 (E.D.N.Y. 1987). Mr. Portnoy has acknowledged that Barstool was in a "war" with Mr. Rapaport designed to humiliate him. (SOMF ¶321). Barstool's platform was also the primary vehicle that Defendants used to spread their defamatory statements. (SOMF ¶¶169-170). Ms. Nardini has likewise noted Barstool's support of Defendants' defamatory statements, stating that Barstool should not remove any content claiming that Mr. Rapaport has herpes, is a racist, or physically harmed his ex-girlfriend. (SOMF ¶275). Given that Defendants were acting as part of a sanctioned "war" against Mr. Rapaport that fell within the scope of their employment and Barstool made no effort to deter Defendants' content despite being aware of it, Barstool is plainly liable for Defendants' defamatory statements.

### B. Defendants' Statements Constituted Statements of Fact

"To qualify as a protected opinion, a 'statement must be accompanied by a recitation of the accurate facts on which it is based. When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable mixed opinion.'" *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) (citation omitted). "Whether a challenged statement is fact or opinion is a question of law to be decided by the Court. The core inquiry is 'whether a reasonable listener . . . could have concluded that [the defendant] was conveying facts about the plaintiff.'" *Id.* at 281-282. "In making this determination, courts consider: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether

either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id*. at 282.

Each category of Defendants' statements contained a precise meaning which is readily understood and capable of being proven as true or false. Whether Mr. Rapaport has herpes is demonstrably false by medical reports, and whether he has a stalking or domestic abuse charge is demonstrably false by court records. Defendants' charges of fraud and racism likewise contain a precise meaning given the circumstances surrounding Defendants' statements.

Although Defendants' charges of fraud first gained traction in a dispute wherein Mr. Smith accused Mr. Rapaport of failing to make good on a bet, the repetitious use of the word "fraud" was later re-contextualized to mean that Mr. Rapaport was an outsider who exploited Barstool but "was never one of us." (SOMF ¶¶312-313). Defendants then extended their accusation of fraud to mean that Mr. Rapaport's depiction of himself as a friend of African Americans was false. (SOMF ¶¶315-17). While Mr. Rapaport was still with Barstool, its employees would frequently comment on and tell stories about Mr. Rapaport and his relationship and interactions with African Americans. (SOMF ¶316). These personal stories grounded Defendants' statements with the inference of providing an "inside look" into the life of Mr. Rapaport. Defendants' accusations of race baiting were used to further the narrative that Mr. Rapaport's concern for the African American community was all an act and that he was just appealing to the demographic for self-promotion. (SOMF ¶317). Ms. Nardini also noted in her testimony that Barstool produced a video accusing Mr. Rapaport of being a "race baiter, old racist man, race baiting, racist" to allude to Mr. Rapaport being a racist. (SOMF ¶272). In light of Defendants' personal knowledge, Defendants' accusations of fraud and racism would have been seen as being based on undisclosed information.

With Defendants' statements satisfying the first two *Enigma* factors, the analysis of whether Defendants' statements constituted statements of fact moves to its third factor. "[T]he third factor 'is often the key consideration in categorizing a statement as fact or opinion.' As a result, the New York Court of Appeals has 'adopted a holistic approach to this inquiry': Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff." *Id.* (citation omitted).

It is notable that Defendants made their statements within their capacities as Barstool employees. Although Barstool has a controversial reputation, the platform does not have a reputation for dishonesty. To the contrary, the platform strongly pushes the narrative that it is authentic and that its words are both true and real. (SOMF ¶¶301-303). As Mr. Smith explained during an online video where he fielded questions about this litigation, including Plaintiffs' defamation claims, he noted that all Barstool spits is "[t]ruth and justice." (SOMF ¶303).

A casual audience, having no direct interest in or practice viewing Barstool, seeing the constant repetition of charges of fraud, racism, low key racist, and race-baiting, domestic violence, and having herpes against a celebrity involved in sports would be expected to accept those charges as having some basis in fact. (SOMF ¶308). The manner in which Mr. Rapaport was repeatedly called a racist, a low key racist, or a race baiter would leave anyone hearing or seeing such comments with the clear impression that Defendants, his former employer and its employees, knew facts about him that others did not and that those facts led them to this conclusion. (SOMF ¶309). The same may be taken as true regarding the constant stream of language and images portraying Mr. Rapaport as engaging in domestic violence. (SOMF ¶310). On top of this stream, statements

that Barstool would make Mr. Rapaport as black and blue as he made his ex-girlfriend, followed by a picture of the woman, would create visual support for this false claim. (SOMF ¶310). This would be expected to lead those hearing and seeing the image to conclude that Mr. Rapaport did, in fact, beat this particular woman. (SOMF ¶310).

