UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

**MICHAEL RAPAPORT and MICHAEL DAVID PRODUCTIONS, INC.,**

        **Plaintiffs,**

    **-against-**

**BARSTOOL SPORTS, INC., ADAM SMITH, KEVIN CLANCY, ERIC NATHAN and DAVID PORTNOY,**

        **Defendants.**

:
:
:
:
:
:
:
:
:

**Case No. 1:18-CV-08783**

**PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS**

-------------------------------------- X

-------------------------------------- X

**BARSTOOL SPORTS, INC.,**

        **Counterclaimant,**

    **-against-**

**MICHAEL RAPAPORT and MICHAEL DAVID PRODUCTIONS, INC,**

        **Cross-Defendants.**

:
:
:
:
:
:
:

-------------------------------------- X

Pursuant to Local Civil Rule 26.1, and Individual Practices of Naomi Reice Buchwald, Section 2(F), Plaintiffs Michael Rapaport ("Mr. Rapaport") and Michael David Productions, Inc. (collectively "Plaintiffs") respectfully submit this Statement of Material Facts, together with references to supporting evidence, in support of their Motion for Summary Judgment:

## I.     BACKGROUND FACTS

### A.  Background on Plaintiffs Pre-Talent Agreement

1.  Mr. Rapaport is an award-winning actor, comedian, and personality. / FAC ¶20; Declaration of Jacob Vega ("Vega Decl.") ¶34 (RAP023712).

2.  Mr. Rapaport is credited with over a hundred acting roles, over a thirty-year period, in addition to credits for directing, producing, and writing. / FAC ¶20.

3.  Michael David Productions, Inc. is a California Corporation, owned by Mr. Rapaport. / FAC ¶14.

4.  In 2014, Mr. Rapaport launched a podcast titled "I AM RAPAPORT: STEREO PODCAST." ("Plaintiffs' Podcast") / FAC ¶21; Declaration of Jordan Winter ("Winter Decl.") ¶4.

5.  Pursuant to an agreement with CBS (the "CBS Agreement"), Plaintiffs' Podcast was broadcast on CBS Radio from approximately June 16, 2015 until June 16, 2017. / FAC ¶21; Declaration of Richard Busch ("Busch Decl.") ¶44 (Deposition of Michael Rapaport 182:19-183:3); Winter Decl. ¶5.

6.  The CBS Agreement was set to automatically renew after consecutive, one-year terms unless a party to the agreement provided to the other party a written notice to terminate no less than thirty days before the end of a term. In the event that Plaintiffs terminated the CBS Agreement, Plaintiffs would be barred from distributing content by means of a podcast unless CBS was afforded a right of first refusal to match the terms between Plaintiffs and any third parties. /

FAC ¶22.

7.  On or about this time, Mr. Rapaport began producing and uploading short videos known as "rants" ("Rants") to his social media handles, including Twitter, Instagram, and YouTube. / FAC ¶23; Declaration of Michael Rapaport ("Rapaport Decl.") ¶7.

8.  In 2015, Mr. Rapaport was showcased by CBS at the industry's first ever Podcast Upfront. / Declaration of Rena Unger ("Unger Decl."), ¶25 (Attachment 1, Pages 14-15).

9.  Podcast Upfront is an event that allows for talent platforms to showcase their network and pitch their content to advertisers. / Unger Decl. ¶27 (Attachment 1, Pages 14-15).

10. Presenting companies are only afforded limited time to present their content and are very selective about the hosts they invite. / Unger Decl. ¶30 (Attachment 1, Pages 14-15).

11. The CBS Radio Play.it team introduced Mr. Rapaport as their "shining sports and male lifestyle star." / Unger Decl. ¶31 (Attachment 1, Page 14).

12. Mr. Rapaport received very favorable feedback from the event and was regarded as a highlight of the event. / Unger Decl. ¶32 (Attachment 1, Page 14).

13. In response to feedback from the event, Mr. Rapaport was invited to host Podcast Upfront the following year. / Unger Decl. ¶33 (Attachment 1, Page 14).

14. This invitation was provided following consultation by IAB with high level executives at Performance Bridge (now Veritone) and AdResults, who were in attendance the previous year. / Unger Decl. ¶33 (Attachment 1, Page 15).

15. Veritone and AdResults are two of the top three advertising agencies globally. / Unger Decl. ¶34 (Attachment 1, Page 15).

16. Ms. Unger, who produced both Podcast Upfront events, received very positive feedback from attendees about Mr. Rapaport and was told by attendees that they had clients in mind who

would want to buy advertising spots on his show. / Unger Decl. ¶36 (Attachment 1, Page 15).

17. The 2016 Podcast Upfront took place on September 7, 2016, a week before Barstool Sports ("Barstool") first reached out to Mr. Rapaport about joining their network. / Unger Decl. ¶33 (Attachment 1, Page 14); FAC ¶26; Defendant's Answer to FAC ¶26.

18. Barstool was not the only company that made inquiries to Mr. Rapaport about joining their platform. / Winter Decl. ¶72 (RAP022732-RAP022737).

**B. Background on Defendants Pre-Talent Agreement**

19. Barstool is a Delaware corporation that is in the business of running a sports and popular culture website at www.barstoolsports.com. / FAC ¶15; Busch Decl. ¶35 (Deposition of David Portnoy, 25:2-26:8).

20. The services provided by Barstool include: website, radio, podcasts, articles, blogs, newspaper, and merchandise. / Busch Decl. ¶35 (Deposition of David Portnoy, 23:25-24:13).

21. Each of the Defendants in this case were employed by Barstool during the timeline of events described herein and at issue in this litigation (and continue to be employed by Barstool).

   a. Adam Smith ("Mr. Smith") / Busch Decl. ¶42 (Deposition of Adam Smith, 14:25-15:2, 25:17-19).

   b. Kevin Clancy ("Mr. Clancy") / Busch Decl. ¶39 (Deposition of Kevin Clancy, 10:20-11:8).

   c. Eric Nathan ("Mr. Nathan") / Busch Decl. ¶36 (Deposition of Eric Nathan, 9:1-9:5).

   d. David Portnoy ("Mr. Portnoy") / Busch Decl. ¶35 (Deposition of David Portnoy, 61:2-4; 131:1-7).

22. Keith Markovich ("Mr. Markovich"), who is discussed herein, was also employed by Barstool

as its editor-in-chief during the timeline of events described herein and at issue in this litigation (and continues to be employed by Barstool). / Busch Decl. ¶47 (Deposition of Kevin Clancy, 9:19-23; 15:3-12).

23. Erika Nardini ("Ms. Nardini"), who is discussed herein, was also employed by Barstool as its CEO during the timeline of events described herein and at issue in this litigation (and continues to be employed by Barstool). / Busch Decl. ¶39 (Deposition of Erika Nardini, 29:15-16; 40:1-10).

24. Ms. Nardini was designated as Barstool's 30(b)(6) expert as to all categories of Plaintiffs' 30(b)(6) request other than topics 5, 24, and 25. / Busch Decl. ¶39 (Deposition of Erika Nardini, 25:5-26:13).

**C. Plaintiffs' Interactions with Defendants**

25. On September 15, 2016, Dan Katz, an employee of Barstool, reached out to Mr. Rapaport about a potential partnership with Barstool, wherein Mr. Rapaport would move his Podcast from CBS to Barstool's network and create content exclusively for Barstool. / FAC ¶26; Defendants' Answer to FAC ¶26; Rapaport Decl., ¶9.

26. Following Mr. Katz' introduction to Mr. Rapaport, Mr. Rapaport was put in contact with Mr. Portnoy. FAC ¶26; Defendants' Answer to FAC ¶26; Rapaport Decl. ¶6.

27. Mr. Portnoy is the founder of Barstool, and he continues to serve as its head of content. / Busch Decl. ¶36 (Deposition of David Portnoy, 61:2-4, 81:5-8).

28. On October 20, 2016, after meeting with Mr. Rapaport for the first time, Mr. Portnoy emailed Mr. Rapaport and noted that he felt Mr. Rapaport was a "huge name" and that he would like for the following terms to be part of an agreement between Mr. Rapaport and Barstool:

   - Daily Radio Show 3-5 EST (You could tape live from LA. We'd get you everything

you need)

- Podcast joins our podcast network

- We post all your videos you make on Barstool but they can go anywhere.

- Essentially when you do any other digital or radio gigs it's "Michael Rapaport from Barstool Sports"

/ Busch Decl. ¶2 (BARSTOOL000162); FAC ¶26.

29. Although Mr. Rapaport told Mr. Portnoy that he was interested in entering into a deal with Barstool, he disclosed that he was under contract with CBS for his Podcast until May. / Busch Decl. ¶3 (BARSTOOL000178).

30. Between December 17, 2016 and June 17, 2017, draft talent agreements were exchanged between Mr. Rapaport and his representatives and Barstool. / Busch Decl. ¶4 (BARSTOOL000258); Busch Decl. ¶5 (BARSTOOL000260 - BARSTOOL000266).

31. In compliance with CBS' right of first refusal, a term sheet ("Term Sheet") was provided to CBS on May 17, 2017 signed by both Ms. Nardini and Mr. Rapaport. / Rapaport Decl. ¶¶47-48 (RAP002022; RAP002023).

32. On May 19, 2017, CBS informed Mr. Rapaport that it was foregoing its right of first refusal and would not be matching the terms of the Term Sheet. CBS further noted that if the terms of Mr. Rapaport's agreement were altered from those of the Term Sheet, CBS's right of first refusal would continue to remain in effect. / Rapaport Decl. ¶49 (RAP002040).

33. Although CBS did not match the terms of the Term Sheet, Mr. Rapaport's podcast remained on CBS through June 16, 2017 before switching over to Barstool on June 17, 2017. / Winter Decl. ¶31 (RAP002596).

34. On May 31, 2017, the Talent Agreement was entered into between Mr. Rapaport, Michael

David Productions, Inc. and Barstool Sports, Inc. with an execution date of June 17, 2017. / Winter Decl. ¶73 (RAP002313); Rapaport Decl. ¶50 (RAP002314); FAC ¶36; Defendants' Answer to FAC ¶36.

35. At the time of his hiring, Barstool promoted Mr. Rapaport's "absurd, dominant, unique social media presence and the unfiltered comments everyone loves." / FAC ¶42.

36. The contractual Term of the Talent Agreement was from June 17, 2017 until June 16, 2018. / Rapaport Decl. ¶50 (RAP002314); Busch Decl. ¶39 (Deposition of Erika Nardini 142:9-11).

37. Mr. Rapaport worked for Barstool as an independent contractor under the terms of the Talent Agreement from June 17, 2017 until February 18, 2018 when he was terminated by Mr. Portnoy. / FAC ¶¶36, 51; Rapaport Decl. ¶50 (RAP002314); Vega Decl. ¶75.

38. Leading up to and continuing after Mr. Rapaport's termination, Defendants made numerous statements alleged by Plaintiffs to be defamatory. / Vega Decl. ¶65 (List of Defamatory Statements (with dates)); FAC ¶¶6-8.

39. On February 18, 2018, Barstool began selling a t-shirt with a picture of Mr. Rapaport that purported to show him with herpes ("Herpes T-Shirt"). / Winter Decl. ¶37 (RAP022635); Winter Decl. ¶39 (RAP022660); FAC ¶57.

40. On February 19, 2018, a cease and desist letter was sent to Barstool on behalf of Mr. Rapaport's then legal counsel for Barstool to stop selling the Herpes T-Shirt. This letter was then immediately posted on Barstool's website, wherein it mocked Mr. Rappaport. / FAC ¶99; Vega Decl. ¶9 (RAP023732- RAP023742).

41. In response to receiving the cease and desist letter, Barstool noted in an internal email on February 19, 2018, "It can't hurt to have it up in the store since we are driving people to the store for rap clown shirts." / Busch Decl. ¶27 (BARSTOOL008918).

42. On February 21, 2018, Barstool sent a letter in response to the February 19, 2018 letter refusing to discontinue selling the herpes t-shirt or making comments and content related to Mr. Rapaport. / Busch Decl. ¶30 (BARSTOOL009004- BARSTOOL009007).

43. On February 23, 2018, Mr. Rapaport's then legal counsel sent a letter in response to the February 21, 2018 letter reaffirming Mr. Rapaport's legal position. / Busch Decl. ¶31 (BARSTOOL009054- BARSTOOL009057).

44. On September 25, 2018, Plaintiffs filed their original Complaint. / (Complaint, Dkt. No. 1)

45. On September 12, 2019, Plaintiffs filed their First Amended Complaint ("FAC"). / (FAC, Dkt. No 60).

## II.   COUNT I OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT / BARSTOOL SPORTS' COUNTERCLAIM

46. This section incorporates by reference all statements in paragraphs 1-45 of this Statement of Material Facts.

### A. Basis of Claims

47. Section 8 of the Principal Agreement of the Talent Agreement ("Principal Agreement") provides that Plaintiffs were to receive a $200,000 Rant Guarantee and a $400,000 Podcast Guarantee from Barstool. / Rapaport Decl. ¶50 (RAP002315).

48. Section 10 of the Principal Agreement notes that $200,000 would be "paid within ten (10) business days of the execution of this Agreement, and the remaining $400,000 will be paid in three equal installments within thirty (30) days of the end of the 2nd, 3rd, and 4th quarters of the Term. Each payment hereunder shall be deemed to be allocated 1/3rd towards the Rant Guarantee and 2/3rds towards the Podcast Guarantee." / Rapaport Decl. ¶50 (RAP002316).

49. Contrary to the above payment structure, Plaintiffs received two checks for $200,000 apiece. The later of these payments was received on December 1, 2017. / Winter Decl. ¶34

(RAP014476); Winter Decl. ¶35 (RAP018382); Winter Decl. ¶36 (RAP018701).

50. Barstool never paid to Plaintiffs the last $200,000 of Podcast and Rant guarantees under the Talent Agreement. / Winter Decl. ¶26; FAC ¶72; Barstool Sports' Counterclaim ¶23.

51. Under Section 3 of the Standard Terms of the Talent Agreement ("Standard Terms"), "In the event the Term is terminated by Barstool for convenience or by [Mr. Rapaport] due to Barstool's material breach, the Rant Guarantee and Podcast Guarantee will be due and payable in full." Alternatively, if the Talent Agreement is terminated by Barstool for Mr. Rapaport's material breach, "any pre-paid portions of [Mr. Rapaport's] Guarantees will immediately be refunded to Barstool and the only amounts owed to [Mr. Rapaport] by Barstool will be [his] share of any Rant Revenue or Podcast Revenue collected by Barstool through the date of termination." / Rapaport Decl. ¶50 (RAP002319).

52. According to Barstool, the Rant and Podcast revenue collected by Barstool that was attributable to Mr. Rapaport as of February 5, 2018 was at least $417,646, with only $182,354 remaining in possible recoupment to Barstool. / Busch Decl. ¶26 (BARSTOOL008757).

53. Count 1 of Plaintiffs' FAC seeks $200,000 for the unpaid Rant and Podcast guarantees under the Talent Agreement under the basis that the Talent Agreement was terminated improperly by Barstool for convenience. / FAC ¶¶ 52, 69-73.

