UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.,

              Plaintiffs,

     -against-

BARSTOOL SPORTS, INC., ADAM SMITH,
KEVIN CLANCY, ERIC NATHAN and
DAVID PORTNOY,

              Defendants.

:
:
:
:
:
:
:
:

Case No. 1:18-CV-08783

**DEFENDANTS' MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
OR IN THE ALTERNATIVE,
SUMMARY ADJUDICATION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BARSTOOL SPORTS, INC., ADAM SMITH,
KEVIN CLANCY, ERIC NATHAN and
DAVID PORTNOY,

              Counterclaim Plaintiffs,

     -against-

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.

              Counterclaim Defendants.

:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF RELEVANT FACTS ........................................................ 2

    A.    Rapaport is a Public Figure Who Calls Himself the "MVP of Talking Trash"................................................................................................. 2

    B.    Barstool is a Popular Media Company and Humor Brand that Does Not Try to be Politically Correct and Has Had its Share of Controversies ................. 5

    C.    The Parties Agree that Rapaport Will Bring His Content to Barstool.................. 6

    D.    Rapaport and Defendant Adam Smith Feud Over Unpaid Bets ........................... 6

    E.    Rapaport Call Stoolies Losers, Causing Barstool to Terminate his Contract ........ 7

    F.    After Rapaport is Fired, the Parties Continue to Trade Insults............................. 7

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' CLAIMS FOR DEFAMATION AND FRAUD.......................................................................................................... 9

    A.    Plaintiffs' Defamation Claim Fails as a Matter of Law (Count XI) ..................... 9

        1.    All the Allegedly Defamatory Comments are Nonactionable Opinions................................................................................. 10

        2.    To the Extent Any of the Allegedly Defamatory Comments are Deemed Statements of Fact, they are Substantially True ....................... 15

        3.    Plaintiffs Cannot Prove that Defendants Acted with Actual Malice ....... 16

    B.    The Court Should Grant Summary Judgment for Defendants on Plaintiffs' Fraudulent Inducement and Concealment Claims (Counts IX, X)..................... 19

        1.    Plaintiffs' Fraud Claims are Barred Because their Breach of Contract Claim (Count II) Relates to the Exact Same Subject Matter.......................................................................................... 19

        2.    Barstool Did Not Owe Plaintiffs any Duty to Disclose ........................... 21

        3.    Plaintiffs Cannot Establish the Elements of Their Fraud Claims ........... 22

IV.  PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR BREACH OF CONTRACT CLAIMS OR BARSTOOL'S COUNTERCLAIM........... 27

    A.    Barstool Properly Exercised its Right to Immediately Terminate the Talent Agreement (Count I) ............................................................................. 27

# TABLE OF CONTENTS
## (continued)

Page

B.    Barstool Engaged in Good Faith Efforts to Secure Plaintiffs an Opportunity for a Weekly Show (Count II).......................................................... 29

C.    Plaintiffs are Not Entitled to Summary Judgment on their Remaining Breach of Contract Claims or Barstool's Counterclaim ..................................... 31

      1.    Plaintiffs Were Not Entitled to any Advertising Revenue Generated by Draft Kings or Casper (Count III) ..................................... 31

      2.    Plaintiffs Were Not Entitled to any Revenue Generated by a Digital Short They Created to Promote a Movie (Count IV).................. 32

      3.    Plaintiffs Have No Right to any Portion of the Revenue Generated by a T-Shirt Sold after Termination (Count VII).................................... 32

      4.    Plaintiffs Had No Obligation to Sell Advertisements for Rapaport's Rants but Still Used Good Faith Efforts to Do So (Count VIII).............. 32

      5.    There are Genuine Issues of Material Facts as to Barstool's Counterclaim for Breach of Contract....................................................... 33

V.    CONCLUSION............................................................................................................ 34

08032-00008/3762387.6

# TABLE OF AUTHORITIES

Page

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................16

*Brian v. Richardson*,
   660 N.E.2d 1126 (N.Y. 1995) ..................................................................................11

*Camofi Master LDC v. College P'ship, Inc.*,
   452 F. Supp. 2d 462 (S.D.N.Y. 2006) .....................................................................26

*Celle v. Filipino Reporter Enters.*,
   209 F.3d 163 (2d Cir. 2000) ..............................................................................9, 17

*Church of Scientology Int'l. v. Behar*,
   238 F.3d 168 (2d Cir. 2001) .....................................................................................17

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (1987) ...............................................................................................20

*Clifford v. Trump*,
   339 F. Supp. 3d 915 (C.D. Cal. 2018) .....................................................................14

*Cummings v. City of New York*,
   2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ...........................................................14

*Davis v. Boeheim*,
   22 N.E.3d 999 (N.Y. 2014) ......................................................................................13

*Dillon v. City of New York*,
   704 N.Y.S.2d 1 (App. Div. 1st Dep't 1999) .............................................................13

*Dragon Inv. Co. II LLC v. Shanahan*,
   854 N.Y.S.2d 115 (App Div. 1st Dep't 2008) ..........................................................22

*Dworkin v. Hustler Magazine, Inc.*,
   867 F.2d 1188 (9th Cir. 1989) ..................................................................................17

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011) .....................................................................19

*Finkel v. Dauber*,
   906 N.Y.S.2d 697 (Sup. Ct. 2010) ...........................................................................11

*Gander Mountain Co. v. Islip U-Slip LLC*,
   923 F. Supp. 2d 351 (N.D.N.Y. 2013) .....................................................................21

08032-00008/3762387.6

# TABLE OF AUTHORITIES
## (continued)

Page

*Green v. Dolphy Constr. Co.*,
  590 N.Y.S.2d 238 (App. Div. 2d Dep't 1992) ........................................................................26

*Greene v. Paramount Pictures Corp.*,
  340 F. Supp. 3d 161 (E.D.N.Y. 2018) ....................................................................................17

*Hoppe v. Hearst Corp.*,
  53 Wn. App. 668 (1989 Wash. Ct. App.) ...............................................................................17

*Immuno AG. v. Moor-Jankowski*,
  567 N.E.2d 1270 (N.Y. 1991) ..........................................................................................11, 12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ......................................................................22, 23, 25

*Jacobus v. Trump*,
  51 N.Y.S.3d 330 (Sup. Ct. 2017) ...........................................................................................12

*James v. Gannett Co.*,
  353 N.E.2d 834 (N.Y. 1976) ..................................................................................................16

*Kipper v. NYP Holdings Co.*,
  912 N.E.2d 26 (N.Y. 2009) ....................................................................................................16

*Leucadia, Inc. v. Reliance Ins. Co.*,
  864 F.2d 964 (2d Cir. 1988) ...................................................................................................22

*Miss Am. Pageant, Inc. v. Penthouse Int'l, Ltd.*,
  524 F. Supp. 1280 (D. N.J. 1981) ..........................................................................................18

*New Times, Inc. v. Issacks*,
  146 S.W.3d 144 (Tex. 2004) .............................................................................................17, 19

*Papa's-June Music, Inc. v. McLean*,
  921 F. Supp. 1154 (S.D.N.Y. 1996) .......................................................................................20

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ..................................................................................................14

*SI03, Inc. v. Bodybuilding.com, LLC*,
  2008 WL 11348458 (D. Idaho May 1, 2008) .........................................................................12

*Silverman v. Daily News, L.P.*,
  11 N.Y.S.3d 674 (App. Div. 2d Dep't 2015) ..........................................................................14

*Steinhilber v. Alphonse*,
  501 N.E.2d 550 (N.Y. 1986) ..................................................................................................10

08032-00008/3762387.6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017).................................................................................15

*Tolbert v. Smith*,
    790 F.3d 427 (2d Cir. 2015).................................................................................15

*Torain v. Liu*,
    2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007).......................................................14

*Tuck Indus., Inc. v. Reichhold Chems., Inc.*,
    542 N.Y.S.2d 701 (App. Div. 2d Dep't 1989)......................................................21

*Wilson v. Grant*,
    297 N.J. Super. 128 (App. Div. 1996) .................................................................15

*Wynn v. AC Rochester*,
    273 F.3d 153 (2d Cir. 2001).................................................................................22

*Zanani v Savad*,
    630 N.Y.S.2d 89 (App. Div. 2d Dep't 1995)........................................................22

08032-00008/3762387.6

## I.   <u>INTRODUCTION</u>

Plaintiff Michael Rapaport ("Rapaport") calls himself the "MVP of Talking Trash" and proudly proclaims: "I can give it and I can take it."  This lawsuit proves otherwise.

