**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------X
MICHAEL RAPAPORT and MICHAEL DAVID
PRODUCTIONS, INC.,

              Plaintiffs,

       - against -

BARSTOOL SPORTS, INC., ADAM SMITH,
KEVIN CLANCY, ERIC NATHAN, and DAVID
PORTNOY,

              Defendants.
---------------------------------------X
BARSTOOL SPORTS, INC.,

              Counterclaimant,

       - against -

MICHAEL RAPAPORT and MICHAEL DAVID
PRODUCTIONS, INC.,

              Cross-Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 8783 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Actor and comedian Michael Rapaport and his production company Michael David Productions, Inc. (together, "Rapaport") brought this case against the sports and pop culture website Barstool Sports Inc. ("Barstool") and its employees Adam Smith, Kevin Clancy, Eric Nathan, and David Portnoy (together, the "Barstool Defendants") for breach of contract, fraud, and defamation arising out of Barstool's termination of its contract with Rapaport and subsequent

comments made by the Barstool Defendants.  Barstool asserted a breach of contract counterclaim against Rapaport to recover pre-paid guarantees that Barstool contends Rapaport must repay because he was terminated for cause.

Rapaport moves for summary judgment on six of his eight breach of contract claims, his two fraud claims, his claim for defamation, and Barstool's counterclaim.  Barstool cross-moves for summary judgment on the fraud and defamation claims. For the reasons below, Rapaport's motion is denied and the Barstool Defendants motion is granted.

## BACKGROUND[1]

Michael Rapaport is a well-known actor, comedian, and podcast show host who has gained popularity as a media personality in part because of his reputation for sharing "unfiltered" views on politics, sports, and popular culture.

In 2014, Rapaport launched a podcast show called "I AM RAPAPORT" to "share[] his strong, funny & offensive points of view on life, sports, music, film & everything in between." While under contract with CBS, Rapaport broadcast I AM RAPAPORT on CBS Radio from 2015 through 2017.  In 2016, as

---

[1]     This factual summary is derived from Rapaport's Rule 56.1 Statement of Material Facts and the Barstool Defendants' corresponding Counterstatement (ECF No. 124 ("DCSOMF")), the Barstool Defendants' Rule 56.1 Statement of Material Facts and Rapaport's corresponding Counterstatement (ECF No. 141 ("PCSOMF")), and the declarations submitted in support of the parties' motions (ECF Nos. 106-114, 127-131, 143-46, 149).

the I AM RAPAPORT show was attracting a larger following,
Barstool approached Rapaport about leaving CBS to produce his
podcast and other content for Barstool's platforms.
Barstool, which is a media company that produces online
articles, blogs, podcasts, videos, radio shows, and other
media about sports and popular culture, has cultivated its
brand around providing "unfiltered," "controversial," crass,
and sometimes humorous views on these topics.  Accordingly,
Portnoy, Barstool's founder and Head of Content, told
Rapaport that he would be a great fit at Barstool.

While other media companies pursued him, Rapaport
ultimately decided to join Barstool.  On May 17, 2017, after
several months of negotiations, Barstool and Rapaport entered
into a "Term Sheet," which Rapaport was obligated to present
to CBS pursuant to CBS's first right of refusal.  The Term
Sheet provided that Rapaport would produce his podcast on
Barstool's platform and create recurring short-form videos
and additional digital content for Barstool in exchange for
$600,000 over a one-year term based on a revenue-sharing
agreement.  The Term Sheet also stated that, contingent on
Barstool entering into an agreement with SiriusXM satellite
radio ("Sirius"), Barstool and Rapaport would work towards
developing a daily radio show for which Rapaport would earn

$375,000.  After being presented with the Term Sheet, CBS declined to exercise its right to match its terms.

On June 17, 2017, Barstool and Rapaport executed the "Talent Agreement" that ultimately governed their professional relationship.  As discussed in more detail below, the Talent Agreement in relevant part provides that:

- (1) the Talent Agreement supersedes any prior agreements or understandings between the parties;

- (2) Rapaport is being hired as an independent contractor for a one-year term;

- (3) Rapaport is entitled to 60% of the revenues for his videos, podcasts, and related merchandise with Barstool obligated to pre-pay him $600,000 in guarantees spread across the term of the Talent Agreement;

- (4) Barstool must "use good faith efforts to secure an opportunity for [Rapaport] to produce and host a 1-2 hour, weekday . . . show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series)" and "[i]n the event such a [show] comes to fruition, Barstool will pay [Rapaport] a fixed fee of $375,000, unless otherwise agreed";

- (5) Barstool acknowledges Rapaport's pre-existing relationships with Casper and DraftKings and shall have no right to any sums paid to Rapaport under any of the related agreements with those companies;

- (6) Barstool can terminate Rapaport for convenience after providing 90 days' notice and for a material breach of the Talent Agreement after providing 15 days' notice and an opportunity to cure, but can terminate Rapaport immediately for conduct that brings himself or Barstool into "public disrepute"; and

- (7) based on the circumstances of Rapaport's termination, the parties may be obligated to pay or

repay to the other certain revenue earned or distributed before the termination.

Eight months into the contractual term, Barstool and Rapaport's relationship disintegrated entirely. By October 2017, Barstool's CEO told a Sirius representative that Barstool would opt not to renew Rapaport's contract at that point if its term were expiring. And, despite launching its own station on Sirius, Barstool did not include a weekday Rapaport show as part of its lineup and also failed to communicate to Rapaport potential opportunities to contribute to other Sirius shows, ostensibly because of budget concerns.

At the same time, Rapaport engaged in public disputes with other Barstool employees over social media. Notably, this included an argument between Rapaport and Smith over Rapaport's supposed failure to pay Smith for bets lost on fantasy football and an amateur boxing match.

In February 2018, the animosity between Barstool and Rapaport came to a head. On February 17, 2018, after Rapaport accused Smith on Twitter of taking steroids to help win the amateur boxing match in question, an individual replied to Rapaport's tweet by urging Barstool to take a poll of Rapaport's popularity among fans of Barstool ("Stoolies").

Rapaport retorted by tweeting: "[I]f you call yourself a fucking stoolie for real, you've already lost in life."



Barstool terminated Rapaport's contract the next morning through a text message sent to Rapaport by Portnoy, which stated that Rapaport was being fired because of what happened "last night." Later that day, Portnoy posted a video to Twitter announcing that Barstool fired Rapaport for "insult[ing Barstool's] entire fucking fanbase."

Rapaport's rejoinder was to log into Barstool's Twitter account, to which he still had access, and publish a video accusing Portnoy of being, among other things, a "dumb

motherfucker," a "dumb fuck," and a "bitch."  Rapaport then posted to his personal Twitter account the following photoshopped picture of him (back) and Portnoy (front) appearing to engage in anal sex:



In the ensuing months, the Barstool Defendants published dozens of tweets, blog posts, online articles, videos, podcasts, and radio shows that accused Rapaport of being racist, a fraud, a hack, a wannabe, and a liar, having herpes, and stalking and beating his former girlfriend.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is only appropriate when "the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016) (citation omitted).

The party moving for summary judgment bears the burden of demonstrating the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[2] When considering whether summary judgment is appropriate, the Court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

Ultimately, "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso,

---

[2]     As provided under S.D.N.Y. Local Rule 56.1, the Court shall deem the facts set forth in a party's Statement of Material Facts that are supported by citation to evidence that could be introduced in admissible form at trial "to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party" that likewise cites to evidence that could be admitted at trial. S.D.N.Y. Local R. 56.1(c), (d).

278 F.3d 138, 145 (2d Cir. 2002) (citation omitted); see Brown
v. Cara, 420 F.3d 148, 152 (2d Cir. 2005) ("We will affirm
the District Court's grant of summary judgment to defendants
only if, based on facts not in genuine dispute and drawing
all inferences in favor of plaintiffs, defendants are
entitled to judgment on the merits as a matter of law.").

### EVIDENTIARY OBJECTIONS

Before discussing the merits of the parties' motions,
the Court first addresses some of the broad evidentiary
objections lodged in response to the Rule 56.1 Statements of
Material Facts.

Rapaport repeatedly objects to Barstool's introduction
of Bates-stamped discovery materials through the declaration
of Barstool's counsel on the basis that counsel lacks personal
knowledge of the accuracy of the documents' content.
Incredibly, Rapaport's objections extend to documents that
Rapaport himself produced in discovery. These objections are
not well taken and, quite frankly, are borderline
sanctionable considering that Rapaport also introduced Bates-
stamped exhibits into the record through the declaration of
his litigation counsel. As the attorney of record in this
litigation, Barstool's counsel has personal knowledge that a
given document was produced in discovery, as evidenced by the
Bates stamp on the face of the document. Moreover, all of

these objections have been advanced without any claim that
the underlying documents are forgeries or otherwise phony.
Accordingly, the declaration of Barstool's counsel is
sufficient to properly put those documents before the Court.
See United States v. Letscher, 83 F. Supp. 2d 367, 381
(S.D.N.Y. 1999) (finding the "usual" practice of "put[ting]
documents before the Court on summary judgment motions as
enclosures to counsel's affidavit" to be proper and
unobjectionable).

