UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.,

            Plaintiffs,

    -against-

BARSTOOL SPORTS, INC., ADAM
SMITH, KEVIN CLANCY, ERIC NATHAN
and DAVID PORTNOY,

            Defendants.

:
:
:
:
:
:
:
:
:

**Case No. 1:18-CV-08783**

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
RECONSIDERATION OF MARCH 29,
2021 MEMORANDUM AND ORDER,
OR, IN THE ALTERNATIVE, FOR
CERTIFICATION OF
INTERLOCUTORY APPEAL**

------------------------------------- X

------------------------------------- X

BARSTOOL SPORTS, INC.,

            Counterclaimant,

    -against-

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.,

            Cross-Defendants.

:
:
:
:
:
:
:
:

------------------------------------- X

## **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...........................................................................1

II.     LEGAL STANDARD.......................................................................................2

III.    BARSTOOL'S COUNTERCLAIM .......................................................................2

IV.     COUNTS IX-X OF PLAINTIFFS' FAC: FRAUDULENT CONCEALMENT
        AND INDUCEMENT .....................................................................................7

        1.      Barstool's Misleading Partial Disclosures and Duty to Remedy...............11

        2.      Barstool's Superior Knowledge and Duty to Disclose ............................13

V.      COUNT VIII OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 4
        OF PRINCIPAL AGREEMENT)........................................................................16

VI.     COUNT XI OF PLAINTIFFS' FAC: DEFAMATION AND DEFAMATION
        PER SE.....................................................................................................20

        A.      Overlooked Evidence that Barstool's Audience Interpreted Defendants'
                Defamatory Statements as True.......................................................21

        B.      Overlooked Evidence Relating to Accusations that Mr. Rapaport is a
                Fraud and a Racist.......................................................................22

VII.    CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566 (2d Cir. 2005)............................ 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................................................ 2

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir. 1996) ........... 8

*Carbone v. Marone*, 2007 U.S. Dist. LEXIS 92350 (S.D.N.Y. Dec. 14, 2007)............................ 5

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, No. 15 CV 9003-LTS-SN, 2019 U.S. Dist. LEXIS 160052 (S.D.N.Y. Sep. 18, 2019).......................................................... 9

*Chase Bank*, No. 06 Civ. 3126 (RJS), 2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ..................... 18

*Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980)............................................ 24

*Cohen v. Koenig*, 25 F.3d 1168 (2d Cir. 1994).......................................................................... 9

*Coliniatis v. Dimas*, 848 F. Supp. 462 (S.D.N.Y. 1994)........................................................... 24

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) ........................................................... 24

*Coughlan v. Jachney*, 473 F. Supp. 3d 166 (E.D.N.Y. 2020)...................................................... 9

*Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654 (2d Cir. 2009)................................................ 5

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010)................................................ 23

*Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144 (2d Cir. 2000)......................................... 24

*Fung-Schwartz v. Cerner Corp.*, No. 17-CV-233 (VSB), 2019 U.S. Dist. LEXIS 156920 (S.D.N.Y. Sep. 13, 2019).......................................................................................................... 9

*Gorman v. Fowkes*, 949 N.Y.S.2d 96 (App. Div. 2nd Dept. 2012 ............................................... 8

*Johnson v. MetLife Bank, NA*., 883 F. Supp. 2d 542 (3d Cir. 2012) .......................................... 5

*KCG Americas LLC v. Brazilmed, LLC*, No. 15 CIV. 4600(AT), 2016 U.S. Dist. LEXIS 30497, 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016)....................................................................... 9

*Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 U.S. Dist. LEXIS 122217, 2016 WL 4735364 (S.D.N.Y. Sept. 8, 2016)........................................................................................................... 5

*Kolel Beth Yechiel of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99 (2d Cir. 2013) .......... 2

*Kunik v. NYC Dep't of Educ.*, No. 15-CV-9512 (VSB), 2020 U.S. Dist. LEXIS 16728 (S.D.N.Y. Jan. 29, 2020)............................................................................................................ 5

*Man Advisors, Inc. v. Selkoe*, 174 A.D.3d 435 (App. Div. 1st Dept. 2019) ................................ 10

*Mariano v. CVI Investments Inc.*, 809 F. App'x 23 (2d Cir. 2020) .............................................. 8

*Meeker v. McLaughlin*, No. 17-CV-5673 (SN), 2019 U.S. Dist. LEXIS 55086 (S.D.N.Y. Mar. 31, 2019) ................................................................................................ 13

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) .............. 2

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705 (S.D.N.Y. 2014).......... 23

*Saji v. Nassau Univ. Med. Ctr.*, No. 13-CV-3866(JS)(AKT), 2017 U.S. Dist. LEXIS 26323 (E.D.N.Y. Feb. 24, 2017) ................................................................................. 2

*Shear Enters., LLC v. Cohen*, 189 A.D.3d 423 (App. Div. 1st Dept. 2020)................................ 10

*Solstein v. Mirra*, 488 F. Supp. 3d 86 (S.D.N.Y. 2020)................................................................ 23

*Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir. 1992) ................................................................ 8

*Sw. Payroll Serv. v. Pioneer Bancorp*, No. 1:19-CV-1349 (FJS/CFH), 2020 U.S. Dist. LEXIS 137202 (N.D.N.Y. July 7, 2020)................................................................ 14

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004).................................. 17

*Wash. 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73 (Bankr. N.D.N.Y. 2009...................... 19

*Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497 (S.D.N.Y. 2017) ........................ 9

*Wood v. Town of E. Hampton*, No. 08-CV-4197 (DRH) (AKT), 2014 U.S. Dist. LEXIS 1653 (E.D.N.Y. Jan. 7, 2014) .................................................................................. 5

<u>Rules</u>

Fed. R. Civ. P. 56(c) ...................................................................................................................... 2

Fed. R. Civ. P. 60(b)(2 ................................................................................................................. 19

## I. <u>PRELIMINARY STATEMENT</u>

Plaintiffs Michael Rapaport ("Mr. Rapaport") and Michael David Productions, Inc. (collectively "Plaintiffs") move for reconsideration of this Court's March 29, 2021 Memorandum and Order (ECF No. 151) ("Order"), which ruled upon both Plaintiffs' Motion for Summary Judgment (ECF No. 103) ("P's Motion") against Defendants Barstool Sports, Inc. ("Barstool"), David Portnoy ("Mr. Portnoy"), Adam Smith ("Mr. Smith"), Kevin Clancy ("Mr. Clancy"), and Eric Nathan ("Mr. Nathan") (collectively "Defendants") and Defendants' Motion for Partial Summary Judgment (ECF No. 119) ("D's Motion").

