UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

MICHAEL RAPAPORT and MICHAEL      :
DAVID PRODUCTIONS, INC.,

                               :

         Plaintiffs,                Case No. 1:18-CV-08783

                               :

   -against-

                               :

BARSTOOL SPORTS, INC., ADAM SMITH,
KEVIN CLANCY, ERIC NATHAN and     :
DAVID PORTNOY,

                               :

         Defendants.

                               :

------------------------------------- X

BARSTOOL SPORTS, INC., ADAM SMITH,  **DEFENDANTS' RESPONSE TO**
KEVIN CLANCY, ERIC NATHAN and     :  **PLAINTIFFS' MOTION FOR**
DAVID PORTNOY,                          **RECONSIDERATION OR, IN THE**
                               :  **ALTERNATIVE, FOR THE**
       Counterclaim Plaintiffs,     :  **CERTIFICATION OF**
                                   **INTERLOCUTORY REVIEW**
   -against-                     :

MICHAEL RAPAPORT and MICHAEL
DAVID PRODUCTIONS, INC.           :

       Counterclaim Defendants.   :

                               :

------------------------------------- X

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...........................................................................................II

II.  STANDARD OF REVIEW ........................................................................... 2

III. LEGAL ARGUMENT ................................................................................... 3

    A.   The Court Did Not "Overlook," but Instead Specifically Referenced and Analyzed, the Document that Rapaport Contends Shows that Barstool Cannot Recover Damages on its Breach of Contract Counterclaim ...................... 3

    B.   Rapaport's "New" Evidence About a Dispute Between Two Barstool Personalities in June 2020 Has No Bearing on Whether Barstool Engaged in Good Faith Efforts to Find Advertisers for the Rant Videos (Count VIII) ........ 6

    C.   The Court Did Not Err by Granting Summary Judgment for Barstool on Rapaport's Fraud Claims .................................................................................. 8

        1.   The Court Did Not Err by Ruling that Rapaport's Fraud Claims are Duplicative of His Contract Claim Regarding Barstool's Purported Lack of Good Faith Efforts to Get Him a Radio Show on Sirius ............. 8

        2.   The Court Did Not Err by Ruling that Barstool Did Not Owe a Duty to Disclose Every Detail of its Negotiations with Sirius ................ 10

        3.   While Rapaport Focused Primarily on Barstool's Asserted Omissions, and Not its Asserted "Misleading Partial Disclosures," the Court Nonetheless Addressed and Rejected His Arguments on this Point ....................................................................................................... 11

        4.   Rapaport's New Argument About Special Damages Should Be Rejected ..................................................................................................... 12

    D.   The Court Properly Granted Summary Judgment on Rapaport's Defamation and Defamation Per Se Claim ........................................................ 13

    E.   The Standard for Granting Interlocutory Review Has Not Been Met ................ 18

IV.  CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Ahrenholz v. Bd. of Trustees of Univ. of Illinois*,
219 F.3d 674 (7th Cir. 2000) .......................................................................18

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012).............................................................................3

*Devinsky v. Kingsford*,
2008 WL 2704338 (S.D.N.Y. July 10, 2008) ...........................................12

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010)........................................................................16

*Eisemann v. Greene*,
204 F.3d 393 (2d Cir. 2000)...........................................................2, 9, 12, 13

*Gonyer v. Vane Line Bunkering, Inc.*,
2014 WL 10250858 (S.D.N.Y. Nov. 6, 2014)............................................10

*Harriscom Svenska AB v. Harris Corp.*,
947 F.2d 627 (2d Cir. 1991)....................................................................18, 19

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018).........................................................10

*In re Houbigant, Inc.*,
914 F. Supp. 997 (S.D.N.Y. 1996) ................................................................5

*In re Initial Public Offering Sec. Litig.*,
399 F.Supp.2d 298 (S.D.N.Y.2005), *aff'd sub nom Tenney v. Credit Suisse
First Boston Corp.*, 2006 WL 1423785 (2d Cir. 2006) ...............................2

*KCG Americas LLC v. Brazilmed, LLC*,
2016 WL 900396 (S.D.N.Y. Feb. 26, 2016)...............................................10

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*,
729 F.3d 99 (2d Cir. 2013)............................................................................2

*M.K.B. v. Eggleston*,
2006 WL 3230162 (S.D.N.Y. Nov. 7, 2006)................................................2

*Mariano v. CVI Investments Inc.*,
809 F. App'x 23 (2d Cir. 2020) ................................................................9, 10

*Ritchie Risk-Linked Strategies Trading, Ltd. v. Coventry First LLC*,
2015 WL 5581817 (S.D.N.Y. Sept. 10, 2015)..............................................2

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Schermerhorn v. James*,
 1998 WL 40205 (S.D.N.Y. Feb. 2, 1998) .............................................................12

*Sequa Corp. v. GBJ Corp.*,
 156 F.3d 136 (2d Cir. 1998) ...............................................................................2

*Shamis v. Ambassador Factors Corp.*,
 187 F.R.D. 148 (S.D.N.Y. 1999) .........................................................................3

*Solstein v. Mirra*,
 486 F.Supp.3d 86 (S.D.N.Y. 2020) ....................................................................16

*Wu Lin v. Lynch*,
 813 F.3d 122 (2d Cir. 2016) ...............................................................................2

**STATE CASES**

*Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*,
 15 N.Y.3d 264 (2010) .......................................................................................13

*Gorman v. Fowkes*,
 949 N.Y.S.2d 96 (N.Y. App. Div. 2012) .........................................................9, 10