To the extent that Defendants claim some or all of their statements were not meant to be taken seriously, "[i]t is no defense to a suit for libel that the defendant did not mean the offending statement to be taken seriously." *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 873 (S.D.N.Y. 1984). Likewise, to the extent that some of Defendants' statements are couched in disclaimers, "[t]he mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." *Enigma,* 194 F. Supp. 3d at 286 ("The impression created by [Defendant's] words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely [his] opinion.")

### C.  Defendants Made Their Statements with Actual Malice

"Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of [its] truth or falsity." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 182 (2d Cir. 2000). "Although actual malice is subjective, a 'court typically will infer actual malice from objective facts.'" *Id.* at 183 (citation omitted). "These facts should provide evidence of 'negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.'" *Id.* at 183 (citation omitted). "Actual malice can be established 'through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]'" *Id.* at 183 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).

Defendants' malice is clearly evidenced by their open recruiting of fans to join in the pile on attacks against Mr. Rapaport. (SOMF ¶¶335-340). Mr. Portnoy admits that Defendants considered themselves to be "in a war" with Mr. Rapaport at the time of their defamatory statements (SOMF ¶321),[9] and that it was his goal to humiliate Mr. Rapaport and for the Herpes T-shirt to haunt him for the rest of his life. (SOMF ¶¶296-97). This idea of "going to war" is well entrenched as a part of Barstool's culture, with the site routinely engaging in attacks against third parties. (SOMF ¶¶318-34). As was done here against Mr. Rapaport, Defendants' attacks often follow a set pattern of attacking a person's legitimacy before further defaming them and commercializing their suffering. (SOMF ¶¶326-34). Barstool's attacks are so central to its image of being "for the common man" and opposing "outsiders" that Barstool recently hired an employee for the sole purpose of carrying out such attacks. (SOMF ¶¶322-24). This active promotion of Mr. Rapaport's suffering and Defendants' indifference to the accuracy of their statements is textbook malice. Defendants' malice is evidenced not only by their decision to not conduct research and ascertain the validity of their statements before making them, but by their indifference to their falsity. (SOMF ¶¶272-300). As Defendants noted in their depositions, even if they learned that their statements were false, they would not disavow them or apologize.[10] (SOMF ¶276).

### D. Accusations of Herpes

Under New York law, loathsome diseases include "existing venereal disease[s]" and other "loathsome and communicable disease[s]." *Oakley v. Dolan*, 2020 U.S. Dist. LEXIS 28267, at *33

---

[9] Defendants Mr. Smith, Mr. Clancy, and Mr. Portnoy have all acknowledged that their assault against Mr. Rapaport was made as part of a coordinated effort by Barstool and its employees. (SOMF ¶¶368-373).

[10] For example, Defendants noted in their depositions that none of them would disavow their accusations of Mr. Rapaport having herpes, even if they were presented a medical record showing otherwise. (SOMF ¶¶276, 290).

(S.D.N.Y. Feb. 19, 2020). All Defendants made public statements accusing Mr. Rapaport of having herpes. (SOMF ¶¶190-220). Mr. Rapaport does not have herpes. (SOMF ¶265). Defendants made their accusations despite having no knowledge as to the truthfulness of their statements and conducting no research as to their accuracy. (SOMF ¶¶280, 285, 287, 292). These factors clearly establish Plaintiffs' claim for defamation and defamation per se as against all Defendants.

### E.   Accusations of Physical Abuse

"Serious misdemeanor may form the basis for a claim of defamation per se particularly where [] it involves a crime that puts another in fear of physical harm." *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 171 n.6 (E.D.N.Y. 2014) (citation omitted). Ms. Nardini acknowledged in her testimony that Barstool produced a that included statements which "were designed to allude to Mr. Rapaport and some type of altercation with an ex." (SOMF ¶273). Ms. Nardini acknowledged that references in the video to "beating, mentioning his ex-girlfriend Lili Taylor, an order of protection, restraining order, and making him as black and blue as your ex," were all included to support this allegation. (SOMF ¶273). Mr. Rapaport has never been charged with domestic or physical abuse. (SOMF ¶267). During his deposition, Mr. Smith, who made the allegations in the video, noted that he was unaware of any information that Mr. Rapaport had physically harmed a female. (SOMF ¶283). Given these factors and the nature of the crime alleged, Plaintiffs' claim for defamation and defamation per se as against Adam Smith and Barstool is clearly established.