54. Conversely, Barstool's Counterclaim seeks $400,000 (the amount of paid Guarantees) under the purported basis that Barstool terminated the Talent Agreement for cause as a result of Plaintiffs allegedly breaching the Talent Agreement in four material ways. / Barstool Sports' Counterclaim ¶¶45-50.

55. The first way that Barstool purports that Plaintiffs breached the Talent Agreement is that "Rapaport brought himself and Barstool into public disrepute by, among other things, attacking

Barstool and Stoolies in violation of Paragraph 3.a. of the Standard Terms." / Barstool Sports'
Counterclaim ¶48(a).

56. The second way that Barstool purports that Plaintiffs breached the Talent Agreement is that
"during the term of the Talent Agreement, Rapaport regularly made media appearances in
which he promoted himself but did not promote or reference that he worked for Barstool in
violation of Paragraph 2 of the Talent Agreement." / Barstool Sports' Counterclaim ¶48(b).

57. The third way that Barstool purports that Plaintiffs breached the Talent Agreement is that
"during the term of the Talent Agreement, Rapaport generated harassing content in violation
of Paragraph 1.b. of the Standard Terms." / Barstool Sports' Counterclaim ¶48(c).

   a. In Barstool's Counterclaim, it specifically refers to Mr. Rapaport's comments about
      Mr. Smith. However, Mr. Portnoy has acknowledged that these statements were
      acceptable and given that Mr. Rapaport was attacked first, "he can do anything." /
      Barstool Sports' Counterclaim ¶¶27-30; Vega Decl. ¶48 (RAP023506 (2:00)).

58. The fourth way that Barstool purports that Plaintiffs breached the Talent Agreement is that
"during the term of the Talent Agreement, Rapaport did not provide the 'rant' videos at least
two times per week in violation of Paragraph 1 of the Talent Agreement." / Barstool Sports'
Counterclaim ¶48(d).

59. Mr. Portnoy could not recall during his deposition ever telling Mr. Rapaport to do more rants.
/ Busch Decl. ¶36 (Deposition of David Portnoy, 191:7-12).

60. Barstool's CEO, Erika Nardini, was had no understanding of Barstool's counterclaim against
Mr. Rapaport or why it had been brought. / Busch Decl. ¶39 (Deposition of Erika Nardini
156:19-157:24).

61. According to Ms. Nardini, Mr. Rapaport was terminated because he tweeted on February 17,

2018, "if you call yourself a fucking stoolie for real, you've already lost in life" ("February Tweet"). / Winter Decl. ¶63 RAP0590; Busch Decl. ¶39 (Deposition of Erika Nardini 147:15-19).

62. The February Tweet made in the context of a promotional feud by Barstool and was not an attack on the entire Barstool community, nor was it meant as such. / Rapaport Decl. ¶¶30-36; Declaration of Daniel Durbin ("Durbin Decl.") ¶¶19-21 (Attachment 1, Pages 16-17).

**B. Barstool Failed to Provide Contractually Required Notice and An Opportunity to Cure**

63. Under Section 3 of the Standard Terms, "either party may terminate this Agreement at any time for cause upon the other's material breach of this Agreement, which is not cured within fifteen (15) days' written notice thereof." / Rapaport Decl. ¶50 (RAP002319); Busch Decl. ¶39 (Deposition of Erika Nardini 147:8-14, 185:14-186:17).

64. Alternatively, under Section 5 of the Principal Agreement, "either party may terminate this Agreement for convenience upon 90 days' written notice to the other at any time during the Term." / Rapaport Decl. ¶50 (RAP002315).

65. Ms. Nardini acknowledges that "If Barstool wanted to terminate the agreement for convenience, it was required to provide 90 days written notice to Mr. Rapaport." / Busch Decl. ¶39 (Deposition of Erika Nardini 142:12-16).

66. Section 3 of the Standard Terms does note, however, that Barstool has "the right to immediately terminate this Agreement upon written notice to you in the event that you […] engage in conduct that brings you or Barstool into public disrepute." / Rapaport Decl. ¶50 (RAP002319).

67. According to Section 1(b) of the Standard Terms, "You agree that while Barstool encourages you to be you, and recognizes that certain topics may generate controversy, in no event should

any episode of the Content include content which (i) is racist or homophobic; (ii) would constitute harassment; (iii) promotes illegal behavior, (iv) infringes upon the intellectual property rights of any third party, or (v) violates the right of privacy of any individual." / Rapaport Decl. ¶50 (RAP002319).

68. Barstool never provided Plaintiffs 90 days' written notice that the Talent Agreement was going to be terminated. / Busch Decl. ¶39 (Deposition of Erika Nardini 142:12-143:1).

69. Barstool never provided Plaintiffs 15 days' written notice alleging a breach of the Talent Agreement or an opportunity to cure any alleged breach prior to terminating the Talent Agreement. / Busch Decl. ¶39 (Deposition of Erika Nardini 136:1-137:9, 185:14-186:17).

**C.  Barstool is a Brand Built on Controversy**

70. Barstool actively promotes itself as "The disruptive and captivating brand, known for its raw and authentic take on most everything" and "the controversial brand that people love or love to hate." / Vega Decl. ¶34 (RAP023712).

71. Mr. Portnoy acknowledged on the HBO program "Real Sports with Bryan Gumbel" during a segment about Barstool that "I monetize chaos."  Vega Decl. ¶69 (RAP023514 (0:41-0:47)).

72. Ms. Nardini acknowledged this year that Barstool is a "company that thrives on drama." / (Dkt. No. 76-2).

73. Ms. Nardini acknowledged in January 2018, "This is a company that intentionally is not PC." / Vega Decl. ¶12 (RAP022789); Busch Decl. ¶39 (Deposition of Erika Nardini, 46:14-25).

74. As part of its brand, Barstool encourages fighting among its employees, such as for the promotion of a fight. Vega Decl. ¶48 (RAP023506 (7:50-7:59)); Vega Decl. ¶67 (RAP23502 (6:55- 7:02); Durbin Decl. ¶¶9-18 (Attachment 1, 10-13).

75. Barstool works to expand its audience through promoting conflict, particularly among its

employees. / Durbin Decl. ¶12 (Attachment 1, Page 11).

76. Barstool employees, Mr. Portnoy included, have routinely been involved in public controversy, including:

    a.  Mr. Portnoy filming Mr. Smith in the shower without his permission and posting it online. / Busch Decl. ¶35 (Deposition of David Portnoy 151:9-154:14).

    b.  Mr. Portnoy using fake credentials to sneak into the Super Bowl, whereby he was thrown out in handcuffs. / Vega Decl. ¶69 (RAP023514 (0:01-0:46)); Vega Decl. ¶4 (RAP022468-RAP022471).

    c.  Mr. Portnoy being arrested for a sit-in at NFL headquarters. / Vega Decl. ¶12 (RAP022793); Vega Decl. ¶17 (RAP023059).

    d.  Mr. Portnoy calling ESPN host Sam Ponder a slut and "a chick that has a job where the #1 requirement is you make men hard." These statements resulted in Barstool losing a television partnership deal with ESPN. Vega Decl. ¶20 (RAP023195); Busch Decl. ¶35 (Deposition of David Portnoy 107:2-17).

    e.  Mr. Portnoy stating, "Even though I never condone rape, if you're a size 6 and you're wearing skinny jeans you kind of deserve to be raped right? I mean skinny jeans don't look good on size 0 and 2 chicks, nevermind size 6′s." Vega Decl. ¶6 (RAP022522).

    f.  In 2012, when defending Blackout Parties to protesters, Portnoy said, "Just to make friends with the feminists I'd like to reiterate that we don't condone rape of any kind at our Blackout Parties in mid- January. However if a chick passes out that's a grey area though." Vega Decl. ¶6 (RAP022522).

    g.  Mr. Clancy being caught cheating on his pregnant wife. / Vega Decl. ¶21

(RAP022491-RAP022496); Busch Decl. ¶39 (Deposition of Kevin Clancy 48:5-54:14). Mr. Portnoy acknowledged that the incident wasn't great for Barstool's brand. / Busch Decl. ¶35 (Deposition of David Portnoy, 125:24-126:19).

    h.  Mr. Portnoy was asked by Boston police to remove a zoomed-in image of Tom Brady's naked toddler son in a blog post about the size of the child's genitals / Vega Decl. ¶40 (RAP023989); Vega Decl. ¶63 (RAP024000 (0:12-1:00)).

77. Barstool, including Mr. Portnoy specifically, are frequently criticized as being sexist and racist. / Busch Decl. ¶35 (Deposition of David Portnoy 85:12-20, 107:18-109:17).

78. When Ms. Nardini became the CEO of Barstool, she lost several friends because of Barstool's reputation. / Vega Decl. ¶12 (RAP022789); Busch Decl. ¶39 (Deposition of Erika Nardini, 44:4-14).

79. After the Philly-area gaming corporation Penn National purchased a $163 million stake in Barstool Sports, its Senior VP recognized a need to have no more "comments that might be deemed as harassment or discrimination of women or minorities, for example." / Vega Decl. ¶40 (RAP023987-RAP023991); Vega Decl. ¶41 (RAP023992-RAP023995).

**D.  Lack of Barstool Guidelines**

80. According to Ms. Nardini, she is unaware of Barstool ever terminating an employee for posting or providing content that was too controversial, too racist, too sexist, or too negative towards Barstool fans. / Busch Decl. ¶39 (Deposition of Erika Nardini 75:8-19).

81. According to both Mr. Portnoy and Ms. Nardini, Barstool has an employee handbook governing employee conduct. / Busch Decl. ¶35 (Deposition of David Portnoy 87:7-11); Busch Decl. ¶39 (Deposition of Erika Nardini 69:1-3).

82. Neither Mr. Portnoy nor Ms. Nardini are aware of the contents of this employee handbook. /

Busch Decl. ¶35 (Deposition of David Portnoy 87:12-16); Busch Decl. ¶39 (Deposition of Erika Nardini 69:12-25).

83. Neither Mr. Portnoy nor Ms. Nardini recall an employee handbook ever being provided to Mr. Rapaport. / Busch Decl. ¶36 (Deposition of David Portnoy 87:21-25).

84. No proof of the handbook has ever been provided to Plaintiffs' counsel despite repeated request for copies of this handbook. / Busch Decl. ¶39 (Deposition of Erika Nardini 86:4-87:13); Busch Decl. ¶40 (September 19, 2019 letter ("We also are unwilling to provide the employee handbook"); Defendants' Response to Plaintiffs' First Request for Production of Documents, Request 5 ("All documents concerning Your Allegation on paragraph 24 of the Counterclaim that Plaintiffs did not comply with their obligations under the Talent Agreement."), Request 6 ("All documents concerning your allegation in paragraph 25 of the Counterclaim that Rapaport engaged in conduct that brought himself and Barstool into "public disrepute" in violation of the Talent Agreement."), Request 7 ("All documents concerning Your allegations in paragraphs 34, 35, 36 & 37 of the Counterclaim that Rapaport violated the Talent Agreement in at least three other material ways."), Request 8 ("All documents concerning Your allegation in Paragraph 38 of the Counterclaim that Rapaport had been violating the terms of the Talent Agreement for months."), Request 13 ("All documents concerning Your allegation in Paragraph 48 of the Counterclaim that Rapaport and MDP breached the Talent Agreement in at least four material ways.").

85. Barstool requested Mr. Rapaport play the role of a bombastic "bud guy" around the "Rough N' Rowdy" pay-per-view fights for promotion and to attract viewership. / Rapaport Decl. ¶7.

86. In a June 2, 2017 video titled "Emergency Press Conference – I Hate Moron Stoolies," Mr. Portnoy publicly stated, "There are no rules. People say, 'You used to do this, you used to do

that.' I do what I want. When I want. All the time. Those are the only fucking rules that there are at this company." Vega Decl. ¶56 (RAP023614 (1:42-1:52)).

87. On February 19, 2018, in a video titled "Dave Portnoy on Barstool Breakfast: Biting the Hand that Feeds You":

    a.  A Barstool host, Willie, stated in the video that he wasn't aware "that the whole calling Stoolies a loser thing" was a terminable offense "because I've heard that traditional so to speak guys who made their name in the business go after their fan base and their fan base tune right back in. How come the line was drawn here because the nature, and I've talked to Francis and Francis has pretty much told us 'listen, it's hard to get fired. Dave doesn't fire anybody. This is kind of a royal rumble type atmosphere and we all swinging at each other.'" Vega Decl. ¶67 (RAP023502 (4:05- 4:50)).

    b.  Willie continued by noting that there is a "mixed message to some degree that you can shoot at everybody but this one thing is the line." Vega Decl. ¶78 (RAP023502 (4:52-4:58)).

    c.  Willie also noted that he felt that the firing felt like a 180 when "the culture is that there that there is no line." Vega Decl. ¶67 (RAP023502 (4:55-5:03)).

    d.  Mr. Portnoy acknowledged that it was a 180. Vega Decl. ¶67 (RAP023502 (4:55-5:03)).

    e.  Willie later stated, "Isn't it kinda choose when to be sensitive to certain issues? […] Like you can't choose when to be sensitive." Vega Decl. ¶67 RAP023502 (6:34-6:40)).

    f.  When Willie asked Mr. Portnoy if the takeaway from the conversation is whether

the line is "don't talk about Stoolie nation and everything else is on the table," Mr. Portnoy responded, "Yeah, I mean and Willie, I never really know what the line is. I didn't expect to have to say the line is don't insult seriously your entire fan base and everyone who likes you. That isn't a line I thought I'd ever be addressing." Vega Decl. ¶67 (RAP023502 (13:26-13:50)).

88. Mr. Portnoy publicly stated on February 19, 2018, in a video titled "Barstool Rundown – February 19, 2018" that "one of the things about Barstool, I'll probably say it on our show too, is that there isn't a standard line. Like we are pretty good. Like every situation is different." Vega Decl. ¶68 (RAP023508 (5:14-5:22)). Mr. Portnoy further stated, "You can afford to be who you can afford to be." (5:30-5:33). Mr. Clancy responded by stating "Rapaport is a different standard." Vega Decl. ¶68 (RAP023508 (5:38-5:39)). Mr. Portnoy, Mr. Clancy, and Mr. Katz agreed that the issue was that Mr. Rapaport wasn't bringing in enough money to make the statement that Barstool is claiming as the basis for his termination. Vega Decl. ¶68 (RAP023508 (5:50-6:05)).

89. In a February 20, 2018 video titled "Stool Scenes Episode 52 – IAMCRAPAPORT STEREO FRAUDCAST," Mr. Portnoy publicly stated "I have no rules. Like there aren't if you cross this line you get fired, if you do this, you get fired. Every situation is different." Vega Decl. ¶48 (RAP023506 (2:19-2:25)). Mr. Portnoy further stated in the same video, "There are no rules. Like our rules are if you are doing more damage than good, then we'll get rid of you." Vega Decl. ¶48 (RAP023506 (6:30-6:36)).

**E. Barstool Actively Participates in Attacks Against Its Fans**

90. Barstool operates in an online ecosystem where insulting fans is expected and part of its culture. / Durbin Decl. ¶¶9-18 (Attachment 1, Pages 10-13).

91. Mr. Portnoy has acknowledged on numerous occasions that attacking fans and "killing the comment section," is part of what Barstool does, himself included. Vega Decl. ¶67 (RAP023502 (5:59-6:04, 7:27-7:33)); Vega Decl. ¶68 (RAP023508 (6:08-6:12)).