On the evening of February 17, 2018, Rapaport went on an unhinged online tirade, sending out dozens of Tweets attacking Defendant Barstool Sports, Inc. ("Barstool"), its employees and its fans.  This diatribe culminated in Rapaport branding loyal fans of the very company he worked for as losers.  In turn, Barstool exercised its right to immediately terminate its contract with Rapaport because he had brought himself and Barstool into disrepute.  Barstool also mocked and insulted Rapaport on social media and on its website.  This feud was much like a schoolyard fight, played out in words and pictures on the Internet.

Rather than simply "taking it" like he claimed he could—while continuing to "give it" at every opportunity—Rapaport and his production company, Michael David Productions, Inc. (collectively, "Plaintiffs"), filed this lawsuit claiming that Barstool breached its contract with Plaintiffs and defamed Rapaport by making fun of him.  Plaintiffs later added a fraud claim asserting that Barstool fraudulently misrepresented and concealed its intention not to give Plaintiffs their own weekly radio show.  None of Plaintiffs' claims has merit.

Plaintiffs seek summary judgment on *nine* claims, asserting that there are no disputed issues of material facts as to the *407* facts set forth in their Rule 56.1 statement.  By contrast, Defendants only are seeking summary judgment on Plaintiffs' defamation and fraud claims.

As to defamation, the Court should grant summary judgment for Defendants for three independent reasons.  First, the evidence establishes that all the allegedly defamatory comments are nonactionable opinions.  They were hyperbolic insults and trash talk that no reasonable reader, viewer or listener would understand to be statements of fact.  Second, even if any of the

comments could have been understood as statements of fact, they were substantially true. Third, Rapaport is a public figure who must establish by clear and convincing evidence that Barstool acted with actual malice. Plaintiffs have no evidence of actual malice, and certainly not the required clear and convincing evidence.

As to Plaintiffs' fraudulent concealment and inducement claims, the Court also should grant summary judgment for Defendants for three independent reasons. First these claims are duplicative of Plaintiffs' breach of contract claims. Second, Defendants did not owe Plaintiffs any duty of disclosure. Third, Plaintiffs cannot show that Barstool misrepresented or concealed any facts (as opposed to nonactionable statements of opinions) or that Plaintiffs reasonably relied on any supposed misrepresentations or concealments.

As to the breach of contract claims, the Court should deny Plaintiffs' request for summary judgment because there are dozens of disputed facts. For example, Plaintiffs assert that Barstool did not engage in "good faith efforts" to get them a weekly radio show on SiriusXM ("Sirius"), but the evidence shows that Barstool *did* engage in such efforts for months by trying to secure funding from Sirius for the show. Likewise, the parties dispute whether Rapaport's attacks on Barstool and its fans brought himself and Barstool into "public disrepute," giving Barstool the right to immediately terminate its contract with him.

Accordingly, Defendants request that the Court grant partial summary judgment on Plaintiffs' claims for defamation (Count XI) and fraud (IX and X) and deny Plaintiffs' motion.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Rapaport is a Public Figure Who Calls Himself the "MVP of Talking Trash"

Rapaport is a well-known actor, comedian and personality with over 100 credited acting roles. (Defendants' Rule 56.1 Statement of Material Facts ("SOMF") ¶¶ 1, 2). Rapaport also

developed, produces and hosts the podcast "I AM RAPAPORT: STEREO PODCAST" ("IAR"), in which he shares his "strong, funny, and offensive points of view." (SOMF ¶ 2). Rapaport is known for providing his "unfiltered views" on politics, sports and pop culture via short video "rants," which he uploads to social media. (SOMF ¶ 4).

Rapaport is the self-proclaimed "MVP of Talking Trash." (SOMF ¶ 5). Trash-talking is a genre of humor that involves insulting or attacking other people in exaggerated terms. (SOMF ¶ 6). Rapaport testified that making exaggerations some may consider offensive to achieve a humorous effect is "one of the great mechanisms of comedy." (SOMF ¶ 7).

Given his public trash talking persona, it should come as no surprise that Rapaport had a reputation for engaging in offensive conduct and making offensive comments long before the events giving rise to this lawsuit. For example:

Rapaport's Reputation for Harassing His Ex-Girlfriend: Rapaport pled guilty to the aggravated harassment of his ex-girlfriend, Lili Taylor. (SOMF ¶ 8). Rapaport's guilty plea was publicized in the media and became associated with him on social media before Barstool made any of the allegedly defamatory comments related to harassment addressed below. (SOMF ¶ 9).

Rapaport's Reputation for Having Herpes: In April 2015, a wire service posted a photo of Rapaport with a large red lesion under his lower lip:



(SOMF ¶ 10).  Rapaport acknowledged that: "In the picture, it looks like I got like a cut, infection or if you wanna pop shit, a herpe." (SOMF ¶ 11).  After the photo was posted, many people on social media commented that Rapaport had herpes. (SOMF ¶ 12).  A February 2017 Tweet about Rapaport having herpes gained widespread attention because it was made by a producer of Dan Le Batard's national sports show in the middle of a highly publicized trash-talking feud between Rapaport and Le Batard. (SOMF ¶ 13).

<u>Rapaport's Reputation for Making Racially Charged Comments</u>: Rapaport has made comments that have been criticized for being racially charged, such as Tweeting to one of Le Batard's producers, who is black, an image that one article described as "evok[ing] old-America racial caricature imagery":



(SOMF ¶ 14).  After Barstool terminated Rapaport, he has continued to engage in conduct that has been criticized as racially charged. (SOMF ¶ 15).

08032-00008/3762387.6

<u>Rapaport's Reputation for Making Sexist and Other Offensive Comments</u>: Rapaport also has a reputation for making sexist, misogynistic and other offensive comments.  For example:

• In February and March 2017, it was widely reported that Twitter suspended Rapaport's account for attacking political commentator Laura Ingraham, including by calling her a "dog-faced animal" who Donald Trump "wouldn't even grab . . . by the pussy." (SOMF ¶ 16).

• After filing this lawsuit alleging that Barstool damaged his reputation, Rapaport was widely denounced for making sexist attacks on singer Ariana Grande's appearance, including by stating that "there's hotter women at Starbucks – no disrespect to Starbucks." (SOMF ¶ 17).

• In April 2018, Rapaport, who was then 48-years-old, falsely Tweeted to Barstool employee Henry Lockwood that he had "fucked Yo Bitch," referring to Lockwood's then 19-year-old girlfriend, Barstool personality Maria Ciuffo.  When, in response, a third party asked whether "Ria" had herpes, Rapaport replied: "Nah but she got this Pipe." (SOMF ¶ 18).

• Rapaport has faced widespread criticism for using the word "retard" even though he stars on a Netflix show in which he plays the father of a special needs child. (SOMF ¶ 19).

Rapaport testified that some of these comments (such as those about Ingraham) were meant to be serious, others (such as those about Grande) were meant to be a joke, that "context is important" to interpreting them, and that his fans "totally understand" him. (SOMF ¶ 21).

**B.      Barstool is a Popular Media Company and Humor Brand that Does Not Try to be Politically Correct and Has Had its Share of Controversies**

Barstool is a popular media company and humor brand "[k]nown for its original takes and unfiltered view of most everything" that "people love or love to hate." (SOMF ¶ 22). Barstool does not try to be politically correct and has had its share of controversies. (SOMF ¶ 23).  Barstool's backbone is its devoted fan base, known as "Stoolies." (SOMF ¶ 27).

### C.     The Parties Agree that Rapaport Will Bring His Content to Barstool

Rapaport first appeared as a guest on a Barstool show in 2015, the reaction was positive, and Rapaport continued to make guest appearances on Barstool shows. (SOMF ¶ 28).  In October 2016, Barstool's founder and Head of Content, David Portnoy ("Portnoy") emailed Rapaport to gauge his interest in formally working with Barstool, writing that he thought Rapaport would "fit perfectly with our style of comedy." (SOMF ¶ 29).

In December 2016, the parties, who were represented by transactional counsel, began negotiating an agreement to bring Rapaport's content to Barstool. (SOMF ¶¶ 35, 36).  After exchanging six drafts over the course of six months, Plaintiffs and Barstool signed an agreement (the "Talent Agreement") with an effective date of June 17, 2017. (SOMF ¶¶ 33-36).