        The parties also object that the opposing side has not
laid the foundation to authenticate documents produced in
discovery.  The Court, however, "has the discretion to
consider unauthenticated . . . evidence where it is apparent
that the party may be able to authenticate . . . those
documents at trial." Bhd. Mut. Ins. Co. v. Ludwigsen, No. 16
Civ. 6369 (CS), 2018 WL 4211319, at *5 n.6 (S.D.N.Y. Sept. 4,
2018) (citations omitted).  Here, as the parties could easily
produce a knowledgeable custodian at trial to authenticate
the documents they produced in discovery, the Court will
consider the otherwise unobjectionable evidence contained in
the summary judgment record.

        Finally, the parties also raise hearsay objections on
the basis that the opposing side is offering documentary
evidence that reflects out-of-court statements for the truth

of the matter stated.  However, "material relied on at summary judgment need not be admissible in the form presented to the district court." Smith v. City of New York, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order).  Instead, the Court may consider the evidence in question so long as it can be presented in admissible form at trial. Id. (citing Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) for the proposition that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form[; w]e instead focus on the admissibility of its contents"); see also S.D.N.Y. Local R. 56.1(d) (Each assertion in a Rule 56.1 statement "must be followed by citation to evidence which would be admissible."). Most of the objections could be cured by calling a knowledgeable witness to introduce the facts contained in document or by laying a proper foundation to introduce the record as under the business records exception to the rule against hearsay.  Accordingly, in deciding the summary judgment motions, the Court considers all evidence that a party could potentially introduce at trial in admissible form.

**DISCUSSION**

## I.  **Breach of Contract**

Rapaport moves for summary judgment on six of his eight breach of contract claims as well as Barstool's counterclaim

for breach of contract.  These claims all arise out of the Talent Agreement, which is governed by New York law, as provided by Section 9.c. of the Standard Terms appended to the Talent Agreement.

To succeed on a breach of contract claim under New York law, Rapaport must establish "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted).  There is no dispute that the Talent Agreement is a valid contract between the parties, and thus the Court analyzes whether Rapaport has established that there exists no dispute of material fact for the other three elements and, conversely, whether Barstool cannot as a matter of law establish the elements to support its counterclaim based on undisputed facts.

### A.   Barstool's Immediate Termination of Rapaport

Two of Rapaport's breach of contract claims and Barstool's counterclaim turn on whether Barstool wrongfully terminated Rapaport following his February 2018 tweet stating that "if you call yourself a fucking stoolie for real, you've already lost in life."  At a basic level, Rapaport argues that Barstool terminated the Talent Agreement improperly and without cause.  Barstool contends that Rapaport's immediate

termination was justified and permitted under the Talent Agreement.  If supported, each party's argument leads to a different calculation of monies owed under the Talent Agreement.

The portions of the Talent agreement relevant to these claims follow.

First, with respect to termination, Section 5 of the Talent Agreement states that "either party may terminate this Agreement for convenience upon 90 days' written notice to the other [party.]"  Section 3.a. of the Standard Terms appended to the Talent Agreement further states that

> [E]ither party may . . . terminate this Agreement at any time for cause upon the other's material breach of this Agreement, which is not cured within fifteen (15) days' written notice thereof. . . . [Barstool] also ha[s] the right to immediately terminate this Agreement upon written notice to [Rapaport] in the event that [Rapaport] . . . engage[s] in conduct that brings [Rapaport] or Barstool into public disrepute.

In other words, Barstool could only terminate the Talent Agreement immediately if Rapaport brought himself or Barstool "into public disrepute."  Otherwise, Barstool would have to give Rapaport either 15- or 90-days' notice before terminating the Talent Agreement, depending on if the termination was for cause or for convenience.

Next, under Section 1 of the Talent Agreement, Rapaport agreed to produce a recurring podcast and to regularly film short videos of him sharing his thoughts (the "Rant Videos"). In turn, Sections 8 through 10 govern how the parties would split the revenues from that media.  Section 9 states that Rapaport is entitled to 60% of the revenues that Barstool derives from Rapaport's podcast, the Rant Videos, and sales of merchandise related to Rapaport.  Sections 8 and 10 guaranteed Rapaport $600,000 for the first year for the podcast and Rant Videos, payable in four installments.  That $600,000 guarantee represents 60% of the first $1 million Barstool stood to earn collectively on Rapaport's podcast and Rant Videos, regardless of whether Barstool actually made that amount.  Any revenues Barstool derived above $666,666 for the podcast or above $333,333 for the Rant Videos would then be divided 60-40 between Rapaport and Barstool.  At the time Barstool terminated the Talent Agreement, it had paid Rapaport $400,000 in pre-paid guarantees.

Finally, Section 3.b. of the Standard Terms states:

> In the event the Term is terminated by Barstool for convenience . . . , [Rapaport's $600,000 guarantee] will be due and payable in full.  In the event the Term is terminated for any other reason . . . , any pre-paid portions of [the $600,000 guarantee] will immediately be refunded to Barstool and the only amounts owed to [Rapaport] will be [Rapaport's

> 60%] share of any Rant Revenue or Podcast
> Revenue collected by Barstool through the
> date of termination.

Thus, if Barstool wrongfully terminated the Talent Agreement without cause, Barstool would have to pay Rapaport the remaining $200,000 installment of the $600,000 guarantee and potentially 60% of the revenues derived from Rapaport-related merchandise sold after his termination during the notice periods described above.  On the other hand, if Barstool properly terminated the Talent Agreement for cause, Rapaport would owe Barstool the $400,000 in guaranteed payments he collected minus 60% of the actual revenues Barstool earned on the podcast and Rant Videos.

Here, Rapaport asserts that Barstool lacked cause to immediately terminate the Talent Agreement and thus violated the Agreement by terminating it without providing Rapaport either (1) 15 days to cure any alleged breach of the Agreement, or (2) 90 days' notice of termination for Barstool's convenience.  Barstool maintains that it was justified in immediately terminating the Talent Agreement because Rapaport's February 2018 tweet brought Barstool into public disrepute.  Rapaport argues in response that his February 2018 tweet did not bring Barstool into public disrepute because (1) it was intended to be directed at a single person, and (2) Barstool has a well-known reputation

for controversy.  Rapaport further claims that Barstool's use of the February 2018 tweet to terminate the Talent Agreement was pretextual, as the evidence shows that Barstool's CEO had expressed doubts in October 2017 about whether Barstool would renew Rapaport's contract.

Whether the evidence demonstrates that Rapaport's tweet actually brought Barstool into public disrepute and thus permitted Barstool to immediately terminate the Talent Agreement is a disputed issue of material fact that must be resolved by a jury following trial.  As a reasonable jury could find that Rapaport's tweet attacking Barstool's fanbase brought Barstool's brand into disrepute, Rapaport is not entitled to summary judgment on these claims.

As an independent ground to dismiss Barstool's counterclaim, Rapaport asserts that Barstool cannot establish damages even if it were justified in immediately terminating the Talent Agreement.  According to Rapaport, 60% of actual revenues earned by Barstool from the Rant Videos and podcast that he would be entitled to is more than the $400,000 guarantee Barstool advanced to Rapaport.  Specifically, Rapaport asserts that 60% of the revenue attributable to him is $417,646, which Rapaport derives from a January 2018 document created by Barstool entitled "Net Revenue Calculation."  That document states that the "Lifetime Gross

Ad Revenue Earned" is $417,646 and that the amount "Remaining to Recoup" is $182,354. While Rapaport submits that the "Lifetime Gross Ad Revenue Earned" refers to his share of the revenues, Barstool maintains that this sum represents the total revenue, of which Rapaport is only entitled to 60%, or $250,587.60. If Barstool's assertion were true, then it would be able to establish damages, as Rapaport would owe Barstool the difference between $400,000.00 and $250,587.60: $149,412.40.

Because the parties dispute how much total revenue Barstool generated from Rapaport's podcast and Rant Videos, this too is a factual issue that must be decided by the finder of fact following trial.

**B.   Barstool's "Good Faith" Efforts to Secure Rapaport an Opportunity for a Weekday Show**

Rapaport's next breach of contract claim concerns Barstool's "good faith" efforts to provide Rapaport with an opportunity for a weekday show on Sirius. As relevant here, Section 12 of the Talent Agreement provides:

> Barstool will use good faith efforts to secure an opportunity for [Rapaport] to produce and host a 1-2 hour, weekday . . . show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series) . . . . In the event such a [show] comes to fruition, Barstool will pay [Rapaport] a fixed fee of $375,000, unless otherwise agreed . . . .

"Whether a party has acted in good faith" in performing its contractual obligations "is typically a question to be answered by the trier of fact, not in a summary judgment motion," as "[i]ssues of motive simply are not easily determinable before trial on the basis of a limited record without the ability to assess the credibility of witnesses." G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Company, Inc., 870 F. Supp. 472, 478 (E.D.N.Y. 1994) (citations omitted); see RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 25 (PGG), 2013 WL 1294515, at *13 (S.D.N.Y. Mar. 30, 2013) ("[W]hether a party to a contract has acted in good faith generally presents a question of fact for a jury.") (citations omitted).