P's Motion was brought as to Counts I-IV and VII-XI of their First Amended Complaint ("FAC") (Doc. 60) and Barstool Sports' only Counterclaim. D's Motion was brought as to Counts IX-XI of the FAC. The Order declined to rule on Counts I-IV and VII-VIII of the FAC and Defendants' Counterclaim, granted Defendants' request to dismiss Counts IX-XI of the FAC, and dismissed Count IV of the FAC *sua sponte*.

Upon review of the Order, it appears that several of the Court's conclusions resulted from oversights by the Court of 1) overwhelming authority from this District that conflicts with the Court's Order; and 2) factual matters[1] raised by Plaintiffs in P's Motion and related filings. As discussed below, respectfully, The Order also is affected by instances of clear error that have resulted in manifest injustice to Plaintiffs. As such, Plaintiffs ask that this Court reconsider its conclusions within the Order. In the alterative, Plaintiffs request that this Court certify these issues for interlocutory appeal and acknowledge that the Order involves controlling questions of law as to which there are substantial

---

[1] It appears that a part of the evidentiary oversights is the result of Plaintiffs including additional evidentiary items in their Counterstatement (ECF No. 141) ("P-CS") to Defendant's Rule 56.1 Statement (ECF No. 121) ("D-SOMF") which were not present in Plaintiffs' Rule 56.1 Statement (ECF No. 105) ("P-SOMF").

grounds for difference of opinion and that an immediate appeal from the Order would materially advance the ultimate termination of the litigation.

To assist this Court in its reconsideration of the Order, Plaintiffs have also submitted new evidence that did not exist at the time P's Motion, D's Motion, and related filings were filed. Such evidence directly rebuts presumptions considered by this Court in ruling on Count VIII of the FAC.

## II.   LEGAL STANDARD

A court should grant a motion for reconsideration when a moving party "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Saji v. Nassau Univ. Med. Ctr.*, No. 13-CV-3866(JS)(AKT), 2017 U.S. Dist. LEXIS 26323, at *8 (E.D.N.Y. Feb. 24, 2017) (quoting *Kolel Beth Yechiel of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013)).

That standard must be applied in light of the summary judgment standard. Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Whether a fact is "material" is determined by the substantive law defining the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a party moves for summary judgment, the non-moving party bears the burden of coming forward with more than "[c]onclusory allegations, conjecture, and speculation." *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (internal quotation and citation omitted).

## III.   BARSTOOL'S COUNTERCLAIM

In its Order, the Court finds that there is a dispute of fact about how much total revenue Barstool generated from Mr. Rapaport's Rant Videos and declined to dismiss Barstool's

2

Counterclaim on those grounds. (ECF. No. 151 at 17). The Court's finding, however, is in clear error as discussed more fully below because it overlooks the undisputed evidence in the record of Barstool's own document which clearly shows "Lifetime Gross Ad Revenue Earned" (i.e. the total revenue Barstool generated from Mr. Rapaport's Rant Videos). As discussed herein, Barstool's assertions are, at best, are a contrived attempt to manufacture a triable issue of fact, where in reality, none exist.

Barstool's Counterclaim seeks $400,000 under the basis that Barstool terminated the Talent Agreement for cause. (P-SOMF ¶54). Regardless of whether Barstool had proper cause for terminating the Talent Agreement, Barstool would still be precluded from recovery due to a lack of damages. (P-SOMF ¶¶51-52)

Under Paragraph 3(b) of the Standard Terms, if the Talent Agreement is terminated by Barstool for Mr. Rapaport's material breach, "any pre-paid portions of [his] Guarantees will immediately be refunded to Barstool and the only amounts owed to [him] by Barstool will be [his] share of any Rant Revenue or Podcast Revenue collected by Barstool through the date of termination." (SOMF ¶51). In other words, Barstool's counterclaim can only survive if 1) Mr. Rapaport committed a material breach, and 2) Mr. Rapaport was paid more in guarantees than his share of accrued Rant Revenue and Podcast Revenue.

P's Motion identified an internal document ("Revenue Document") prepared by Barstool that shows that the Rant and Podcast revenue collected by Barstool that was attributable to Mr. Rapaport (his 60% of total revenue) as of February 5, 2018 was at least $417,646, with only $182,354 remaining in possible recoupment to Barstool. (SOMF ¶52). The accuracy of this document has not been contested by Barstool.

3



Because Mr. Rapaport's sixty-percent share ($417, 646) of total Rant and Podcast Revenue ($696, 077) exceeded the $400,000 in guarantees that he had received, Barstool has no damages upon which to bring its Counterclaim. This is because even if Barstool's termination of Mr. Rapaport was "for cause," which it wasn't, Barstool's termination of Mr. Rapaport would only entitle it to recover any "Guaranteed Paid" ($400,000) that it had yet to recoup. Here, however, not only had Barstool recouped all portions of paid guarantees, but Barstool earned an additional $17,646 which should have been paid to Mr. Rapaport.

Despite the clear language of the Revenue Document, the Order refused to grant summary judgment to Plaintiffs on this issue on the basis that "Barstool maintains that this sum represents the total revenue, of which Mr. Rapaport is only entitled to 60%, or $250,587.60," and, as such, a factual issue exists as to how much total revenue was generated from Mr. Rapaport's podcast and Rant videos. This decision constitutes clear error by this Court that stands against both the clear language of the Revenue Document and controlling law.

Barstool's bare assertion about the meaning of the Revenue Document, in complete defiance

to its plain language and the contradictory effect that such an interpretation has on other portions of the Revenue Document, is not sufficient to create a genuine issue of fact. [2]  Rather, to oppose a motion for summary judgment, a party must support their position with evidence such that the issue is not so one sided that no reasonable person could find in their favor. *See Carbone v. Marone*, 2007 U.S. Dist. LEXIS 92350, at *11 (S.D.N.Y. Dec. 14, 2007) (recognizes that summary judgment should be granted when "the non-moving party fails to support its asserted interpretation with relevant extrinsic evidence or the evidence presented by the parties is so one-sided that no reasonable person could decide to the contrary.").