*Immuno AG. v. Moor-Jankowski*,
 567 N.E.2d 1270 (N.Y. 1991) ...........................................................................14

*Steinhilber v. Alphonse*,
 501 N.E.2d 550 (N.Y. 1986) .............................................................................16

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

28 U.S.C. §1292(b) ............................................................................................1, 18

FRCP 12(b)(6) .......................................................................................................16

Southern District of New York Local Rule 6.3 .........................................................2

## I.   **INTRODUCTION**

Defendants Barstool Sports, Inc., Adam Smith, Kevin Clancy, Eric Nathan and David Portnoy (collectively, "Barstool") strongly oppose the motions of plaintiffs Michael Rapaport and Michael David Productions, Inc. (collectively, "Rapaport") for reconsideration of this Court's Opinion and Order dated March 29, 2021 (the "Opinion"), or in the alternative for certification of the Opinion for interlocutory appeal under 28 U.S.C. §1292(b).

Over the course of nearly a year, the Court conducted an exhaustive review of a massive summary judgment record.  Rapaport alone submitted eight declarations, over 400 so-called "material facts" and nearly 200 exhibits.  Following its review, the Court issued a well-reasoned and carefully-considered 64-page Opinion.  Dissatisfied with the outcome, Rapaport seeks a second bite at the apple while failing to meet the threshold requirements for the "extraordinary remedy" of reconsideration.  Rapaport's arguments amount to nothing more than a disagreement with the Court's Opinion, which addressed and rejected all of the issues raised in the motion.  The Court should again reject these same arguments and deny Rapaport's motion for reconsideration out of hand.

Likewise, Rapaport cannot meet the heavy burden for a permissive interlocutory appeal, which is also reserved only for exceptional situations.  Under 28 U.S.C. § 1292(b), the Court may certify an order for an immediate appeal only when the Court of Appeals may rule on a pure, controlling question of law without having to determine any disputed facts.  Such is plainly not the case here, where an appellate court would need to conduct a detailed inquiry into a massive, fact-intensive record in a case that ultimately turns on an application of the law to hundreds of disputed issues of fact.  This is the antithesis of a proper Section 1292(b) appeal, and this request too should be summarily denied.

## II.   <u>STANDARD OF REVIEW</u>

A motion for reconsideration is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Initial Public Offering Sec. Litig.*, 399 F.Supp.2d 298, 300 (S.D.N.Y.2005) (internal quotation marks omitted), *aff'd sub nom Tenney v. Credit Suisse First Boston Corp.*, 2006 WL 1423785, at *1 (2d Cir. 2006).

Under Local Rule 6.3, reconsideration is appropriate only when a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion" and which, if examined, might reasonably have led to a different result. *Eisemann v. Greene*, 204 F.3d 393, 395 n.2 (2d Cir. 2000) (quoting *Shamis v. Ambassador Factors Corp.*, 187 F.R.D. 148, 151 (S.D.N.Y. 1999)); *see Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) ("A motion for reconsideration should be granted only when the defendant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal quotation marks omitted); *M.K.B. v. Eggleston,* 2006 WL 3230162, at *1 (S.D.N.Y. Nov. 7, 2006) (the "sole function" of a motion for reconsideration is to correct an "obvious and glaring mistake"); *Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016) ("[T]he phrase 'clear error' is to be taken literally: the error must be clear").

A motion for reconsideration is not, however, a "second bite at the apple" for a party dissatisfied with a court's ruling. *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998); *see Ritchie Risk-Linked Strategies Trading, Ltd. v. Coventry First LLC*, 2015 WL 5581817, at *2 (S.D.N.Y. Sept. 10, 2015) ("Motions for reconsideration are 'not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or likewise taking a second bite at the apple.'") (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).  As such, Local Rule 6.3 is to be "narrowly construed and strictly

applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Shamis*, 187 F.R.D. at 151.

"Denials of motions for reconsideration are reviewed only for abuse of discretion." *Analytical Survs., Inc.*, 684 F.3d at 52.

## III.   LEGAL ARGUMENT

### A.   The Court Did Not "Overlook," but Instead Specifically Referenced and Analyzed, the Document that Rapaport Contends Shows that Barstool Cannot Recover Damages on its Breach of Contract Counterclaim

Barstool alleges that Rapaport breached the Talent Agreement by attacking its fans, bringing himself and Barstool into public disrepute. Dkt. 61, ¶¶ 25- 33, 48.a.  Rapaport does not seek reconsideration of the Court's finding that there are genuine issues of fact as to whether Barstool properly terminated the Talent Agreement, but instead asserts that the Court erred in finding a triable issue of fact as to whether Barstool can prove damages if it prevails on this claim. Dkt. 156, pp. 2-7.[1]

Barstool's claim for contract damages is based on the plain language of the Talent Agreement.  Paragraph 3.b. of the Standard Terms of the Talent Agreement states that, if Barstool terminates the agreement for material breach, "any pre-paid portions" of Rapaport's rant and podcast guarantees "will immediately be refunded to Barstool," and the "only amounts owed to you by Barstool will be your share of any" rant or podcast revenue collected by Barstool.  Paragraph 8 of the Talent Agreement states in relevant part that Barstool will pay Rapaport a $400,000 Podcast Guarantee, "which will be applicable to and recoupable from