### F.   Accusations of Stalking

"[S]talking/first degree harassment, a class B misdemeanor" may form the basis for a claim of defamation per se. *Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188 (Sup. Ct. N.Y. Cnty. 2003) (citation omitted). Mr. Portnoy and a non-Defendant Barstool host accused Mr. Rapaport of stalking. (SOMF ¶¶261-264). While only Mr. Portnoy referred to Mr. Rapaport as

having a stalking charge, the host accused Mr. Rapaport of stalking girls in a video that also featured accusations of Mr. Rapaport having a protective order against him. (SOMF ¶251). Mr. Rapaport has never been charged with stalking. (SOMF ¶266). Mr. Portnoy also repeated his accusations of Mr. Rapaport having a stalking charge despite prior knowledge that he had no such charge. (SOMF ¶262). Given these factors and the nature of the crime alleged, Plaintiffs' claim for defamation and defamation per se as against David Portnoy and Barstool is clearly established.

## G. Accusations of Fraud and Racism

"Under New York law, a written statement constitutes libel per se where it 'tend[s] to injure another in his or her trade, business, or profession'" *Daniels v. Kostreva*, 2017 U.S. Dist. LEXIS 5534, at *23 (E.D.N.Y. Jan. 12, 2017) (quoting *Zherka v. Amicone*, 634 F.3d 642, 645 n.6 (2d Cir. 2011)). "Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties." *Enigma*, 194 F. Supp. 3d at 290. As noted above, Defendants repeatedly accused Mr. Rapaport of being a racist and infused their accusations of fraud to carry the same meaning. The statements were made to imply that Barstool had insider knowledge as to the "true" Michael Rapaport and that he was not the same as he presented himself. (SOMF ¶¶315-17). These repeated statements that Mr. Rapaport is various forms of a racist and a fraud are actionable because, among other reasons, Defendants' statements suggest that they are based on undisclosed facts and personal knowledge. See *Bacon v. Nygard*, 2019 N.Y. Misc. LEXIS, at *20 Sup Ct. July 18, 2019);*see also Brummer v. Wey*, 2016 N.Y. Misc. LEXIS 2029, at *7 (Sup. Ct. Mar. 1, 2016). ("Racist terms referring to plaintiff […] together with other statements describing the plaintiff as available for hire, involved in fraud, and affiliated with felons, could reasonably be susceptible to a defamatory connotation.") Diversity has been a hallmark of Rapaport's brand in both his content

production and the guests he has invited on his various programs. (SOMF ¶315). Mr. Rapaport's podcast has been a forum for countless African-American guests. (SOMF ¶¶315-17). This direct attack on Mr. Rapaport's trade constitutes defamation per se. Even if this Court were to find to the contrary, Mr. Rapaport has suffered substantial special damages, as discussed below. These factors clearly establish Plaintiffs' claim for defamation and defamation per se against all Defendants.

### H. Resulting Damages

Defendants' defamations were made as part of a coordinated attack against Mr. Rapaport and caused significant and irreparable damage to both his reputation and that of his Podcast. Prior to the 24-hour window in which Mr. Rapaport was terminated, Mr. Rapaport's Podcast had received only a single Apple Podcasts rating accusing him of having herpes or of being a racist. (SOMF ¶361). The accusation of racism occurred after Barstool called Mr. Rapaport a "low key racist." (SOMF ¶361). Likewise, Mr. Rapaport had never been accused in his Apple Podcasts ratings of being a stalker or a fraud or beating women. (SOMF ¶362). However, immediately after Defendants began making their defamatory statements about Mr. Rapaport, his Podcast was swarmed with thousands of negative reviews and negative comments repeating Defendants' vile statements. (SOMF ¶363). This not only led to a massive drop in users and financial crippling of the Podcast, but it evidences the extent that audiences perceived Barstool's accusations as true. (SOMF ¶¶365-66). Even today, when searching "Michael Rapaport" on Bing, the first related search recommendation is "michael rapaport herpes." (SOMF ¶359). Defendants' defamations also resulted in significant emotional and physical hardship to Mr. Rapaport. (SOMF ¶¶374-97).

DATED: March 6, 2020

**KING & BALLOW**

By: /s/Richard S. Busch
      Richard S. Busch (SB 5613)
      *Attorney for Plaintiffs*
      *Michael Rapaport and Michael*
      *David Productions, Inc.*
      1999 Avenue of the Stars, Suite 1100
      Century City, CA 90067