92. Mr. Portnoy himself has called Stoolies "morons," "losers," and "braindead idiots." Vega Decl. ¶22 (RAP023558); Vega Decl. ¶56 (RAP023614 (0:18-22, 0:34-0:36, 0:55-1:01)).

93. On October 13, 2017, Mr. Portnoy told Mr. Rapaport in the video titled "Stool Scenes Episode 36 (Part 2)" that he would not be punished for attacking Barstool, including if such attacks were made on Twitter. / Vega Decl. ¶70 (RAP023507 (12:47-13:07)).

94. The October 13, 2017 discussion was in response to a feud between a Barstool host and Mr. Rapaport's co-host, Tommy G. Vega Decl. ¶70 (RAP023507 (10:50-14:14)). This feud started from the Barstool host calling Tommy G "Prison Mike," and including repeated accusations that he was a lunatic. Vega Decl. ¶70 (RAP023507 (10:33, 10:52 13:09)); Winter Decl. ¶49 (RAP022858); Rapaport Decl. ¶¶19-29.

95. As part of this feud, Tommy G tweeted, "LETS GO STOOLIES….U FUCKING BASEMENT DWELLING LOSERS……COME AT ME AND DEFEND UR KING U FUCKIN NOBODIES!! COME AT ME!" Winter Decl. ¶50 (RAP022873).

96. This feud was promoted in the October 13, 2017 video titled, "Stool Scenes Episode 36 (Part 2)" and included a discussion between various Barstool employees, including Mr. Portnoy, with Tommy G over the radio. Vega Decl. ¶70 (RAP023507 (10:50-14:14)).

97. Despite the feud, Barstool never expressed a desire to Mr. Rapaport to remove Tommy G from his show. / Rapaport Decl. ¶¶25-29. Instead, he was invited onto the radio program where he and Barstool laughed it off. Rapaport Decl. ¶27.

98. Mr. Portnoy acknowledged during his deposition that he has heard Barstool employees talk

about Stoolies being losers. / Busch Decl. ¶35 (Deposition of David Portnoy, 214:2-5).

99. Mr. Portnoy acknowledged in his deposition that he has seen social media posts describing Stoolies as losers. / Busch Decl. ¶35 (Deposition of David Portnoy, 214:16-18).

**F. Mr. Rapaport's Termination Was Pretextual and Barstool Had Already Decided to Get Rid of Him**

100.    Even prior to the February Tweet, Barstool had already decided as early as October 2017, in an email drafted by Barstool's then Head of Programming and Strategy Mark Kohn to Ms. Nardini, that it probably wouldn't be renewing Mr. Rapaport's contract. Mr. Portnoy acknowledged during his deposition that the decision of whether to renew Mr. Rapaport's contract would have been based on conversations with Mr. Kohn and Ms. Nardini. Mr. Portnoy has likewise stated that Barstool probably wasn't going to renew Mr. Rapaport's contract. / Busch Decl. ¶24 (BARSTOOL008089); Winter Decl. ¶47 (RAP022845); Vega Decl. ¶48 (RAP023506 (5:00-5:02)). Mr. Portnoy further acknowledge that Barstool wasn't going to renew Mr. Rapaport on Barstool radio after his termination. When asked, "If this wouldn't have happened, would his contract have been renewed," Mr. Portnoy responded, "No, we weren't going to renew him." / Winter Decl. ¶69 (RAP023529 (0:28:0:33)

101.    In line with this decision not to renew Mr. Rapaport's contract, Barstool had already begun moving content away from Mr. Rapaport and secretly blocking him from entering into new contracts. / Busch Decl. ¶19 (BARSTOOL003352); Busch Decl. ¶20 (BARSTOOL003385); Busch Decl. ¶21 (BARSTOOL003391); Busch Decl. ¶22 (BARSTOOL003394).

102.    Mr. Portnoy publicly stated on February 20, 2018, in a video titled, "Stool Scenes Episode 52 – IAMCRAPAPORT STEREO FRAUDCAST", the following:

    a.   "I have no rules. Like there aren't if you cross this line you get fired, if you do this, you get fired. Every situation is different. Its…if you are doing more damage than

you are good, than you're gone. I mean if Big Cat or KFC or PFT were like 'Stoolies are losers' I'm probably not going to fire them…I'm definitely not going to fire them." Vega Decl. ¶48 (RAP023506 (2:19-2:39)).

    b.  "There are no rules. Like our rules are if you are doing more damage than good, then we'll get rid of you. Like if Dan or KFC said what he said, we wouldn't fire them. It's like a…everybody is treated differently, and he's not bringing in nearly enough to be like Stoolies fucking suck." Vega Decl. ¶48 (RAP023506 (6:30)).

103.    In a February 26, 2018 video titled "Best of Barstool Radio Week 60 – You're Fired" Mr. Portnoy publicly stated that, "Again, everyone is different. Like if for some reason something went absolutely…and the only one I could think who would ever, and he wouldn't but let's use PFT who's not as established. Obviously Kevin and Dan are. They have been here for fucking decades so it's not…they aren't going to be the ones who ever…but PFT was relatively new, and he would never do it either. PFT is too valuable for us. If PFT actually said that, we'd have to discuss it." Vega Decl. ¶46 (RAP023503 (13:34-14:04)).

104.    Mr. Portnoy publicly acknowledged designing the Herpes T-Shirt prior to Mr. Rapaport being fired and just waiting for him to say something stupid. / Vega Decl. ¶48 (RAP023506 (2:58-3:26)).

## III.    COUNTS IX AND X OF PLAINTIFFS' FIRST AMENDED COMPLAINT: FRAUDULENT INDUCEMENT AND CONCEALMENT / COUNT II OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 12 OF PRINCIPAL AGREEMENT)

105.    This section incorporates by reference all statements in paragraphs 1-104 of this Statement of Material Facts.

106.    Pursuant to the CBS Agreement, Plaintiffs' Podcast was broadcast on CBS Radio from approximately June 16, 2015 until June 16, 2017. / FAC ¶21.

107.    The CBS Agreement was set to automatically renew after consecutive, one-year terms unless a party to the agreement provided to the other party a written notice to terminate no less than thirty days before the end of a term. In the event that Plaintiffs terminated the CBS Agreement, Plaintiffs would be barred from distributing content by means of a podcast unless CBS was afforded a right of first refusal to match the terms between Plaintiffs and any third parties. / FAC ¶22; Winter Decl. ¶5.

108.    On October 20, 2016, after meeting with Mr. Rapaport for the first time, Mr. Portnoy emailed Mr. Rapaport and noted that he would like for the following terms to be part of an agreement between Mr. Rapaport and Barstool:

- Daily Radio Show 3-5 EST (You could tape live from LA. We'd get you everything you need)

- Podcast joins our podcast network

- We post all your videos you make on Barstool but they can go anywhere.

- Essentially when you do any other digital or radio gigs it's "Michael Rapaport from Barstool Sports" / Busch Decl. ¶2 (BARSTOOL000162)

109.    Although Mr. Rapaport stated that he was interested to enter into a deal, he told Mr. Portnoy that he was under contract with CBS for his Podcast until May. / Busch Decl. ¶3 (BARSTOOL000178).

110.    Mr. Portnoy knew during the negotiation of the Talent Agreement that Mr. Rapaport wanted a daily radio show. / Busch Decl. ¶35 (Deposition of David Portnoy, 171:5-6).

111.    On March 1, 2017, Steve Cohen, an employee of SiriusXM, informed Ms. Nardini that he had just gotten off the phone with Mr. Rapaport and that he was "totally committed to a daily show for Barstool and could start very soon." / Busch Decl. ¶6 (BARSTOOL000336).

112.   On March 3, 2017, Andrew Moss, an employee of Sirius XM, stated the following to Ms. Nardini, "Also let me know when you want to talk Rapaport, I don't know the real window or opportunity for you to hire him but we could defray some of those costs if as part of your deal we had him host daily if you thought that made sense." / Busch Decl. ¶6 (BARSTOOL000339).

113.   On March 6, 2017, Ms. Nardini asked Steve Cohen and Andrew Moss if they would "ever do a deal arrangement where u fund the majority of rappaport cost (paid thru barstool) and we forego the rev share on top of it?" Andrew Moss responded that they would depending on the number. / Busch Decl. ¶7 (BARSTOOL000372).

114.   On March 6, 2017, Ms. Nardini spoke with Mr. Rapaport about his proposed deal with Barstool. Among the key points summarized by Ms. Nardini to Mr. Rapaport and Mr. Portnoy were:

- "Create a daily radio show for you on the Barstool channel"

- "Barstool will promote you, all your content"

- We will monetize your rants & podcast"

Busch Decl. ¶8 (BARSTOOL000391).

115.   On March 16, 2017, Ms. Nardini told Mr. Rapaport that her goal was to get the Sirius daily show "locked and loaded within 3-4 weeks." Busch Decl. ¶9 (BARSTOOL000427).

116.   On March 28, 2017, Ms. Nardini told Andrew Moss that the economics of Mr. Rapaport's radio show would be $375k. / Busch Decl. ¶11 (BARSTOOL000463).

117.   Andrew Moss responded to Ms. Nardini on March 29, 2017 by noting that Barstool's current deal with Sirius was for a year and he didn't "want to sign Michael and then our deal ends 6 months later" / Busch Decl. ¶10 (BARSTOOL000462).

118.   Ms. Nardini responded to Andrew Moss on March 30, 2017 by stating that she'd "rather re

do our deal altogether once we get a channel (eta sept?) vs extend." / Busch Decl. ¶10 (BARSTOOL000462).

119.   Andrew Moss responded to Ms. Nardini on April 5, 2017 by stating, "ETA yes fall but I really want some extension here (even 6 mths); its hard for us to invest and promote a show that could theoretically go away 6 months later. At least that makes the show a year from launch; assuming it launches call it after memorial day. And then when/if we do the channel we can rip up that deal but I just cant recommend or get approval on investing $375K in a show that basically have a 6 month commitment." / Busch Decl. ¶10 (BARSTOOL000462).

120.   On April 5, 2017, after her email with Mr. Moss, Ms. Nardini emailed Mr. Rapaport reiterating that among the "Basic components of our partnership" were "MR Rants on BSS" and "Sirius Show (daily 2 hours)." Ms. Nardini further stated that she would "call with Sirius tomorrow re: the show & when it could launch. Could be as soon as May or as late as Sept." Busch Decl. ¶10 (BARSTOOL000476).

121.   On April 12, 2017, Ms. Nardini sent a draft agreement to Mr. Rapaport that included "A 1-2 hour, weekday (i.e., 5 days a week) podcast or radio show for Barstool Radio or Barstool Radio on Sirius XM ("Sirius Show")." The agreement further stated that Mr. Rapaport would be paid for the Sirius Show "a fixed fee of $375,000 ("Radio Fee"). The Radio Fee will cover your fee, as well as any fees you choose to pay to co-hosts or producers. The Radio Fee will be paid directly to you and you will be solely responsible for any payments due to your co-hosts or producers." The email specifically highlighted, "Daily show (1-2 hours) either on Barstool Radio or as a daily podcast." / Busch Decl. ¶12 (BARSTOOL000514); Busch Decl. ¶13 (BARSTOOL000515-BARSTOOL000522).

122.   On April 20, 2017, Ms. Nardini "[t]ook out Sirius so that we can get moving with the

rants and the podcast." / Busch Decl. ¶14 (BARSTOOL000540).

123.    On April 21, 2017, Mr. Rapaport asked Ms. Nardini, "What's the ETA for negotiations

with Sirius? Our podcast is part of the Sirius deal so we want that to be secured or close to it?"

/ Busch Decl. ¶15 (BARSTOOL000556).

124.    On April 23, 2017, Ms. Nardini responded to Mr. Rapaport, noting, "Sirius should be done

in matter of weeks at most. The podcast isn't dependent on Sirius. We can move forward with

the pod and the rants now and follow up with Sirius." / Busch Decl. ¶15 (BARSTOOL000556).

125.    On April 25, 2017, Mr. Winter requested that Ms. Nardini add language into the agreement

concerning "Good faith efforts by Barstool Sports about if/when they come to terms with

Barstool Radio or Sirius XM for a channel that would lead to Lender hosting a 1-2 hour,

weekday (i.e., 5 days a week) podcast or radio show for Barstool Radio or Barstool Radio on

Sirius XM ("Sirius Show) then a fixed fee of no less than $375,000 ("Radio Fee") will be

negotiated as a separate agreement or be added as an addendum to this contract." / Busch Decl.

¶16 (BARSTOOL000592).

126.    Following Mr. Winter's April 25, 2017 request, Ms. Nardini sent an amended draft to Mr.

Winter containing language in Section 12 stating, "Barstool will use good faith efforts to secure

an opportunity for you to produce and host a 1-2 hour, weekday (i.e., 5 days a week) show in

a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a

podcast, a video series)" / Winter Decl. ¶29 (RAP001884); Winter Decl. ¶30 (RAP001892).

127.    On April 26, 2017, Section 12 of the draft Principal Agreement was adjusted to the final

language appearing in the Principal Agreement. / Rapaport Decl. ¶46 (RAP001872); Rapaport

Decl. ¶46 (RAP001879).

128.    In compliance with CBS' right of first refusal, a term sheet ("Term Sheet") was provided

to CBS on May 17, 2017 signed by both Ms. Nardini and Mr. Rapaport. / Rapaport Decl. ¶47 (RAP002022); Rapaport Decl. ¶48 (RAP002023).

129.    According to the term sheet, "Barstool Sports Agrees to compensate Michael Rapaport $600,000 for daily videos and podcast plus $375,000* for an in-development daily national radio show on the Barstool Radio SiriusXM channel. […] *Contingent on SiriusXM / Barstool Radio channel." Rapaport Decl. ¶48 (RAP002023).

130.    On May 31, 2017, the Talent Agreement was entered into between Mr. Rapaport and Michael David Productions, Inc. and Barstool Sports, Inc with an execution date of June 17, 2017. / Winter Decl. ¶73 (RAP002313); Rapaport Decl. ¶50 (RAP002314); FAC ¶27; Defendants' Answer to FAC ¶27.

131.    Section 12 of the draft Principal Agreement remained the same as the April 26, 2017 draft language that predated the Term Sheet sent to CBS. / Rapaport Decl. ¶46 (RAP001872); Rapaport Decl. ¶46 (RAP001879); Rapaport Decl. ¶50 (RAP002317).

132.    Pursuant to Section 12 of the Principal Agreement, "Barstool will use good faith efforts to secure an opportunity for you to produce and host a 1-2 hour, weekday (i.e., 5 days a week) show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series) ("Weekly Show"). In the event such a Weekly Show comes to fruition, Barstool will pay you a fixed fee of $375,000, unless otherwise agreed." / Rapaport Decl. ¶50 (RAP002317).

133.    Mr. Rapaport would not have entered into the Talent Agreement had Barstool not concealed the contents of its discussions with Sirius and of the high uncertainty of whether Barstool would be able to provide him a Weekly Show. / Rapaport Decl. ¶¶2-5.