Under the Talent Agreement, Rapaport agreed, *inter alia*, to deliver rant videos and a recurring podcast to Barstool.  Barstool agreed to pay Plaintiffs a $400,000 "Podcast Guarantee" and a $200,000 "Rant Guarantee."  Barstool had the right to "immediately" terminate the Talent Agreement if Rapaport brought himself or Barstool into "public disrepute." (SOMF ¶ 34).

The Talent Agreement also required Barstool to engage in "good faith efforts" to secure an opportunity for Plaintiffs to have a weekly show in a platform to be agreed to by the parties ("e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series"). (SOMF ¶ 34(h)). Barstool engaged in such efforts: It obtained a channel on Sirius, tried to secure Plaintiffs a show on the channel, but was unable to obtain a large enough budget to do so. (SOMF ¶¶ 64-70). Barstool regularly apprised Plaintiffs about its efforts to secure them a show. (SOMF ¶¶ 68-69).

### D.     Rapaport and Defendant Adam Smith Feud Over Unpaid Bets

Within months of joining Barstool, Plaintiffs reaped the benefits of Barstool's devoted fanbase.  For example, by October 2017, Rapaport's IAR podcast was the second-highest ranked

sports podcast on iTunes, causing him to Tweet: "The Barstool Effect is real!!!" (SOMF ¶ 39).

Rapaport then began feuding with one of Barstool's bloggers, Defendant Adam "Smitty" Smith.  Smith complained that Rapaport made a fantasy football bet with him, lost it, and did not pay; Rapaport denied making the bet.  In November 2017, Smith posted a blog describing what he believed had happened titled "Michael Rapaport Is A Fraudulent Sack of Shit." (SOMF ¶ 40).

In February 2018, Rapaport and Smith had another dispute over a bet.  Smith was fighting in an amateur boxing contest owned by Barstool.  Rapaport bet that Smith would lose but refused to pay when Smith won, asserting that Smith had used steroids (which Smith readily acknowledged).  On February 14, 2017, Smith posted another blog describing what he believed had happened titled "Michael Rapaport Is A Fraudulent Sack of Shit – Part II." (SOMF ¶ 41).

### E.    Rapaport Call Stoolies Losers, Causing Barstool to Terminate his Contract

Rapaport posted dozens of Tweets accusing Smith of being on steroids, and then started attacking Stoolies and other Barstool personalities. (SOMF ¶¶ 42, 43).   On the evening of February 17, 2018, Rapaport Tweeted: "[I]f you call yourself a fucking stoolie for real, you've already lost in life." (SOMF ¶¶ 43-45).  Rapaport's Tweet enraged Stoolies and Barstool personalities, escalating the feud. (SOMF ¶¶ 44, 45).

The next morning, Portnoy texted Rapaport that he had to fire him "after last night." (SOMF ¶ 46).  Portnoy then posted a video to Twitter and Barstool's website explaining that he was firing Rapaport because he had "insult[ed] our entire" fan base, that Stoolies are the reason "we all have jobs," and that "we love our fucking fans, they're the best." (SOMF ¶ 47).

### F.    After Rapaport is Fired, the Parties Continue to Trade Insults

After he was fired, Rapaport continued to attack Barstool.  For example, Rapaport logged into Barstool's main Twitter account (to which he still had access) and posted a video in which

he said that Portnoy was a "dumb mother fucker," a "dumb fuck," and a "bitch." (SOMF ¶ 48).

He later posted a photoshopped image in which he appears to be having anal sex with Portnoy:



(SOMF ¶ 49).  He also falsely Tweeted to Lockwood that he had "fucked Yo Bitch"—referring

to his girlfriend, a 19-year-old Barstool personality—and given her his "pipe" (SOMF ¶ 18).

Barstool responded in kind.  For example, several Barstool personalities produced and

posted a "diss track" song and video.  The context of the diss track, including the lyrics of the

song (*e.g.,* Rapaport is a "10 gallon drum of curdled milk") and the images (*e.g.,* see below),

were hyperbolic to the extreme such that no reasonable viewer would take it seriously:



(SOMF ¶¶ 50, 51). Yet Plaintiffs assert this video is defamatory. (SOMF ¶ 52).

Each side traded insults, but it was Rapaport, the self-proclaimed "MVP of Talking Trash," who, notwithstanding his mantra that "you got to give it; you got to take it" (SOMF ¶ 56), decided to bring a schoolyard fight to federal court by filing this lawsuit.

## III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' CLAIMS FOR DEFAMATION AND FRAUD

### A.   Plaintiffs' Defamation Claim Fails as a Matter of Law (Count XI)

Plaintiffs' defamation claim consists of more than 75 written, audio and visual comments made by Barstool personalities on social media and on Barstool platforms. (SOMF ¶¶ 52, 53). For the most part, Plaintiffs cherry pick isolated words, phrases or sentences from these larger works, ignoring the entirety of the communications and their larger context. (*Id*.)  The allegedly defamatory comments fall into one or more of four categories: (1) comments allegedly claiming that Rapaport has herpes (the "Herpes Comments"); (2) comments allegedly claiming that Rapaport is racist (the "Race Comments"); (3) comments allegedly claiming that Rapaport is a fraud (the "Fraud Comments"); and (4) comments allegedly claiming that Rapaport committed stalking and domestic violence (the "Stalking Comments"). (*Id*.)

The elements of a claim for defamation are: (1) a false and defamatory statement of fact concerning the plaintiff; (2) that was published by the defendant to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); and (4) special damages or "per se actionability." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000). Plaintiffs cannot satisfy these elements.  First, none of the comments at issue is an assertion of fact capable of being proven true or false.  Second, to the extent any statement could be deemed a statement of fact, it was substantially true when made.  Third, Rapaport is a public figure and

Plaintiffs cannot prove that Defendants made any of the statements with actual malice.

**1.      All the Allegedly Defamatory Comments are Nonactionable Opinions**

Statements of fact are actionable; statements of opinion are not. *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986).  A "pure opinion" is one that either includes a "recitation of the facts upon which it is based" or that "does not imply that it is based upon undisclosed facts." *Id*.  Opinions can only be actionable if they imply that the speaker knows certain facts which are detrimental to the plaintiff and false. *Id*. at 553.  Moreover, even apparent statements of fact may assume the character of opinion—and are thus privileged—when made under circumstances in which the audience would anticipate the use of "epithets, fiery rhetoric or hyperbole." *Id*. at 556 (internal quotation marks omitted).

The question of whether a statement is one of fact or opinion is a question of law to be determined by the Court. *Id*. at 553.  The Court must decide what a reasonable person hearing or reading the communication would understand it to mean. *Id*.  In order to make this determination, New York courts consider four factors: (1) whether the specific language at issue has a precise meaning that is readily understood; (2) whether the statement is capable of being objectively characterized as true or false; (3) the full context of the communication in which the statement appears; and (4) "the broader social context or setting surrounding the communication . . . which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact[.]'" *Id*. at 554 (quoting *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984)). Each of the allegedly defamatory comments is a non-actionable opinion under this analysis.

**a.      The Context Surrounding the Allegedly Defamatory**

**Comments Shows that They Are Nonactionable Opinions**

New York courts begin the fact vs. opinion analysis by examining "the content of the

whole communication, its tone and apparent purpose." *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991).  Although Plaintiffs focus on isolated words, phrases and sentences within larger publications, those statements "must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts." *Id*.  "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made" to determine in the first instance whether they can be understood as statements of fact or opinion. *Brian v. Richardson,* 660 N.E.2d 1126, 1130 (N.Y. 1995).

The overall context of the allegedly defamatory comments demonstrates that any reasonable person would understand that they all are opinions.  For example:

The Comments Were Made During a Trash-Talking Feud: These comments were made in the context of a trash-talking feud that began when Smith and Rapaport traded insults about unpaid bets[1] and escalated when Rapaport attacked Barstool and its fans, calling Stoolies losers, posted an image of himself having anal sex with Portnoy, and falsely insinuated that he had sex with a 19-year-old Barstool personality. (SOMF ¶¶ 18, 40, 41, 43-45, 49).  A quick review of the allegedly defamatory comments demonstrates that they are precisely the type of insults made during trash-talking—*e.g.*, "herpes-riddled fuck," "old crusty herpe," "herp-infested horse," "fraudulent sack of shit," "pasty, sickly, race-baiting fraud hack." (SOMF ¶¶ 52, 53).  These comments are, in the words of one court, "puerile attempts . . . to outdo each other." *Finkel v.*

---

[1] Based on his belief that Rapaport had refused to pay on a bet, Smith wrote a series of blogs entitled "Michael Rapaport is a Fraudulent Sack of Shit," Parts I, II and III. (SOMF ¶¶ 40, 41, 53(x), (y)).  These blogs are the foundation for Plaintiffs' defamation claim based on the Fraud Comments and are full of invective, hyperbole and insults. (SOMF ¶ 52).  Indeed, the phrase "sack of shit" in their titles is a clear indication to any reasonable reader that they should be understood as trash talking opinions, albeit opinions based on disclosed facts.