Rapaport insists that summary judgment is appropriate because there is no evidence in the record that Barstool made any good faith efforts whatsoever to secure Rapaport a radio show on Sirius.  Rather, according to Rapaport, the record shows that Barstool failed to tell Rapaport about two proposals that Sirius presented to Barstool about a show for Rapaport and that Barstool removed Rapaport from a list of initial hosts when launching Barstool's Sirius channel.

Barstool strenuously disagrees with Rapaport's view of the evidence.  Barstool points to evidence of communications it had with Sirius in which Barstool raised concerns about

budgeting for Rapaport's show as a reason why it removed Rapaport from a draft lineup of hosts and why it did not immediately provide Rapaport with a show on Sirius.  Barstool also references emails between Barstool's CEO and Rapaport's representatives as late as January 2018 in which the two sides discussed using Rapaport's podcast content on Sirius, having Rapaport contribute content for Barstool's Sirius station over the NBA All-Star game weekend, and using the All-Star festivities as an opportunity to launch a radio show for Rapaport on Sirius.

This is not the rare circumstance in which a party's motives and good faith efforts can be determined as a matter of law at the summary judgment stage.  Construing the evidence in the light most favorable to Barstool, we cannot say that no reasonable jury could find on this record that Barstool categorically failed to live up to its obligation to use good faith efforts.  Rather, that issue must be decided by a jury after weighing the documentary record, the credibility of the witnesses, and the plausibility of Barstool's explanations for why it never secured a radio show for Rapaport.

## C.  Barstool's "Good Faith" Efforts to Acquire Advertisers for Rapaport's Rant Videos

Rapaport similarly claims that Barstool failed to "[r]easonably promote" the short Rant Videos and to "[u]se

good faith efforts to promote [Rapaport] and [his] brand," as
provided by Section 4 of the Talent Agreement.

   In support, Rapaport argues that Barstool never acquired
advertisers for the Rant Videos during Rapaport's employment
and that Rapaport was able to secure advertisers for these
videos shortly after he was fired.[3]  Rapaport further asserts
that Barstool blocked Rapaport's involvement with Barstool's
business partners and tarnished Rapaport's brand by attacking
him even before he was terminated.

   Barstool maintains that it did make good faith efforts
to promote Rapaport and his brand and that it reasonably tried
to obtain advertising for the Rant videos, but found the
market for advertisers volatile because Rapaport was viewed
as "very unpredictable" and his videos "were extremely
unfriendly from an advertising perspective" due to Rapaport
"us[ing] the word cunt incessantly."

   On its face, Rapaport's claims are difficult to
comprehend.  Throughout the entirety of the contractual term,
Barstool had every incentive to profit from Rapaport's Rant
Videos by acquiring advertisers.  Indeed, Barstool contracted

---

[3]      Barstool objects that Rapaport did not cite record evidence
to support the proposition that Barstool never secured any advertising
for the Rant videos during Rapaport's tenure.  (See DCSOMF ¶ 400 (citing
the Declaration of Jordan Winter (ECF No. 114) ¶¶ 16-20.)  The Court
agrees that the cited evidence does not establish that Barstool never
secured advertising for the Rant Videos, which is an independent reason
to deny Rapaport's motion for summary judgment on this issue.

with Rapaport to pay him a minimum guarantee of $200,000 for those videos, and thus would not "break even" under the terms of the parties' revenue sharing arrangement until it earned at least $333,333 in revenue from the Rant Videos.  This record establishes, at the very least, that the parties' interests in generating advertisements for the Rant Videos were mutually aligned for the duration of the contractual term.  Given the difficulties in proving a lack of good faith when the parties' interests are coterminous, the Court would have given serious consideration to granting a motion by Barstool for summary judgment on this claim, had it filed one.[4]

Ultimately, while Rapaport will face serious challenges in proving bad faith given the alignment of the parties' interests, there remains a dispute of material fact that must be resolved by the trier of fact and thus summary judgment is not appropriate.

---

[4]      See, e.g., Wagner v. JP Morgan Chase Bank, No. 06 Civ. 3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (granting summary judgment to defendant on claim that it failed to perform its good faith obligations under the contract because, since the beginning of the contract, the parties' "interests were perfectly aligned" and, "[g]iven this alignment of interests, there is no credible evidence showing that [d]efendant sabotaged its own [interests]" in order to harm those of plaintiffs, which the court suggested would be a "bizarre scenario") (citation omitted).

D.    **Barstool's Advertising Revenue from Contracts With DraftKings and Casper**

We next turn to Rapaport's claim that Barstool breached the Talent Agreement by wrongfully retaining revenue paid by DraftKings and Casper to advertise on Rapaport's podcast.  As relevant to this claim, Section 13 of the Talent Agreement provides:

> Barstool acknowledges [Rapaport's] pre-existing relationships with . . . DraftKings . . . and Casper and agrees that [Rapaport] shall have the right to continue such relationships during the Term; Barstool further acknowledges that it shall have no right to any sums paid to [Rapaport] under any of the related agreements with those companies.

After the Talent Agreement was executed, both DraftKings and Casper signed contracts with Barstool to advertise with Barstool, including on podcasts and videos produced by Rapaport, under which Barstool collected $157,000.  With respect to this claim, Rapaport argues that Section 13 unambiguously provides that Barstool has no right to any money generated from contracts with DraftKings and Casper to advertise with Rapaport, and thus he is entitled to the $157,000.  Barstool reads Section 13 as only limiting its ability to collect advertising fees paid by DraftKings and Casper to Rapaport under pre-existing contracts with Rapaport.

The record is unclear about whether Rapaport continued to collect money from pre-existing contracts with DraftKings and Casper to advertise on his shows.  If not, Barstool's contracts with the companies would seem to frustrate the central purpose of this contractual provision, which was to safeguard Rapaport's revenue streams from DraftKings and Casper.  Under such circumstances, a reasonable finder of fact may find that Barstool breached the contract. Conversely, if Barstool's contracts with DraftKings and Casper did not substitute for revenues from the companies that Rapaport was intending to protect, then a reasonable jury may determine that no breach occurred.  As questions remain about the factual record that must be resolved by the trier of fact, summary judgment on this claim is denied.

**E.  Compensation for the "Death Wish" Digital Short Video**

We finally turn to Rapaport's claim that Barstool failed to compensate him for his help producing a digital short video promoting the film "Death Wish" that Barstool published on its blog.  Under Section 1 of the Talent Agreement, Rapaport agreed to

> [P]roduce, edit and deliver . . . [d]igital shorts and other short form digital content to be mutually agreed upon and subject to the parties' agreement (after good faith negotiation) regarding

>           ownership, responsibility for costs and
>           split of revenue in connection therewith.

The provision is clearly conditional: the parties must agree on the digital content and negotiate an agreement on ownership, costs, and revenue splitting before Rapaport incurs any obligation to produce videos and Barstool incurs any obligation to share revenues from those videos.

In support of his claim, Rapaport fails to introduce any evidence that the parties reached any agreement on these items.  Thus, the conditions of this conditional provision have not been met.  Rapaport instead argues that as an independent contractor he is entitled to compensation for each service that he provided to Barstool and also that he should not be penalized for Barstool's failure to negotiate terms for a time-sensitive project.  There is, however, no evidence in the record of Barstool's bad faith.  Rather, it appears that Rapaport went ahead and assisted with producing the "Death Wish" video without securing an agreement from Barstool.  While Rapaport may regret having contributed to the production of the "Death Wish" video without first reaching an agreement with Barstool, that is not a predicate upon which to hold Barstool liable under the Talent Agreement.

The Court therefore concludes that there is no reasonable dispute of material fact on this claim and that no

reasonable jury could find in favor of Rapaport on this record.   While Barstool did not cross-move for summary judgment on this claim, the Court has the authority to award summary judgment in Barstool's favor under Federal Rule of Civil Procedure 56(f)(1),[5] and the Court does so here on this claim.

## II.   **Fraud**

The parties cross-move for summary judgment on Rapaport's claims for fraudulent concealment and fraudulent inducement.   These claims arise out of Barstool's supposed misrepresentations to Rapaport about securing a weekday radio show for Rapaport.

Under New York law, a party cannot maintain a claim for fraud when it arises from the same conduct underlying a breach of contract claim.   See Gorman v. Fowkes, 949 N.Y.S.2d 96,

---

[5]      Under Federal Rule of Civil Procedure 56(f)(1), the Court may "grant summary judgment for a nonmovant" after "giving notice and a reasonable time to respond."  As made clear by the Second Circuit, formal notice is not required, as long as the party is not procedurally prejudiced by not being able to present evidence in favor of its position. Bridgeway Corp. v. Citibank, 201 F.3d 134, 139-40 (2d Cir. 2000).  Where, as here, "it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a sua sponte grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law."  Id. at 140 ("[T]he threat of procedural prejudice is greatly diminished if the court's sua sponte determination is based on issues identical to those raised by the moving party," and "the moving party speaks to those issues in the course of the district court proceedings.") (citations omitted).  As Rapaport has had an opportunity submit all relevant evidence on this issue in support of his motion for summary judgment, there is no procedural prejudice to granting summary judgment in favor of Barstool.

97-98 (N.Y. App. Div. 2012).  To show that his fraud claim does not duplicate his breach of contract claim, Rapaport must (1) establish a legal duty separate from Barstool's duty to perform under the contract, (2) demonstrate a fraudulent misrepresentation extraneous to the contract, or (3) identify special damages.  Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).