Here, Plaintiffs established, both in P's Motion and below, that "Lifetime Gross Ad Revenue **Earned**" (emphasis added) clearly represents Mr. Rapaport's earned portion of revenue, not only because that is what the Revenue Document says, but also because it is the only interpretation where the line "Remaining to Recoup" makes sense. To accept Barstool's illogical assertion that "Lifetime Gross Ad Revenue Earned" constitutes total revenue, of which Mr. Rapaport is only entitled to 60% of that figure, or $250,587.60, requires a trier of fact to accept the following:

---

[2] See *Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 U.S. Dist. LEXIS 122217, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (finding that "Plaintiffs 'self-serving' and 'incomplete' testimony ... is insufficient to create a genuine dispute of fact"); See also *Deebs v. Alstom Transp., Inc*., 346 F. App'x 654,656 (2d Cir. 2009) ("[T]he only 'evidence' cited in plaintiffs' brief is their own selfserving testimony and [the] plaintiffs have 'made no attempt ... to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery. Such evidence is insufficient to defeat summary judgment.'"); *Wood v. Town of E. Hampton*, No. 08-CV-4197 (DRH) (AKT), 2014 U.S. Dist. LEXIS 1653, at *20 (E.D.N.Y. Jan. 7, 2014) ("[Defendant], on the other hand, correctly argues that Plaintiffs claims are supported only by Plaintiffs' own selfserving deposition testimony which, by itself, would ordinarily be insufficient to create a triable issue of fact."); *Johnson v. MetLife Bank, NA*., 883 F. Supp. 2d 542, 550-51 (3d Cir. 2012) (acknowledging the precedent that conclusory, self-serving deposition testimony is insufficient to withstand a motion for summary judgment); *Kunik v. NYC Dep't of Educ*., No. 15-CV-9512 (VSB), 2020 U.S. Dist. LEXIS 16728, at *19 (S.D.N.Y. Jan. 29, 2020) (Found that "self-serving comments from [a] deposition after the filing of this lawsuit cannot create an issue of fact.")

1) It is pure coincidence that the Revenue Document lists $182,354 as the amount "Remaining to Recoup," which is the exact amount left of Mr. Rapaport's $600,000 in guarantees after subtracting out the "Lifetime Gross Ad Revenue Earned" ($600,000 - $417,646 = $182,354); and

2) The "Remaining to Recoup" line is a mistake because the figure listed ($182,354) only makes sense if "Lifetime Gross Ad Revenue Earned" refers to Mr. Rapaport's earned portion.

In order for a party to "recoup" something, there must first be something to regain (e.g., a forwarding of funds).[3] As the only funds that Barstool forwarded or was required to forward were Mr. Rapaport's guarantees, any interpretation of "Remaining to Recoup" that does not relate to these guarantees is nonsensical.[4]

If $417,646 were truly total revenue, as opposed to Mr. Rapaport's 60% of total revenue, Barstool could have easily furnished evidence in support of this position and shown how this figure was calculated. However, Barstool not only chose not to do so, but it failed to provide the necessary documents for Plaintiffs to do so, in direct defiance of Plaintiff's Requests for Production No. 3, which requested "All documents concerning the Rant Revenue, Podcast Revenue and Net Merchandise Revenue (as set forth in the Talent Agreement) that was received by and/or credited

---

[3] See Recoup, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/recoup.

[4] If $417,646 were to represent total revenue rather than 60% of total revenue, then 60% of this amount ($250,587.60), when added to the amount remaining to be recouped ($182,354), would equal $432,941.60. However, $432,941.60 is not a number that is grounded in any underlying forwarding of funds or obligation to provide such a forwarding. As such, Barstool's interpretation of the Revenue Document necessitates a finding that portions of the Revenue Document were drafted in error, something for which no arguments nor evidence have been presented. Barstool should not be rewarded for failing to present evidence in support of its position.

to BSI," and No. 15, which requested "All documents concerning Your allegation in Paragraph 50 of the Counterclaim that Barstool has suffered damages in the amount of at least $400,000." If Barstool's assertions had any grounding in fact – which they don't – they have utterly failed to provide such facts to Plaintiffs and to the Court. Barstool should not be rewarded for hiding evidence, especially when Barstool has submitted an untenable interpretation of the Revenue Document that completely contradicts another portion of the document.

In conclusion, Barstool's dishonest interpretation of the Revenue Document is completely contradicted by the Revenue Document and is clearly presented in an effort to confuse this Court. Given the baselessness of Barstool's interpretation, which is certainly not enough to create a genuine dispute of fact, Plaintiffs respectfully request this Court reconsider its Order and grant summary judgment to Plaintiffs as to Barstool's Counterclaim.

## IV.   COUNTS IX-X OF PLAINTIFFS' FAC: FRAUDULENT CONCEALMENT AND INDUCEMENT

Plaintiffs' fraud claims focus on representations made by Barstool related to its **ability** to provide a Weekly Show on Sirius Radio. Although Barstool disclosed to Plaintiffs through the Term Sheet that Mr. Rapaport's receipt of a Weekly Show was contingent upon Barstool entering into a channel agreement with Sirius, Plaintiffs' fraud claims take issue with Barstool's omissions and misrepresentations relating to 1) the progress of and efforts made towards such an agreement being entered into and 2) surrounding requirements that would need to be met before Barstool was able to provide Mr. Rapaport with a Weekly Show. In this vein, the evidence provided in support of Plaintiffs' fraud claims, as well as the damages sought and recoverable under those claims, are distinct from Plaintiffs' breach of contract claims. (P-COMF ¶¶ 161; 346).

As the Court noted in its Order, "[t]o show that his fraud claim does not duplicate his breach of contract claim, Mr. Rapaport must (1) establish a legal duty separate from Barstool's duty to

perform under the contract, (2) demonstrate a fraudulent misrepresentation extraneous to the contract, or (3) identify special damages [that are caused by the misrepresentation and unrecoverable as contract damages]. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc*., 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted)" (ECF. No. 151 at 26). This Court's conclusion that such elements were not established appears to be the result of the Court's application of inapplicable case law and a clear oversight of arguments and evidence presented in P's Motion.

### A.  Barstool's Misrepresentations Were Extraneous to the Contract

In ruling against Plaintiffs' fraud claims, this court erroneously concluded that "Rapaport's fraud claims about Barstool's ability and obligation to secure him an opportunity for a weekday show impermissibly duplicate his breach of contract claim premised on the 'good faith efforts' provision of the Talent Agreement." In support of this statement, this Court cites to *Gorman v. Fowkes*, 949 N.Y.S.2d 96, 97-98 (App. Div. 2nd Dept. 2012*)* (opining that when "the alleged misrepresentations amount[] only to a misrepresentation of the intent or ability to perform under the contract," then a claim for "fraud [is] wholly duplicative of the breach of contract claim") and *Mariano v. CVI Investments Inc*., 809 F. App'x 23, 27 (2d Cir. 2020) (affirming dismissal of fraud claim "because it turns on conduct that was expressly contemplated by the contract").