---

[1] Rapaport repeatedly asserts that the Court found that there is a "dispute of fact about how much total revenue Barstool generated from Mr. Rapaport's Rant Videos." Dkt. 156, pp. 2-3.  Rapaport's framing of this issue is wrong in two ways.  First, at issue is the revenue generated by Rapaport's podcasts, not the rant videos—there is no dispute that Rapaport's rant videos generated no revenue.  Second, the parties do not dispute the total revenue generated by Rapaport's podcasts ($417,646), but instead whether Barstool's right of recoupment applies to this amount, thereby requiring Rapaport to refund a portion of the Minimum Guarantees that he received to Barstool.

amounts due to you pursuant to your applicable Revenue Splits related to the Podcast as described" in Paragraph 9.  Paragraph 9.b. of the Talent Agreement states that "[s]ubject to Barstool's right of recoupment described in Section 8," Barstool will pay Rapaport "60% of Podcast Revenue."  The term "Podcast Revenue" is then defined to include "100% of gross sums actually received by or credited to Barstool . . . directly arising from the podcast . . . less only an amount equal to 100% of the Podcast Guarantee." Dkt. 112-7.

Based on this language, Barstool asserts that, once it properly terminated Rapaport for cause, it was entitled to a refund of the full $400,000 Podcast Guarantee and was only required to pay Rapaport 60% of the gross Podcast Revenue received as of that date. Dkt. 134, pp. 39-40. As the Court correctly noted, the evidence presented on Rapaport's summary judgment motion demonstrates that the podcast had generated $417,646 in *gross* revenue at the time of termination.  Rapaport is only entitled to 60% of this amount, or $250,587.60.  Accordingly, Rapaport was required to refund the difference between $400,000 and $250,587.60, or $149,412.40.   As the Court correctly found, there are genuine issues of material fact as to whether Barstool can recover such damages. Dkt. 151, pp. 16-17.

Rapaport asserts that the Court's finding on this point is "clear error" because the Court allegedly "overlooked" Attachment 25 submitted in support of his summary judgment motion (Dkt. 113), which is a PowerPoint document that Barstool created purporting to show gross revenue and recoupment figures from Rapaport's podcast. Dkt. 156, pp. 2-7.  But the Court did not "overlook" this evidence.  It specifically referenced and analyzed it in concluding there were genuine issues of fact:

> According to Rapaport, 60% of actual revenues earned by Barstool from the Rant Videos and podcast that he would be entitled to is more than the $400,000 guarantee Barstool advanced to Rapaport. Specifically, Rapaport asserts that 60% of the revenue attributable to him is $417,646, which Rapaport derives from a January 2018 document created by Barstool entitled "Net Revenue Calculation." **That document**

> **states that the "Lifetime Gross Ad Revenue Earned" is $417,646 and that the amount "Remaining to Recoup" is $182,354.** While Rapaport submits that the "Lifetime Gross Ad Revenue Earned" refers to his share of the revenues, Barstool maintains that this sum represents the total revenue, of which Rapaport is only entitled to 60%, or $250,587.60. If Barstool's assertion were true, then it would be able to establish damages, as Rapaport would owe Barstool the difference between $400,000.00 and $250,587.60: $149,412.40.

Dkt. 151, pp. 16-17 (emphasis added). While Rapaport disagrees with the Court's interpretation of this document, that is not a valid ground for reconsideration. *See In re Houbigant, Inc.*, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996) (reconsideration motion "is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved").

In fact, the PowerPoint fully supports Barstool's position and the Court's finding. Rapaport asserts that the $417,646 figure referenced on the third page of the PowerPoint reflects only Rapaport's 60% share of the total rant and podcast revenue collected by Barstool. But as the Court correctly notes, the PowerPoint itself refers to this amount as "Lifetime *Gross* Ad Revenue." Dkt. 113-25 (emphasis added). The use of the term "gross" indicates that the PowerPoint does *not* reflect Rapaport's percentage share of revenue. The next page of the PowerPoint makes this clear, listing the breakdown of "Lifetime *Gross* Revenue" generated by Rapaport's podcasts. *Id.* (emphasis added). Contrary to what Rapaport asserts, this document does not suggest in any way that Barstool generated $696,077 from Rapaport's rants and podcasts. Rapaport's entire argument is based on incorrect assumptions and implications.

Further, and contrary to Rapaport's assertions, the PowerPoint's reference to $182,354 "Remaining to Recoup" is fully consistent with the $417,646 being *gross* revenue, not Rapaport's 60% share. Rapaport was only entitled to share in "Podcast Revenue" as defined in the Talent Agreement. Section 9.b. of the Talent Agreement makes clear that "Podcast Revenue" is calculated using 100% of *gross* revenue less only the guaranteed payments. That is precisely what the PowerPoint shows—lifetime *gross* revenue from Rapaport's podcasts less the

guaranteed payments required under the Talent Agreement.[2]  Moreover, the PowerPoint states that Rapaport's podcast needed to be sold at a higher rate for Barstool to recoup the Minimum Guarantees, and that its sell-through rate was below that of other Barstool podcasts.  Thus, far from showing "clear error" in the Court's ruling, the PowerPoint fully supports that there are genuine issues of fact as to Barstool's damages on its Counterclaim.[3]

**B.**  **Rapaport's "New" Evidence About a Dispute Between Two Barstool Personalities in June 2020 Has No Bearing on Whether Barstool Engaged in Good Faith Efforts to Find Advertisers for the Rant Videos (Count VIII)**

Paragraph 4 of the Talent Agreement requires Barstool to "[r]easonably promote the Content and your involvement with Barstool" and "[u]se good faith efforts to promote you and your brand."  Dkt. 124, ¶¶ 51, 435.  Rapaport sought summary judgment on the grounds that Barstool breached these provisions by not obtaining advertisements for his rant videos and instead seeking to tarnish his brand. Dkt. 104, pp. 15-16.  Characterizing this claim as "difficult to comprehend," the Court found that Rapaport had not cited evidence supporting his position but that, even if he had, "Barstool had every incentive to profit from Rapaport's Rant Videos by acquiring advertisers" under the Talent Agreement. Dkt. 151, pp. 19-21.  The Court wrote that it would have given serious consideration to granting summary judgment for Barstool on this claim if it had sought such relief. *Id*.