134.    Mr. Rapaport would not have entered into the Talent Agreement had Barstool not made

false statements concerning the certainty that it would be able to provide Mr. Rapaport with a Weekly Show and that this show would happen in a matter of weeks at most. / Rapaport Decl. ¶¶2-5.

135.    The contractual Term of the Talent Agreement was from June 17, 2017 until June 16, 2018. / Rapaport Decl. ¶50 (RAP002315); Busch Decl. ¶39 (Deposition of Erika Nardini 142:9-11).

136.    On July 18, 2017, Sirius emailed Ms. Nardini and noted that "if we get there we have a fee Michael Rappaport would agree to for the daily show so he is ready to go if we get there, he would do it for $300K." / Busch Decl. ¶18 (BARSTOOL002246); Busch Decl. ¶39 (Deposition of Erika Nardini, 204:14-208:2).

137.    On August 15, 2017, Ms. Nardini emailed Sirius, stating:

> "Let's sync up when you're back on the two options.
>
> Option 1: Continue to pursue Sirius selling all Barstool audio (pod + radio) with the understanding that we are looking for a higher guarantee - while understanding that you need to manage risk.
>
> Option 2: Go back to the original discussion around creating a Barstool Radio    channel."    /    Busch.    Decl.    ¶23    (BARSTOOL007231-BARSTOOL007232).

138.    Ms. Nardini never communicated to Plaintiffs that Sirius was willing to pay $300,000 for a Weekly Show. / Busch Decl. ¶39 (Deposition of Erika Nardini, 204:14-208:2).

139.    Ms. Nardini could not recall during her deposition ever informing Mr. Rapaport about this communication. / Busch Decl. ¶39 (Deposition of Erika Nardini, 207:5-208:2).

140.    On October 19, 2019, Ms. Nardini was informed by Marc Kohn, "Rapaport: we would not re-sign him if contract was up today." / Busch Decl. ¶24 (BARSTOOL008089).

141.    On October 31, 2017, Barstool informed Sirius that, "We've removed Michael Rapaport as an initial host for reasons you and Erika can discuss." / Busch Decl. ¶19 (BARSTOOL3352).

142.    On October 31, 2017, Sirius asked Ms. Nardini, "Why was Rappaport taken out? Assume that means you aren't sure about him? I have to think about this and may be ok but wanted to just understand the reasoning." / Busch Decl. ¶20 (BARSTOOL003385).

143.    On October 31, 2017, Ms. Nardini responded to Sirius, noting, "We are having some doubts about Rapaport (we haven't shared any of this with him and aren't ruling him out but let's absolutely discuss)." / Busch Decl. ¶20 (BARSTOOL003385).

144.    On October 31, 2017, Sirius responded to Ms. Nardini, noting "Understood, ill tell scott confidentially and look first thing am." / Busch Decl. ¶20 (BARSTOOL003385).

145.    On October 31, 2017, Ms. Nardini responded to Sirius, noting, "Ok thank you. He is pretty polarizing (we are watching closely how our crowd responds to him) and expensive when you look at the $1.5" / Busch Decl. ¶20 (BARSTOOL003385).

146.    On November 1, 2017, Sirius responded to Ms. Nardini by asking, "gave comments to legal, scott's ok with the Rappaport thing. Do you care if we hire him to contribute to mad dog radio? I told them I want it back in the next hour." / Busch Decl. ¶21 (BARSTOOL003391).

147.    On November 1, 2017, Ms. Nardini responded to Sirius, noting, "We think him going on Mad Dog defeats the purpose of our bigger partnership w/ him but we are concerned about his radio fee eating too much into our $1.5." / Busch Decl. ¶22 (BARSTOOL003394).

148.    On November 17, 2017, Ms. Nardini wrote in an email to Mr. Portnoy, "Talking to Sirius this morning about funding Rapaport outside our budget." / Busch Decl. ¶43 (BARSTOOL008242).

149.    On November 18, 2017, Ms. Nardini wrote in an email to Mr. Portnoy, "Rapaport show

(Waiting on Sirius to confirm. My sense from our conversation on Friday was they will go above budget for him to have a weekly show with regular guest appearances on other barstool shows but they are not sure they want to invest more in the daily)." / Busch Decl. ¶25 (BARSTOOL008259).

150.   On December 19, 2017, Mr. Rapaport asked Ms. Nardini by text, "You don't have any idea what your doing with an entire radio station that's starting in a few weeks? Not a clue? I sent you a bunch of questions last week. Nothing." / Rapaport Decl. ¶53 (RAP023115).

151.   On January 5, 2018, Mr. Rapaport asked Ms. Nardini by text for a status update on "Sirius and Barstool in general." / Rapaport Decl. ¶53 (RAP023119).

152.   On January 5, 2018, Ms. Nardini replied to Mr. Rapaport noting, "In a bit of a shitstorm. KFC marriage going down the tubes. No word from Sirius. I need them to give us more money and I'm not sure it's happening." / Rapaport Decl. ¶53 (RAP023119).

153.   On January 10, 2018, Ms. Nardini stated, "Talked to Sirius today. Working on getting a daily one hour for you. Hang tight." / Rapaport Decl. ¶53 (RAP23120).

154.   On January 15, 2018, Plaintiffs sent an email to Ms. Nardini asking for a status update about getting the Podcast on Sirius. Plaintiffs proposed content they could produce for Sirius and a potential lead in for promoting the show. / Winter Decl. ¶33 (RAP014103). On January 15, 2018, Ms. Nardini responded to Plaintiffs, noting "Shows that are locked are Pat McAfee / Heartland 10 -1 EST, Barstool Radio 4 -6 EST, JSB /Francis/Willie Colon TBD. We are also playing with a bunch of other things - Chicks in the Office, etc. We will rotate the pods, including IAR. No need to create anything specific right now unless Marc /Mikey say differently. If you want specific pods to run (we will do most current) just tell them & it's easy to do." / Winter Decl. ¶33 (RAP014103).

155.    On February 18, 2018, Mr. Portnoy stated on the following Twitter: "We hired lots of new talent for Sirius. We pay them. We didn't give you your show because frankly everybody hates you. I was just being nice. Still am." / Busch Decl. ¶37.

156.    On Barstool radio, when asked "was there ever talk of giving him his own show with Sirius," Mr. Portnoy responded, "Well that was, we had that, so yes, because Sirius was interested in him and we had the whole lineup to fill. He wanted more money and it was I'm not going to pay him because frankly he wasn't making back what he was making already and I knew our audience for the most part hated him." / Winter Decl. ¶69 (RAP023529 (2:02-2:24)). Mr. Portnoy continued by noting that Mr. Rapaport wasn't provided his own show because he didn't want to pay him any money, noting that none of Barstool's employees were getting paid money to do radio. Winter Decl. ¶69 (RAP023529 (2:46-3:30)).

157.    As a result of Plaintiffs entering into the Talent Agreement, as opposed to partnering with another platform, Plaintiffs have suffered lost profit damages equal to $8,966,523 (in addition to interest). / Declaration of Sidney Blum ("Blum Decl.") (Attachment 2, at 67-73, 78).

## IV.    COUNT III OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 13 OF PRINCIPAL AGREEMENT)

158.    This section incorporates by reference all statements in paragraphs 1-157 of this Statement of Material Facts.

159.    Pursuant to Section 13 of the Principal Agreement, "Notwithstanding any of the foregoing, Barstool acknowledges your pre-existing relationships with The LA Clippers, DraftKings Fandango / Rotten Tomatoes and Casper and aggress that you shall have the right to continue such relationships during the Term; Barstool further acknowledges that it shall have no right to any sums paid to you under any of the related agreements with those companies." / Rapaport Decl. ¶50 (RAP002317).

160.    Both DraftKings and Casper advertised with Mr. Rapaport during the Term of the Talent
        Agreement. / Busch Decl. ¶42 (Defendants' Counsels' September 19, 2019 letter).

161.    DraftKings contracted for $102,000 in ad reads with Mr. Rapaport. / Winter Decl. ¶58
        (RAP023980-RAP023982); Winter Decl. ¶59 (RAP023983); Winter Decl. ¶53 (RAP023278-
        RAP023282); Busch Decl. ¶42 (Defendants' Counsels' September 19, 2019 letter).

162.    DraftKings also contracted with Barstool for $40,000 for Mr. Rapaport to provide a video
        for DraftKings' Billion Dollar video series. / Winter Decl. ¶53 (RAP023282).

163.    Mr. Rapaport provided the video for DraftKings' Billion Dollar video series to Louis
        Roberts, then head of advertising for Barstool, on August 22, 2017. / Winter Decl. ¶53
        (RAP023282).

164.    Casper contracted for $15,000 in ad reads with Mr. Rapaport. / Winter Decl. ¶53
        (RAP023238); Winter Decl. ¶53 RAP023248; Busch Decl. ¶42 (September 19, 2019 letter).

165.    Mr. Rapaport was never paid any money generated from the agreements with DraftKings
        and Casper. / Winter Decl. ¶26.

## V.    COUNT IV OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 1 OF PRINCIPAL AGREEMENT)

166.    Under Section 1 of the Talent Agreement, Mr. Rapaport agreed to "produce, edit, and
        deliver to Barstool […] [d]igital shorts and other short form digital content to be mutually
        agreed upon and subject to the parties' agreement (after good faith negotiation) regarding
        ownership, responsibility for costs and split of revenue in connection therewith."

167.    In February 2018, Mr. Rapaport assisted in the development of a digital short as part of a
        promotion for the film "Death Wish." / Busch Decl. ¶34 (BARSTOOL009452-
        BARSTOOL009453).

168.    This video was added to Barstool's blog but was removed by Barstool after Mr. Rapaport's

termination. / Busch Decl. ¶34 (BARSTOOL009452).

169.    Barstool derived revenue from the "Death Wish" video. / Busch Decl. ¶42 (September 19, 2019 letter).

170.    Mr. Rapaport was never paid any money generated from the agreements with "Death Wish." / Winter Decl. ¶26.

171.    Mr. Rapaport is entitled to the funds received from "Death Wish." / Winter Decl. ¶26.

## VI.    COUNTS VII OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 3 OF PRINCIPAL AGREEMENT)

172.    Under Section 3 of the Principal Agreement, "Subject to the mutual approval of the parties in each instance, Barstool may produce, distribute, sell and promote merchandise (including apparel) based on or associated with you and/or your Content. ("Approved Merchandise")." Rapaport Decl. ¶50 (RAP002314).

173.    Pursuant to Section 9 of the Principal Agreement, Plaintiffs are entitled to 60% of "gross sums actually received by or credited to Barstool or its affiliated companies directly arising from the sale of Approved Merchandise less (i) any and all third party fees, expenses and commissions, (ii) Barstool's actual verifiable costs and expenses relating to the production, distribution, licensing, sale, advertising and promotion of the Approved Merchandise, and (iii) returns, allowances and discounts" / Rapaport Decl. ¶50 (RAP002316).

174.    Barstool has acknowledged selling the Herpes T-shirt subsequent to Mr. Rapaport's termination. / Winter Decl. ¶39 RAP022660; Vega Decl. ¶42 (RAP023503 (30:27-31:00)); Vega Decl. ¶49 (RAP023509 (2:52-2:54)).

175.    Mr. Portnoy publicly acknowledged designing the Herpes T-Shirt prior to Mr. Rapaport being fired and just waiting for him to say something stupid. / Vega Decl. ¶48 (RAP23506 (2:55-3:25)).

176.   On numerous occasions, Barstool, Mr. Portnoy included, confirmed that $100,000 was generated from the sale of the Herpes T-Shirt. / Winter Decl. ¶39 (RAP022660; RAP023503) (30:27-31:00); Vega Decl. ¶49 (RAP023509 (2:52-2:54)).

177.   Barstool's counsel has confirmed that revenue was derived from the Herpes T-Shirt. / Busch Decl. ¶33 (BARSTOOL009444).

178.   No money has been paid to Plaintiffs for the sale of the Herpes T-shirt. / Winter Decl. ¶26.

## VII.   COUNT XI OF PLAINTIFFS' FIRST AMENDED COMPLAINT: DEFAMATION AND DEFAMATION PER SE

179.   Count XI of Plaintiffs' FAC alleges Defendants made defamatory statements about Mr. Rapaport, including that he has herpes, that he has physically abused a woman, and that he is a racist, a stalker, and a fraud. FAC ¶147; Vega Decl. ¶65 (List of Defamatory Statements).

180.   Pursuant to an agreement between Plaintiffs' and Defendants' counsel, an Excel spreadsheet ("List of Defamatory Statements") was provided to Defendants identifying which documents contained statements alleged by Plaintiffs to be defamatory. / Busch Decl. ¶44 (Deposition of Michael Rapaport 176:15-177:10).

181.   The List of Defamatory Statements contained two tabs: "Text Based Documents" and "Audio and Video Recordings." / Vega Decl. ¶65 (List of Defamatory Statements).

182.   The tab titled "Text Based Documents" included the following column titles: "Bates Range of Recording," "Bates Num[b]er Where Defamatory Statement Appears," "Defamatory Statement," "Statement Made By," "Context of Statement," "Date Defamatory Statement Occurred," and "Time (CST)." / Vega Decl. ¶65 (List of Defamatory Statements).

183.   The tab titled Audio and Video Recordings included the following column titles: "Bates Range of Recording," "Time Stamp When Defamatory Statement is Made," "Defamatory Statement," "Statement Made By," "Context of Statement," "Date Defamatory Statement

Occurred," and "Time (CST)." / Vega Decl. ¶65 (List of Defamatory Statements).

### A. Defamatory Statements Made by Each Defendant

184.    This list is likely incomplete, as Barstool deleted over 60,000 social media posts on March 7, 2019. / Busch Decl. ¶40 (October 15, 2019 Email).

185.    Plaintiffs' counsel expressed concern to Defendants' counsel about the deleted content, noting that it had already identified online content being unavailable. / Busch Decl. ¶40 (October 15, 2019 Email).

186.    As an example of content that Plaintiffs' counsel is unable to locate, the video "Stool Scenes Episode 52 – IAMCRAPAPORT STEREO PODCAST", which was uploaded by Barstool on February 20, 2018, discusses accusations Mr. Smith made against Mr. Rapaport regarding a "domestic abuse thing." Vega Decl. ¶48 (RAP023506 (6:01-6:06)). Plaintiffs' counsel has been unable however, to locate the content containing these accusations (although it did identify later accusations as detailed below).

187.    Defendants' counsel responded noting that some content may have been lost as Barstool never controlled the social media accounts of its former employee, Dylan Stone (aka "Tex"), and therefore were unable to prevent his deletion of content. / Busch Decl. ¶40 (October 15, 2019 Email).

188.    As to the broader deletion of 60,000 social media posts, Defendants' counsel noted:

"We are unaware of any content that Barstool has deleted relating to Mr. Rapaport:

- Barstool has become a target for lawsuits by 'copyright trolls.'  Among other things, to try to limit the number of these lawsuits, we understand that Barstool deleted a large number of social media posts containing images that might attract the attention of copyright trolls in or around March 2019.

We are unaware of Barstool deleting any statements relating to Mr. Rapaport.  Although we dispute their relevance, we also are unaware of Barstool deleting any 'controversial' statements or of Barstool personalities deleting any content that brought themselves and Barstool into 'public disrepute.'" / Busch Decl. ¶40 (October 15, 2019 Email).