*Dauber*, 906 N.Y.S.2d 697, 701-02 (Sup. Ct. 2010).

The Comments Were Made by the "MVP of Talking Trash" and a Humor Brand: A reasonable reader would consider *who* made these comments.  Rapaport, the "MVP of Talking Trash," readily admits that his fans understand that many of the comments he makes are not meant to be true. (SOMF ¶ 54).  Likewise, Barstool is a humor brand with a no-holds-barred approach to popular culture where "politically incorrect" speech and behavior is widely accepted. (SOMF ¶¶ 22-24).  Fans of both would expect comments of hyperbole and opinion, not a "rigorous and comprehensive presentation of factual matter." *Immuno AG.*, 567 N.E.2d at 1280 (internal quotation marks omitted).  Indeed, the fact that 80% of those who read the blogs containing the allegedly defamatory comments were repeat visitors to Barstool's site demonstrates that a reasonable reader would consider them in context. (SOMF ¶ 57).

The Comments Were Made on Online: A reasonable reader would consider *where* these comments were made.  They were not made in the *New York Times*, but rather, on social media and Barstool's virtual platforms. (SOMF ¶¶ 52, 53).  The "culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a freewheeling, anything-goes writing style" that signals to readers that statements made in these forums should be interpreted as opinion or hyperbole rather than fact. *Jacobus v. Trump*, 51 N.Y.S.3d 330, 339 (Sup. Ct. 2017) (internal quotation marks omitted); *SI03, Inc. v. Bodybuilding.com, LLC,* 2008 WL 11348458, at *10 (D. Idaho May 1, 2008) ("[I]n the context of Internet postings and the casual dialogue that typically accompanies such 'cyber-smackdowns,' name-calling, hyperbole, and, generally, juvenile behavior is not unusual; indeed, it is not only expected at times, but often encouraged.").  The comments at issue are precisely this type of Internet-based insult and heated rhetoric.

Moreover, Plaintiffs concede that context is important in determining whether something is meant seriously or as a joke.  Indeed, Rapaport testified that not only are context and tone important, but that exaggeration and hyperbole are cornerstones of comedy. (SOMF ¶ 55).  For example, when Rapaport himself joked about having had a sexually transmitted disease, he "didn't think anyone would actually take it seriously." (SOMF ¶ 58).

Plaintiffs argue that Barstool's brand is "authentic" and therefore Barstool's audience expects its content to be literal or consist of statements of fact. Dkt. 104, pp. 2, 20.  But that is not what "authentic" means.  Authentic means that Barstool is true to its brand of humorous, no-holds barred discourse. (SOMF ¶ 24).  Accordingly, context demonstrates that the allegedly defamatory comments are non-actionable opinions.

**b.     The Allegedly Defamatory Comments Contain Loose, Figurative Terms Not Capable of Being Proven True or False**

Only statements of fact that are capable of being proven true or false are actionable. *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014).  "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999).

Here, all of the allegedly defamatory comments contain loose, figurative and colloquial expressions that are not of a nature that can be proven true or false:

<u>The Herpes Comments</u>: These are all figurative insults designed to mock Rapaport.  For example, phrases like "old crusty herp," "herpes riddled fuck," "herp-infected horse" and "Herp Brooks" are clearly vague comments not capable of precise definition.  Indeed, the t-shirt that Plaintiffs assert is defamatory portrays Rapaport as a clown with a lesion on his face. (SOMF ¶ 53(s)).  The loose and comedic nature of the words used, in addition to the portrayal of Rapaport

as a clown, indicates to the reasonable viewer that Defendants were simply attempting to mock Rapaport in various humorous ways, not setting forth factual statements about him.

The Racist Comments: Rapaport testified that, "[i]f someone calls me a racist, that's their right to say that I'm a racist if that's how they feel." (SOMF ¶ 60).  New York courts agree, and "have consistently held that terms like 'racist' constitute nonactionable opinion." *Cummings v. City of New York*, 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24, 2020).  This is because the term "racist" is inherently subjective, lacks a precise meaning and is nothing more than a non-actionable insult. *See, e.g., id.* at *22 ("Descriptions of Plaintiff as a 'bigot,' 'white devil' and 'cracker-ass-cracker' are not actionable."); *Torain v. Liu,* 2007 WL 2331073, at *2-3 (S.D.N.Y. Aug. 16, 2007) (statement during "war of words" that the plaintiff was a "racist pedophile" was non-actionable opinion); *Silverman v. Daily News, L.P.,* 11 N.Y.S.3d 674, 675 (App. Div. 2d Dep't 2015) (statements that the plaintiff had authored "'racist writings,'" and that he had ties to a "'white supremacist group,'" were non-actionable opinions).

The Fraud Comments: The comments that Rapaport is a "fraud" are also no more than rhetorical hyperbole, *i.e.*, exaggerations employed for rhetorical effect. *See, e.g., Clifford v. Trump*, 339 F. Supp. 3d 915, 925-26 (C.D. Cal. 2018) (statement that plaintiff was "engaging in a 'con job' or is lying" was rhetorical hyperbole).  And these comments are based on disclosed facts: Smith's belief that Rapaport had refused to pay on a bet and, as a result, was a fraud. *See Partington v. Bugliosi,* 56 F.3d 1147, 1156 (9th Cir. 1995) (if "the author presents the factual basis for his statement, [it] can only be read as his personal conclusion about the information presented, *not as a statement of fact*") (emphasis in original) (internal quotation marks omitted).

The Stalking Comments: These comments, including the one in the "diss track" about "making you look as black and blue as your ex," are also rhetorical hyperbole based on

Rapaport's guilty plea to aggravated harassment. *See Wilson v. Grant*, 297 N.J. Super. 128, 136 (App. Div. 1996) ("When 'wife-beating' is considered in the context with the remaining words . . . the language is mere name-calling or verbal abuse.").  Accordingly, when properly evaluated in context, all of the allegedly defamatory comments are non-actionable statements of opinion.

2.      <strong>To the Extent Any of the Allegedly Defamatory Comments are Deemed Statements of Fact, they are Substantially True</strong>

Truth is an absolute defense to defamation. *See Tannerite Sports, LLC v. NBCUniversal News Grp.,* 864 F.3d 236, 242-44 (2d Cir. 2017).  To prove truth, the defendant need only establish that the statement is "*substantially* true, as when the overall 'gist or substance of the challenged statement' is true." *Tolbert v. Smith*, 790 F.3d 427, 440 (2d Cir. 2015) (emphasis in original) (quoting *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014)).  "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC*, 864 F.3d at 242-43 (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)) (internal quotation marks omitted).  Each of the allegedly defamatory statements was substantially true.

<u>The Herpes Comments</u>: A widely circulated photo of Rapaport showed a large lesion on his chin, in which Rapaport himself admitted that it "looks like I got . . . a herpe." (SOMF ¶¶ 10 11).  Indeed, long before any of the Defendants made any of the Herpes Comments, many others on the Internet had commented, based on that photo, that Rapaport had herpes. (SOMF ¶¶ 11-13).  Thus, to the extent that Defendants' comments about Rapaport's "herpes infested mouth," "herpes mouth" or "herpes face" could be considered statements of fact, they truthfully describe Rapaport's own appearance in a photo in which he admits it looks like he has a herpes lesion.

<u>The Stalking Comments</u>: If any of these comments are deemed to be statements of fact,

they are also substantially true.  Rapaport pleaded guilty to a charge of aggravated harassment of his former girlfriend, Lili Taylor, which stemmed from complaints that, after they broke up, Rapaport called Taylor repeatedly and showed up at her apartment at 1 a.m. after she refused to return his calls. (SOMF ¶¶ 8, 9).  The "gist" of a charge of "stalking" is that a person engages in unwanted contact with another person—precisely what Rapaport admitted doing to Taylor.