Here, Rapaport attempts to fit within this framework by presenting his fraud claim as resting on Barstool's "extraneous" misrepresentations about its ability and intent to obtain Rapaport a weekday show.[6]  For instance, Rapaport claims that Barstool failed to disclose that it would place onerous preconditions on securing a show for Rapaport, such as insisting that Sirius cover all costs for the show.  However, the imposition of unreasonable preconditions would violate Barstool's contractual duty to use "good faith

---

[6]    Rapaport also claims that Barstool had an independent duty to disclose the status of its negotiations with Sirius separate from the contract.  Under New York law, a party may have a duty to disclose when (1) it is in a fiduciary role, (2) it made a misleading partial disclosure, or (3) it has superior knowledge that is not readily available to the counterparty and knows that the counterparty is acting on mistaken knowledge.  Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005) (citations omitted).  Rapaport offers no argument in support of the first two scenarios.  As for the special facts doctrine, the record shows that Rapaport knew about the tentative nature of the Barstool-Sirius negotiations when entering the Talent Agreement; the record does not support a finding that Barstool had to disclose to Rapaport more granular details of its negotiations.

efforts" to secure Rapaport an opportunity to host a show. Likewise, Rapaport complains that Barstool failed to disclose that aspects of its negotiations with Sirius suggested that a Rapaport show might not be able to launch on Sirius for several months.  That, too, overlaps with Barstool's good faith obligations, as an unreasonable delay is emblematic of bad faith.

Moreover, Rapaport's claims focus exclusively on representations about securing a potential show with Sirius. This focus fails to acknowledge the breadth of the good faith provision in the Talent Agreement, which contemplated Barstool looking for opportunities for a "show in a format to be agreed upon by the parties (e.g., a Sirius radio show, a terrestrial radio show, a podcast, a video series)[.]" Consequently, Rapaport's exclusive emphasis on representations about Sirius is misplaced, as the Talent Agreement was not so limited.

The drafting history of the good faith efforts provision further confirms the duplicative nature of Rapaport's claims. In April 2017, nearly five weeks after Barstool first told Rapaport that its "goal" was to reach an agreement with Sirius in three weeks, Rapaport insisted on adding the following language to the draft Talent Agreement to protect his interest

in securing a weekday show after Barstool proposed removing
references to a Sirius show from the draft contract:

> Good faith efforts by Barstool Sports
> about if/when they come to terms with
> Barstool Radio or Sirius XM for a channel
> that would lead to [Rapaport] hosting a
> 1-2 hour, weekday (i.e., 5 days a week)
> podcast or radio show[.]

After further negotiations, the parties agreed on the
final language that appears in the Talent Agreement.  And, on
May 31, knowing that Barstool had not yet reached any
agreement with Sirius, Rapaport decided to nevertheless
execute the Talent Agreement.  Thus, the record clearly shows
that Rapaport was the party who insisted on adding the good
faith efforts language to protect his interests and that
Rapaport felt comfortable entering into the contract with
that language despite the obvious uncertainty surrounding a
Barstool-Sirius deal.

Accordingly, the Court finds that Rapaport's fraud
claims about Barstool's ability and obligation to secure him
an opportunity for a weekday show impermissibly duplicate his
breach of contract claim premised on the "good faith efforts"
provision of the Talent Agreement.[7]  Barstool is therefore
entitled to summary judgment on Rapaport's fraud claim.

---

[7]    See Gorman, 949 N.Y.S.2d at 97-98 (opining that when "the
alleged misrepresentations amount[] only to a misrepresentation of the
intent or ability to perform under the contract," then a claim for "fraud
[is] wholly duplicative of the breach of contract claim") (citation

## III. **Defamation**

The parties cross-move for summary judgment on Rapaport's claim for defamation based on approximately 80 representations published by the Barstool Defendants. At bottom, these statements accuse Rapaport of: (1) being racist; (2) being a fraud, a hack, and a wannabe; (3) having herpes; and (4) stalking and abusing his ex-girlfriend. (DCSOMF ¶¶ 190-264.)

Under New York law, which the parties agree applies to Rapaport's claim, to prevail on a claim for defamation Rapaport must establish five elements: (1) a defamatory statement of fact concerning the plaintiff; (2) published by the defendant to a third party; (3) fault established by defendant's actual malice, as the libeled party is a public figure; (4) falsity of the defamatory statement; and (5) special damages or per se actionability (that is, a statement that is defamatory on its face). See Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted). The Barstool Defendants attack the first element by arguing that the challenged representations are not actionable assertions of fact.

---

omitted); see also Mariano v. CVI Investments Inc., 809 F. App'x 23, 27 (2d Cir. 2020) (summary order) (affirming dismissal of fraud claim "because it turns on conduct that was expressly contemplated by the contract") (citation omitted).

A.   **Legal Standards Governing Whether a Statement is an Actionable Assertion of Fact or Non-Actionable Opinion**

Under both the First Amendment and New York law, for a statement to be actionable for defamation it must be understood by a reasonable audience as asserting an objective fact about plaintiff as opposed to the author's opinion. See Mann v. Abel, 10 N.Y.3d 271, 276 (N.Y. 2008) ("Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.") (citations omitted); Gross v. New York Times Co., 82 N.Y.2d 146, 152-53 (N.Y. 1993) ("[O]nly statements alleging facts can properly be the subject of a defamation action.") (citations omitted).[8]

Whether a representation is an actionable statement of fact is a question of law for courts to decide, Chau v. Lewis, 771 F.3d 118, 128 (2d Cir. 2014), and the "burden rests with

---

[8]   While both the First Amendment and the New York State Constitution insulate statements of opinion from liability, "[t]he New York Court of Appeals has consistently found that the New York Constitution affords greater protection for statements of opinion than its federal counterpart." Chau v. Lewis, 935 F. Supp. 2d 644, 658 (S.D.N.Y. 2013) (citations omitted).   As compared to the framework established by the Supreme Court for analyzing statements for purposes of the First Amendment, the approach adopted by the New York Court of Appeals under the New York Constitution places primary emphasis on the immediate and broader context of the statement at issue to determine if a reasonable audience would understand it as an expression of opinion as opposed to a factual assertion. See Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235, 240-52 (N.Y. 1991) (responding to the First Amendment framework announced by the Supreme Court in Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990)).

the plaintiff to establish that in the context of the entire communication a disputed statement is not protected opinion." Celle, 209 F.3d at 179.

To separate statements of fact from statements of opinion, courts analyze three factors: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances . . . signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact." Brian v. Richardson, 87 N.Y.2d 46, 51 (N.Y. 1995) (citations and internal quotation marks omitted).

Ultimately, a court must decide whether the challenged statements would "have been understood by a reasonable [audience] as assertions of fact that were proffered for their accuracy." Id. at 53. This inquiry "should not consist of a mechanical enumeration of each factor," Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 153 (2d Cir. 2000), and involves more than viewing the challenged portion of a publication in isolation. Davis v. Boeheim, 24 N.Y.3d 262, 270 (N.Y. 2014). Rather, courts must take a "holistic approach" and focus on "the over-all context in which the assertions were made and

determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the plaintiff." <u>Id.</u> (citations, internal quotation marks, and alterations omitted).

Thus, based on the context in which it was delivered, a statement that is capable of being proven false may still be a non-actionable opinion. <u>See</u> <u>Steinhilber v. Alphonse</u>, 68 N.Y.2d 283, 294-95 (N.Y. 1986).

For example, a publication's "tone and apparent purpose" may indicate to the audience that what they are hearing is likely to be a statement of opinion delivered from a "highly partisan point of view," <u>Immuno AG.</u>, 77 N.Y.2d at 254-55, rather than an accurate factual assessment offered by a "disinterested observer," <u>Brian</u>, 87 N.Y.2d at 53.[9]  Similarly, a publication may indicate to audiences that they are likely hearing opinionated viewpoints and not factual assessments when its "tenor . . . often escalates into the hyperbolic,"[10]

---

[9]    <u>See also</u> <u>Vengroff v. Coyle</u>, 647 N.Y.S.2d 530, 532 (N.Y. App. Div. 1996) (reasoning that statements are not actionable when context establishes that "any reasonable reader should have been aware that [the publication's] contents included biased opinion, not objective fact") (citations omitted); <u>Goetz v. Kunstler</u>, 625 N.Y.S.2d 447, 452 (N.Y. Sup. Ct. 1995) ("The content, tone and apparent purpose of these statements would be a signal to the reasonable reader, as if a giant flag were raised, that what is being read . . . is likely to be an opinion—a biased point of view of an activist lawyer——rather than objective fact.").

[10]    <u>Hayashi v. Ozawa</u>, No. 17 Civ. 2558 (AJN), 2019 WL 1409389, at *5 (S.D.N.Y. Mar. 28, 2019); <u>see also</u> <u>Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC</u>, 151 F. Supp. 3d 287, 294 (E.D.N.Y. 2015), <u>aff'd</u>, 670 F. App'x 731 (2d Cir. 2016) (summary order) ("[A]n opinion may be offered with such excessive language that a reasonable audience may not fairly

when its "tone . . . indicates that the writer is expressing his or her personal views, in that it reflects a degree of anger and resentment,"[11] or when it is presented as satire or fiction that audiences would not reasonably interpret as "describing actual facts about the plaintiff or actual events in which [he] participated".[12]  Moreover, when a statement, "read in context, [is] readily understood as conjecture, hypothesis, or speculation," that "signals [to] the reader that what is said is opinion, and not fact."  Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997) (citation omitted).