The Second Circuit[5], including the Southern District of New York, has routinely ruled that false statements about a party's **ability** to perform under a contract are not duplicative of contract claims. *See e.g. KCG Americas LLC v. Brazilmed, LLC*, No. 15 CIV. 4600(AT), 2016 U.S. Dist.

---

[5] Also note that the Second Circuit has held that "'representations of present fact' [..] give rise to a separate claim of fraudulent inducement." *See e.g. Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (Holding that representations by Defendant that it "had recently secured a large environmental law client" and "was in the process of establishing an environmental law department" were not future promises but representations of present fact" that "support a claim for fraudulent inducement which is distinct and separable from any contract action.").

LEXIS 30497, 2016 WL 900396, at *4 (S.D.N.Y. Feb. 26, 2016) ("Representations about an entity's ability to perform under a contract are distinct from representations that the entity will perform."); *See also Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, No. 15 CV 9003-LTS-SN, 2019 U.S. Dist. LEXIS 160052, at *35-36 (S.D.N.Y. Sep. 18, 2019) ("As an initial matter, [Plaintiff]'s fraudulent inducement claim is not duplicative of its claims for breach of contract. […] [Plaintiff]'s fraudulent inducement claim is premised upon certain allegedly false or misleading statements made by [Defendant] regarding its current and future business activities which relate to [Defendant]'s capacity to perform under the Note and are thus sufficiently collateral to the contract to sustain a separate claim for fraudulent inducement under New York law.").[6]

---

[6] Other citations include: *Wild Bunch, SA v. Vendian Entm't*, LLC, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017) ("New York law is clear that, at a minimum, false statements about a party's present financial condition or current ability to perform, made in order to induce a party to enter into a contract, will support a claim of fraudulent inducement. Such statements are not 'promissory statement[s] of what will be done in the future,' but are instead 'misrepresentation[s] of a present fact,' made to induce the counter-party to enter the contract. […] It is one thing to promise to perform a contract. It is quite something else to induce someone to enter a contract by lying as to one's current financial condition, present ability to perform, and the like. Courts therefore cannot recharacterize statements that are unmistakably about present facts and made for the purpose of inducing a party to enter a contract as being about future intent to perform. Indeed, such an approach would severely undercut the fraudulent inducement cause of action, because lies about one's solvency and **abilities to perform** are exactly the sorts of lies that would likely induce a counterparty to enter a contract.") (emphasis added); *Fung-Schwartz v. Cerner Corp*., No. 17-CV-233 (VSB), 2019 U.S. Dist. LEXIS 156920, at *15-16 (S.D.N.Y. Sep. 13, 2019) (finding that fraud claim not to be duplicative of Plaintiffs' breach of contract claim where statements made were not statements of the contractual terms or intent to perform the contract, but rather were collateral statements about present facts—the functional capabilities of Defendants' computer system and their staff to perform the contract—intended to obtain Plaintiffs' business."); *Coughlan v. Jachney*, 473 F. Supp. 3d 166, 193 (E.D.N.Y. 2020) (holding that a claim for fraud was not duplicative of a concurrently-filed claim for breach of contract as, "a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud.") (citing *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994)).

Many New York state courts have similarly concluded that fraudulent representations regarding the ability of a Defendant to perform under a contract are not duplicative of contract claims. *See e.g. Man Advisors, Inc. v. Selkoe*, 174 A.D.3d 435, 435 (App. Div. 1st Dept. 2019) ("The foregoing states a claim for fraudulent inducement, which is not duplicative of plaintiff's claim for breach of the guarantee. Plaintiff does not allege that [Defendant] misrepresented the intent to perform on the guarantee and underlying promissory note, which would render the fraud claim duplicative, but rather alleges that [Defendant] misrepresented his and [third party]'s ability to perform."); *See also Shear Enters., LLC v. Cohen*, 189 A.D.3d 423, 424 (App. Div. 1st Dept. 2020) (Overturning the trial court's dismissal of fraud claims for duplicity as "plaintiff assert[ed] that defendants misrepresented their very 'ability to perform,' an allegation that supports a non-duplicative fraudulent inducement claim.").

These cases clearly demonstrate that fraud claims arising from a defendant's representations about its ability to perform under a contact are not duplicative of claims arising out of that contract. As such, Plaintiffs' respectfully request that this Court reconsider its Order and reach a finding in Plaintiffs' favor. However, to the extent this Court disagrees with its peers in this Circuit, including this District, and those in New York state courts on what the controlling law is regarding the duplicity of fraud claims with contract claims, the issue should be certified for an immediate interlocutory review given this Circuit's authority cited above that is in direct conflict with this Court's Order.

### B. Plaintiffs Established a Legal Duty Separate from Barstool's Duty to Perform Under the Contract

Under New York law, a party may have a duty to disclose when (1) it is in a fiduciary role, (2) it made a misleading partial disclosure, **or** (3) it has superior knowledge that is not readily available to the counterparty and knows that the counterparty is acting on mistaken knowledge.

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co*., 404 F.3d 566, 582 (2d Cir. 2005) (emphasis added) (citations omitted).

### 1. Barstool's Misleading Partial Disclosures and Duty to Remedy

The Order erroneously concludes that "Rapaport offers no argument in support of the first two scenarios." (ECF. No. 26). This is not correct. P's Motion argues that Barstool made misleading partial disclosures to Mr. Rapaport, which were fundamentally material to the inducement to enter into the Talent Agreement, and P's Motion notes that Plaintiff relied upon Barstool's misleading partial disclosures as they were made from a position of superior knowledge about the status of the negotiations with Sirius.[7] As stated in P's Motion:

On Pages 9-10:

> "Since Plaintiffs' first meeting with Mr. Portnoy, Barstool made continuous, knowingly false assurances to Plaintiffs that Mr. Rapaport would be provided a Weekly Show in 'a matter of weeks at most.' Mr. Rapaport considered the Weekly Show to be fundamental to any proposed agreement with Barstool, and had he known that a Weekly Show was unlikely, he would have more actively shopped himself and his content to other talent platforms. (SOMF ¶134)"

On Page 10:

> "Due to Barstool's withholding key information from Plaintiffs that it had learned from Sirius, Plaintiffs entered into the Talent Agreement. These omissions included that: (1) Barstool would not provide Mr. Rapaport a Weekly Show unless Sirius covered all costs (SOMF ¶113); (2) Sirius wouldn't invest in Mr. Rapaport without an extension to its pre-existing contract with Barstool as it did not want to invest in a show that may be gone in six months (SOMF ¶119); (3) Barstool did not intend to extend its prior contract with Sirius and preferred to negotiate a new contract for its own radio channel (SOMF ¶118); (4) even if Sirius did invest in a show for Mr. Rapaport, it would not cover the full cost of the show (SOMF ¶136); and (5) a Sirius radio channel would not occur until after Memorial Day at the earliest. (SOMF ¶119). This information would have evidenced to Plaintiffs, months before the Talent Agreement was executed, that it was unlikely that Barstool would provide a Weekly Show."