In his reconsideration motion, Rapaport admittedly and improperly rehashes the same

---

[2] Indeed, when addressing Rapaport's claim that Barstool did not engage in good faith efforts to obtain advertisements for his rants, the Court wrote: "Barstool contracted with Rapaport to pay him a minimum guarantee of $200,000 for those videos, and thus would not 'break even' under the terms of the parties' revenue sharing arrangement until it earned at least $333,333 in revenue from the Rant Videos." Dkt. 151, pp. 20-21.  As the Court recognized, because of Barstool's recoupment right, Rapaport is only entitled to 60% of *gross* revenue above the guaranteed minimum.

[3] Plaintiffs also attempt to fault Barstool for assertedly not producing documents responsive to certain requests relating to the revenue generated by Rapaport's podcasts.  But Barstool did so—the PowerPoint at issue is just one of many examples.  Regardless, Plaintiffs never moved to compel the production of such documents or otherwise raised this issue with the Court.  They cannot do so now.

arguments that he made in his prior briefing—that Barstool attacked Rapaport and therefore could not have possibly engaged in good faith efforts to sell advertisements for his rants. Dkt. 156, pp. 16-18.  But as the Court recognized, this argument is unsupported by the evidence and at odds with common sense.  Why, for example, would Barstool fail to even try to sell advertisements for Rapaport's rant videos purely out of animus when it would profit by doing so and when it was concomitantly selling hundreds of thousands of dollars in advertising for Rapaport's podcasts?  As the Court recognized, Barstool submitted evidence showing that there was a simple reason why it was unable to sell advertisements for the rant videos—they were "extremely unfriendly from an advertising perspective" because, among other things, Rapaport used the word "cunt" and other vulgarities "incessantly." Dkt. 124, ¶¶ 400-01.  This is more than sufficient evidence to support the Court's finding that there are genuine issues of fact.

To try to get around the Court's ruling, Rapaport introduces "new" evidence purportedly showing that Barstool's interests are not always aligned with its employees. Dkt. 156, pp. 18-20. But this evidence is neither "new" nor relevant.  It concerns an asserted feud between two Barstool employees (neither of whom are defendants here) in June 2020.[4]  The fact that two Barstool employees traded barbs years after Barstool terminated Rapaport for attacking its fans, and that Barstool purportedly sided with one employee over the other, has nothing to do with Barstool's efforts to sell advertisements for Rapaport's rant videos.  Rapaport asserts that he needed to submit this evidence to "dispel [the Court's] *sua sponte* but unfounded belief" that Barstool would not attack its own employees. Dkt. 156, p. 18.  But this completely mischaracterizes the Court's ruling.  The Court found that Barstool had an incentive to sell advertisements for Rapaport's rant videos because it would profit by doing so (Dkt. 151, pp. 20-

---

[4] Rapaport does not identify any reason why, if this evidence is so important, he did not try to raise it with the Court in June 2020, mere weeks after the parties submitted their summary judgment briefing.

21), not that Barstool does or does not attack its employees.  Rapaport is simply trying to confuse the issues.

### C.   The Court Did Not Err by Granting Summary Judgment for Barstool on Rapaport's Fraud Claims

In opposing Barstool's summary judgment motion, Rapaport asserted for the first time that Barstool defrauded him by misrepresenting and omitting information about its ability to obtain him a show on Sirius (but not specifying what information was misrepresented or omitted that did not also violate the Talent Agreement's good faith efforts requirements). Dkt. 140, pp. 23-24.[5]  The Court granted summary judgment for Barstool as to Rapaport's fraud claim on two independent grounds: (1) Rapaport's fraud claims were barred because they arise from the "same conduct underlying" his contract claim which alleges that Barstool did not use good faith efforts to secure him a show on Sirius; and (2) Barstool did not owe Rapaport a duty to disclose every detail of its negotiations with Sirius. Dkt. 156, pp. 25-28.  Rapaport asserts that both rulings are clearly erroneous and, further, that an argument he failed to raise in his prior briefing regarding special damages is grounds to grant reconsideration.   He is wrong on all accounts.

#### 1.   The Court Did Not Err by Ruling that Rapaport's Fraud Claims are Duplicative of His Contract Claim Regarding Barstool's Purported Lack of Good Faith Efforts to Get Him a Radio Show on Sirius

As he did in his prior briefing, Rapaport argues that Barstool's asserted misrepresentations and omissions relating to the "progress of and efforts made towards" reaching an agreement with Sirius and "surrounding requirements that would need to be met before Barstool was able to provide" the show were extraneous to the Talent Agreement. Dkt. 156, pp.

---

[5] Rapaport sought summary judgment based on his claim that Barstool breached the Talent Agreement by not using good faith efforts to secure him a weekday show on Sirius.  The Court found that there are genuine issues of fact as to this claim, and Rapaport is not seeking reconsideration of the Court's ruling on this point.