189.   The subheading below labeled "Barstool Sports" refers to statements made by Barstool employees other than Defendants.

    **i.    HERPES RELATED**

        **a.    Barstool Sports**

190.   On February 18, 2018, at 12:09 pm, Mr. Portnoy began promoting the sale of the Herpes T-shirt on Twitter. / Vega Decl. ¶38 (RAP023743).

191.   In an internal Barstool radio summary for February 19, 2018, Barstool noted that Mr. Rapaport had been referred to on air as a "herpes-riddled fuck Rapaport." / Busch Decl. ¶29 (BARSTOOL008941).

192.   In an internal Barstool radio summary for February 19, 2018, Barstool noted that they had said the following on air about Mr. Rapaport: "He's got herpes on his lip, he's got herpes on his lip." / Busch Decl. ¶28 (BARSTOOL008941).

193.   In an internal Barstool radio summary for February 20, 2018, Barstool noted that they had said the following on air about Mr. Rapaport: "Michael Rapaport went on FS1 today and claimed that he is going 15 rounds with us, despite lawyering up in 15 minutes when we put his herpes-riddled face on a t-shirt that is selling like wildfire." / Busch Decl. ¶28 (BARSTOOL008978).

194.   As the introduction to a February 2018 radio discussion about Mr. Rapaport, Barstool

played a song that repeats "I got herpes on my lips, I got herpes on my *laughter." / Winter Decl. ¶68 (RAP023528 (0:48-1:08)).

195.    In a February 21, 2018 tweet, Pat McAfee, then an employee of Barstool Sports, stated, "This morning is a morning 4 us to remember that a herpe, never ever stops..It might be gone for a little while, but it's committed for the long haul..Let's be as persistent as a herpe when it comes to our happiness." / Winter Decl. ¶44 (RAP022676).

196.    In a February 21, 2018 blog published on Barstool's website, titled "Shout Out To Josh Donaldson For Sending His Condolences After Michael Rapaport Was Murdered By A Barstool Diss Track," Barstool referred to Mr. Rapaport as "Herp Brook." / Vega Decl. ¶18 (RAP023075).

197.    On February 23, 2018, Keith Markovich, Barstool's editor-in-chief, published a cartoon video on Barstool's website that featured characters throughout with prominent lesions on their faces meant to depict Michael Rapaport. The lesion also talks during the video. / Vega Decl. ¶54 (RAP023516 (1:20-7:45)).

198.    On February 23, 2018, Markovich published a cartoon video on Barstool's website that includes the following exchange, between a doctor and Mr. Rapaport's "self-proclaimed son": Doctor: "Your fake dad has herpes." Child: "What, yes, I know." / Vega Decl. ¶54 (RAP023516 (6:55-7:00)).

199.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," a Barstool host said the following about Mr. Rapaport: "herpes-havin motherfucker givin girls the heebie jeebies" Vega Decl. ¶49 (RAP023509 (3:47-3:48)).

200.    In a February 26, 2018 video published on Barstool's website titled, "Fire Rap," photo-shopped pictures purporting to show Mr. Rapaport with herpes appear throughout, with one of

these occasions coinciding with the statement that Mr. Rapaport is a "herpes-having motherfucker." / Vega Decl. ¶49 (RAP023509 (0:00, 0:25, 3:47, 4:32)).

201.   In an internal Barstool radio summary for March 2, 2018, Barstool noted that they had said the following on air about Mr. Rapaport: "Fuck Rapaport that herpes ridden fuck." / Busch Decl. ¶32 (BARSTOOL009114).

202.   On September 25, 2018, a Barstool employee stated the following about Mr. Rapaport on Barstool Radio, "He wants to make clear that he doesn't have herpes." "It makes you think that he has herpes." / Winter Decl. ¶64 (RAP023518 (6:58-7:03)).

203.   On September 25, 2018, a Barstool employee stated the following about Mr. Rapaport on Barstool Radio, "He saying he doesn't have herpes when he pretty clearly had a red mark near his mouth." / Winter Decl. ¶65 (RAP023519 (6:28-6:31)).

### b.   Adam Smith

204.   On February 18, 2018, Mr. Smith tweeted, "Hey @MichaelRapaport, you unfollowed me like a bitch boy and now are going after my boss? I'm still here, and will always be here. Like the herp." / Winter Decl. ¶42 (RAP022666).

205.   In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Smith refers to Mr. Rapaport as, "that perp with herp." / Vega Decl. ¶49 (RAP023509 (4:43-4:45)).

206.   In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Smith states the following about Mr. Rapaport: "that shit on your face looks stage-5 contagious" / Vega Decl. ¶49 (RAP023509 (5:35)).

207.   In a February 27, 2018 blog published on Barstool's website titled "Let's Check In On Fraud Michael Rapaport's '#1' Podcast For The First Time Since He Got Canned From Barstool, Shall We?" Mr. Smith included a photo-shopped picture of Mr. Rapaport that

attempts to depict him with herpes and stated "I want to stomp the herp-infested horse into fine paste then fire the sludge into the sun." / Vega Decl. ¶15 (RAP022910, RAP022915).

208.    In a February 27, 2018 video published on Barstool's official Twitch channel titled "Fortnite Squad Up Session As Well As A Live AMA On Barstool Smitty's Current Lawsuit With D-List Actor (Part III – THIS DAMN INTERNET)," Mr. Smith stated the following about Mr. Rapaport: "herpes last forever." In response to the question, "Does Mr. Rapaport tell women about his H before V'ing them," Mr. Smith stated, "I'm not going to allude to anything. All that I know, the facts of the matter are Michael Rapaport, he has obvious skin issues. I'm not going to allude to what they are. All that I do know is, and I'm not saying he has any, but all I'm saying is that herpes last forever." In the video, Mr. Smith is wearing the Herpes T-Shirt and actively promoted sales of the shirt, offering to personally sell them. Mr. Smith states that Mr. Rapaport "wants it publicly known that he doesn't have herpes" while putting the Herpes T-Shirt in front of the camera. / Vega Decl. ¶¶51-52 (RAP023513 (0:11-0:26, 1:15-1:50, 8:09-8:13 12:54-13:08)).

209.    In that same February 27, 2018 video, Mr. Smith stated, "Michael Rapaport is a fraudulent sack of shit" and "I could not stop laughing last night just thinking that this douchebag couldn't even land Phoebe from Friends is actually suing me over calling him a fraud and may or may not alluding to him having a certain skin ailment." / Vega Decl. ¶52 (RAP023513 (17:06-17:43)).

       **c.**    **Kevin Clancy**

210.    In a February 17, 2018 Tweet, Mr. Clancy states, "I could have behaved like such a pathetic piece of lowlife trash that a helpless innocent girl would need an order of protection from law enforcement to keep a creepy herpes riddled failure from coming within 250 feet of her." /

Vega Decl. ¶13 (RAP022834).

211.    In a February 18, 2018 blog published on Barstool's website titled "Last Night Was A Pivotal Moment In Barstool History," Mr. Clancy states, "But enough about that old crusty herpe" and that "Michael Rapaport opened up his herpes infested mouth and something special happened." / Vega Decl. ¶14 (RAP022890).

212.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Clancy states the following about Mr. Rapaport: "Only flames that come out your mouth is when you have a flare up." / Vega Decl. ¶49 (RAP023509 (2:58-3:00)).

213.    In February 2018, in response to a question from Mr. Portnoy of whether it is a fact that Mr. Rapaport has herpes, Mr. Clancy stated that Barstool is "literally selling a t-shirt about it" and refers to "pictures" that show him having herpes. / Winter Decl. ¶44 RAP023528 (1:16-1:21).

214.    In a March 2, 2018 video published on Barstool's website titled "It's Time To Put Up Or Shut Up Rapaport," Mr. Clancy said "Literally, put your money where your herpes mouth is." / Vega Decl. ¶50 (RAP023510 (10:03-10:05)).

**d.    Eric Nathan**

215.    In a February 19, 2018 blog published on Barstool's website titled "Michael Rapaport Just Made Me And Johnny Football Best Friends #ComebackSZN," Mr. Nathan calls Mr. Rapaport a "herpe having, race baiting, D-list actor." / Vega Decl. ¶16 (RAP022976).

216.    Mr. Nathan wrote a February 19, 2018 blog published on Barstool's website titled "Sad Story: D List Actor With A Slight STD Problem Traps Plane Of Innocent Travelers Inside," wherein Mr. Nathan clarified that the D list actor was Michael Rapaport. / Vega Decl. ¶71 (RAP023665- RAP023667).

217.     In a February 19, 2018 video titled "Professor Nate Breaks Down The Michael Rapaport Saga," Mr. Nathan stated, "Smitty then put Rapaport on blast for refusing to pay, being a fraud, having herpes, etc." and "Johnny Football bought a shirt that shows Rapaport has herpes." / Vega Decl. ¶47 (RAP023504 (0.32-0:40, 4:40-4:46)).

218.     In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Nathan says the following about Mr. Rapaport: "You 75 year old herpe having piece of shit." / Vega Decl. ¶49 (RAP023509 (3:23-3:28))

       **e.     David Portnoy**

219.     In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Portnoy states the following about Mr. Rapaport: "Hope the girls you gave the herp to don't snitch." / Vega Decl. ¶49 (RAP023509 (2:26-2:28)).

220.     In a March 2, 2018 video published on Barstool's website titled "It's Time To Put Up Or Shut Up Rapaport," Mr. Portnoy said, "Shut fucking your herpes face up." / Vega Decl. ¶50 (RAP023510 (5:29-5:32)) / Winter Decl. ¶67 (RAP023525 (0:43)).

       **ii.     FRAUD RELATED**

       **a.     Barstool Sports**

221.     In a February 21, 2018 blog published on Barstool's website titled "Shout Out To Josh Donaldson For Sending His Condolences After Michael Rapaport Was Murdered By A Barstool Diss Track," a Barstool employee said the following about Mr. Rapaport: "God, I'm so glad that I don't have to pretend to tolerate that loudmouth, coughing ass, shark food, Skip Bayless wannabe hack fraud anymore." / Vega Decl. ¶18 (RAP023075).

222.     In a February 26, 2018 video published on Barstool's website titled "Fire Rap," a Barstool employee states the following about Mr. Rapaport: "The most fake twitters accounts on the

globe. More burners than an industrial stove." / Vega Decl. ¶49 (RAP023509 (1:24-1:29)).

223.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," a Barstool employee states the following about Mr. Rapaport: "He's a snake oils salesman with nothing to sell." / Vega Decl. ¶49 (RAP023509 (1:30-1:32)).

224.    On September 25, 2018, a Barstool employee stated the following about Mr. Rapaport on Barstool Radio: "What a fucking fraud." / Winter Decl. ¶40 RAP023518 (6:29-6:30).

**b.    Adam Smith**

225.    In a November 17, 2017 blog published on Barstool's website titled "Michael Rapaport Is A Fraudulent Sack Of Shit," Mr. Smith states, "I don't know if you've been following this middle-school drama sparked and continued by 'celebrity' Michael Rapaport, but here's a quick summary of his fraudulence." / Vega Decl. ¶23 (RAP023628).

226.    In a November 19, 2017 tweet, Mr. Smith stated the following: "Never got it, fraud." / Vega Decl. ¶31 (RAP023708).

227.    In a November 19, 2017 tweet, Mr. Smith stated the following: "FRADRAPORT AT IT AGAIN:  Never got a challenge or invite from you on DK.  I, however, challenged you to a $100 game, that of course was never accepted, you fucking chump fraud." Vega Decl. ¶31 (RAP023708).

228.    In a November 22, 2017 tweet, Mr. Smith stated the following about Mr. Rapaport: "You're a fucking fraud." / Vega Decl. ¶32 (RAP023709).

229.    On December 19, 2017, Mr. Smith published an article on Barstool's website titled "The Only Update On The Barstool Fantasy Football League Playoffs You Need: Michael Rapaport Is STILL A Fraud." / Vega Decl. ¶19 (RAP023167).

230.    In a February 14, 2018 tweet, Mr. Smith stated, "@MichaelRapaport is a liar.  A fraud.  A

hack. Read the above blog for the truth with actual facts and evidence." / Vega Decl. ¶29 (RAP023706).

231.   In a February 14, 2018 tweet, Mr. Smith stated the following about Mr. Rapaport: "You're a lying, deadbeat, hack, fraud." / Vega Decl. ¶33 (RAP023710).

232.   On February 14, 2018, Mr. Smith published an article on Barstool's website titled "Michael Rappaport Is A Fraudulent Sack Of Shit - Part II." / Vega Decl. ¶25 (RAP023655).

233.   In a February 18, 2018 video titled "BREAKING: That lying fraud hack Michael Rapaport is FIRED from Barstool Sports," Mr. Smith states the following about Mr. Rapaport: "our resident lying fraud hack, Michael Rapaport," "that fucking hack lying fraud is done," and "he is a fraud and a hack." / Vega Decl. ¶53 (RAP023515 (00:36-00:44, 1:32-1:36, 4:49)).

234.   In a February 18, 2018 tweet, Mr. Smith stated, "BREAKING: That lying fraud hack Michael Rapaport is FIRED from Barstool Sports." RAP023707; *see also* Vega Decl. ¶8 (RAP022636).

235.   On February 19, 2018, Mr. Smith published an article on Barstool's website titled, "Michael Rapaport Is A Fraudulent Sack Of Shit: Part III, The Final Chapter." In the article, Mr. Smith states "lying, fraud, hack of a human." / Vega Decl. ¶24 (RAP023649).

236.   In a February 20, 2018 video titled, "Stool Scenes Episode 52 – IAMCRAPAPORT STEREO FRAUDCAST," Mr. Smith states, "He's a loser, and fraud, and an asshole."  Mr. Portnoy responds, "I know how that's…I know, you're very much on that." Mr. Smith continues, "and a hack." Vega Decl. ¶48 (RAP023506 (6:49-6:55)).

237.   In a February 20, 2018 article published on Barstool's website titled "How About That Fraud Michael Rapaport Bitching To Shannon Sharpe About Not Owning Up To A Bet?" Mr. Smith states, "How about that lying fraud hack @MichaelRapaport going on national TV and

complaining about someone not owning up to a bet???" / Vega Decl. ¶11 (RAP022771).

238.    In a February 25, 2018 tweet, Mr. Smith stated the following about Mr. Rapaport: "You better [b]elieve we anchored this puppy. FUCK that fraud. Let's cook." / Vega Decl. ¶35 (RAP023717).

239.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Smith calls Mr. Rapaport: "a fraud and a hack." Vega Decl. ¶49 (RAP023509 (5:49))

240.    In a February 27, 2018 article published on Barstool's website titled "Let's Check In On Fraud Michael Rapaport's '#1' Podcast For The First Time Since He Got Canned From Barstool, Shall We?" Mr. Smith states, "Michael Rapaport needs help from his 8 real fans to run his 400 social media burner accounts to get back on top! And these rankings are from this morning. The last I've heard he's at least out of the top 10 in sports podcasts (s/o to the #1 in that game, PMT) and dropped at least 20 spots overall in the hour I took this screenshot? My word, Fraud." / Vega Decl. ¶15 (RAP022914).