The Race and Fraud Comments: Rapaport's long history of making racially charged comments has been subject to criticism. (SOMF ¶ 15).  Similarly, Defendants believed Rapaport had failed to pay bets he made with Smith, which was the basis to call him a fraud. (SOMF ¶¶ 40, 41, 53(d), (g), (j), (x), (cc), (tt), (yy), (fff), (jjj), (sss)).

### 3. Plaintiffs Cannot Prove that Defendants Acted with Actual Malice

As an actor and comedian credited in over 100 roles, there is no dispute that Rapaport is a public figure. (SOMF ¶¶ 1, 2); *James v. Gannett Co.*, 353 N.E.2d 834, 839 (N.Y. 1976) ("public performers such as . . . television and movie actors" are public figures.).  A public figure cannot prevail on a defamation claim "unless ***clear and convincing evidence*** proves that a false and defamatory statement was published with actual malice—that is, ***with knowledge that it was false or with reckless disregard of whether it was false or not***." *Kipper v. NYP Holdings Co.*, 912 N.E.2d 26, 29 (N.Y. 2009) (emphasis added) (internal quotation marks omitted).  "The actual malice standard recognizes that falsehoods relating to public figures are 'inevitable in free debate' and that publishers must have sufficient 'breathing space[.]'" *Id.* at 30 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988)).  The clear and convincing evidence standard applies with equal force to the Court's determination on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("a court ruling on a motion for

summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary

standard in determining whether a genuine issue of actual malice exists").

To meet this standard, Plaintiffs must present clear and convincing evidence that

Defendants "had a subjective awareness of either falsity or probable falsity of the defamatory

statement, or acted with reckless disregard of . . . its truth or falsity." *Celle*, 209 F.3d at 182.  The

actual malice standard does not "measure malice in the sense of ill will or animosity," as

Plaintiffs assert (Dkt. 104, pp. 21-22), "but instead the speaker's subjective doubts about the

truth of the publication." *Church of Scientology Int'l. v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).

Where the speech at issue involves fiction, humor, satire or parody, courts must examine

what the speaker subjectively intended to convey in order to determine whether the speaker acted

with actual malice. *Greene v. Paramount Pictures Corp*., 340 F. Supp. 3d 161, 170-71 (E.D.N.Y.

2018) (defendant did not act with actual malice because it did not intend its fictional character to

be "of and concerning" the plaintiff).  In reaching this conclusion, the *Greene* court relied

extensively on *New Times, Inc. v. Issacks*, 146 S.W.3d 144, 148-49 (Tex. 2004) in which the

court considered a satirical article commenting on the performance of a district attorney and a

judge.  The *New Times, Inc.* court affirmed summary judgment because "none of the witnesses

knew or had reckless disregard for whether the satire would be taken as stating actual facts, nor

is there any evidence that they intended such a result." *Id*. at 165.  Other courts are in accord. *See

e.g., Hoppe v. Hearst Corp.,* 53 Wn. App. 668, 676-77 (1989 Wash. Ct. App.) (plaintiff failed to

establish actual malice in publishing satirical article calling him "Hurley Herpes," because no

evidence showed the defendants "intended the column to convey defamatory facts, or believed

that the column did convey such facts."); *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188,

1194 (9th Cir. 1989) (plaintiff could not establish actual malice where the defendant did not

intend that its satirical cartoons and articles about the plaintiff would be taken as factual or truthful assertions); *Miss Am. Pageant, Inc. v. Penthouse Int'l, Ltd.*, 524 F. Supp. 1280, 1287 (D. N.J. 1981) (plaintiff could not prove actual malice in defamation claim arising out of a fictional work because "such works are not intended to convey truth.").

 Here, the evidence establishes that Defendants did not intend their comments about Rapaport to be taken as statements of fact. (SOMF ¶¶ 61-63).  For example, Defendants testified that the Herpes Comments were "funny" and "trash talk for a joke." (SOMF ¶ 63).  The comments were part of the ongoing "war of words" between Barstool and Rapaport. (SOMF ¶ 59).

Even if Defendants had intended their comments to be factual, Plaintiffs still cannot prove actual malice because Defendants had a reasonable basis to believe their comments were substantially true.  Defendants had a reasonable basis to believe that Rapaport may have had herpes based on the photo with the red lesion and the many comments people had made on social media about him having herpes.  Defendants had a reasonable basis to believe that Rapaport was a racist based on his history of making racially charged comments. Defendants had a reasonable basis to believe that Rapaport was a fraud based on their belief that he had twice refused to pay bets that he made.  And Defendants had a reasonable basis to believe that Rapaport was a harasser and stalker based on his guilty plea to aggravated harassment of his ex-girlfriend. Indeed, Defendants testified that they made these comments based on information available online and ongoing jokes that were "all over the internet." (SOMF ¶¶ 61-63).

Plaintiffs claim Defendants acted with actual malice because they viewed themselves to be "in a war" with Rapaport and their goal was to humiliate Rapaport. *See* Plaintiffs' Motion (Dkt. 104), p. 22.  But "evidence of intent to ridicule is not evidence of actual malice. Rather,

actual malice concerns the defendant's attitude toward the truth, not toward the plaintiff." *Isaacks*, 146 S.W.3d at 165.  Indeed, "[e]quating intent to ridicule with actual malice would curtail the 'uninhibited, robust, and wide-open' public debate that the actual malice standard was intended to foster, particularly if that debate was expressed in the form of satire or parody." *Id*. (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  Accordingly, Plaintiffs cannot prove actual malice.

### B.   The Court Should Grant Summary Judgment for Defendants on Plaintiffs' Fraudulent Inducement and Concealment Claims (Counts IX, X)

Plaintiffs assert claims for fraud based on Barstool's purported misrepresentation and concealment of material facts relating to its efforts to secure them a weekly show on Sirius. Dkt. 104, pp. 9-12.  These claims fail as a matter of law for two independent reasons: (i) Plaintiffs have asserted a breach of contract claim arising out of the same subject matter, and (ii) Barstool had no duty to disclose each of its individual discussions with Sirius, which occurred over a period of eight months in a process that, as Plaintiffs acknowledge, was "fluid."  Even if they can get past these hurdles, Plaintiffs cannot establish the elements of fraud.  Based on the undisputed facts, Plaintiffs cannot show: (a) that Barstool misrepresented or omitted material facts (as opposed to non-actionable statements of opinion), (b) that Plaintiffs' purported reliance on these asserted misrepresentations and omissions was reasonable, or (c) that Barstool did not intend to perform at the time it made the alleged representations.

### 1.   Plaintiffs' Fraud Claims are Barred Because their Breach of Contract Claim (Count II) Relates to the Exact Same Subject Matter

"Under New York law, a cause of action sounding in fraud cannot be maintained when the only fraud charged relates to a breach of contract." *Ellington Credit Fund, Ltd. v. Select*

*Portfolio Servicing, Inc*., 837 F. Supp. 2d 162, 197 (S.D.N.Y. 2011); *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co*., 70 N.Y.2d 382, 388 (1987) (contract governing particular subject matter "precludes recovery" for events "arising out of the same subject matter").  Plaintiffs assert that Barstool engaged in fraud by misrepresenting and concealing facts relating to its efforts to secure Plaintiffs a weekly show on Sirius. Dkt. 104, pp. 9-12.  Yet, in Count II of their FAC, Plaintiffs assert a claim for breach of the Talent Agreement based on the very same facts. *Id*., pp. 12-14. Plaintiffs' fraud claims are therefore barred because their breach of contract claim arises out of the exact same subject matter: Barstool's efforts to secure Plaintiffs a weekly show on Sirius.

In order to maintain their overlapping fraud and breach of contract claims, Plaintiffs must show either (i) a fraudulent misrepresentation or concealment "extraneous" to the Talent Agreement or (ii) that they have suffered special damages caused by the misrepresentation or omission that are unrecoverable as contract damages. *See Papa's-June Music, Inc. v. McLean,* 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996)*.*  Plaintiffs can do neither.

Plaintiffs cannot show that there was any misrepresentation or concealment "extraneous" to the Talent Agreement.  Plaintiffs assert that (i) while negotiating the Talent Agreement, Barstool CEO Erika Nardini ("Nardini") misrepresented when Barstool and Sirius would reach a deal, and (ii) while negotiating the Talent Agreement and shortly after its execution, Nardini did not disclose facts about Sirius' willingness to fully fund Plaintiffs' show. Dkt. 104, pp. 9-11. Even if these purported representations and omissions were actionable (as addressed below, they are not), they are not "extraneous" to the Talent Agreement but instead relate directly to Barstool's contractual obligation to engage in "good faith efforts" to secure Plaintiffs a weekly show. (SOMF ¶ 34(h)).