    In addition to the immediate contextual indicators discussed above, "apparent statements of fact may assume the character of statements of opinion" when considered in light of the broader context in which the statement was published. Steinhilber, 68 N.Y.2d at 294-95 (citation omitted).  This includes "circumstances in which an audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole."  Id. (citation and internal quotation marks omitted).  It also includes situations where comments are made on free-wheeling

---

conclude that the opinion has any basis in fact, such as the type of speech often characterized as rhetorical hyperbole, parody, loose, or figurative.") (citation and internal quotation marks omitted).

    [11]    Sandals Resorts Int'l Ltd. v. Google, Inc., 925 N.Y.S.2d 407, 415 (N.Y. App. Div. 2011).

    [12]    Netzer v. Continuity Graphic Assocs., Inc., 963 F. Supp. 1308, 1324-25 (S.D.N.Y. 1997) (citations and internal quotation marks omitted).

internet fora, such as blogs or social media sites, which courts have generally found to be a persuasive factor in holding that a statement would be understood by readers as reflecting the author's opinion. See Ganske v. Mensch, 480 F. Supp. 3d 542, 553 (S.D.N.Y. 2020) ("[T]he fact that [the] allegedly defamatory statement . . . appeared on Twitter conveys a strong signal to a reasonable reader that this was [d]efendant's opinion.") (listing cases); see also Bellavia Blatt & Crossett, 151 F. Supp. 3d at 295 ("New York courts have consistently protected statements made in online for[a] as statements of opinion rather than fact.") (citations omitted).

Finally, even when the circumstances above suggest that reasonable audiences would understand that what is being said is an opinion, a statement may nevertheless be actionable if it implies that the speaker's conclusion is based on his knowledge of undisclosed defamatory facts. Gross, 82 N.Y.2d at 153-54; see Levin, 119 F.3d at 197. On the other hand, when a statement of opinion is either "accompanied by a recitation of the facts on which it is based or . . . does not imply the existence of undisclosed underlying facts," it is not actionable. Gross, 92 N.Y.2d at 153-54; see Steinhilber, 68 N.Y.2d at 290 (explaining that "[t]he essential task is to decide whether the words complained of,

considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion") (citation omitted).

### B. Application to Statements About Rapaport Being Racist, a Fraud, a Hack, a Wannabe, and a Liar

We start with two broad categories of statements published by the Barstool Defendants in Twitter tweets, blog posts, online articles, podcasts, and radio shows that: (1) Rapaport is "racist,"[13] and (2) Rapaport is a "fraud," a "hack," a "wannabe," and a "liar."[14]

---

[13]    The challenged representations for this category are: (1) tweets calling Rapaport "racist" (DCSOMF ¶ 252) and a "racebaiter" (id. ¶ 254) as well as radio hits, blog entries, videos, and images stating the same (id. ¶¶ 252, 255-56, 259, 260); (2) a blog entry entitled "Michael Rapaport Possibly Alluded To Comparing A Black Woman To A Monkey," which concluded that such a comparison would be "blatantly racist" (id. ¶ 257); (3) a comment on the radio stating that with Rapaport "everything comes down to race" and that he "hates white people," including because he roots for white athletes to lose just because the color of their skin (id. ¶ 258); and (4) a blog post imagining the context in which Rapaport sent an insulting tweet to a Black woman stating: "How is that janky wig not sliding off of your head?" (id. ¶ 253).  The blog post about the "janky wig" comment (id. ¶¶ 250, 253) is not actionable for the independent reason that reasonable readers would not understand the piece, which is clearly a figment of the author's imagination and styled as if it were a scene from a television show (complete with theme music), to be describing "actual facts about the plaintiff or actual events in which [he] participated." Netzer, 963 F. Supp. at 1324-25.

[14]    The challenged representations for this category are blog posts, tweets, online articles, and radio comments labeling Rapaport a "fraud," "wannabe fraud hack," a "fucking fraud," a "fraudulent sack of shit," a "fucking chump fraud," a "lying deadbeat fraud hack," "a loser, and fraud, and an asshole," "a fraud hack of a coward," "a pasty sickly race baiting fraud hack," the "biggest fraud I've ever met," an "all-time fraud," and other variations on these themes.  (DCSOMF ¶¶ 221, 224-49.) This category also includes statements from a February 2018 video

As used here, these labels represent nothing more than the Barstool Defendants' subjective evaluations of Rapaport that are incapable of being objectively proven true or false.

For instance, the observation that someone is "racist," i.e., someone who believes that racial differences produce an inherent superiority of a particular race,[15] will almost always depend on the eye of the beholder. To illustrate the epithet's subjective nature when used in this context, one need not look further than the evidence Rapaport introduces in an attempt to falsify the assertion: that he does not consider himself to be a racist; that he is married to a Black woman; that he does not use the issue of race for personal benefit; and that he has had many Black guests on his podcast shows. (DCSOMF ¶¶ 269-71, 315, 317.) While the Court does not intend to suggest that Rapaport is in fact racist, this evidence simply does not establish by objective proof that the challenged representations are false.

Statements identifying Rapaport as a "fraud" (someone who is not the type of person they present themselves to be), a "hack" (someone who is motivated entirely by money, often at the expense of integrity or professional standards), or a

published by Barstool called "Fire Rap," which is analyzed separately below. (Id. ¶¶ 222-23, 239.)

[15]   See Racist, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/racist.

"wannabe" (someone who aspires vainly to emulate or attain success)[16] suffer from the same defect: when used in contexts like this case, they are readily understood as inherently subjective assessments that are incapable of being proven objectively false.[17]

It is for that reason that courts evaluating similar comments have routinely held that they are not actionable statements of fact. See Cummings v. City of New York, No. 19 Civ. 7723 (CM)(OTW), 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24, 2020) ("Courts in New York have consistently held that terms like 'racist' constitute nonactionable opinion.") (listing cases); Eros Int'l, PLC v. Mangrove Partners, No. 13070, 2021 WL 432837, at *1 (N.Y. App. Div. Feb. 9, 2021) (citations omitted) (finding that a tweet describing a subject as "a fraud" was a non-actionable opinion).[18] The

---

[16]     See Fraud, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fraud; Hack, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hack; Wannabe, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/wannabe.

[17]     While calling someone a "liar" is more capable of being proven true or false, the context in which the term is used here—e.g., calling Rapaport a "lying fraud hack" (DCSOMF ¶¶ 221, 231, 233-35, 237, 247)—demonstrates that the term was simply amplifying the Barstool Defendants' assessments that Rapaport is not genuine or trustworthy, an inherently subjective topic. Further underscoring the comments' subjective nature, Rapaport does not even attempt to offer any objective evidence that would prove that the "fraud," "hack," "wannabe," or "liar" statements are false in the "Falsity of Defendants' Statements" section of his Rule 56.1 Statement of Material Facts. (See id. ¶¶ 265-71.)

[18]     See also Sherr v. HealthEast Care Sys., 416 F. Supp. 3d 823, 843 (D. Minn. 2019) (applying similar standards under Minnesota law and holding that calling someone a "hack" is a non-actionable opinion that cannot be "verifi[ed] and cannot reasonably be interpreted as stating

Court agrees with the conclusions reached by these courts, and thus holds that Rapaport does not carry his burden in demonstrating that these statements are assertions of fact.

Moreover, as these statements of opinion do not imply that they are based on undisclosed facts know to the speaker, they are not actionable as defamatory "mixed opinions." Cf. Levin, 119 F.3d at 197 (explaining that statements of opinion "may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader") (citation omitted); Steinhilber, 68 N.Y.2d at 289 ("When . . . the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable.") (citations omitted).[19]

## C.  Application to Statements About Herpes and Criminal Conduct

Unlike the statements above, accusations that Rapaport has herpes, is a stalker, or has committed domestic abuse are

---

actual facts") (citations omitted); Ferlauto v. Hamsher, 74 Cal. App. 4th 1394, 1404 (Cal. Ct. App. 1999) (finding that labeling someone a "loser wannabe lawyer" is "classic rhetorical hyperbole which cannot reasonably [be] interpreted as stating actual facts" under the First Amendment) (citations and internal quotation marks omitted).

[19]   While context reveals that none of these subjective epithets would be understood by audiences as implying that it is based on undisclosed defamatory facts known to the author, the vast majority of the statements go a step further by explicitly referencing the underlying bases informing the authors' opinions.  (See DCSOMF ¶¶ 224-27, 229-35, 237, 240-49, 252, 257-58.)

capable of being objectively proven true or false as used in context. Here, Rapaport introduces evidence that establishes that he tested negative for herpes and has never been convicted of stalking or battery, thus establishing the falsity of those assertions. (DCSOMF ¶¶ 265-68.)

That these statements are objectively false is not dispositive, as the Court must consider the immediate and broader context in which each challenged statement was delivered to determine whether a reasonable audience would understand the statement to be an assertion about Rapaport intended to convey factual accuracy. See Brian, 87 N.Y.2d at 53.