---

[7] *See* P-SoMF ¶¶106-137 for expanded timeline of relevant events.

On Page 11:

> "Barstool also knew that Plaintiffs were relying upon the information it provided. (SOMF ¶123)."

On page 12:

> "Barstool made repeated false statements about the progress of its deal with Sirius and its ability to provide a Weekly Show, including that a show could be provided in "a few weeks at most" and that a Weekly Show would be provided contingent upon Barstool contracting with Sirius for a radio channel. (SOMF ¶¶124, 129)."

Although the Order correctly identifies that "Rapaport knew about the tentative nature of the Barstool-Sirius negotiations when entering the Talent Agreement" (ECF. No. 151 at 26, fn 6), the Order appears to reflect a misunderstanding of Plaintiffs' fraud claims. The crux of Plaintiffs' fraud claims is not whether Barstool ultimately entered into a deal with Sirius and provided Mr. Rapaport with a Weekly Show, nor are Plaintiffs' fraud claims premised on any failure by Barstool to communicate that Mr. Rapaport would not receive a Weekly Show unless a deal was entered into with Sirius. Those issues are relevant to Plaintiffs' breach of contract claims, and as the Court notes, Plaintiffs' fraud claims would be duplicative of its contract claims if they were based on these issues. They are not.

Rather, Plaintiffs' fraud claims are grounded in misrepresentations and omissions made by Barstool during the negotiations of the Talent Agreement prior to its execution relating to the status of its negotiations with Sirius, the likelihood and timing of a possible deal with Sirius, and the level of certainty surrounding Barstool's ability to offer Mr. Rapaport a Weekly Show.

Mr. Rapaport made it clear to Barstool that its ability to provide a show to him on Sirius was fundamental to him entering into a deal with Barstool. (P-SOMF ¶¶110, 111, 123). Despite knowing this, Barstool made material misrepresentations to Mr. Rapaport suggesting that there was a near certainty that Barstool would have the means to offer a Weekly Show to Mr. Rapaport. Even

if these representations were true at the time they were made – which they were not – Barstool was obligated to correct such misstatements upon learning that a Weekly Show was virtually impossible to occur. *See Cochran v. Channing Corp.*, 211 F. Supp. 239, 243 (S.D.N.Y. 1962) ("Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak."). As alleged in the P's Motion, Barstool knew that these representations were false *prior to* the execution of the Talent Agreement. (P-SOMF ¶¶112-113, 116-120).

### 2. Barstool's Superior Knowledge and Duty to Disclose

"The special facts doctrine holds that, 'absent a fiduciary relationship between the parties, there is nonetheless a duty to disclose when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.' To establish liability under this doctrine, the plaintiff must allege that the material was 'particularly' within the knowledge of one party, and that the information is such that it could not have been discovered by the other party through the exercise of ordinary intelligence." *Meeker v. McLaughlin*, No. 17-CV-5673 (SN), 2019 U.S. Dist. LEXIS 55086, at *4-5 (S.D.N.Y. Mar. 31, 2019) (citations omitted).

As P's Motion notes, Barstool's knowledge of its contractual relations with Sirius was exclusively within its possession and could not have uncovered by Plaintiffs. (ECF No. 104 at 11). Nonetheless, the Court concluded that the special facts doctrine does not apply, finding that "the record shows that Rapaport knew about the tentative nature of the Barstool-Sirius negotiations when entering the Talent Agreement; the record does not support a finding that Barstool had to disclose to Rapaport more granular details of its negotiations." (ECF. No. 151 at 26, fn 6)

Plaintiffs fail to see how Barstool's misinformation regarding the status of its contractual relations with Sirius constitutes "granular details." The likelihood of a future agreement with Sirius was of paramount concern to Mr. Rapaport in negotiating the Talent Agreement. During

negotiations, Barstool communicated, and Mr. Rapaport was of the understanding, that a deal with Sirius was near certain. Barstool made these representations despite knowing that such a deal was virtually impossible. However, regardless of whether this Court considers such details granular, **the granularity of details is not the standard for the special facts doctrine**. Rather, the Second Circuit has routinely held that the special facts doctrine applies whenever "one party has superior knowledge that is not readily available/accessible to the other party and that party knows the other party is acting on the basis of mistaken knowledge." *Sw. Payroll Serv. v. Pioneer Bancorp*, No. 1:19-CV-1349 (FJS/CFH), 2020 U.S. Dist. LEXIS 137202, at *10 (N.D.N.Y. July 7, 2020) (citation omitted). In such a scenario, the party with superior knowledge must furnish information sufficient to rectify the mistaken knowledge to the extent that such information could not have been discovered by the plaintiff through the exercise of ordinary intelligence. *Id*.

Regardless of whether this Court considers certain information to be "granular," the fact is that Barstool never corrected Plaintiffs' mistaken knowledge regarding the (un)likelihood of Barstool entering into a deal with Sirius and being able to provide a Weekly Show. Again, Plaintiffs' only basis for the knowledge of the status of the likelihood of a deal with Sirius was Barstool who had repeatedly made material misrepresentations during the course of negotiations of the Talent Agreement. This alone shows Barstool's failure to comply with the special facts doctrine, which is a results-driven test (i.e. did the defendant provide information that is in its control and unavailable to the plaintiff that was necessary to rectify plaintiff's mistaken knowledge). No other analysis is relevant.

Given the clear error of law present in the Order's analysis of the special facts doctrine, Plaintiffs respectfully request that this Court reconsider its Order and, at the very least, find that the special facts doctrine applies and that Plaintiffs' fraud claims are not duplicative of its fraud claims.

However, should this Court choose not to do so, Plaintiffs respectfully request that this issue be certified for an immediate interlocutory review.

### C.  Plaintiffs Identified Special Damages

As the Order notes, Mr. Rapaport's fraud claims are not duplicative of his breach of contract claims if he can identify special damages that are caused by the misrepresentation and unrecoverable as contract damages. Despite Plaintiffs' filings doing this very thing, the Order wholly ignores Plaintiffs' presentation of special damages.