7-9.  But as the Court recognized (Dkt. 151, p. 27), the scope of the Talent Agreement on this point is broad—Barstool must engage in good faith efforts to secure Rapaport a show.  If Barstool did not do so, then that would give rise to a contract claim, not a fraud claim.  As the Court explained, Rapaport's claims that Barstool engaged in "unreasonable delay" or "failed to disclose that it would place onerous preconditions on securing" a show are *not* extraneous to the Talent Agreement—they would violate its good faith efforts provision, thereby barring his fraud claims. Dkt. 151, pp. 26-27.

Although unclear, Rapaport suggests that the Court erred by relying on *Gorman v. Fowkes*, 949 N.Y.S.2d 96, 97–98 (N.Y. App. Div. 2012) and *Mariano v. CVI Investments Inc.*, 809 F. App'x 23, 27 (2d Cir. 2020) for the proposition that that his fraud and contract claims are duplicative because they arise from the same conduct.  Rapaport cites to Second Circuit and New York cases that he suggests the Court should have instead relied on for the proposition that false statements or omissions about a party's "ability" to perform under a contract are not duplicative of contract claims. Dkt. 156, pp. 8-10.  But Rapaport did not cite to any of these cases in his prior briefing even though they were all decided before he submitted that briefing.  He cannot properly contend that the Court's asserted failure to consider cases that he did not even present to the Court in his summary judgment briefing was clear error. *See Eisemann*, 204 F.3d at 395 n.2 (reconsideration appropriate only where a court overlooks "controlling decisions . . . that *were put before it on the underlying motion*") (emphasis added) (internal quotation marks omitted).

Even if this Court were to consider Rapaport's newly cited cases, they would not change its analysis.  These cases do not hold that *Gorman* or *Mariano* were wrongfully decided or

otherwise distinguish them.  To the contrary, Rapaport's newly cited cases[6] support the same

basic principle of New York law set forth in *Mariano* and *Gorman*—that fraud claims are barred

if they arise out of the same conduct as contract claims.  Thus, these cases are not in conflict with

the Court's ruling. *See Gonyer v. Vane Line Bunkering, Inc*., 2014 WL 10250858, at *1

(S.D.N.Y. Nov. 6, 2014) ("The additional cases that Defendant now cites stand for propositions

that are not in conflict with the Court's holding and which the Court did not overlook.").

### 2.  The Court Did Not Err by Ruling that Barstool Did Not Owe a Duty to Disclose Every Detail of its Negotiations with Sirius

As he did in his prior briefing, Rapaport asserts that the "special facts" doctrine applies

because Barstool had exclusive knowledge of its negotiations with Sirius and did not disclose

certain unspecified details relating to these negotiations to Rapaport. Dkt. 156, pp. 13-15.  Again,

it is completely unclear what facts Rapaport contends that Barstool misrepresented or failed to

disclose.[7]  As Rapaport admits in his motion for reconsideration (*id*, p. 11), the Court "correctly"

found that Barstool made Rapaport aware of the "tentative nature of the Barstool-Sirius

negotiations when entering the Talent Agreement." Dkt. 151, p. 26 n.6.  As such, Barstool was

not thereafter required to disclose every "granular" detail about these negotiations. *Id*.

Rapaport nitpicks the Court's verbiage, taking exception to its use of the word

"granular," and asserting that the "granularity of details is not the standard for the special facts

doctrine." Dkt. 156, p. 14 (emphasis omitted).  The Court did not say it was.  Rather, the Court

---

[6] *See, e.g., KCG Americas LLC v. Brazilmed, LLC,* 2016 WL 900396, at *4 (S.D.N.Y. Feb. 26, 2016) ("Under New York law, a plaintiff claiming both fraud and breach of contract must demonstrate a legal duty separate from the duty to perform under the contract[.]") (internal quotation marks omitted).

[7] Rapaport asserts that "likelihood of a future agreement with Sirius was of paramount concern to Mr. Rapaport in negotiating the Talent Agreement," and that Barstool misled him about the "level of certainty surrounding Barstool's ability" to secure him a show. Dkt. 156, pp. 12-13.  Rapaport's attempt to fault Barstool for not having a crystal ball and being unable to handicap admittedly tentative negotiations is not actionable.  Even if Barstool had made such representations or omissions, this would not constitute fraud. *See In re Aratana Therapeutics Inc. Sec. Litig*., 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (representations or omissions of "express expectations about the future," as opposed to "presently existing, objective facts," are "statements of opinion" and not actionable).

expressed the common-sense proposition that, once Barstool disclosed that negotiations with Sirius were tentative, it was not obligated to disclose every detail of every exchange that it had with Sirius.  Rapaport does not cite, nor is there, any authority supporting that the special facts doctrine requires that *all* facts be disclosed, even if they are *immaterial* and concern negotiations in flux.  Nor should Rapaport have reasonably expected that Barstool would do so.  As the Court found, *Rapaport* was the party that proposed the good faith efforts language and then entered into an agreement that did not guarantee him a radio show, much less one on Sirius. Dkt. 151, p. 28.  Regardless, even though it was under no duty to do so, Barstool disclosed to Rapaport the state of its negotiations with Sirius. *See, e.g.,* Dkt. 124, ¶ 446 (disclosing in November 2017 that Barstool was trying to secure funding from Sirius for Rapaport's show and disclosing in January 2018 that there was "[n]o word from Sirius i need them to give us more $$ and I'm not sure it's happening").