241.    In a February 27, 2018 video published on Barstool's official Twitch channel titled, "Fortnite Squad Up Session As Well As A Live AMA On Barstool Smitty's Current Lawsuit With D-List Actor (Part III – THIS DAMN INTERNET)," Mr. Smith promotes the "Rapaport is a Fraudulent Sack of Shit" articles and stated "Michael Rapaport is a fraudulent sack of shit." / Vega Decl. ¶52 (RAP023513 (15:03-16:15, 17:06-17:10)).

242.    In an October 16, 2018 article on Barstool's website titled "'Michael Rapaport Is The Latest Celebrity Slave Catcher To Go After Kayne West' Is On Helluva YouTube Title For An Insightful Lecture," Mr. Smith links to multiple articles calling Mr. Rapaport a "fraudulent sack of shit." / Vega Decl.¶3 (RAP022400)

243.    In a December 31, 2018 article on Barstool's website titled "My Official Response To

Getting Sued By That Fraudulent Sack Of Shit Michael Rapaport," Mr. Smith call Mr. Rapaport a "fraud hack of a coward" and a "fraud hack."/ Vega Decl. ¶36 (RAP023722).

      **c.    Kevin Clancy**

244.    In a February 26, 2018 video published on Barstool's website titled "Last Night Was A Pivotal Moment In Barstool History," Mr. Clancy states the following about Mr. Rapaport: "lets make fun of this pasty sickly race baiting fraud hack." / Vega Decl. ¶14 (RAP022890).

      **d.    Eric Nathan**

245.    In a February 19, 2018 video titled "Professor Nate Breaks Down The Michael Rapaport Saga," Mr. Nathan stated, "Smitty then put Rapaport on blast for refusing to pay, being a fraud, having herpes, etc." / Vega Decl. ¶47 (RAP023504 (0.32-0:40)).

      **e.    David Portnoy**

246.    In a February 8, 2018 article published on Barstool's website titled "Self Proclaimed 'King Of Shit Talk' Michael Rapaport AKA Litigation Mike AKA Marshmellow Mike Has Hired ANOTHER Lawyer To Sue Us Because We Hurt His Feelings," Mr. Portnoy states the following about Mr. Rapaport: "It just sucks he turned out to be the biggest fraud I've ever met." / Vega Decl. ¶28 (RAP023700).

247.    In a March 2, 2018 video published on Barstool's website titled "It's Time To Put Up Or Shut Up Rapaport," Mr. Portnoy states the following about Mr. Rapaport:  "You don't pay your fucking bets you lying sack of shit," "I'll tell you what Rapaport, you fucking lying hack fraud," and "[y]ou are a lying sack of shit." / Vega Decl. ¶50 (RAP023510 (3:35-3:39, 5:25-5:32)).

248.    On September 25, 2018, Mr. Portnoy stated on Barstool Radio, "He's a fraud." / Winter Decl. ¶40 (RAP023518 (21:09))

249.    On September 25, 2018, Mr. Portnoy stated on Barstool Radio, "Michael Rapaport is one
of the all time frauds." / Winter Decl. ¶65 (RAP023519 (6:19)).

### iii.    PHYSICAL ABUSE RELATED

#### a.    Barstool Sports

250.    In a February 8, 2018 article published on Barstool's website, a Barstool employee states
that Mr. Rapaport has a parole officer that he meets weekly. / Winter Decl. ¶48 (RAP022857).

#### b.    Adam Smith

251.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Smith
states the following about Mr. Rapaport: "I'll make you as black and blue as your ex." Vega
Decl.  ¶49  (RAP023509  (5:55-5:58)).  This  statement  comes  after  previous  statements
throughout the video referring to a protective order against Mr. Rapaport alongside images of
his ex-girlfriend. Vega Decl. ¶49 (RAP023509 (0:43-0:45, 2:31-2:33, 2:40-2:42, 3:09-3:11)).

### iv.    RACISM RELATED

#### a.    Barstool Sports

252.    On September 10, 2017, a Barstool employee posted a tweet about Mr. Rapaport stating,
"U are low key racist." / Winter Decl. ¶40 (RAP022662). The statement was given further
exposure in a in a September 12, 2017 Barstool podcast titled, "Stool Scenes 32 (Part 1)." Vega
Decl. ¶53 (RAP023515 (1:44)).

253.    In a February 6, 2018 blog published on Barstool's website, titled "Black Twitter Is Furious
At My Colleague Michael Rapaport For Disrespecting Janet Jackson," a Barstool employee
says the following about Mr. Rapaport: "Michael Rapaport sits on his couch, holding his
phone. No light enters the room as he keeps the blinds perpetually closed. The TV is set to the
BET channel, though no sound comes out. It comforts him to be surrounded by black culture

as long as he doesn't have to hear it," And "'Janky wig,' he thinks, sipping a Surfer Cooler Capri Sun. 'Might be a little on the nose.' For a moment, he worries he has gone too far. He pulls up his IMDB page and reads his credits to reassure himself that he is, in fact, a friend to the black community. Satisfied, his mind goes back to noses." / Vega Decl. ¶7 (RAP022532)

254.   A tweet from a Barstool employee included an "I'M A RACEBAITER" t-shirt with the message "Gonna miss you buddy! @michaelrapaport." The date of the tweet is unknown as it has since been deleted. / Winter Decl. ¶43 (RAP022668).

255.   In a February 20, 2018 Barstool Podcast titled "Stool Scenes Episode 52 – IAMCRAPAPORT STEREO FRAUDCAST," a shirt modeled off of Mr. Rapaport's I AM RAPAPORT shirt is altered to say "I'M A RACEBAITER." / Vega Decl. ¶48 (RAP023506 (0:01-0:10)).

256.   In a February 26, 2018 video published on Barstool's website titled "Fire Rap," a Barstool employee states the following about Mr. Rapaport: "You'll be a race baiter til you've got a pacemaker," "you're a racist motherfucker," and "you act like you're from the corner, but who's fooling who." Vega Decl. ¶49 (RAP023509 (1:16-1:18, 4:03, 4:43-4:45)).

      **b.**   **Adam Smith**

257.   In an October 15, 2018 blog published on Barstool's website titled "Did You Know Michael Rapaport Possibly Alluded To Comparing A Black Woman To A Monkey?" Mr. Smith accuses Mr. Rapaport of "blatantly racist" activity. / Vega Decl. ¶39 (RAP023750).

      **c.**   **Kevin Clancy**

258.   In February 2018, after Mr. Rapaport's termination, Mr. Clancy stated the following about Mr. Rapaport on radio, "Every single thing comes down to race and he hates white people," and "it's like every time he hates white people." Winter Decl. ¶70 (RAP023530 (1:29, 1:31)).

259.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," Mr. Clancy

calls Mr. Rapaport an "old racist man" followed by a picture of Nazi flag and states the

following about him: "that race baiting shit." / Vega Decl. ¶49 (RAP023509 (2:36, 3:12, 3:02)).

### d.    Eric Nathan

260.    In a February 19, 2018 blog published on Barstool's website titled "Michael Rapaport Just

Made Me And Johnny Football Best Friends #ComebackSZN," Mr. Nathan calls Mr. Rapaport

a "herpe having, race baiting, D-list actor." / Vega Decl. ¶16 (RAP022976).

### v.    STALKER RELATED

### a.    Barstool Sports

261.    In a February 26, 2018 video published on Barstool's website titled "Fire Rap," a Barstool

host said the following about Mr. Rapaport: "Givin girls the heebie jeebies so you stalk them."

Vega Decl. ¶49 (RAP023509 (3:50)).

### b.    David Portnoy

262.    On February 19, 2019, Mr. Portnoy stated the following about Mr. Rapaport: "He has a

stalking charge or something in his past." / Vega Decl. ¶67 (RAP023502 (5:25)).

263.    On February 19, 2019, Mr. Portnoy stated the following about Mr. Rapaport: "Well if you

are going to bring up his stalking case." / Vega Decl. ¶67 (RAP023502 (5:48)).

264.    On February 19, 2018, Mr. Portnoy stated on the Barstool Rundown, a Barstool podcast,

"He has this stalking case." / Vega Decl. ¶68 (RAP023508 (4:00-4:02; 4:30)).

### B.  Falsity of Defendants' Statements

265.    Mr. Rapaport does not have herpes. / Rapaport Decl. ¶¶37, 44 (RAP00045-RAP00194;

Busch Decl. ¶44 (Deposition of Michael Rapaport, 64:7-9).

266.    Mr. Rapaport has never had a stalking charge. / Rapaport Decl. ¶38.

267.    Mr. Rapaport has never been charged with domestic or physical abuse. Rapaport Decl. ¶39.

268.    Mr. Rapaport has never hit a woman. / Rapaport Decl. ¶40.

269.    Mr. Rapaport is married to a black woman. / Rapaport Decl. ¶41.

270.    Mr. Rapaport does not discriminate based on race, nor does he consider himself a racist. / Rapaport Decl. ¶42.

271.    Mr. Rapaport does not actively use the issue of race for personal benefit. / Rapaport Decl. ¶43.

### C.  Defendants' Knowledge and Intent When Making Their Statements

#### a.  Barstool Sports

272.    Ms. Nardini agreed that the statements in the "diss track," Vega Decl. ¶49 (RAP023509), about being a "race baiter, old racist man, race baiting, racist" were designed to allude to Mr. Rapaport being a racist.  / Busch Decl. ¶39 (Deposition of Erika Nardini 267:10-267:24).

273.    Ms. Nardini agreed that the statements in the "diss track," Vega Decl. ¶49 (RAP023509), "about beating, mentioning his ex-girlfriend Lilli Taylor, an order of protection, restraining order, order of protection, black and blue as your ex" "were designed to allude to Mr. Rapaport and some type of altercation with an ex." / Busch Decl. ¶39 (Deposition of Erika Nardini 267:25-268:11).

274.    Ms. Nardini said she did not believe that Barstool should remove the "diss track," Vega Decl. ¶49 (RAP023509), which she agreed "alludes to herpes, racism, physical assaults" and is still "present on the site today." Busch Decl. ¶39 (Deposition of Erika Nardini 268:18-269:10).

275.    Ms. Nardini stated that she did not believe Barstool should remove any content claiming that Mr. Rapaport has herpes, is a racist, or physically harmed his ex. / Busch Decl. ¶39

(Deposition of Erika Nardini 269:11-270:2).

276.    Ms. Nardini acknowledged that even if she learned that it "is true that Michael Rapaport

does not have herpes and has a medical condition that he's had since he was a child that causes

sores on his skin," there was not "any reason that Barstool should apologize to Mr. Rapaport."

/ Busch Decl. ¶39 (Deposition of Erika Nardini 270:15-21).

277.    Mr. Portnoy never told anyone at Barstool to stop saying that Mr. Rapaport had herpes. /

Busch Decl. ¶35 (Deposition of David Portnoy 250:2-8).

278.    No statements, videos, any radio show or any other content that referenced Mr. Rapaport

having herpes was removed by Mr. Portnoy or anyone at Barstool. / Busch Decl. ¶35

(Deposition of David Portnoy 250:9-16).

279.    Nobody at Barstool Sports was reprimanded or disciplined for stating that Mr. Rapaport

had herpes. / Busch Decl. ¶35 (Deposition of David Portnoy 250:17-22).

### b.  Adam Smith

280.    Mr. Smith never did any research into whether Mr. Rapaport had herpes, nor does he have

knowledge of whether Mr. Rapaport has herpes. / Busch Decl. ¶42 (Deposition of Adam Smith,

120:8-17, 136:2-7).

281.    Mr. Smith was unaware of any reason to believe Mr. Rapaport is a racist. / Busch Decl.

¶42 (Deposition of Adam Smith, 153:23-25)

282.    Mr. Smith was unaware of any reason to believe Mr. Rapaport is a race baiter. / Busch

Decl. ¶42 (Deposition of Adam Smith, 154:1-6).

283.    Mr. Smith was unaware of any information that Mr. Rapaport had physically harmed a

female. / Busch Decl. ¶42 (Deposition of Adam Smith, 159:21-160:1).

284.    Even following the commencement of this litigation, Mr. Smith has continued to remind

his fans about his prior statements regarding Mr. Rapaport, such as an October 26, 2018 article by Mr. Smith titled, "Here's Michael Rapaport Fidgeting Around Like A Madman And Discussing His 'Skin Stuff,'" wherein Mr. Smith states, "As for the 'Skin Stuff,' here's hoping it gets better, Michael. We're all rooting for you." / Vega Decl. ¶10 (RAP022763).

### c.  Kevin Clancy

285.  Mr. Clancy had no knowledge of whether Mr. Rapaport had herpes and conducted no research to ascertain this fact. / Busch Decl. ¶39 (Deposition of Kevin Clancy, 101:9-20).

286.  Mr. Clancy had no knowledge of anything that Mr. Rapaport did that would be considered race baiting. / Busch Decl. ¶39 (Deposition of Kevin Clancy, 96:10-15).

### d.  Eric Nathan

287.  Mr. Nathan had no knowledge of whether Mr. Rapaport had herpes and conducted no research to ascertain this fact. / Busch Decl. ¶36 (Deposition of Eric Nathan, 141:2-23, 142:20-143:9, 143:24-144:9).

288.  Mr. Nathan has no evidence or reason to believe that Mr. Rapaport is a racist, nor does he believe he is one. / Busch Decl. ¶36 (Deposition of Eric Nathan, 178:7-12).

289.  Mr. Nathan has no personal knowledge of whether Mr. Rapaport has ever inflicted harm on a female. / Busch Decl. ¶36 (Deposition of Eric Nathan, 179:6-9).

290.  Mr. Nathan acknowledged that even if he was provided a medical certificate showing that Mr. Rapaport does not have herpes, he would not retract his statements that Mr. Rapaport has herpes. / Busch Decl. ¶36 (Deposition of Eric Nathan 147:7-149:21).

### e.  David Portnoy

291.  During a February 2018 radio discussion about Mr. Rapaport, Mr. Portnoy expressed concern about whether Mr. Rapaport did in fact have herpes and asked Mr. Clancy what the

basis of those statements was. / Winter Decl. ¶68 (RAP023528).

292.    Mr. Rapaport had no knowledge of any evidence to suggest that Mr. Rapaport had herpes. / Busch Decl. ¶35 (Deposition of David Portnoy, 251:23-252:4).

293.    Mr. Portnoy had no knowledge of any evidence to suggest that Mr. Rapaport is racist. / Busch Decl. ¶35 (Deposition of David Portnoy, 263:21-25).

294.    Mr. Portnoy was aware however that Mr. Rapaport's wife was African American. / Busch Decl. ¶35 (Deposition of David Portnoy, 264:1-3).

295.    Mr. Portnoy had no knowledge of any statement or basis to claim that Mr. Rapaport ever was physically violent with either his ex-wife or ex-girlfriend. / Busch Decl. ¶35 (Deposition of David Portnoy 264:15-19).

296.    Mr. Portnoy designed the Herpes T-Shirt to humiliate Mr. Rapaport. / Busch Decl. ¶35 (Deposition of David Portnoy 238:18-23).

297.    Mr. Portnoy admitted during his deposition that after Mr. Rapaport's termination, "everything from then on was designed to return fire and humiliate him." / Busch Decl. ¶35 (Deposition of David Portnoy 292:13-293:8).