Plaintiffs also cannot show that they have suffered special damages caused by the purported misrepresentations and omissions that are unrecoverable as contract damages. If Plaintiffs recover on their breach of contract claim (Count II), they would at most be entitled to $375,000, the amount that Barstool had to pay them under the Talent Agreement if it secured them a weekly show. (SOMF ¶ 34(h)). Plaintiffs cannot show that, but for Barstool's purportedly fraudulent conduct, they could recover more than $375,000. When the parties entered into the Talent Agreement, Plaintiffs had no comparable offer. In fact, no other company was willing to give Plaintiffs a weekly show at all, much less pay them $375,000 for one. (SOMF ¶ 38). As such, the damages Plaintiffs could recover for their fraud claims are, at best, "redundant" of their breach of contract damages. *See Tuck Indus., Inc. v. Reichhold Chems., Inc.*, 542 N.Y.S.2d 701, 702 (App. Div. 2d Dep't 1989).

### 2.     Barstool Did Not Owe Plaintiffs any Duty to Disclose

In business transactions, absent a fiduciary relationship, a party is under no duty to disclose material facts unless it has superior knowledge that is not readily available to the other party *and* it knows that the other party is acting based on mistaken knowledge. *See Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 366 (N.D.N.Y. 2013). Plaintiffs did not allege in their First Amended Complaint ("FAC") that Barstool owed them any duty of disclosure. *See* FAC (Dkt. 60), Counts XI, X. Now, Plaintiffs fault Barstool for concealing information relating to its discussions with Sirius around the time the parties executed the Talent Agreement in June 2017. Dkt. 104, p. 10. But at this time, discussions between Barstool and Sirius were only preliminary—a draft of the agreement between Barstool and Sirius was not even circulated until September 2017. (SOMF ¶¶ 64, 65). Barstool had no duty to disclose these

nascent discussions to Plaintiffs, who were independent contractors. (SOMF ¶ 34(a)).[2]  And

Plaintiffs were not acting based on mistaken knowledge: Barstool regularly apprised Plaintiffs

about its efforts to secure Plaintiffs a weekly show. *See infra* Section III.B.3.c.

### 3.    Plaintiffs Cannot Establish the Elements of Their Fraud Claims

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a

misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3)

which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff

reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d

153, 156 (2d Cir. 2001).  A plaintiff must establish each element by "clear and convincing

evidence." *Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir. 1988).

### a.    The Assertions and Omissions at Issue are Non-Actionable Statements of Opinion, not Material Facts

To establish fraud, a plaintiff must identify misrepresentations or omissions of past or

present material facts. *Zanani v Savad,* 630 N.Y.S.2d 89, 90 (App. Div. 2d Dep't 1995).

Moreover, "'a prediction of something which is . . . expected to occur in the future will not

sustain an action for fraud.'" *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 117 (App

Div. 1st Dep't 2008) (quoting *Zanani*, 630 N.Y.S.2d at 90); *In re Aratana Therapeutics Inc. Sec.

Litig*. ("*Aratana*"), 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) ("Statements that express

expectations about the future rather than presently existing, objective facts are . . .  statements of

opinion.") (internal quotation marks omitted).

---

[2] Plaintiffs assert (without any citation) that Barstool owed them a duty to disclose its discussions with Sirius because the "nature of the relationship between Barstool and Sirius was of a high-level confidential business nature." Dkt. 104, p. 11.  Even if this were true (Plaintiffs have not identified any evidence to this effect), the nature of the relationship between Barstool and *Sirius* does not impose on Barstool any duty of disclosure to *Plaintiffs*.

Here, the four purported misrepresentations and omissions that Plaintiffs have identified (Dkt. 104, p. 10) were non-actionable expressions of opinions or promises of future conduct:

Plaintiffs only have identified a single purported misrepresentation by Barstool—Nardini's statement in April 2017 that "Sirius *should* be done in a matter of weeks at most. *The podcast isn't dependent on Sirius. We can move forward with the pod and the rants and follow up with Sirius*." (SOMF ¶ 70) (emphasis added). Plaintiffs assert this was a misrepresentation of when its deal with Sirius would be "done." Dkt. 104, p. 10. But Nardini's use of the word "should" makes clear that she was merely expressing her belief about when Barstool's deal with Sirius might be done. Such "forward-looking" statements, "accompanied by meaningful cautionary language," are not actionable. *See Aratana*, 315 F. Supp. 3d at 758. In fact, even though Plaintiffs *knew* that the Sirius deal was *not* done "in a matter of weeks," that did not stop them from executing the Talent Agreement two months later, in June 2017.

Plaintiffs have identified three emails that they assert contain material facts that Barstool omitted, all relating to Sirius' asserted unwillingness to fund their show. Dkt. 104, p. 10. As with Barstool's "misrepresentation," these purported "omissions" are not actionable.

In the first, Nardini asked Sirius in March 2017 if it would consider an arrangement whereby Sirius would fund the majority of the cost of Plaintiffs' show, and Sirius responded: "Depending on the number yes we would." (SOMF ¶ 70). Plaintiffs assert that this exchange shows that Barstool concealed that it "would not provide Plaintiffs a weekly show unless Sirius covered all costs." Dkt. 104, p. 10. To the contrary, this exchange was simply one of many early discussions about how to fund Plaintiffs' show, and Barstool and Sirius were exploring options.

In the second, a March 2017 exchange, Barstool had a daily show on Sirius that was set to expire in six months and was in early discussions with Sirius about extending the show or

getting its own channel. (SOMF ¶ 64).  Nardini wrote to Sirius that Rapaport wanted $375,000 for his show, and Sirius responded that this was "great," but then expressed concern about investing in the show without extending its relationship with Barstool (which it ultimately did). Sirius did *not* say that it would not fully fund the show, as Plaintiffs assert. (SOMF ¶ 70).

In the third, Sirius wrote to Nardini in July 2017: "[I]f we get there we have a fee[ling] Michael Rapaport would agree to for the daily show so he is ready to go if we get there, he would do it for $300k." (SOMF ¶ 70).  Plaintiffs assert that this email shows that Barstool concealed that Sirius "would not cover the full cost of the show." Dkt. 104, p. 10.  In fact, Sirius appears to be stating its *belief* that *Rapaport* would be willing to do his show for $300,000, not that it was unwilling to cover the full cost of the show.  Sirius' belief was not a material fact that Defendants had to disclose to Plaintiffs.  And even if Sirius were unable to fully fund the show, this does not mean that Barstool would not have covered the remainder.

Barstool's purported concealment of these statements of opinions and forward-looking expression, as opposed to present material facts, was in no way fraudulent conduct.

### b.   Plaintiffs' Purported Reliance on These Asserted Representations and Omissions was Not Reasonable

Plaintiffs' purported reliance on these asserted representations or omissions to conclude Barstool was guaranteeing them a show on Sirius was not reasonable for three reasons.

First, the Talent Agreement did not guarantee Plaintiffs a Sirius show but merely required that Barstool engage in good faith efforts to secure them an "opportunity" for a weekly show "in a format to be agreed upon by the parties"—"e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series"—not necessarily on Sirius. (SOMF ¶ 34(h)).

-24-

To get around this fact, Plaintiffs assert that Barstool waited until the "last hour" to add the "good faith efforts" language. Dkt. 104, p. 10.  Not so.  On April 25, 2017, Nardini sent Plaintiffs a revised version of the Talent Agreement removing any reference to Barstool committing to provide them a weekly show.  Far from objecting to this fact, Plaintiffs wrote internally and to Nardini that the agreement was "terrific."  Plaintiffs then proposed *adding the "good faith efforts" language the Talent Agreement*, to which Nardini agreed. (SOMF ¶¶ 36, 37).  Thus, it was Plaintiffs, not Barstool, who proposed the language they now seek to avoid.

Second, Plaintiffs could not reasonably rely on purported misrepresentations or omissions outside the Talent Agreement because it is a fully integrated agreement negotiated by counsel over the course of six months. (SOMF ¶¶ 34((j), 35, 36).[3]  Indeed, Plaintiffs have significant experience negotiating and executing similar contracts. (SOMF ¶¶ 35).