In support of his claim, Rapaport generally argues that the statements would be understood as assertions of fact because: (1) Barstool holds itself out as an "authentic" brand that tells the truth; (2) many of the statements were published online; (3) many of the statements lacked a disclosed factual basis; and (4) the Barstool Defendants repeated these accusations numerous times in various forms. (See DCSOMF ¶¶ 301-11.) Beyond making these broad assertions and identifying selective portions of larger publications that he claims to be defamatory, Rapaport spends little time analyzing the tone and broader context of each statement he challenges.

A close review of the challenged statements in context reveals that they would not have been "understood by a reasonable [audience] as assertions of fact that were proffered for their accuracy." Brian, 87 N.Y.2d at 53. Instead, context suggests that audiences would readily recognize the challenged statements as representing the (often overtly biased) viewpoints of the Barstool Defendants. As discussed in detail below, the statements were largely laden with epithets, vulgarities, hyperbole, and non-literal language and imagery; delivered in the midst of a public and very acrimonious dispute between the Barstool Defendants and Rapaport that would have been obvious to even the most casual observer; and published on social media, blogs, and sports talk radio, which are all platforms where audiences reasonably anticipate hearing opinionated statements.

### 1.   The "Fire Rap" Video

We begin with a February 26, 2018 online video entitled "Fire Rap," which is a six-minute long so-called "diss track" of the Barstool Defendants rapping a constant stream of insults and slurs about Rapaport against a backdrop of unflattering video clips and images of Rapaport. This video contains over a dozen challenged statements, which include calling Rapaport a "herpes-having motherfucker giving girls the heebie jeebies," a "herpes-ridden fuck," the "perp with

the herp," and a "75-year-old, herpe-having piece of shit"; stating that the "only flames that come out [Rapaport's] mouth is when [he] ha[s] a flare up"; and threatening to make Rapaport "as black-and-blue as [his] ex."  (DCSOMF ¶¶ 199-200, 205-06, 212, 218-19, 222-23, 239, 251, 256, 259, 261.)

As an initial matter, the Fire Rap video describes the recent history of the acrimonious dispute that resulted in Rapaport's termination just days before the video's publication.  For example, the video reproduces the clip of Portnoy publicly announcing that Rapaport had been fired as well as the photoshopped picture that Rapaport tweeted in response, wherein Rapaport appears to engage in anal sex with Portnoy.  This background contextualizes for the audience that the statements in the video are being offered in the midst of a hostile public feud between Rapaport and Barstool. See Steinhilber, 68 N.Y.2d at 294-95 (suggesting that statements may be understood as opinion when an "audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole") (citation omitted); see also Brian, 87 N.Y.2d at 53 (concluding that an author's signal in the publication that "he was not a disinterested observer" put audiences on notice that the challenged statements were non-actionable opinions) (citation omitted).

The tone and apparent purpose of the diss track reinforce for audiences that the video is not intended to reflect an accurate factual assessment of Rapaport. Exaggerated, vitriolic words and imagery pervade the six-minute-plus video to attack all aspects of Rapaport's life, including his career, popularity, relationships, appearance, age, and legal troubles. For example, alongside the obviously hyperbolic statements that Rapaport identifies as defamatory are similarly sensational assertions that Rapaport is a "fucking 10 gallon drum of curdled milk," a "walking blob of jizz," a "snake-oil salesman with nothing to sell," and a "puddle of pudding," and that he looks like "Larry Bird's mom's sister," or a "chemo Yertle the Turtle." The video also suggests that Rapaport has such poor rap skills that the speaker would rather "get a spinal tap" or "go out to Neverland Ranch and sit in Michael's lap" than listen to him rap.

On top of these caustic insults, the video also displays several images and video clips of Rapaport that are obviously doctored, further underscoring the non-factual nature of the piece. The following are just four of the many examples of these types of photoshopped images:






If an article's publication on the Op-Ed page of the New York Times can create the "common expectation" that it "will represent the viewpoints of [its] author[] and, as such, contain considerable hyperbole . . . [and] diversified forms of expression and opinion," Brian, 87 N.Y.2d at 53, and if a letter to the editor likewise generates the "common expectation" that it will not "serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion," Immuno AG., 77 N.Y.2d at 253 (citation omitted), and if the context of a heated labor dispute causes audiences to

"anticipate [the use] of epithets, fiery rhetoric or
hyperbole," and thus allows "apparent statements of fact [to]
assume the character of statements of opinion," <u>Steinhilber</u>,
68 N.Y.2d at 294-95 (citation omitted), then the Court has no
difficulty concluding that the context of this "diss track"
video reasonably signals to viewers that the challenged
statements are the prejudiced, opinionated viewpoints of the
Barstool Defendants, not accurate factual assessments of
Rapaport.

Moreover, none of the challenged statements are rendered
actionable by virtue of implying that they are based on
undisclosed facts known to the Barstool Defendants. <u>Cf.
Levin</u>, 119 F.3d at 197. In fact, the Barstool Defendants
reasonably convey to viewers that photographs of Rapaport
with a red lesion under his lip informed their conclusion
that he has herpes:

 

Accordingly, the Court finds that Rapaport has not
sustained his burden to show that the challenged statements

in the "Fire Rap" video are actionable assertions of fact under New York law.

### 2.   The "Fired Up" Cartoon

The Court likewise finds that an eight-minute cartoon called "Fired Up" published on Barstool's website less than a week after Rapaport was fired is not actionable.  (DCSOMF ¶¶ 197-98.)   Here, Rapaport specifically challenges the cartoon's depiction of Rapaport with a talking lesion on his face and its portrayal of a doctor stating that Rapaport has herpes.

Like the Fire Rap video, this cartoon summarizes the background of the ongoing feud between Barstool and Rapaport and thus creates a reasonable expectation it is likely to represent a biased, opinionated viewpoint as opposed an accurate factual portrayal of Rapaport.  See Brian, 87 N.Y.2d at 53; Steinhilber, 68 N.Y.2d at 294-95.

The cartoon also features a series of quite obviously fictional scenes and events.  For instance, the lesion on Rapaport's face is introduced as Rapaport's "producer" and even speaks during the video.




The cartoon also imagines Rapaport as the Stay Puft Marshmallow Man from "Ghostbusters," Humpty Dumpty, and a litigious ghost that sues his own family for copyright infringement for putting his name on a tombstone.

 



The scene in which Rapaport is diagnosed with herpes shows Rapaport lying in a hospital bed with casting covering his entire body while a doctor states to a boy who is introduced as Rapaport's "fake son" that "your fake dad has herpes." The doctor then diagnoses Rapaport with "Ding Dongs for Brains," which is described as a fatal condition.

 

It is self-evident that this crude cartoon is a work of fiction and would be understood as such. Just as no reasonable viewer would interpret the cartoon as asserting for a fact that Rapaport died as a result of having "Ding Dongs for Brains," those same viewers would not understand the cartoon as factually asserting that Rapaport has herpes or that a lesion on his face speaks and serves as his producer. See Netzer, 963 F. Supp. at 1324-25 (statements that "plainly involve humor, fiction and fantasy" and "could not be reasonably understood as describing actual facts about the plaintiff or actual events in which [he] participated" are not actionable) (citations and internal quotation marks omitted).

Moreover, the cartoon does not imply that there are undisclosed facts known to its creator that would defame Rapaport. Cf. Levin, 119 F.3d at 197. Accordingly, Rapaport does not carry his burden in demonstrating that the representations in the cartoon are actionable.

### 3. The Herpes/Clown Shirt

We next consider Rapaport's claim that he was defamed by Barstool's statements promoting and describing a shirt that Barstool designed and sold. (DCSOMF ¶¶ 190, 208-09, 213, 215, 217.) The shirt in question is an artistic rendering of an actual photograph of Rapaport with a red lesion under his

lip, which Barstool illustrated by adding a clown nose and coloring both the nose and the lesion the same shade of red (see DCSOMF ¶ 190):



Two of the challenged statements contain an image of the shirt without any further description of it as depicting Rapaport with herpes.  (DCSOMF ¶¶ 190, 215.)  While hardly flattering to Rapaport, this image standing alone is not actionable because a reasonable audience would not understand the shirt to be asserting as a fact that Rapaport has herpes. See Shiamili v. Real Est. Grp. of New York, Inc., 17 N.Y.3d 281, 292-93 (N.Y. 2011).

While the remaining three challenged publications in this category do suggest that the shirt portrays Rapaport with herpes, the broader context of these statements reveals that reasonable audiences would understand that these

observations represent the speaker's opinion, not factual
declarations.

First, in an online video, Nathan impersonates a
professor to explain the nature of the Barstool-Rapaport
feud.  (DCSOMF ¶ 217.)  Towards the end of his "lesson,"
Nathan states that Barstool is selling a shirt that "shows
Rapaport has herpes and is a clown," while the video displays
an image of the shirt.  When viewed in context, the challenged
comment is best understood as Nathan's opinion of what the
image on the shirt depicts, which the audience remains free
to disagree with.  See Levin, 119 F.3d at 197; Gross, 92
N.Y.2d at 154-55.