As noted in across Plaintiffs' filings, Barstool's fraud resulted in Mr. Rapaport accepting an inferior offer to work for Barstool as opposed to CBS or some other company. At the time of contracting with Barstool, Mr. Rapaport had a superior offer from CBS for his Podcast. (P-CS ¶161). This contract, at a minimum, was worth $120,000 more than Mr. Rapaport's contract with Barstool. Plaintiff respectfully refers the Court to P-CS ¶161 for a multi-page, comprehensive comparison between the contracts offered to Mr. Rapaport by CBS and Barstool, as well as a calculation of special damages, which for brevity's sake are not detailed herein, but are incorporated by reference. The CBS offer was also not the only competing offer presented to Mr. Rapaport by a company besides Barstool.

Had Barstool not lured Mr. Rapaport in with its misrepresentations regarding the Sirius Show (which, again, was the very reason Mr. Rapaport contracted with Barstool), 1) Mr. Rapaport would not have contracted with Barstool, 2) Mr. Rapaport would have more extensively negotiated opportunities with other companies, and 3) through these negotiations, expected improvements would have come to the offers presented to him. (P-CS ¶¶38, 165). However, even without considering expected improvements to the offers presented to Mr. Rapaport, the fact is that Plaintiffs have presented to this Court a non-speculative offer from which special damages can be calculates for Barstool's fraudulent acts. (P-CS ¶161) Plaintiffs have also submitted an expert report

authored by Sid Blum that speaks to damages incurred by Mr. Rapaport arising from Barstool's fraudulent representations. (P-SOMF ¶157)

Given Plaintiffs' uncontroverted evidence of special damages, there is no basis for concluding that such a presentation of damages is insufficient, especially since Defendants have not even attempted to oppose this presentation of evidence. As such, at the very least, Plaintiffs' fraud claims should be found to be non-duplicative of their fraud claims. Again, to the extent the Court declines to reconsider its Order, Plaintiffs respectfully request that this Court certify this issue for interlocutory appeal.

## V.      COUNT VIII OF PLAINTIFFS' FAC: BREACH OF CONTRACT (SECTION 4 OF PRINCIPAL AGREEMENT)

The heart of Count VIII of the FAC is that Barstool failed to "[u]se good faith efforts to promote [Rapaport] and [his] brand," as provided by Section 4 of the Talent Agreement. Without addressing Barstool's failure to promote Mr. Rapaport's Rant videos and its blocking of Mr. Rapaport's involvement with business partners, this claim should be a clear-cut case of breach of contract based on irrefutable evidence that Barstool openly disparaged Mr. Rapaport and his brand prior to his departure from Barstool.

As Plaintiffs noted in their filings, *prior to Mr. Rapaport's termination,* Barstool engaged in a campaign designed to destroy Mr. Rapaport and his brand. (P-SOMF ¶404). In addition to the statements claimed by Plaintiffs to be defamatory[8], Barstool repeatedly accused Mr. Rapaport of being insane, delusional, bipolar, stupid, unsanitary, a "slave catcher," a crazy person, an idiot, and "a one trick pony" whose "trick sucks" on its platform. (P-SOMF ¶405). These attacks and

---

[8] Note that regardless of whether this Court finds such statements to be defamatory, such statements would nonetheless be disparaging and a clear violation of Section 4 of the Talent Agreement.

encouragements by Barstool's employees towards its fans to flood Mr. Rapaport's Apple Podcast with negative ratings and comments completely destroyed the marketability of Mr. Rapaport's Podcast. (P-SOMF ¶¶318-340; 360-405).

The fact that these attacks happened is undisputed, as is the fact that these attacks occurred *prior to* Mr. Rapaport's termination. In fact, Barstool did not present a shred of evidence, argument, or legal authority across its filings on whether these attacks constitute a violation of Section 4 of the Talent Agreement. *See e.g.* ECF. Dkt. No. 134 at 32-33. Barstool has only contested whether it made good faith efforts to monetize Rant videos. However, it has never addressed the clear breach of Section 4 of the Talent Agreement that occurred when Barstool attacked Mr. Rapaport and his brand **during his employment with Barstool.**

Where, as here, a non-moving party fails to oppose a movants' assertions raised in support of its summary judgment motion, "summary judgment, if appropriate, shall be entered against him." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Summary judgment is appropriate so long as "each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014).

There is no basis for denying summary judgment to Plaintiffs on this issue, and any such denial constitutes clear error in light of no legal authority, evidence, or argument being presented in opposition to Plaintiffs' thoroughly evidenced position. Despite this, the Order cites to *Chase Bank*, No. 06 Civ. 3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) for the proposition that the interest of contracting parties are generally coterminous. Unless this statement was made only in reference to Barstool's failure to promote Mr. Rapaport's Rant videos, which itself was addressed in P's Motion and P-SOMF, it is unclear why such a presumption is being cited in the

face of clearly contradicting facts. As already noted, the uncontroverted facts show that Barstool attacked Mr. Rapaport and his Podcast's brand during his employment. Barstool's motivations for making these attacks, and whether such an attack go against Barstool's own self-interest, is irrelevant.

Although this should be the end of this Court's review of this issue and result in a granting of summary judgment in Plaintiffs' favor, Plaintiffs direct this Court to further uncontroverted evidence in the record that shows that Mr. Rapaport's and Barstool's interest were not-coterminous (even though this issue is irrelevant).

As noted in Plaintiffs' filings, Barstool decided well in advance of Mr. Rapaport's termination that his one-year contract would not be renewed, and it had already begun to block the allocation of advertising and promotional opportunities to Mr. Rapaport. (P-SOMF ¶¶140-147, 156; P-CS ¶¶132-133). Given Barstool's decision not to renew Mr. Rapaport's contract, Barstool, a company based on controversy, certainly had an incentive to attack Mr. Rapaport. (P-SOMF ¶¶70-79). By attacking Mr. Rapaport, not only was Barstool able to create a public spectacle through which it generated considerable site traffic and sold merchandise (P-SOMF ¶¶39, 41, 340), but Barstool was able to use this spectacle as pretext (albeit ineffective pretext) to get Barstool out of paying Mr. Rapaport the remaining $200,000 in guarantees that he was owed under the Talent Agreement (P-SOMF ¶51).

Should this Court feel Plaintiffs' uncontroverted evidence to be insufficient to dispel its *sua sponte* but unfounded belief that Barstool would not attack its own employees, Plaintiffs direct the Court's attention to a public dispute between Keith Markovich ("Mr. Markovich"), Barstool's

Editor in Chief[9], and Kirk Minihane, a Barstool host, that transpired in June 2020.[10] The dispute resulted from Mr. Markovich publishing an article designed to cast Mr. Minihane as "a bigoted know-nothing and a howling racist." *See* Declaration of Jacob Vega ("Vega Decl."), Attachment 4.