### 3. While Rapaport Focused Primarily on Barstool's Asserted Omissions, and Not its Asserted "Misleading Partial Disclosures," the Court Nonetheless Addressed and Rejected His Arguments on this Point

Rapaport asserts that the Court incorrectly noted that he did not argue that Barstool made "misleading partial disclosures" when in fact he argued this extensively in his prior briefing. Dkt. 156, pp. 10-13.  He did not.  The fraud section of Rapaport's summary judgment motion primarily focused on the fact that Barstool made material *omissions*, not "misleading partial disclosures." Dkt. 104, p. 9.  Regardless, the Court addressed the single asserted false assurance that Rapaport identified in the fraud section of his summary judgment motion.[8]  And the Court

---

[8] The one purportedly "false assurance" that Rapaport cited to in his summary judgment motion was not an assurance at all, but instead self-serving statements in his supporting declaration to the effect that he "would not have entered into the Talent Agreement had Barstool not made false statements concerning the certainty that it would be able to provide Mr. Rapaport with a Weekly Show and that this show would happen in a matter of weeks at most." Dkt. 104, p. 10 (citing P-SOMF [Dkt. 105], ¶134).  Yet the Court addressed this point extensively in ruling on Rapaport's fraud claim, explaining that this assertion was not credible because:

addressed other false assurances in its discussion of the good faith effort contracts claims (since these claims overlap). Dkt. 151, pp. 11-25.[9] Rapaport's belief that the Court did not address every single one of his arguments, when he submitted 400 material facts (and refers the Court to dozens of them in his reconsideration motion on this point), is not a basis to obtain reconsideration. *See Devinsky v. Kingsford*, 2008 WL 2704338, at *3 (S.D.N.Y. July 10, 2008) ("The Court is not required to delineate every reason for the decisions it makes; it is in the Court's discretion to respond specifically-or not-to arguments made by the parties."); *Schermerhorn v. James*, 1998 WL 40205, at *3 (S.D.N.Y. Feb. 2, 1998) ("The fact that the Court did not deem plaintiffs' argument on this issue sufficiently persuasive to warrant further detail does not justify plaintiffs' attempt to reargue it here.").[10]

### 4. Rapaport's New Argument About Special Damages Should Be Rejected

Rapaport did *not* argue in his prior briefing that his fraud claims give rise to "special damages," and are therefore not barred by his good faith efforts contract claim. He cannot do so now. *See Eisemann*, 204 F.3d at 395 n.2 (reconsideration appropriate only where a court

---

The drafting history of the good faith efforts provision further confirms the duplicative nature of Rapaport's claims. In April 2017, nearly five weeks after Barstool first told Rapaport that its "goal" was to reach an agreement with Sirius in three weeks, <u>Rapaport</u> insisted on adding . . . language to the draft Talent Agreement to protect his interest in securing a weekday show after Barstool proposed removing references to a Sirius show from the draft contract . . . .

After further negotiations, the parties agreed on the final language that appears in the Talent Agreement. And, on May 31, knowing that Barstool had not yet reached any agreement with Sirius, Rapaport decided to nevertheless execute the Talent Agreement. Thus, the record clearly shows that Rapaport was the party who insisted on adding the good faith efforts language to protect his interests and that Rapaport felt comfortable entering into the contract with that language despite the obvious uncertainty surrounding a Barstool-Sirius deal.

Dkt. 151, pp. 27-28 (emphasis in original).

[9] Rapaport refers the Court in his motion for reconsideration to paragraphs 106-137 of his Rule 56.1 Statement for an "expanded timeline of relevant events." Dkt. 156, p. 11 n.7. Yet these statements are contained in the same section and under the same heading addressing Rapaport's good faith efforts contact claim and his fraud claim, underscoring that these claims overlap. *See* Dkt. 105.

[10] Even if Rapaport were right (he is not), this was an *alternative* ground on which the Court granted summary judgment as to the fraud claims. Rapaport would still need to show that the Court erred in ruling that his fraud and contract claims overlap. As addressed above, he cannot do so

-12-

overlooks "*factual matters* that *were put before it on the underlying motion*") (emphasis added) (internal quotation marks omitted).  Even if he had raised this argument, this would not change things because Rapaport has not identified any special damages arising from his fraud claims. Dkt. 156, pp. 15-16.  Rapaport asserts that he had a "superior" offer from CBS that he turned down to sign the Talent Agreement. *Id*.  Not so.  The Talent Agreement provided Rapaport $600,000 in Minimum Guarantees—$400,000 for his podcasts and $200,000 for his rant videos. The record reflects that CBS paid Rapaport $240,000 for his podcast the year before joining Barstool, offered him only a $200,000 podcast guarantee to stay,[11] and did not offer him *any* compensation for his rant videos, much less a $200,000 guarantee. Dkt. 124, ¶ 438.  Although Rapaport asserts that the CBS offer was "not the only competing offer" he received, he omits that he only received one other competing offer—a $100,000 podcast guarantee. *Id*.  Rapaport's self-serving speculation that he could have negotiated or obtained better offers if he had not signed the Talent Agreement is too tenuous to give rise to special damages. *See Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271 (2010) ("The damages are to compensate plaintiffs for what they lost because of the fraud, not for what they might have gained.").

### D.    The Court Properly Granted Summary Judgment on Rapaport's Defamation and Defamation Per Se Claim

Rapaport seeks reconsideration of the Court's ruling on its defamation claim by simply rearguing two points that were previously raised in Rapaport's Opposition and Reply brief.

---

[11] CBS' offer also stated that Rapaport would get 100% of the first $100,000 in advertising revenue generated by his podcast above $200,000, and then 60% after that. Dkt., 141, ¶ 161.  Even if Rapaport's podcast at CBS generated the same revenue as his podcast at Barstool ($417,646), Rapaport would only net $370,587.76—less than the $400,000 podcast guarantee that Barstool provided.  Unlike Barstool, CBS was not *guaranteeing* Rapaport a $400,000 minimum for his podcast even if Rapaport did not sell a single ad.  And unlike Barstool, CBS was not offering Rapaport *any* compensation for his rant videos, much less a $200,000 guarantee.  Even without factoring in the prospect of a show, Barstool's offer was better than CBS'.