298.    Although Mr. Portnoy listed a number of actions that he felt justified this behavior, each of these events occurred after the commencement of Defendants' attacks on Mr. Rapaport. / Durbin Decl. (Attachment 1, 37-39).

299.    In reference to the Herpes T-Shirt, Mr. Portnoy said, "This shirt haunting him for the rest of his life in enough for me. […] I'll see ya in hell." / Winter Decl. ¶47 (RAP022845).

300.    In a February 18, 2018 tweet, Mr. Portnoy stated that Mr. Rapaport needed "to be put down like a wounded animal." / Winter Decl. ¶39 (RAP022660).

**D. How Defendants' Statements Were Interpreted by Its Audience**

### a.   **Defendants' Assertions Were Perceived As True**

301.   Barstool Sports holds itself as being an authentic brand. / Busch Decl. ¶35 (Deposition of David Portnoy, at 119:8-13). When asked during his deposition what Barstool meant by "authentic," Mr. Portnoy responded that it meant, "true, real." / Busch Decl. ¶35 (Deposition of David Portnoy, at 119:8-15).

302.   Mr. Portnoy stated in his deposition that he could not recall any publicly accessible description of Barstool created by Barstool where Barstool states the content it provides is satire. Busch Decl. ¶35 (Deposition of David Portnoy, at 28:20-24).

303.   In a February 27, 2018 video published on Barstool's official Twitch channel titled, "Fortnite Squad Up Session As Well As A Live AMA On Barstool Smitty's Current Lawsuit With D-List Actor (Part III – THIS DAMN INTERNET), following a discussion of this lawsuit and the defamation claims brought against Mr. Smith and Barstool, an audience member responded, "I hear nothing but truth." Mr. Smith responded "[t]hat's all we spit. Truth and justice baby. Truth and justice." / Vega Decl. ¶52 (RAP023513 (15:04-16:26)).

304.   According to Defendants' Expert, Jeffrey Hancock ("Mr. Hancock"), "Online communication is more honest than face to face." / Vega Decl. ¶64 (Deposition of Jeffrey Hancock, Exhibit 555 (9:13-9:30)).

305.   According to Mr. Hancock, "We are really bad at detecting deception, really bad. 54% accuracy on average when you have to tell if someone who just made a statement is lying or not." / Busch Decl. ¶48 (Deposition of Jeffrey Hancock, 79:7-24); Vega Decl. ¶65 (Deposition of Jeffrey Hancock, Exhibit 555 (9:46-9:55)).

306.   According to Mr. Hancock, "The research over the last 50 years shows there is actually no reliable cue to deception." / Busch Decl. ¶48 (Deposition of Jeffrey Hancock, 80:14-24); Vega

Decl. ¶65 (Deposition of Jeffrey Hancock, Exhibit 555 (10:20-10:24)).

307.   Barstool did not disclose the basis of many of its statements when they were made. / Busch Decl. ¶48 (Deposition of Jeffrey Hancock, 188:15-21).

308.   A casual audience, having no direct interest in or practice viewing Barstool Sports and seeing the constant repetition of charges of fraud, racism, low key racist, and race-baiting, domestic violence, and having herpes against a celebrity involved in sports would be expected to accept those charges as having some basis in fact. / Durbin Decl. ¶35 (Attachment 1, Page 24).

309.   The manner in which Rapaport was repeatedly called a racist, a low key racist, or a race baiter would leave anyone hearing or seeing such comments with the clear impression that Defendants, his former employer and its employees, knew facts about him that others did not and that those facts led them to this conclusion. / Durbin. Decl. ¶35 (Attachment 1, Page 24).

310.   The same may be taken as true regarding the constant stream of language and images portraying Rapaport as engaging in domestic violence. On top of this stream, statements that Barstool would make Rapaport as black and blue as he made his ex, followed by a picture of his ex-girlfriend, would create visual support for the false claim. This would be expected to lead those hearing and seeing the image to conclude that Mr. Rapaport indeed beat this particular woman./ Durbin. Decl. ¶36 (Attachment 1, Page 24).

311.   Defendants' statements caused Mr. Rapaport's wife to ask him if he actually did have herpes. / Busch Decl. ¶44 (Deposition of Michael Rapaport, Pages 159:19-160:7).

**b.  How Accusations of Fraud, Racism, and Race Baiting Were Interpreted**

312.   Defendants' charges of fraud first gained traction in a dispute with Adam Smith in which Mr. Smith claimed that Mr. Rapaport had not paid on a bet. Mr. Smith persistently called Mr.

Rapaport a "fraudulent sack of shit" leading into the firing controversy late in February of 2018. This repetitive use of the word "fraud" distanced it from its immediate context and left it open to any interpretation Barstool bloggers might want to put on it. Durbin Decl.¶¶40-43 (Attachment 1, Page 26).

313.    The accusation that Mr. Rapaport was a fraud was re-contextualized on the date of Mr. Rapaport in the article "Last Night was a Pivotal Moment in Barstool History" to mean that Mr. Rapaport was an outsider who exploited Barstool Sports but "was never one of us." / Durbin Decl. ¶43 (Attachment 1, Page 26); Vega Decl. ¶14 (RAP022890).

314.    Through these repeated accusations of fraud, Defendants were able to strip away Mr. Rapaport's ability to defend himself as his statements were no longer viewed as credible. / Durbin Decl. (Attachment 1, Page 26).

315.    Barstool's accusations of fraud also took on the meaning that Mr. Rapaport's depiction of himself as a friend of African Americans was false. / Durbin Decl. ¶43-44 (Attachment 1, Page 27). Diversity has been a hallmark of Rapaport's brand in both his content production and the guests he has invited on his various programs. Rapaport's I AM RAPAPORT podcast has been a forum for countless African-American guests. Durbin Decl. ¶52.

316.    As Barstool Sports noted in an August 29, 2017 video titled "Stool Scenes 30 (Part 1)," Mr. Rapaport is very popular among African American demographics. / Vega Decl. ¶55 (RAP023517 (6:48-7:38)).

317.    Defendants' accusations of race baiting carried the meaning that Mr. Rapaport's concern for the African American community was all an act and that he was just appealing to the demographic for self-promotion. / Durbin Decl. ¶50 (Attachment 1, Page 30). We can safely say that Rapaport has built his brand on an embrace of inclusivity, particularly involving

African-American athletes, celebrities, stories and audiences. Barstool's mass of innuendo and outright charges attack Rapaport at the core of the brand he has worked for decades to build. These charges, when taken up by the bulk of Barstool bloggers, particularly Adam Smith and Kevin Clancy, and, through their instigation, taken up by a mass of "Stoolies", gained a sheen of authority and authenticity, the "universal" voices of those who had "worked" with Mr. Rapaport and, presumably, knew him. Durbin Decl. ¶53.

**E.   Barstool Routinely Recruits Its Followers to Attack People Online and Repeat Its Statements to Secondary Audiences**

318.   Barstool has a history and reputation for galvanizing its audience to attack people in online "wars." / Dkt. No. 76-3.

319.   The expectation that Barstool's fans will rally together and attack Barstool's enemies was discussed by two Barstool hosts during a November 2019 podcast titled "EVERYTHING I DON'T LIKE IS RACIST AND SEXIST: THE TALIB KWELI TWITTER FIGHT." / Vega Decl. ¶59 (RAP023996 (19:40-20:10, 24:30-25:40)).

320.   Barstool often uses the term "war" to refer to attacks by it and its fans against outsiders. / Vega Decl. ¶56 ((RAP023614 (1:16-1:19, 2:25-2:31)).

321.   Mr. Portnoy himself acknowledged on Barstool radio, during a discussion about this litigation, that Barstool was "in a war with him," referring to Mr. Rapaport. Winter Decl. ¶64 (RAP023518 (16:51-16:54)).

322.   On January 14, 2020, Mr. Portnoy announced the hiring of an employee whose sole job would be to engage in online wars. / Vega Decl. ¶42 (RAP024001).

323.   On February 15, 2020, Mr. Portnoy posted a picture of him texting the employee about "a meme war breaking out." / Vega Decl. ¶45 (RAP024019).

324.   On February 24, 2020, Mr. Portnoy took to Twitter and commanded Barstool's followers

to "ATTACK!!!!" who were "waiting for direction from the boss @stoolpresidente" to engage in an online war. / Vega Decl. ¶43 (RAP024007).

325.    Despite being asked on Twitter to tell his following to "chill out a bit" and stop their rude attacks, Mr. Portnoy refused to do so. / Vega Decl. ¶44 (RAP024011).

326.    Another example of Barstool's history of attacks include Barstool's 2014 attack on Sam Ponder.

327.    In 2014, Mr. Portnoy made public tweets to Ms. Ponder, calling her a slut and "a chick that has a job where the #1 requirement is you make men hard." Ms. Ponder brought attention to these tweets in 2018 following the first episode of an ESPN/Barstool partnered TV show titled, "Barstool Van Talk." In light of these statements, ESPN cancelled "Barstool Van Talk" and its partnership with Barstool. / Dkt. No. 76-3; Busch Decl. ¶36 (Deposition of David Portnoy 107:2-17).

328.    Numerous Barstool hosts attacked Ms. Ponder on social media, calling her a liar. / Dkt. No. 76-3.

329.    When one of his co-hosts stated that he did not want to get the hashtag trending on Twitter, and only wanted to "make people laugh", Mr. Portnoy responded, "I like to make them laugh through pain." / Dkt. No. 76-3; Vega Decl. ¶ 62 (RAP023998 (0:33:0:48)).

330.    Mr. Portnoy went on Barstool radio and talks about his intent to slowly suffocate Ms. Ponder in an "internet online war." / Dkt. No. 76-3; Vega Decl. ¶61 (RAP023998 (0:08:0:12)).

331.    Mr. Portnoy said "I'm excited, it's not ending." "I will get #samponderlies trending." / Dkt. No. 76-3; Vega Decl. ¶61 (RAP023998 (0:13:0:17)).

332.    Mr. Portnoy offered to give free merchandise to anyone who could get a sign stating "Sam Ponder Lies" on TV. / Dkt. No. 76-3; Vega Decl. ¶61 (RAP023998 (0:17:0:23)).

333.    Barstool sold t-shirts depicting Ms. Ponder as a clown during this dispute. / Dkt. No. 76-3.

334.    Barstool created a photo-shopped video of Ms. Ponder being naked and publicly shamed during this dispute. / / Dkt. No. 76-3.

**F.    Barstool Recruited Its Followers to Repeat Its Statements to Secondary Audiences**

335.    On February 17, 2018, Mr. Smith tweeted, "Honestly, my greatest, most fulfilling accomplishment at Barstool is uniting the clans vs the fraud @MichaelRapaport. The highlanders from HQ coming down from the hundreds, and thousands. Love it. #vivalastool." / Winter Decl. ¶62 (RAP0587).

336.    On February 18, 2018, Mr. Clancy said, "A three act play entitled 'Shooting Yourself In The Foot.' 10:16pm 4.5 [stars]…6:30am 4.0 [stars]…9:59am…3.5 [stars]. The Power of the Stoolies is SCARY. Also this is hilarious that we're torpedoing a podcast ON OUR OWN NETWORK." / Vega Decl. ¶9 (RAP022637).

337.    In a February 18, 2018 blog published on Barstool's website titled "Last Night Was A Pivotal Moment In Barstool History," Mr. Clancy claimed that, even though "technically he was a Barstool Sports employee," Rapaport was an "outsider," and "he sure as fuck was *never* one of us. He most certainly wasn't a Stoolie." / Vega Decl. ¶14 (RAP022890).

338.    In Mr. Clancy's February 18, 2018 blog, he discussed numerous controversies of which Barstool had been involved, including the "Sam Ponder drama" and compared the coming together against Mr. Rapaport to "Infinity War," noting "Last night it wasnt Eagles Stoolies vs Pats stoolies. It wasnt Philly Stoolies vs Heartland Stoolies. Nobody cared about my marriage problems anymore. None of our bloggers were fighting over clicks. At our most volatile and crucial moment, where we could have all ripped ourselves to shreds, we all stood together and said 'Nah lets make fun of this pasty sickly race baiting fraud hack!'" He further added, "We've

rallied together before but last night was the most galvanizing moment in Barstool history." / Vega Decl. ¶14 (RAP022892-RAP022893).

339.   On February 18, 2018, Barstool began selling the Herpes T-Shirt. / Winter Decl. ¶37 (RAP022635); Winter Decl. ¶39 (RAP022660); FAC ¶57.

340.   By selling the Herpes T-Shirt, Barstool was able to generate more revenue while promoting the narrative of supporting the home team and humiliate the "outsider." / Busch Decl. ¶27 (BARSTOOL008918); Durbin Decl. ¶23, (Attachment 1, Page 18).

**G. Mr. Rapaport's Reputation Prior to Defendants' Statements**

341.   Prior to being employed at Barstool, Mr. Rapaport was viewed very favorably among advertisers and talent platforms, and was considered a "huge name." / Busch Decl. ¶2 (BARSTOOL000162); Unger Decl. ¶¶38-39 (Attachment 1, Pages 14-15).

342.   In 2015, Mr. Rapaport was showcased by CBS at the industry's first ever Podcast Upfront. / Unger Decl., ¶27 (Attachment 1, Pages 14-15).

343.   Podcast Upfront is an event that allows for talent platforms to showcase their network and pitch their content to advertisers. / Unger Decl., ¶32 (Attachment 1, Page 14-15).

344.   Presenting companies are only afforded limited time to present their content and are very selective about the hosts they invite. / Unger Decl., ¶30 (Attachment 1, Pages 14-15).

345.   The CBS Radio Play.it team introduced Mr. Rapaport as their "shining sports and male lifestyle star." / Unger Decl., ¶31 (Attachment 1, Page 15).

346.   Mr. Rapaport received very favorable feedback from the event and was regarded as a highlight of the event. / Unger Decl., ¶32 (Attachment 1, Page 15).

347.   In response to feedback from the 2015 show, Mr. Rapaport was invited by IAB to host Podcast Upfront the following year. / Unger Decl., ¶33 (Attachment 1, Page 15).

348.    This invitation was provided following consultation by IAB with high level executives at Performance Bridge (now Veritone) and AdResults, who were in attendance the previous year.

349.    Veritone and AdResults are two of the top three advertising agencies globally. / Unger Decl., ¶34 (Attachment 1, Page 15).

350.    The 2016 Podcast Upfront took place on September 7, 2016. / Unger Decl. ¶33.

351.    Ms. Unger, who produced both Podcast Upfront events, received very positive feedback from attendees about Mr. Rapaport and was told by attendees that they had clients in mind who would want to buy advertising spots on his show. / Unger Decl. ¶32, (Attachment 1, Page 15).

352.    As of September 2016, Mr. Rapaport was extremely marketable with advertisers and talent performers.  / Unger Decl. ¶38 (Attachment 1, Page 15).

353.    In addition to Barstool, Mr. Rapaport also received inquiries from Wondery to join its platform. / Winter Decl. ¶72 (RAP022732-RAP022737).

354.    Barstool's statements about Mr. Rapaport, and those repeated by its followers, were not a continuation of pre-existing criticisms. Mr. Rapaport's reputation was not damaged with respect to the various brands of defamation authored by Barstool and its followers until after Defendants made their statements. / Declaration of Eric Rose ("Rose Decl.") ¶39 (Attachment 1, Page 47).