Third, Barstool repeatedly told Plaintiffs that it had not secured them a show on Sirius. (SOMF ¶ 68).  In November and December 2017, Nardini repeatedly advised Plaintiffs that she was trying to get more money from Sirius to fund their show and was waiting for an answer. (SOMF ¶ 68).  In January 2018, Nardini advised Rapaport: "No word from Sirius I need them to give us more $$ and I'm not sure it's happening." (*Id.*).  Indeed, Plaintiffs acknowledged on January 15, 2018, two days before Barstool's Sirius channel launched, that "**we understand that Sirius is a fluid situation as far as radio show goes**." (SOMF ¶ 69) (emphasis added).  Thus, Plaintiffs were well aware that that there was no guarantee a Sirius show would happen.

///

///

---

[3] Plaintiffs assert that the Term Sheet somehow "clarified" that the good faith efforts language was really a guarantee. Dkt. 104, pp. 4, 11-12.  But, of course, the Term Sheet was superseded by the Talent Agreement. (SOMF ¶¶ 30, 32, 33, 34(j)).

   c.      **Barstool Did Not Intend to Defraud Plaintiffs and, in Fact,**
           **Performed its Obligations under the Talent Agreement**

Overwhelming evidence shows that Barstool intended for Rapaport to have a show on Sirius when it executed the Talent Agreement and thereafter engaged in good faith efforts to secure that show for Plaintiffs.  For example, in June 2017, Nardini circulated documents identifying Rapaport as a daily host and wrote in an internal email to a Barstool colleague: "Rapaport has a show."  From June to October 2017, Barstool identified Rapaport as a daily host in its draft agreements with Sirius, internal emails, and on proposed schedules.  Even after Barstool removed Rapaport as a daily host from its draft agreement with Sirius in late October 2017 because of budgetary issues, Barstool continued to try to secure funding for Plaintiffs' show well into 2018. (SOMF ¶¶ 66-69).  All of this evidence undermines any claim that Barstool intended to defraud Plaintiffs at the time the Talent Agreement was entered. *See Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 476 (S.D.N.Y. 2006); *Green v. Dolphy Constr. Co.*, 590 N.Y.S.2d 238, 239-40 (App. Div. 2d Dep't 1992) (dismissing fraud claim where partial performance of contract alleged).

In other words, the evidence shows that Barstool intended for Rapaport to be a daily host when it executed the Talent Agreement and then, consistent with this intent, performed its obligations under the Talent Agreement to engage in "good faith efforts" to secure Plaintiffs an opportunity to have a weekly show by trying to secure the money necessary to fund the show. Thus, Plaintiffs cannot establish that Barstool had any intent to defraud them.

///

///

///

IV.     **PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR
         BREACH OF CONTRACT CLAIMS OR BARSTOOL'S COUNTERCLAIM**

Plaintiffs completely disregard the standard governing summary judgment in moving on six of their breach of contract claims along with Barstool's Counterclaim.  The Court must, of course, "construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). As set forth below, when the evidence is viewed in the light most favorable to Defendants, it is clear that there are genuine issues of material fact as to each of these claims.

A.      **Barstool Properly Exercised its Right to Immediately Terminate the Talent
         Agreement (Count I)**

Plaintiffs assert that Barstool terminated the Talent Agreement in violation of provisions requiring advance written notice and the opportunity to cure. Dkt. 104, p. 6.  But the Talent Agreement gave Barstool the "right to **immediately** terminate this Agreement upon written notice to [Plaintiffs] in the event that [Plaintiffs] . . . engage in conduct that brings [Plaintiffs] or Barstool into public disrepute." (Counter Statement of Material Facts ("CSMF") ¶ 435(j)) (emphasis added). Barstool properly exercised this right.

Rapaport brought himself into public disrepute with Barstool by attacking its employees and fans. (CSMF ¶ 452).  Rapaport's February 17, 2018 Tweet, "if you call yourself a fucking stoolie for real, you've already lost in life," enraged Stoolies, many of whom commented that he did not understand Barstool's culture or appreciate its fans. (CSMF ¶¶ 453, 454).  The morning after Rapaport sent this Tweet, Portnoy made clear in a text he sent to Rapaport and then in a video he posted to Twitter and Barstool's website that he was terminating Rapaport because of

these attacks. (CSMF ¶ 455).[4]  These facts alone, which must be accepted as true, create a triable issue as to whether Rapaport's attacks on Barstool and its fans justified immediate termination of the Talent Agreement.

Plaintiffs argue that controversies involving Barstool somehow prove that Rapaport's behavior did not bring him or Barstool into public disrepute, but these arguments simply create more disputed issues of fact.

For example, Plaintiffs assert that Rapaport's attack on Stoolies could not have brought himself and Barstool into public disrepute because Portnoy has referred to Stoolies as losers. Dkt. 104, p. 7.  But Plaintiffs' own evidence shows that Portnoy was not calling *all* Stoolies losers.  Rather, Portnoy called out specific Stoolies who disagreed with him for disciplining a Barstool blogger who called a female musician, Rihanna, fat. (CSMF ¶ 92).[5]  As Portnoy testified: "[N]obody in the history" of Barstool, much less a new hire, "has ever said anything remotely similar" to what Rapaport said in attacking Stoolies. (CSMF ¶ 90).

Plaintiffs also assert that Rapaport's attack on Stoolies could not have brought himself and Barstool into public disrepute because Barstool "creates" controversy. Dkt. 104, pp. 1, 7. But Portnoy testified that Barstool does not intentionally create controversy. (CSMF ¶ 71). Regardless, there is a difference between a Barstool personality feuding with another Barstool personality or a third party and a Barstool personality attacking the fans of the very company that he or she works for.  As Portnoy testified, it should be "common sense" not to "bite the hand that

[4] Portnoy's text to Rapaport ("I'm sure you know this but have to fire you after last night.") satisfied the minimal written notice requirement set forth in the "public disrepute" provision. (CSMF ¶ 435(j)).
[5] Plaintiffs assert that Barstool has not punished anyone but Rapaport for making controversial statements. Dkt. 104, p. 7.  But in addition to disciplining the blogger who called Rihanna fat, Barstool fired a blogger for making an insensitive post about a missing person. (CSMF ¶ 80).

feeds you" or to say that your employer's fans "are losers in life." (CSMF ¶ 89).

As a last resort, Plaintiffs assert that Barstool's "motives" for terminating the Talent Agreement were pretextual because it had already decided not to renew the agreement. Dkt. 104, pp. 6-8. This argument, by definition, turns on the credibility of Barstool's testimony regarding its decision to terminate Rapaport and precludes summary judgment. Moreover, if Barstool had a legitimate basis for terminating the agreement, it is "legally irrelevant whether [Barstool] was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract." *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F.Supp. 738, 742 (S.D.N.Y. 1993).

B.     **Barstool Engaged in Good Faith Efforts to Secure Plaintiffs an Opportunity for a Weekly Show (Count II)**

Plaintiffs assert that Barstool breached the Talent Agreement by not securing them a weekly show on Sirius. Dkt. 104, p. 12. But the Talent Agreement does not guarantee Plaintiffs a weekly show or state that a weekly show is "contingent" on Barstool obtaining a Sirius channel. Instead, it states that Barstool shall use "good faith efforts" to secure an opportunity for Plaintiffs to have a weekly show in a format agreed to by the parties. (CSMF ¶ 435(h)).

Whether a party has acted in good faith is almost always a question of fact that is not "readily determinable on a motion for summary judgment." *Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 533 (1st Dep't 2011) (internal quotation marks omitted); *see Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("whether particular conduct violates or is consistent with [a good faith provision] necessarily depends upon the facts of the particular case, and is ordinarily a question of fact") (internal quotation marks omitted).

Plaintiffs baldly assert that "there is no evidence in the record to indicate Barstool made

-29-

any good faith efforts to secure Plaintiffs a Sirius radio show." Dkt. 104, p. 13. As addressed above, nothing could be further from the truth. Barstool identified Rapaport as a daily host in various documents from June 2017 through the end of October 2017. (CSMF ¶ 444). Barstool then removed Rapaport as a daily host from its draft agreement with Sirius due to budgetary issues,[6] but continued to try to secure funding for the show. (CSMF ¶ 445). Indeed, Barstool's effort to secure Plaintiffs a show continued through the time its channel launched: In January 2018, Barstool proposed that Plaintiffs launch a show during the NBA All-Star weekend in February 2018. (CSMF ¶ 154). The fact that, due to budget constraints, Barstool was unable to secure Plaintiffs a show does not demonstrate that it acted in bad faith. *See Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671, 681 (2d Cir. 1983) (finding of bad faith inappropriate "unless the plaintiff proves that the motivation underlying those decisions was not a good faith business judgment"). Accordingly, as a minimum, there is a triable issue of fact as to whether Barstool's efforts to secure Plaintiffs an opportunity for a weekly show were in good faith.