Second, in another online video, Smith streams himself
playing a videogame for almost an hour while sharing his
thoughts in a rambling fashion.  (DCSOMF ¶¶ 208-09.)  During
the course of the video, Smith explains that Rapaport is suing
him for defamation because Rapaport "wants it publicly known
that he doesn't have herpes," and then stands up to show the
camera that he is wearing the shirt in question.  Smith later
makes comments that allude to Rapaport having herpes by
stating: (1) that he has responded to Rapaport's insults by
asserting that "herpes lasts forever"; (2) that it is his
observation that Rapaport "has obvious skin issues . . . and
I'm not saying he has any, but all I'm saying is that herpes

last forever"; and (3) that he finds it humorous that this "douchebag . . . is actually suing me over calling him a fraud and may or may not alluding to him having a certain skin ailment."

Taken as a whole, the context of these statements——which were published in an online video of Smith playing a videogame, which were delivered in a stream-of-consciousness digression, and which were communicated by a source who made his bias against Rapaport clear——reasonably suggests to viewers that the challenged comments represented Smith's opinions, not statements of fact offered for their accuracy. See Brian, 87 N.Y.2d at 53; Versaci v. Richie, 815 N.Y.S.2d 350, 351 (N.Y. App. Div. 2006) (finding that "rambling commentary" published in an online forum suggested to audiences that the statements took the form of opinions).

Finally, on a radio show, Portnoy, Clancy, and a third Barstool employee acknowledge that the bases for their conclusion that Rapaport has herpes are photographs of Rapaport with a lesion on his face.[20]  Accordingly, this

---

[20]    The relevant exchange is reproduced below:

**Portnoy:**  Why are we saying that by the way?  Is that like a fact or something?

**Clancy:**  I mean you have the pictures.

**Host 3:**  He had a cold sore, yeah.

**Portnoy:**  Well, pictures doesn't mean anything does it?

**Clancy:**  We are literally selling a t-shirt about it.

exchange is "readily understood as conjecture" premised on a disclosed factual record, which "signals [to] the [listener] that what is said is opinion, and not fact." Levin, 119 F.3d at 197 (citation omitted).[21]

As none of the challenged statements discussed above imply that they are based on the speaker's knowledge of undisclosed defamatory facts, here, too, Rapaport does not meet his burden of showing that these statements are actionable assertions of fact. Cf. id.

---

**Portnoy:**  It was a picture with an image of him from that picture.  But who is saying he has herpes?

[Host 3 discusses how cold sores are a form of herpes]

**Portnoy:**  But people are saying it just because of that picture?

**Clancy and Host 3:**  Yes.

**Portnoy:**  Ok, got it.  I don't think it's under your chin, like where it is.

**Host 3:**  Well, they can expand.

**Portnoy:**  I didn't know the way it came out.  I don't know why people were saying that.  It was making me nervous, to be honest.

**Clancy:**  Gotcha.  Yeah, I think it is just stemming from those pictures of him with that gross whatever it was on his face.

**Host 3:**  Yeah.

**Clancy:**  So, we are talking about Michael Rapaport, obviously. . . .

(DCSOMF ¶ 213.)

[21]     Likewise, Rapaport's challenge to the music played on the program immediately before this exchange, which includes the lyrics, "I have herpes on my lip," is not actionable.  (See DCSOMF ¶ 194.)

      **4.**    **Video Comment About Rapaport's "Stalking Case or Whatever"**

Rapaport next challenges Portnoy's statements in a February 19, 2018 video that Rapaport "has this stalking case or whatever he has."  (DCSOMF ¶ 264.)  As Portnoy makes those comments, the video displays a news article explaining that Rapaport was sentenced for harassment of his ex-girlfriend.



A reasonable viewer would understand Portnoy's comments to be conveying his (erroneous) understanding of the charges described in the article that was simultaneously presented to the audience, and thus the comments are protected opinions. See Gross, 82 N.Y.2d at 154-55; Parks v. Steinbrenner, 520 N.Y.S.2d 374, 378 (N.Y. App. Div. 1987) ("That one may dispute the conclusions drawn from the specified facts is not, however, the test.  So long as the opinion is accompanied by a recitation of the facts upon which it is based it is deemed

a 'pure opinion' and is afforded complete immunity even though the facts do not support the opinion.").

### 5.   **Tweets About Herpes**

We next consider Rapaport's contention that he was defamed by three tweets from Barstool employees.

In analyzing these tweets, we start from the basic premise that courts interpreting New York law have generally found that comments made on Twitter are more likely to be understood by audiences as statements of opinion than statements of fact.  See, e.g., Ganske, 480 F. Supp. 3d at 552-53 (observing that a statement's publication "on Twitter conveys a strong signal to a reasonable reader that this was Defendant's opinion," and finding that the tweets in question were not actionable); Jacobus v. Trump, 51 N.Y.S.3d 330, 339 (N.Y. Sup. Ct. 2017), aff'd, 64 N.Y.S.3d 889 (N.Y. App. Div. 2017) (noting that "social media, such as . . . Twitter, is increasingly deemed to attract less credence to allegedly defamatory remarks than other contexts," and holding that the tweets at issue were not actionable) (citation and internal quotation marks omitted).  Beyond this broader context, the content of the three tweets at issue confirms their non-actionable nature.

For example, here is the first tweet:



(DCSOMF ¶ 195.)  This tweet does not even mention Rapaport, and thus there is no basis on which a reader could reasonably conclude that it was communicating that Rapaport has herpes. See Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82, 86 (N.Y. 2016) (stating that to prevail on a defamation claim, plaintiffs must "prove" to the court "that the statement referred to them and that a person hearing or reading the statement reasonably could have interpreted it as such," which is "not a light" burden) (citations omitted).

The second tweet states:



(DCSOMF ¶ 204.)  Though this tweet mentions Rapaport, it would not be understood as clearly asserting that Rapaport has herpes.  If anything, the tweet implies to readers that it is <u>Smith</u> who "will always be here[, l]ike the herp."

Finally, here is the third tweet:



(DCSOMF ¶ 210.)  While this tweet falls closer to the line of being a factual assertion that Rapaport has herpes, context suggests that the tweet is not an actionable statement of

fact.   In   reaching   that   conclusion,   Jacobus v. Trump   is
instructive.   51 N.Y.S.3d 330.   As Jacobus explained, comments
on   Twitter   that   "could   be   found   to   convey   facts"   when   "viewed
in   isolation"   may   not   be   actionable   when   context   suggests   the
statements   were   contained   in   "intemperate   tweets"   published
in   the   midst   of   a   "hyperbolic . . . dispute   cum   schoolyard
squabble."   Id. at 343 (citations and internal quotation marks
omitted).   The use of "epithets, fiery rhetoric or hyperbole"
in   such   heated   online   exchanges   "warrant   an   understanding
that   the   statements   contained   therein   are   vigorous
expressions of personal opinion, rather than the rigorous and
comprehensive   presentation   of   factual   matter."    Id. at 339
(citations and internal quotation marks omitted).

Here,   the   tweet   at   issue   was   published   by   Clancy   as   a
response   to   Rapaport's   insult   about   Clancy's   familial
situation.   Given that the escalating quarrel was apparent to
anyone   who   came   across   the   tweet,   Clancy's   rejoinder   that
Rapaport   is   a   "creepy   herpes   riddled   failure"   is   best
understood as an intemperate epithet delivered in the heat of
a   series   of   charged   personal   attacks   rather   than   as   an
objective factual observation that Rapaport is a failure, is
creepy, and has herpes.

As   none   of   the   tweets   reasonably   imply   that   the
challenged comments are premised on undisclosed defamatory

facts known to author, Rapaport does not sustain his burden of demonstrating that these statements are actionable.  Cf. Levin, 119 F.3d at 197.

### 6.  Blog Posts About Herpes

Next, Rapaport challenges comments made in five blog posts.

As with the tweets discussed above, we begin our analysis of these blog posts by noting that a statement's publication in a blog "suggests that it is informed, at least in part, by . . . its author's opinions," and thus "cuts against a determination that it is an assertion of fact meant to be taken literally."  Wexler v. Dorsey & Whitney LLP, 815 F. App'x 618, 622 (2d Cir. 2020) (summary order).  The more specific context of these blogs confirms that they are non-actionable.

Four of the blog posts give readers the general background about the animosity between Barstool and Rapaport, which establishes the authors' biases against Rapaport, and then proceed to make hyperbolic comments, such as:

> (1) Smith stating that "I don't want to beat a dead horse to the ground.  This is well beyond that.  I want to stomp the herp-infected horse into a fine paste then fire the sludge into the sun." (DCSOMF ¶ 207);
>
> (2) Clancy referring to Rapaport as a "moronic trashbag," an "old crusty herpe," someone who "whores himself out to absolutely any outlet that will take him because he knows what little career he had left

is fading fast," someone who is "not smart enough to do this job" because "[h]e's not clever, he has no wit, and he cant keep up with the guys at this company who are naturally funny and can do this job quickly and effectively," and someone who was fired by Barstool for "open[ing] his herpes infested mouth" (id. ¶ 211);

(3) Nathan calling Rapaport a "herpe having, race baiting, D-list actor" (id. ¶ 215); or

(4) a Barstool employee using the nickname "Herp Brooks" in reference to Rapaport, a play-on-words invoking the gold medal-winning coach of the 1980 Miracle on Ice U.S. Olympic men's ice hockey team (id. ¶ 196).