During the dispute, Mr. Minihane invited Mr. Markovich onto his show and called him out for coordinating an attack against him to try and get him fired. (Vega Decl., Attachment 2 at 0:42-0:53). Although Mr. Markovich initially deflected responsibility for publishing the article, he later admitted that he published the article because he "hated" Mr. Minihane. (Vega Decl., Attachment 2 at 4:36-5:00). Mr. Markovich further admitted to timing the article's release to maximize the audience of the article and to cause Barstool's fans to go on the attack and to cause a spiral of controversy. (Vega Decl., Attachment 2 at 5:57-6:17).

As part of a series of videos on the controversy, Mr. Minihane and his co-host noted how being accused of being a racist by their own company (Barstool) is damaging to relations with advertisers. (Vega Decl., Attachment 1 at 0:42-0:47). Defendants David Portnoy and Kevin Clancy and Dan Katz, an employee of Barstool, also admitted that the article was inappropriate and Mr. Minihane had every right to be mad about it being published. (Vega Decl., Attachment 3 at 16:29-16:41).

As part of the public feud between Mr. Minihane and Mr. Markovich, Barstool sold merchandise promoting Mr. Markovich's termination and the term "#FireKMarko" went trending on Twitter in the United States. (Vega Decl., Attachment 4)

---

[9] Note that Mr. Markovich was also the Editor in Chief during Mr. Rapaport's employment with Barstool and participated in the attacks made against him. (P-SOMF ¶¶22, 197, 198).

[10] FRCP 60(b)(2) allows a court to review newly discovered evidence provided it: "1) be newly discovered; (2) could not, with reasonable diligence, have been discovered in time for a new trial [or dispositive motion]; and (3) be presented within a year of entry of the judgment." *Wash. 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73, 92-93 (Bankr. N.D.N.Y. 2009)

Plaintiffs' highlight the controversy between Mr. Markovich and Mr. Minihane only to further dispel any presumption that exists that Barstool would not attack its own employees, something directly contradicted by the bevy of evidence already in the record. Afterall, the dispute between Mr. Markovich and Mr. Minihane is a direct example of Barstool's own Editor and Chief admitting to attempting to destroy the reputation of one of Barstool's employees (as he did with Mr. Rapaport) due to a personal grudge.

However, as already noted, this Court's review of whether there is a presumption of whether a company would attack its own employees is ultimately irrelevant as the evidence clearly establishes that Barstool did attack and severely damage Mr. Rapaport's brand, and that of his Podcast, during his time with Barstool. As this evidence is uncontroverted and Defendants have failed to submit any evidence, case law, or arguments to the contrary, it would be clear error not to grant summary judgement to Plaintiffs on Count VIII of the FAC, at least with respect to Barstool's attacks against Mr. Rapaport that happened prior to his termination in clear violation of Section 4 of the Talent Agreement.

## VI.   COUNT XI OF PLAINTIFFS' FAC: DEFAMATION AND DEFAMATION PER SE

The Orders sweeping dismissal of Plaintiffs' defamation claims appears to result, in large part, from oversights of evidence and non-adherence to governing standards.[11]

---

[11] In addition to the matters discussed below, Plaintiffs address cases cited by the Court for the presumption that statements made online constitute statements of opinion rather than fact. However, as noted in Plaintiffs' Reply Brief (ECF No. 142 at 21), the cases cited by Defendants (and to which this Court cites in its Order), all involved anonymous message boards, chat rooms, and weblogs. None of these cases stand for the position that statements posted online have less credibility than statements made in other mediums. They only stand for the position that representations made by anonymous and pseudo-anonymous individuals are less credible. Here, the statements were made by known individuals without a shield of anonymity and from verified twitter accounts. As such, Defendants statements would have been treated as fully credible, especially given their representations as such. (P-SOMF ¶¶301-310). This credibility was observed by Defendants' own

(footnote continued)

### A. Overlooked Evidence that Barstool's Audience Interpreted Defendants' Defamatory Statements as True

The Court's review of Defendants' defamatory statements wholly ignores how Barstool's audience interpreted Defendants' statements and how secondary audiences interpreted these statements as they were repeated at Defendants' request. Given the implications of this Court's subjective review of whether Defendants' statements would be perceived as statements of fact or mixed opinion, this oversight constitutes clear error.

As Plaintiffs note, prior to the 24-hour window in which Mr. Rapaport was terminated, Mr. Rapaport's Podcast had received only a single Apple Podcast rating accusing him of having herpes (7-17-2017) or of being a racist (10-24-2017). The 10/24/2017 rating followed Barstool calling Mr. Rapaport a "low key racist." (P-CS ¶354; 359). Similarly, prior to the 24-hour window in which Mr. Rapaport was terminated, Mr. Rapaport had never been accused in his Apple Podcast ratings of being a stalker or a fraud or beating women. (P-CS ¶355; 359). However, during and subsequent to Defendants' onslaught of defamatory statements against Mr. Rapaport, his podcast received

---

expert. (P-CS ¶306). *See also Solstein*, 488 F. Supp. 3d 86 ("[A]lthough courts have 'noted that statements made online in blogs or forum boards are more likely to be interpreted as opinion,' courts have also found that such statements may qualify as defamation. See, e.g., *Watson v. N.Y. Doe 1*, 439 F. Supp. 3d 152, 162 (S.D.N.Y. 2020) (finding that a defendant's Facebook comments could "reasonably be read to suggest that [the defendant] intended to endorse the alleged defamatory statement that the plaintiff sexually assaulted women"); *Goldman*, 417 F. Supp. 3d at 173 (finding that the plaintiff stated a claim of defamation when the defendant published "numerous statements" on Facebook accusing the plaintiff of rape); *Krusen v. Moss*, 174 A.D.3d 1180, 105 N.Y.S.3d 607 (App. Div. 2019) (finding that a statement on Facebook that the plaintiff was "pilfering free gas from taxpayers" was "susceptible to a defamatory meaning, in as much as it conveys, at a minimum, serious impropriety and, at worst, criminal behavior" (citations, alterations, and quotation marks omitted)).")

The Court's mischaracterization of legal precedent and oversight of evidence constitutes clear error and should result in a reversal of the Order, or at least a certification of issues for interlocutory review, to the extent that such mischaracterizations served as a basis for the Order's dismissal of Plaintiffs' defamation claims.

thousands of negative statements accusing him of being a "racist," a "race baiter," a "sexual abuser," a "women beater/abuser," a "wife beater,"[12] a "rapist," a "fraud," a person who "hates black people," a "woman assaulter," a "stalker," and a "hitter of women," as well as having "herpes" and an "STD." (P-CS ¶357; 359).