Rapaport has offered no reasonable explanation for why the Court's rejection of these arguments should be reconsidered.

First, Rapaport claims that the Court committed clear error in ruling that the allegedly defamatory comments were nonactionable opinion, arguing that the Court ignored evidence that the public understood Barstool's allegedly defamatory comments as statements of fact.  Not so.  The Court's analysis of the allegedly defamatory statements properly looks at the totality of the circumstances surrounding the statements, as required by New York law. *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991).  Notably, whether the public understood the statements as factual is not a factor to be considered in that analysis. *Id.* (New York Courts consider the following four factors in deciding whether an allegedly defamatory statement is an opinion: (1) whether the statement has a precise meaning that is readily understood; (2) whether the statement is capable of being objectively characterized as true or false; (3) the full context of the communication in which the statement appears; and (4) the broader context of the communication).   Based on its review of these four factors, the Court correctly concluded that no reasonable person would understand Barstool to be making statements of fact.

Even if evidence of the public's understanding were relevant (it is not), contrary to Rapaport's assertions, the record contains no evidence that any reader or listener actually understood the claimed defamatory statements to be statements of fact.  As explained by Barstool in its reply brief, Rapaport offered no evidence that the public understood Barstool's statements about Rapaport to be true.  Rapaport simply submitted evidence that the public was "repeating" Barstool's trash talking in reviews of Rapaport's podcast. *See* Dkt. 150, p. 5; Dkt. 141 ¶¶ 351, 361, 363.  Rapaport offered absolutely no evidence that any of the people who posted those reviews actually believed those insults to be statements of fact.  The mere fact that

anonymous reviewers, even a large number of them, referenced or repeated Barstool's insults in giving Rapaport's podcast a negative rating cannot possibly convert statements of opinion into statements of fact.

Moreover, Rapaport's reliance on the anonymous posting of negative reviews is directly at odds with Rapaport's own (incorrect) view of the law. Rapaport concedes that numerous cases hold that statements made by anonymous posters on Internet sites are "less credible." Dkt., 156, p. 20 n.11. Yet, Rapaport's request for reconsideration assumes that these reviews are "credible" as to something they do not even say—the reviewers' understanding of Barstool's statements as factual. Rapaport cannot legitimately contend that the Court's refusal to consider these anonymous posts as literal statements of fact is a clear error.

Second, Rapaport contends that the Court supposedly overlooked evidence regarding the allegedly defamatory statements calling Rapaport a "fraud" and "racist." Specifically, Rapaport claims that the Court ignored evidence that the disclosed basis for calling Rapaport a "fraud"—that he failed to pay bets that he made with Defendant Smith—was untrue. He also argues that the Court ignored evidence that Barstool's statements implied undisclosed bases for their opinions that Rapaport was a "fraud" and "racist." Rapaport's arguments misconstrue the law, the evidence and the Opinion.

With respect to the allegedly defamatory "fraud" comments, Rapaport misrepresents the law and the Opinion. Rapaport persists in his baseless assertion that the allegedly defamatory "fraud" comments were tantamount to calling Rapaport a liar. Not so. As the Opinion makes clear, the Court properly interpreted the "fraud" comments as merely conveying the subjective opinion that Rapaport is not the type of person he holds himself out to be. Dkt. 151, p. 36.

Rapaport then attempts to deflect from this finding by misconstruing the Court's comments in footnote 17 of the Opinion.  Rapaport asserts that the Court "recognizes that calling someone a liar is capable of being proven true or false." Dkt. 156, p. 23.  But that is not what the Court said.  What the Court actually said is: "While calling someone a 'liar' is *more* capable of being proven true or false…." Dkt. 151, p. 37, n.17 (emphasis added).  The Court then goes on to find that the "fraud" comments on which Rapaport's claim is based do not actually call Rapaport a "liar."  They simply "amplify[] the Barstool Defendants' assessments that Rapaport is not genuine or trustworthy, an inherently subjective topic."  *Id.*

Rapaport next argues that the disclosed basis for the "fraud" comments—that Rapaport refused to pay bets he made with Defendant Smith—contains false assertions and the Court supposedly overlooked evidence of that falsity.  But that is irrelevant.  As the Opinion correctly holds, a statement of opinion which discloses the facts on which it is based is a "pure opinion" protected by the First Amendment and therefore not actionable. *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986).

Rapaport's citation to *Solstein v. Mirra*, 486 F.Supp.3d 86 (S.D.N.Y. 2020) and *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) does not change this result.  As an initial matter, *Solstein* and *DiFolco* are each FRCP 12(b)(6) cases in which the Court was required to accept the truth of the plaintiff's allegations. *Solstein*, 486 F.Supp.3d at 94; *DiFolco*, 622 F.3d at 110-11.   That is not the case here.  Moreover, *Solstein* expressly recognizes that only "mixed opinions" where a party implies that there are undisclosed facts supporting an opinion are actionable. 486 F. Supp. 3d at 97.  And Rapaport merely cites *Solstein* and *DiFolco* for the proposition that, where an opinion *implies* that it is based on undisclosed facts, any defendant with knowledge of the falsity or probable falsity of those implied facts may be held liable. Dkt.