**H. Harm of Defendants' Statements**

      a.   **Impact on Search Results**

355.    The search term "Michael Rapaport" received a massive spike in public interest in February 2018 based on Google Trends data during the peak of Barstool's termination of Mr. Rapaport and Defendants' defamatory statements. / Rose Decl. ¶41 (Attachment 1, Pages 17-19).

356.    This spike in public interest is attributable to Defendants' actions against Mr. Rapaport. /

Rose Decl. ¶42 (Attachment 1, Pages 20-23).

357.    No other controversies impacted Mr. Rapaport's rise in public interest at this time. / Rose

Decl. ¶42 (Attachment 1, Pages 20-23).

358.    Following Barstool's statements, and those repeated by its followers, one cannot search

Michael Rapaport's name without seeing comments spread by Barstool. / Rose Decl. ¶38

(Attachment 1, Page 47).

359.    When searching "Michael Rapaport" on Bing, "Michael Rapaport herpes" is the first item

listed on "related searches for Michael Rapaport." / Busch Decl. ¶49 (Deposition of Aaron

Curtiss, 188:4-189:3).

### b.  Impact on Podcast

360.    Prior to the 24-hour window in which Mr. Rapaport was terminated from Barstool, his

podcast had consistently maintained a 4.5 average rating. / Rose Decl. ¶20 (Attachment 1,

Pages 11-12).

361.    Prior to the 24-hour window in which Mr. Rapaport was terminated, Mr. Rapaport's

Podcast had received only a single Apple Podcast rating accusing him of having herpes (7-17-

2017) or of being a racist (10-24-2017). The 10/24/2017 rating followed Barstool calling Mr.

Rapaport a "low key racist." / Rose Decl. ¶¶21-22 (Attachment 1, Pages 11-12).

362.    Prior to the 24-hour window in which Mr. Rapaport was terminated, Mr. Rapaport had

never been accused in his Apple Podcast ratings of being a stalker or a fraud or beating women.

/ Rose Decl. ¶22 (Attachment 1, Page 12).

363.    On the date of his termination, Mr. Rapaport received thousands of one-star Apple Podcast

ratings and reviews parroting Defendants defamatory statements about him. / Rose Decl. ¶20

(Attachment 1, Page 12).

364.    The onslaught of vile statements made by those making comments and rating the podcast

following the verbal assault by Barstool included, but were not limited to: "racist," "herpes,"

"race baiter," "sexual abuser," "women beater/abuser," "wife beater," "rapist," "fraud," "hates

white people." "hates black people," "woman assaulter," "wigger," "stalker," "Hitler," "STD,"

"hitter of women," "mud monkey," and much, much more. / Durbin Decl ¶33 (Attachment 1,

Page 21-22).

365.    These ratings and comments show that the audience accepted the defamatory statements

about Rapaport as fundamentally true. / Durbin Decl ¶33 (Attachment 1, Page 21-22).

366.    In a report prepared by Chartable, Chartable has 909 ratings on record attached to

corresponding reviews for Rapaport's podcast prior to his termination. Of these ratings, 783

were 5's (86%), 12 were 4's (1%), 8 were 3's (1%), 9 were 2's (1%), and 97 were 1's (11%).

From the date of Rapaport's termination (2018-02-18) until the end the February, Chartable

has 3,756 ratings on record attached to corresponding reviews for Rapaport's podcast. Of these

ratings, 152 were 5's (4%), 5 were 4's (<1%), 2 were 3's (<1%), 13 were 2's (<1%), and 3,584

were 1's (95%). / Durbin Decl ¶30 (Attachment 1, Page 21).

367.    This influx in ratings and disproportionate swing ratings indicates a clear and successful

attack carried out against Mr. Rapaport. / Durbin Decl ¶31 (Attachment 1, Page 21).

368.    The drop in Podcast ratings, and the hundreds of comments repeating Defendants'

allegedly defamatory statements, caused a massive decline in the Podcasts average downloads

per episode. / Unger Decl., ¶¶10-15, (Attachment 2, Pages 8-11).

369.    Download numbers are the primary metric when assessing advertisement costs. / Unger

Decl., ¶14 (Attachment 2, Page 12).

370.    Prior to the drop in Podcast ratings, and the hundreds of comments repeating Defendants'

allegedly defamatory statements, the Podcast had far exceeded the average industry growth rate of 11.11% per year with a growth rate of 67% per year. / Unger Decl., ¶16 (Attachment 2, Page 7, 12).

371.    The Podcast's rate of growth was attributable to the efforts of Mr. Rapaport, not because of efforts made by Barstool or as a result of the Podcast appearing on Barstool's network. / Unger Decl. ¶7 (Attachment 2, Pages 10-11).

372.    Even applying the industry growth rate of 11.11% as opposed to the much greater rate of 67% that the Podcast was experiencing, the drop in Podcast ratings, and comments repeating Defendants' allegedly defamatory statements, resulted in significant lost revenue to the Podcast. / Unger Decl. ¶ 19 (Attachment 2, Page 13); Blum Decl. ¶10 (Attachment 1, ¶ 177-194).

373.    No matter what Mr. Rapaport does, his Podcast has thousands of negative ratings and vile comments that will never go away. / Rose Decl. ¶38 (Attachment 1, Page 47).

### c.   Impact on Reputation and Ability to Secure Advertisers

374.    There has long been a stigma around herpes with the belief that only those who are tainted have the disease. / Rose Decl. ¶44 (Attachment 1, Page 43).

375.    A person who has uttered racist thoughts or commits racist deeds find it difficult or may be unable to find work in the entertainment industry. / Rose Decl. ¶47 (Attachment 1, Page 43).

376.    The devastation to the careers of those who have committed racist thoughts or deeds is something widely known by the public, and certainly those in the entertainment industry such as the personalities at Barstool Sports. / Rose Decl. ¶48 (Attachment 1, Page 43).

377.    Similarly, in the era of #MeToo, those who harass or are violent towards women have had

their sports careers severely damaged. / Rose Decl. ¶50 (Attachment 1, Page 43).

378.   The I AM RAPAPORT: STEREO PODCAST was unable to acquire advertisers after termination of the Talent Agreement by Barstool for weeks on end, and when it was able to attract sponsors, it was minimal in earnings and term. The expenses from the I AM RAPAPORT: STEREO PODCAST put it at $37,000. / Winter Decl. ¶23-25.

379.   Mr. Rapaport also found himself unable to find any podcast platforms willing to commit to his podcast for over a year after termination, even with podcast platforms who had expressed their desire to work with Mr. Rapaport prior to his time with Barstool. / Winter Decl. ¶45 (RAP022707- RAP022721); Winter Decl. ¶46 (RAP022747); Winter Decl. ¶25.

380.   On September 2018, Mr. Rapaport entered into a production and distribution agreement with Luminary Media, LLC. ("Luminary"). / Winter Decl. ¶71 (RAP023953).

381.   Under this agreement, the Podcast is exclusively available on Luminary's platform. / Winter Decl. ¶71 (RAP023953).

382.   The Podcast did not launch on Luminary's network until April of 2019. / Winter Decl. ¶71 (RAP023936).

383.   The value that Plaintiffs received under the Luminary agreement is less than the value that Plaintiffs could have received from advertisers had the Podcast's average download numbers not decreased around the time of Mr. Rapaport's termination and Defendants' defamatory statements. / Unger Decl. ¶20 (Attachment 2, Pages 14-15); Dkt. No. 84.

384.   Unlike CBS and Barstool, where Mr. Rapaport's content was primarily made available for free, with revenue being generated off of advertising, Luminary generates revenue based upon paid subscriptions. / Unger Decl. ¶22 (Attachment 2, Pages 13-14).

385.   Luminary's audience is substantially smaller than the Podcast's pre-termination audience.

/ Unger Decl. ¶24 (Attachment 2, Page 14).

386. The deal that Mr. Rapaport was able to secure with Luminary was valued based upon the download numbers of the Podcast. / Busch Decl. ¶46 (Deposition of Jordan Winter (09-06-2019) 153:1-155:9); Busch Decl. ¶45 (Deposition of Jordan Winter (10-08-2019) 240:14-18).

387. Even if the Podcast were to break away from Luminary, it would take years for the Podcast to return to its former download numbers. / Unger Decl. ¶¶25-26 (Attachment 1, Page 14).

388. Separate and apart from the Podcast, the cost to repair Mr. Rapaport's own reputation would require an extensive, two-year campaign. / Rose Decl. ¶¶60 (Attachment 1, Page 67).

389. This campaign would consist of Twitter Ads, Instagram/Facebook Ads, Online Ads, PR Firm, Newspaper Advertising, and Radio Advertising (plus market research). / Rose Decl. ¶61 (Attachment 1, Pages 57-67).

390. The cost of this campaign would cost $5,725,000. / Rose Decl. ¶63 (Attachment 1, Page 67).

### d. Impact on Mr. Rapaport

391. The accusations of fraud, racism, domestic abuse, herpes, etc. affected Mr. Rapaport's personal reputation and caused him immense emotional harm. / Rapaport Decl. ¶14.

392. This was humiliating and ongoing for weeks, into months and not a day goes by that Mr. Rapaport doesn't get harassed by someone online on his personal and business accounts. / Rapaport Decl. ¶14-15.

393. Mr. Rapaport had built up a good standing in 30 years of hard work and professionalism in media, only to have these humiliating accusations repeated over and over again. He has been humiliated and embarrassed by these attacks to defame and discredit me. These accusations were untrue and knowingly based on unconfirmed facts and lies. / Rapaport Decl. ¶15.

394.    The targeting of Mr. Rapaport as a racist, domestic abuser & sexually transmitting disease deviant has directly affected how his wife, children, ex-wife, fans, former fans and onlookers perceive him. / Rapaport Decl. ¶16.

395.    Physically this has been detrimental to his compromised immune system as he is afflicted with ulcerative colitis. / Rapaport Decl. ¶17.

396.    Professionally it brought harm and chaos to his business of I AM RAPAPORT: STEREO PODCAST that he had been building for over 3 years prior to being employed by Barstool Sports, costing him sponsorship and business opportunities after their parting of ways due to the accusations being thrown at me. / Rapaport Decl. ¶17.

397.    Emotionally it was devastating in every aspect of his life because there were millions of people who were made to believe lies about him that were unjust and unwarranted. / Rapaport Decl. ¶18.

## VIII.   COUNTS VIII OF PLAINTIFFS' FIRST AMENDED COMPLAINT: BREACH OF CONTRACT (SECTION 4 OF PRINCIPAL AGREEMENT)

398.    This section incorporates by reference all statements in paragraphs 1-397 of this Statement of Material Facts.

399.    Under Section 4 of the Principal Agreement, Barstool agreed to, among other commitments, "Reasonably promote the Content and your involvement with Barstool," and "Use good faith efforts to promote you and your brand to, and to connect you with, its network of contacts (e.g., television producers) subject to your prior written approval in each instance." / Rapaport Decl. ¶50 (RAP002314-RAP002315).

400.    At no point during the Term of the Agreement did Barstool acquire advertisements for Mr. Rapaport's Rant Videos. / Winter Decl. ¶16-20.

401.    This failure comes in spite of numerous requests by Mr. Rapaport and his agent for Barstool

to sell advertisements for Mr. Rapaport's Rant videos. / Winter Decl. ¶52 (RAP023265-RAP023266); Rapaport Decl. ¶11 (RAP023450-RAP023455).

402.  After Mr. Rapaport was terminated from Barstool, Plaintiffs were able to sell advertisements for his Rant videos. Winter Decl. ¶55 (RAP023797); Winter Decl. ¶56 (RAP023803); Winter Decl. ¶74 (RAP023757); Winter Decl. ¶57 (RAP023809-RAP023821); Blum Decl. (Attachment 1, ¶165); Busch Decl. ¶45 (Deposition of Jordan Winter (10-08-2019), 246:1-20).

403.  While with Barstool, Mr. Rapaport was excluded from benefits provided to other hosts, and had to make continued requests to receive expected benefits such as being listed on Barstool's app or being invited to events. / Rapaport Decl. ¶51 (RAP023121).

404.  Prior to Mr. Rapaport's termination, Barstool engaged in a campaign of negative statements alleged by Plaintiffs to be defamatory that neither reasonably promoted Mr. Rapaport's content and involvement with Barstool, nor promoted him and his brand.

405.  In addition to these statements alleged by Plaintiffs to be defamatory, Barstool also referred to Mr. Rapaport across its platform as insane, delusional, bipolar, stupid, unsanitary, a slave catcher, a crazy person, an idiot, and "a one trick pony" whose "trick sucks" on numerous occasions. / Winter Decl. ¶47 RAP022845; Winter Decl. ¶39 RAP022660; Vega Decl. ¶37 (RAP023740); Vega Decl. ¶73 (RAP023518 (23:35)); Winter Decl. ¶65 (RAP023519 (2:57)); Winter Decl. ¶66 (RAP023524 (5:18, 7:36-7:40)); Winter Decl. ¶69 (RAP023529 (0:44; 1:19)); Vega Decl. ¶14 (RAP022889).

## IX.  Out of Court Statements by Defendants' Counsel

406.  One March 2, 2020, Defendants' counsel provided the following public statements concerning this litigation.

a. "Barstool doesn't shy away from controversy, but Michael Rapaport's problem was that he bit the hand that fed him," responds Aaron Moss, Barstool's lead litigation counsel in the Rapaport matter. "No company in its right mind would continue to employ talent that ridiculed its entire fan base by calling them losers, which is exactly what Rapaport did here. As for defamation, it's incredibly ironic that Michael Rapaport, the self-proclaimed 'king of trash talk,' would file a lawsuit over a Twitter feud. While you would never know it from his motion, this is a guy who, among many other things, publicly posted a photo of him anally raping Dave Portnoy and who said of a then-19 year old Barstool personality that she 'got [his] Pipe.'" Vega Decl. ¶74.

b. Moss doesn't stop there, adding, "This is a guy who has been suspended from Twitter for his misogynistic remarks, who pled guilty for aggravated harassment of an ex-girlfriend, and who has been accused by African-American cultural publications as having a 'hobby of castigating black women' and of being the 'worst kind of racist.' Rapaport has publicly acknowledged that it looked like he had herpes in a widely-publicized photo over which he has been ridiculed for years before joining Barstool. As we've said from the beginning, this lawsuit is nothing but a schoolyard squabble that has no business being in federal court, and we look forward to bringing our own motion for summary judgment soon." Vega Decl. ¶74.

407. The response of Plaintiffs' counsel was limited to the following:

a. Richard Busch, attorney for Rapaport, retorts, "We have seen Mr. Moss's statement, and we are simply not going to take the bait and litigate this case in the press. It is just not appropriate. We will be making our case to the Court and to the

jury." Vega Decl. ¶74.

DATED: March 6, 2020                    **KING & BALLOW**

                                        By: /s/Richard S. Busch
                                             Richard S. Busch (SB 5613)
                                             *Attorney for Plaintiffs*
                                             *Michael Rapaport and Michael*
                                             *David Productions, Inc.*
                                             1999 Avenue of the Stars, Suite 1100
                                             Century City, CA 90067