Rather than address this evidence of Defendants' good faith efforts, Plaintiffs misconstrue a few emails to assert that Barstool did not engage in such efforts. Dkt. 104, p. 13. As addressed above, these emails were part of ongoing discussions between Barstool and Sirius about, among other things, a potential weekly show for Plaintiffs. (CSMF ¶¶ 136, 141-147). In each of these emails, Barstool expresses a desire to continue considering and pursuing the possibility of giving Plaintiffs a weekly show. (CSMF ¶¶ 136, 143, 145, 147). Accordingly, these emails confirm that Barstool tried to secure Plaintiffs a show.

Plaintiffs fault Barstool for not disclosing the status of its efforts to secure them a show.

---

[6] Nardini had to use the $1.5 million budget that Sirius gave her to fill 12 hours of daily programming. Plaintiffs' show would have taken up one-fourth of this budget. (CSMF ¶ 156).

08032-00008/3762387.6

Dkt. 104, p. 13.  But the Talent Agreement does not impose any duty of disclosure on Barstool.

Nevertheless, Barstool apprised Plaintiffs of its efforts to secure them a show. (CSMF ¶ 446).

Plaintiffs also assert that the Term Sheet, which states that Barstool will pay Rapaport for a weekly show contingent on Barstool obtaining a Sirius channel, should control. Dkt. 104, pp. 12-13.  But the Talent Agreement is fully integrated and supersedes the Term Sheet. (CSMF ¶ 435(l)).  The Term Sheet has no bearing on the Talent Agreement's good faith efforts language.

**C.**     <u>**Plaintiffs are Not Entitled to Summary Judgment on their Remaining Breach of Contract Claims or Barstool's Counterclaim**</u>

Plaintiffs address the remaining contract claims in a cursory manner, failing to establish the elements of their claims, much less show that there are no genuine issues of material fact.

**1.**     **Plaintiffs Were Not Entitled to any Advertising Revenue Generated by Draft Kings or Casper (Count III)**

Plaintiffs assert that Barstool breached the Talent Agreement by not paying them revenue from two advertisers, Draft Kings and Casper, with which they had pre-existing relationships. Dkt. 104, p. 14.  But the Talent Agreement states only that Barstool "shall have no right to any sums paid to you under any" of the *pre-existing* agreements that Plaintiffs had with Draft Kings and Casper. (CSMF ¶¶ 159, 435(i)).  Plaintiffs have not identified any evidence showing that they had pre-existing agreements with Draft Kings and Casper.  In fact, the evidence shows that *after* Plaintiffs joined Barstool, Draft Kings and Casper entered into agreements with *Barstool*, not *Plaintiffs*. (CSMF ¶¶ 161, 164).  Barstool was entitled to the revenue generated from these contracts because they were not *pre-existing* agreements between Plaintiffs and these companies.

///

///

08032-00008/3762387.6

2. **Plaintiffs Were Not Entitled to any Revenue Generated by a Digital Short They Created to Promote a Movie (Count IV)**

Plaintiffs assert that Barstool breached the Talent Agreement by not paying them revenue purportedly generated by a digital short they created to promote the film "Death Wish." Dkt. 104, p. 15. But the Talent Agreement states that Plaintiffs only are entitled to revenue from digital shorts "mutually agreed upon and subject to the parties' agreement (after good faith negotiation) regarding ownership, responsibility of costs and split in connection therewith." (CSMF ¶¶ 166, 435(b)). Plaintiffs do not identify any evidence showing that the parties negotiated, much less reached, such an agreement. Rather, the evidence shows that the ad buyer for "Death Wish" paid Barstool to promote the movie across its platforms and podcasts (not just IAR) and that Plaintiffs had no right to any portion of this payment. (CSMF ¶ 171).

3. **Plaintiffs Have No Right to any Portion of the Revenue Generated by a T-Shirt Sold after Termination (Count VII)**

Plaintiffs assert that Barstool breached the Talent Agreement by not first obtaining Rapaport's approval before selling a t-shirt depicting him with a clown nose and a red lesion under his lower lip. Dkt. 104, p. 15. But Barstool did not start selling the t-shirt until *after* it terminated the Talent Agreement. (CSMF ¶ 104). As such, Plaintiffs have no contractual right to any revenue generated by the sale of the t-shirt. Nor is Rapaport asserting any claim that Barstool misappropriated his likeness or otherwise improperly exploited his image.

4. **Plaintiffs Had No Obligation to Sell Advertisements for Rapaport's Rants but Still Used Good Faith Efforts to Do So (Count VIII)**

Plaintiffs assert that Barstool breached the Talent Agreement by failing to "[r]easonably promote [his] content" and "[u]se good faith efforts to promote [Plaintiffs] and [Plaintiffs'] brand

to . . . its network of contacts" by not selling advertisements for Rapaport's "rant" videos. Dkt. 104, pp. 15-16.  But these provisions do not impose any obligation on Barstool to sell ads for Rapaport's rants. (CSMF ¶ 399).  Indeed, the Talent Agreement is clear that Barstool is *not* guaranteeing that Plaintiffs' content "will generate any amount of revenue." (CSMF ¶ 435(k)). Regardless, the evidence shows that Barstool acted in good faith to monetize Rapaport's rants but was unable to do so because they were "unpredictable" and "extremely unfriendly from an advertising perspective" because he "used the word cunt incessantly in them." (CSMF ¶ 400).

### 5.      There are Genuine Issues of Material Facts as to Barstool's Counterclaim for Breach of Contract

Barstool alleges in its Counterclaim that Rapaport breached the Talent Agreement by attacking Stoolies, thereby bringing himself and Barstool into public disrepute. Dkt. 61, ¶¶ 25-33, 48.a.  There are disputed issues of fact as to Barstool's Counterclaim for the same reasons that there are disputed issues of fact as to Plaintiffs' claim that Barstool improperly terminated the Talent Agreement under the "public disrepute" provision. *See supra* Section III.A.1.

Plaintiffs assert that Barstool cannot establish damages on its Counterclaim. Dkt. 104, p. 8 n.6.  But the Talent Agreement states that, if Barstool terminates the agreement for material breach, "any pre-paid portions" of Plaintiffs' rant and podcast guarantees "will immediately be refunded to Barstool," and the "only amounts owed to you by Barstool will be your share of any rant or podcast revenue collected by Barstool. (CSMF ¶¶ 51, 435(j)).  As Plaintiffs recognize, the revenue that Barstool collected for advertisements sold on Plaintiffs' podcasts and rants as of February 5, 2018 was $417,646. (CSMF ¶ 52).  Subject to Barstool's right of recoupment of the guarantees that it had paid them, Plaintiffs were entitled to 60% of this revenue, or $250,587.60. (CSMF ¶ 435(f)).  Upon termination, the Talent Agreement required Plaintiffs to refund Barstool

the difference between this $250,587.60 amount and the $400,000 they had received in

guarantees, *i.e.* $149,412.40. (CSMF ¶¶ 49, 439, 440).  Thus, Barstool can establish damages.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that the Court grant their motion for partial

summary judgment as to Plaintiffs' defamation (Count XI) and fraudulent inducement and

concealment claims (Counts IX, X).  For the foregoing reasons, Defendants also request that the

Court deny Plaintiffs' motion for summary judgment in its entirety.


Dated: April 9, 2020                    Respectfully submitted,

                                        GREENBERG GLUSKER FIELDS CLAMAN &
                                        MACHTINGER LLP


                                        By: _____
                                          Aaron J. Moss (AMoss@ggfirm.com)
                                          Ricardo P. Cestero (RCestero@ggfirm.com)
                                          Steven A. Stein (SStein@ggfirm.com)
                                          2049 Century Park East, 26th Floor
                                          Los Angeles, CA 90067-3101
                                          (310) 553-3610 Telephone
                                          (310) 553-0687 Facsimile

                                          HERRICK FEINSTEIN, LLP
                                          Barry Werbin (BWerbin@Herrick.com)
                                          Elena McDermott (EMcdermott@Herrick.com)
                                          2 Park Avenue
                                          New York, NY 10016
                                          (212) 592-1400 Telephone
                                          (212) 592-1500 Facsimile

                                          Attorneys for Defendants