Thus, both the broader and specific contexts of these blog posts suggest that reasonable readers would interpret these insulting comments as opinionated epithets rather than "assertions of fact that were proffered for their accuracy" by "disinterested observer[s]." Brian, 87 N.Y.2d at 53; see DePuy v. St. John Fisher Coll., 514 N.Y.S.2d 286, 287 (N.Y. App. Div. 1987) ("A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more.") (citation omitted).

The last blog post, entitled "Sad Story: D List Actor With A Slight STD Problem Traps Plane Of Innocent Travelers Inside," provides a link to an actual news story about Rapaport, which reports that Rapaport prevented a man from opening a plane's emergency door mid-flight. (DCSOMF ¶ 216.) The blog post satirically portrays the article as a piece

about Rapaport trapping people inside the plane with him.  In
relevant part, the blog post states:

> Awful, awful story tonight. . . . As you
> can see [from the linked story] above, D
> list actor Michael Rapaport stopped
> innocent travelers from jumping out of a
> plane today, forcing them to be in a
> closed space, breathing his same air for
> HOURS until the plane was able to safely
> land.  . . .  Thinking about those sad
> victims who were trying to escape that
> plane by any means necessary, only for
> Rapaport to tackle the brave man who was
> trying with all his might to open the
> emergency door and give everyone freedom.
> Tonight, my thoughts and prayers, as well
> as everyone here at Barstool Sports, are
> with the passengers of that plane who were
> not able to jump out at 35,000 feet
> because of the actions of a pasty man and
> his herpe sidekick.

No reasonable reader would understand the blog post's
sardonic tone as accurately describing the linked story, as
the blog post (1) shows the headline of the actual story
("Michael Rapaport Stops Man from Opening Plane's Emergency
Door Mid-Flight"), and (2) includes a link to the actual story
that allows readers to view the referenced article for
themselves.

Because none of these blog posts implies that the
authors' opinions are based on undisclosed defamatory facts,
Rapaport fails to carry his burden of proving that the
challenged statements are actionable.  Cf. Levin, 119 F.3d at
197.

### 7.   Radio Comments About Herpes and Stalking

We finally consider Rapaport's claims that he was defamed by comments made on various sports talk radio broadcasts.

First, Rapaport challenges comments made during a September 25, 2018 radio show in which the host states: (1) that Rapaport "wants to make clear that he doesn't have herpes," which "makes you think that he has herpes"; and (2) that Rapaport is "saying he doesn't have herpes when he pretty clearly had a red mark near his mouth." (DCSOMF ¶¶ 202-03.) Both of these comments amount to no more than speculation about why Rapaport would be denying that he has herpes as opposed to an assertion of fact that Rapaport has herpes.

Second, Rapaport identifies two statements made on a March 2, 2018 radio broadcast discussing how Rapaport challenged Portnoy to a boxing match. (DCSOMF ¶¶ 214, 220.) While discussing Rapaport's proposal, Portnoy and Clancy complain that Rapaport wants to make money off of the fight while Barstool would be the only entity paying for its promotion. In comments styled as demands directed to Rapaport, Portnoy and Clancy state: (1) if you "put up 250 grand of your own money," then "this fight is on and, until then, shut your fucking herpes face up dude"; and (2) "there has to be something put up beforehand that we know we have in

hand, so literally put your money where your herpes mouth is."

Rather than an accurate factual assessment of Rapaport from disinterested observers, these comments made on a sports talk radio show would be reasonably understood by listeners as fiery, epithet-laced taunts intended to be a display of machismo in response to Rapaport's proposal to physically fight Portnoy. When "[g]ratuitously tasteless and disparaging" remarks like these are made in a "crude and hyperbolic manner" on a "shock talk" radio show, "it is clear" that such comments "would not have been taken by reasonable listeners as factual pronouncements." Hobbs v. Imus, 698 N.Y.S.2d 25, 26 (N.Y. App. Div. 1999); see Steinhilber, 68 N.Y.2d at 294-95 (statements may be understood as opinions in circumstances where audiences "anticipate [the use] of epithets, fiery rhetoric or hyperbole") (citation omitted).

Third, Rapaport asserts that two statements Portnoy made on a February 19, 2018 radio show were defamatory. (DCSOMF ¶¶ 262-63.) The segment in question begins with Portnoy asking a Barstool host, "[Rapaport] has, what, a stalking charge or something in his past?" The host immediately answers that it was a harassment charge. A few seconds later, Portnoy then references the criminal charge as Rapaport's "stalking case or whatever that was."

Portnoy's first statement quite obviously would not be understood as an assertion of fact, as it was posed as a question that was accurately answered by the show's host. And, when considered in context, Portnoy's second statement made less than 20 seconds later would be reasonably understood as nothing more than an equivocal reference to the harassment charge that had just been discussed.

Here, too, none of the statements reasonably implies that the speakers' opinions rest on undisclosed defamatory facts, and thus Rapaport does not meet his burden of proving that the complained of statements are actionable assertions of fact. Cf. Levin, 119 F.3d at 197.

Finally, Rapaport challenges statements contained in Barstool's internal summaries of its radio shows, which were authored by a non-defendant Barstool employee and sent solely to other Barstool employees. (DCSOMF ¶¶ 191-93, 201.) Rapaport cannot sustain his defamation claim against Barstool based on the email summaries themselves, as the evidence does not establish that they were ever published by Barstool to third parties outside of the company. See Hope v. Hadley-Luzerne Pub. Libr., 94 N.Y.S.3d 723, 724 (N.Y. App. Div. 2019) (explaining that "defamation requires proof that the defendant made a false statement[ and] published that statement to a third party") (citation and internal quotation

marks omitted).  Moreover, the summaries are self-evidently not verbatim transcripts of the actual comments made on air. Rather, they appear to describe comments made on broadcasts that Rapaport separately identified as defamatory,[22] which are not actionable for the reasons stated above in analyzing those statements.[23]

---

[22]    See DCSOMF ¶¶ 191-92 (describing the comments made on the February 19, 2018 Barstool Radio show, which Rapaport challenged in Paragraphs 194 and 213 of his Rule 56.1 Statement of Material Facts); id. 201 (describing the comments made on a March 2, 2018 Barstool Radio show and related video, which Rapaport challenged in Paragraphs 214 and 220 of his Rule 56.1 Statement of Material Facts).

The one exception is the summary referenced in Paragraph 193 of Rapaport's Rule 56.1 Statement of Material Facts, which does not appear to summarize a recording of any broadcast provided to the Court.  That summary states that on the February 20, 2018 broadcast of Barstool Radio, the hosts discuss how "Rapaport went on FS1 today and claimed that he is going 15 rounds with us, despite lawyering up in 15 minutes when we put his herpes-riddled face on a t-shirt that is selling like wildfire," which Rapaport objects to because it refers to him as "herpes-riddled."  (Id. ¶ 191.)  The "herpes-riddled" comment was not actually aired during the described portion of the February 20, 2018 Barstool Radio broadcast, which the Court was able to locate on Barstool's website:

> **Clancy:**  Rapaport was on Fox Sports today doing all of their shows and flapping his gums about us and talking about how tough he is and how is the biggest disrupter on the internet and how he is going 15 rounds with us.  But the reality of the matter is that yesterday, after about 15 minutes, he decided to lawyer up.  We have been selling the Michael Rapaport clown shirts . . .
>
> **Portnoy:**  Big seller.
>
> **Clancy:**  Big seller, right.

Barstool Radio, Michael "Takes It As Well As He Gives It" Rapaport Lawyered Up In 15 Minutes Over The Clown Shirt, Barstool Sports (Feb. 20, 2018), https://www.barstoolsports.com/video/940220/michael-takes-it-as-well-as-he-gives-it-rapaport-lawyered-up-in-15-minutes-over-the-clown-shirt.  Given the absence of any reference to herpes, this exchange is not defamatory.  The Court takes judicial notice of the February 20, 2018 Barstool Radio broadcast published on Barstool's official website on the same date, as the accuracy of the source and its contents "cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

[23]    Having resolved the fraud and defamation claims, all that remains are the parties' contractual claims.  Given the clear limits on the maximum recovery for each party's breach of contract claims as well

**CONCLUSION**

In summary, Rapaport's motion for summary judgment is denied.  Barstool's motion for summary judgment on Rapaport's fraud claims is granted, as those claims are duplicative of Rapaport's breach of contract claims.   The Barstool Defendants' motion for summary judgment on Rapaport's defamation claim is granted, as Rapaport fails to sustain his burden of proving that the challenged representations are actionable statements of fact under New York law.  Finally, the Court awards summary judgment to Barstool on Rapaport's breach of contract claim contained in Count Four relating to the "Death Wish" video.

The Clerk of Court is respectfully directed to terminate the motions currently pending at ECF Nos. 103 and 119.

**SO ORDERED.**

Dated:     New York, New York
           March 29, 2021

                              _____
                                 NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

---

as the parties' investment in this lawsuit to date, the Court is hopeful
that the parties can reach resolution on the remaining disputes.