These ratings and comments show that the audience did, in fact, accept the defamatory statements about Rapaport as fundamentally true. (P-CS ¶358). This is evidenced for example by the fact that when searching "Michael Rapaport" on Bing, "Michael Rapaport herpes" is the first item listed on "related searches for Michael Rapaport." (P-CS ¶352). Given that the evidence shows that Barstools audience clearly **did** interpret Defendants' statements as true, something that Defendants admitted to intending, despite knowing their falsity, as part of a "war" with Mr. Rapaport designed to ruin him and "put [him] down like a wounded animal,"[13] the Court's Order is noticeably devoid of any analysis of this reality. Instead, the Court focuses on the "likelihood" that a reasonable observer would understand the statements to be assertions of fact or opinion, while turning a blind eye to the fact that reasonable observers in droves did, in fact, believe Defendant's assertions about Mr. Rapaport to be factually true and repeated them presuming them to be true.

### B. Overlooked Evidence Relating to Accusations that Mr. Rapaport is a Fraud and a Racist

The challenged representations relating to fraud are blog posts, tweets, online articles and videos, and radio comments labeling Rapaport a "fraud," "wannabe fraud hack," a "fucking fraud," a "fraudulent sack of shit," a "fucking chump fraud," a "lying deadbeat fraud hack," "a loser, and

---

[12] Such statements evidence the Court's clear error in concluding that Defendants' distribution of a video that suggested Mr. Rapaport made his ex "black and blue" alongside a photo of his ex-wife would not infer that Mr. Rapaport had physically assaulted his ex-wife.

[13] *See* P-SOMF ¶¶272-300, 321, 368-373.

fraud, and an asshole," "a fraud hack of a coward," "a pasty sickly race baiting fraud hack," the "biggest fraud I've ever met," an "all-time fraud," and other variations on these themes. (DCSOMF ¶¶221, 224-49.)

The Order recognizes that calling someone a liar is capable of being proven true or false. (ECF. No. 151 at fn 17). However, the Order is marred by the erroneous observation that Mr. Rapaport did not "offer any objective evidence that would prove that the 'fraud,' 'hack,' 'wannabe,' or 'liar' statements are false. According to Defendants, their accusations that Mr. Rapaport is a fraud are all "based on disclosed facts: Smith's belief that Rapaport had refused to pay on a bet and, as a result, was a fraud." (ECF No. 11 at 14). Although not all of Defendants' statements directly reference the bet, Defendants have taken the position that broader context would have informed reasonable viewers of these facts.

As such, P-CS ¶¶40-41 provided pages of analysis and evidentiary support showing that 1) the alleged bets upon which Defendants claimed to have based their defamatory statements never happened, 2) one of the bets, which purportedly was made on DraftKings, was objectively impossible and could not have occurred due to the limitations of DraftKings' platform, and 3) Mr. Smith later admitted that one of the bets did not occur (though for purposes of trashing Mr. Rapaport, has returned to claiming that it did).

Given that Defendants' have sought refuge for their defamatory statements through the facts disclosed in Mr. Smith's blog posts, the fact that these blogs were knowingly falsified subjects Defendants to liability for their accusations that Mr. Rapaport is a fraud as "opinions based on false facts are actionable against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." *Solstein v. Mirra*, 488 F. Supp. 3d 86 (S.D.N.Y. 2020) (quoting *Restis v. Am. Coalition Against Nuclear Iran, Inc*., 53 F. Supp. 3d 705, 719 (S.D.N.Y. 2014)); see also *DiFolco*

*v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir. 2010) (stating the same and reversing a district court's dismissal of a defamation claim based on a statement of opinion because the plaintiff alleged that the defendants knew of the falsity of the underlying facts).

Similarly, to the extent that other Defendants accused Mr. Rapaport of being a fraud in reliance upon Mr. Smith false statements, those Defendants would similarly be liable for defamation. As noted in *Solstein*, 488 F. Supp. 3d 86,

> "'It is well settled that [a defendant] cannot escape liability simply because [he is] conveying someone else's defamatory statements without adopting those viewpoints as [his] own.' *Biro*, 883 F. Supp. 2d at 461 (also noting that the Second Circuit has "expressly embraced the 'widely recognized' rule that 'one who republishes a libel is subject to liability just as if he had published it originally'" (quoting *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980)); see also *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 152 (2d Cir. 2000) ("[T]he fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." (citation and quotation marks omitted)); *Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) (although statements were "literally true because [the] defendant clarifie[d] that he  [was] merely retelling stories told to him[,]" the defendant was not "immune from a slander suit" because the stories themselves [were] false and defamatory"); *Coliniatis v. Dimas*, 848 F. Supp. 462, 468 (S.D.N.Y. 1994) (finding that although a letter "purport[ed] to merely relay information" told by one person to another, the plaintiff's libel claim was actionable if he could prove that the factual assertions were "actually false")."

In addition to directly disproving the "disclosed facts" that Defendants purport to have made their defamatory accusations that Mr. Rapaport is a fraud, which alone should result in a grant of summary judgment in Plaintiffs' favor, Plaintiffs also presented evidence showcasing additional "undisclosed facts" inferred by Defendants' accusations that Mr. Rapaport is a fraud and a racist. *See* P-CS ¶¶305-310.

For example, while Mr. Rapaport was still with Barstool, its employees, including Defendants, would frequently comment on and tell stories about Mr. Rapaport and his relationship and interactions with African Americans. (P-SOMF ¶316). These personal stories grounded Defendants' statements with the inference of providing an "inside look" into the life of Mr. Rapaport. This added credibility to Defendants' defamatory assertions and suggested that their accusations were bases on undisclosed "inside look" experiences. Plaintiffs respectfully request that in reconsidering Plaintiffs' defamation claims arising from accusations of fraud that this Court also review the submitted evidence.

## VII.   <u>CONCLUSION</u>

In light of the foregoing, Plaintiffs respectfully request that this Court reconsider its Order and grant summary judgment to Plaintiffs on Counts VIII-XI of the FAC and Barstool's Counterclaim, or, in the alternative, either allow the Counts to proceed to a jury or certify relevant issues of law discussed herein for an interlocutory appeal.

DATED: April 12, 2020

**KING & BALLOW**

By: /s/Richard S. Busch
Richard S. Busch (SB 5613)
*Attorney for Plaintiffs*
*Michael Rapaport and Michael*
*David Productions, Inc.*
1999 Avenue of the Stars, Suite 1100
Century City, CA 90067