156, p. 23.  But here, the Court correctly found that none of the allegedly defamatory "fraud" comments implied any factual basis that was not disclosed. Dkt. 151, p. 38.  As explained below, Rapaport makes no serious argument to the contrary.  Accordingly, Rapaport has failed to demonstrate any error in the Court's analysis.[12]

Finally, Rapaport falsely contends that he presented evidence of "undisclosed facts" implied by Barstool in connection with the allegedly defamatory "fraud" and "racist" comments. Dkt. 156, p. 25.  Notably, Rapaport fails to identify any specific allegedly defamatory comment that supposedly implied such undisclosed facts, thereby preventing both Barstool and the Court from being able to verify that assertion.  This alone is grounds to deny reconsideration.  More to the point, Rapaport mischaracterizes the facts contained within his own Rule 56.1 statements. Nothing in paragraphs 305 through 310 of Rapaport's Rule 56.1 Counterstatement or Paragraph 316 of Rapaport's original Rule 56.1 Statement even mentions implied assertions of fact contained within any of the allegedly defamatory comments.  Indeed, most of the "evidence" contained within those paragraphs is nothing more than Rapaport's repeated assertion that he is popular with, and a friend to, the African American community.  Nothing in these statements suggests in any way that Barstool implied undisclosed facts when expressing any of the opinions at issue in the case.  Accordingly, Rapaport has failed to justify his request for reconsideration of the Court's ruling on the Defamation claim.

---

[12]  Moreover, the Court correctly noted in its Opinion that Rapaport offered no evidence of the falsity of the "fraud," "hack," "wannabe," or "liar" statements in the "Falsity of Defendant's Statements" section" of Rapaport's Rule 56.1 counterstatement. *See* Dkt. 141, ¶¶ 258-293.  Rapaport now claims that he included this evidence only in response to paragraphs 40 and 41 of the Defendants' Rule 56.1 statement.  But those paragraphs contain no objective evidence of falsity.  They simply contain evidence of Rapaport's subjective belief that he never agreed to the bets to which Defendant Smith believes had been agreed.  Indeed, in paragraph 40, Rapaport concedes that the dispute resulted from Smith's supposed misinterpretation of Rapaport's tweets as proposing a bet that Rapaport apparently did not intend to make.  That is precisely why the Court correctly concluded that these statements reflect nothing more than the Barstool's subjective opinions regarding Rapaport's behavior and character.

E.      **The Standard for Granting Interlocutory Review Has Not Been Met**

Rapaport seeks immediate interlocutory review of almost every issue that he raises in his reconsideration motion. Dkt. 156, pp. 10 (seeking interlocutory review of the Court's ruling that Rapaport's good faith efforts contract claim bars his fraud claims), 14 (seeking same regarding special facts doctrine), 16 (seeking same regarding special damages for fraud claims), 20-21, n.11 (seeking same regarding defamation).  Yet he completely glosses over the standard governing interlocutory appeals.

Under 28 USC § 1292(b), such appeals are appropriate only if the district court certifies that the order (1) involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance ultimate termination of the litigation. 28 USC § 1292(b).  Section 1292(b) was "not intended to make denials of summary judgment routinely appealable." *Ahrenholz v. Bd. of Trustees of Univ. of Illinois*, 219 F.3d 674, 676 (7th Cir. 2000) (collecting cases, including *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 631 (2d Cir. 1991)).  Rather, certification should be granted "only if there are interests of sound judicial administration and efficiency to be served" or where "there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Harriscom Svenska AB*, 947 F.2d at 629 (cleaned up).  The determination of whether to grant certification is committed to the sound discretion of the district court. *Id*.

Rapaport has not come close to meeting this burden.  Rapaport has not shown that an appellate court would only need to rule on a pure, controlling question of law without having to also determine any disputed facts.  No review of the Court's detailed, fact-intensive Opinion could be done "quickly and cleanly without having to study the record" in this case. *Ahrenholz*, 219 F.3d at 677. To the contrary, as the massive number of "material" facts that Rapaport identified makes clear, these issues ultimately involve the application of law to hundreds of

disputed facts.  Nor has Rapaport identified any hardship or injustice that would be alleviated by such review.  And far from promoting judicial economy, granting interlocutory review would "require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case." *Id*. at 631 (recognizing that this "does not normally advance the interests of sound judicial administration or efficiency").   This is particularly true here because the facts giving rise to Rapaport's good faith efforts contract claim overlap with those giving rise to his fraud claims and others.  These and other interconnected issues should be appealed together if the party that does not prevail on these issues so chooses.

## IV.   **CONCLUSION**

It is unfortunate that, after the Court issued a thorough 64-page decision, and clearly devoted substantial time to reviewing the facts and law, Rapaport decided to waste the parties' resources and the Court's time with an improper reconsideration motion and improper requests for interlocutory review.  His motion should be denied.

Dated:  April 26, 2021

Respectfully submitted,

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP

By:  _____

    Aaron J. Moss (AMoss@ggfirm.com)
    Ricardo P. Cestero (RCestero@ggfirm.com)
    Steven A. Stein (SStein@ggfirm.com)
    2049 Century Park East, 26th Floor
    Los Angeles, CA 90067-3101
    (310) 553-3610 Telephone
    (310) 553-0687 Facsimile

    HERRICK FEINSTEIN, LLP
    Barry Werbin (BWerbin@Herrick.com)
    Elena McDermott (EMcdermott@Herrick.com)
    2 Park Avenue
    New York, NY 10016
    (212) 592-1400 Telephone
    (212) 592-1500 Facsimile

    Attorneys for Defendants